Sarah McMillan (MT Bar No. 3634)
WILDEARTH GUARDIANS
P.O. Box 7516
Missoula, MT 59807
(406) 549-3895
smcmillan@wildearthguardians.org

Edward B. Zukoski (*Pro Hac Vice Pending*)
CENTER FOR BIOLOGICAL DIVERSITY
1536 Wynkoop Street, Suite 421
Denver, CO 80202
(303) 641-3149
tzukoski@biologicaldiversity.org

Andrea Zaccardi (*Pro Hac Vice Pending*)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 469
Victor, ID 83455
(303) 854-7748
azaccardi@biologicaldiversity.org

*Counsel for Plaintiffs*

Marla Fox (*Pro Hac Vice Pending*)
WILDEARTH GUARDIANS
P.O. Box 13086
Portland, OR 97213
(651) 434-7737
mfox@wildearthguardians.org

*Counsel for Plaintiff WildEarth Guardians*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION**

CENTER FOR BIOLOGICAL DIVERSITY, YAAK VALLEY FOREST COUNCIL, and WILDEARTH GUARDIANS,

Plaintiffs,

vs.

UNITED STATES FOREST SERVICE; KEITH LANNOM, in his official capacity as Deputy Regional Forester for the Northern Region of the U.S. Forest Service; and CHAD BENSON, in his official capacity as Supervisor of the Kootenai National Forest;

Federal Defendants.

CV-

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. Plaintiffs in this case challenge the U.S. Forest Service's Black Ram Project, which authorizes major commercial logging and road construction in old and mature forests of the Yaak Valley in northwest Montana—despite the growing climate crisis and a dwindling local grizzly bear population—without legally required environmental analysis.

2. The scenic and remote Yaak Valley is located in Montana's northwest corner, on the border with Idaho and Canada, and includes thousands of acres managed by the Kootenai National Forest. The Valley's forests include spruce, sub-alpine and Douglas fir, lodgepole pine, and the deciduous larch. Old and mature trees that have been spared to date from logging still persist in moist pockets, some largely undisturbed for centuries. The old and mature forests here provide refuge for 190 animal species, including lynx, wolverine, and native trout. A relatively isolated population of about 25 grizzly bears, as of 2017, clings tenuously to life in this area. Last year, the U.S. Fish & Wildlife Service completed a five-year status review which concluded that the grizzly population in the Cabinet-Yaak recovery zone—which includes those bears in the Yaak Valley and an additional 25 or so bears in the Cabinet Mountains—is very low, and has the

lowest fecundity, lowest genetic diversity, and lowest resiliency of any grizzly population in the lower 48 states.

3. In 2018, the Kootenai National Forest proposed the "Black Ram" Project. The Black Ram Project will clearcut forest, destroy and fragment habitat, displace wildlife, alter hydrology, and adversely affect the area's tiny grizzly population. Specifically, Black Ram would commercially log nearly 4,000 acres, including clearcutting 1,783 acres (more than 3 square miles). One of the clearcuts would be more than 100 acres in size. The project would log 700 acres within old growth and mature forest stands, cut down centuries-old trees in the Rampike Creek area, remove 57 million board feet of commercial timber, and bulldoze nearly a mile of new permanent road through old growth forest. The project will involve a total of 3.3 miles of new permanent road construction, and the reconstruction or maintenance of 90.3 miles of road throughout the project area.

4. To review the project, the agency prepared a mere environmental assessment, and concluded that this major project would not require preparation of an environmental impact statement as required by the National Environmental Policy Act (NEPA) because the project would have "no significant impacts." The Forest Service reached this arbitrary conclusion despite the fact that the project authorizes: the substantial alteration of the forest ecosystem caused by scores of

massive clearcuts; damage to habitat for and anticipated harm to the dwindling population of threatened grizzly bears; logging hundreds of acres of old and mature trees; treatments in inventoried roadless areas; and more than 270 acres of logging within special management areas–areas meant to safeguard river stretches eligible for protection as wild and scenic rivers.

5. Further, the environmental assessment the Forest Service relied on to approve the Black Ram Project failed to take a "hard look" at the project's impact to grizzly bears. The agency failed to address the fact that as of 2017 the Yaak ecosystem population of approximately 25 bears is genetically isolated from those in the Cabinet Mountains, meaning that impacts to even one female grizzly in the Yaak could significantly harm the recovery of this population. The Forest Service failed to account for the fact that increased human presence in the project area to implement 10 years of logging and burning could cause increased human-bear conflicts, nor did the agency address the likely increase of motorized over-the-snow travel in grizzly habitat facilitated by dozens of very large clearcuts.

6. The Forest Service also failed to take a "hard look" at the carbon and climate impacts of removing hundreds of thousands of trees from the Forest (including hundreds of acres of old and mature trees). Trees, particularly large and old trees, are champions of carbon storage, yet the Forest Service dismissed the

impacts of logging these forests on carbon storage as "infinitesimal" based on a years-old cut-and-paste "Carbon Report" that ignored years of science and agency guidance, and failed to address the climate pollution caused by cutting, hauling, and processing timber.

7. The Forest Service violated the National Forest Management Act (NFMA) by authorizing a project that is inconsistent with the Kootenai National Forest's 2015 Forest Plan. The Forest Plan includes components designed to protect old growth forest, grizzly bears, and special management areas. Activities authorized by the Black Ram Project decision are inconsistent with these plan components.

8. Because the Forest Service's approval of the Black Ram Project violates federal law, this Court should vacate the agency's approval, and enjoin logging activities and construction or re-construction of roads allowed or authorized by the agency's actions.

9. The Forest Service approved the project on June 21, 2022. The Forest Service stated in its media release that no harvest will occur until calendar year 2023 and only after additional core habitat is secured for grizzly bears. Other activities authorized by the decision, such as road construction and road closures, may begin within weeks.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction), 1346 (United States as a defendant), and 5 U.S.C. §§ 701-706 (Administrative Procedure Act's judicial review provisions). This Court may order relief pursuant to 28 U.S.C. § 2201 (declaratory judgment) and § 2202 (further relief), and 5 U.S.C. §§ 702 and 706.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because: plaintiff Yaak Valley Forest Council is based in Lincoln County, Montana; the lands at issue in this suit are located in Lincoln County, Montana; the office of Federal Defendant Chad Benson is located in Lincoln County, Montana; and substantial part of the events giving rise to Plaintiffs' legal claims occurred in Lincoln County, Montana. See 28 U.S.C. § 1391(e)(1); D. Mont. L.R. 1.2(c)(5), 3.2(b).

## PARTIES

12. Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (the Center) is a non-profit environmental organization dedicated to the preservation, protection, and restoration of biodiversity, native species, and ecosystems. The Center is headquartered in Tucson, Arizona, with offices in a number of states and Mexico. The Center uses science, policy, and law to advocate for the conservation and

recovery of species on the brink of extinction and the habitats they need to survive. The Center has and continues to actively advocate for increased protections for species and their habitats in Montana. The Center has over 89,000 members, more than 500 of whom live in Montana, and some of whom recreate within the Black Ram Project area.

13. Plaintiff WILDEARTH GUARDIANS is an American West-based non-profit environmental advocacy organization dedicated to protecting and restoring the wildlife, wild places, wild rivers, and health of the American West. WildEarth Guardians is headquartered in Santa Fe, New Mexico, and has offices in Missoula, Montana and throughout the western U.S. WildEarth Guardians has over 7,900 members, and over 187,000 members and supporters, many of whom live in western Montana, and some of whom recreate within the Black Ram Project area.

14. Plaintiff YAAK VALLEY FOREST COUNCIL (Forest Council) is a non-profit community organization working to ensure that the natural and human communities of northwest Montana are healthy and resilient. Its mission is to protect the last roadless areas in the Yaak Valley and Kootenai National Forest; maintain and restore the ecological integrity of our geographical zone by conserving habitat for native and sensitive species; encourage and support the development of local economies based on stewardship principles, value-added

forest products, habitat conservation and ecological restoration; and educate local residents on the value of protected and restored landscapes for community and economic development. The Forest Council is dedicated to cultivating and encouraging meaningful dialogue between historically polarized groups by bringing them to the same table to find common ground on ecologically sound, stewardship-based forestry management practices. Forest Council members and supporters work in, use, and enjoy the Kootenai National Forest and the lands of the Black Ram Project area for recreation, nature study, photography, and spiritual renewal.

15. The Center, WildEarth Guardians, and the Forest Council (collectively, "Plaintiffs") have longstanding interests in the preservation and recovery of grizzly bears in the Northern Rocky Mountains region, including the Yaak Valley and the broader Cabinet-Yaak ecosystem in northwest Montana. Over a period of years, Plaintiffs have invested in the protection and recovery of grizzly bears in the region through a variety of actions including public outreach and education, investment in conflict reduction measures, scientific analysis, advocacy, and when necessary, litigation.

16. Over the past four years, Plaintiffs have participated actively in available public processes concerning the Black Ram Project and its effects on

forests, grizzly bears, and the climate crisis, including by filing extensive comments on the draft environmental assessment issued by the U.S. Forest Service on the project, and filing two sets of objections to Forest Service proposed decisions on the project.

17. Members and staff of the Plaintiffs' organizations regularly use and enjoy the lands impacted within the Black Ram Project area for a variety of purposes, including wildlife and wildflower viewing, photography, recreation, and aesthetic appreciation of the area's natural, wild values. The Plaintiffs' members and staff are concerned with protecting the wildlife, scenery, air quality, and other natural values of the Black Ram area.

18. For example, Pam Fuqua, a member of Center for Biological Diversity, and a member and former staffer of the Yaak Valley Forest Council, lives on private property within the boundary of the Black Ram Project area, and directly across a road from one of the forest stands the project authorizes for logging. She visits forest stands the project will cut down on a weekly basis to enjoy their current, scenic, unspoiled, natural values, and to seek out and observe wildlife, including grizzly bears. Her ability to enjoy these areas, and to find the wildlife she enjoys, will be irreparably harmed by logging the Black Ram Project authorizes.

19. Anthony South, a staff member of the Yaak Valley Forest Council since 2014, grew up in Lincoln County, Montana, and has been camping, hiking, fly-fishing, and photographing landscapes and wildlife in the Black Ram Project area since 2005. He particularly enjoys his visits to the Northwest Peaks Scenic Area; accessing the area requires him to pass directly adjacent to Black Ram cutting units. In addition, he has visited the vast majority of areas authorized for logging and burning in the project area. On his many visits, he has enjoyed the area's abundant wildlife, and has viewed lynx, bobcat, deer, elk, wolves, marmots, grizzlies, and odd, rare species like the jumping slug. From the high peaks, he has viewed areas that will become glaring clearcuts if the Black Ram Project proceeds. He returns to the Black Ram area for work–to evaluate water quality in streams impacted by previous logging projects–and for recreation and renewal many times each year and intends to do so for the foreseeable future. Mr. South's ability to enjoy his regular visits to observe the project area's wildlife and natural scenery, and to feel the serenity of the wildlands, will be irreparably harmed by the 10 years of logging, noise, and road construction the Black Ram Project authorizes, and the clearcuts, destroyed habitat, and dried landscapes logging will leave behind.

20. Adam Rissien, a member and employee of WildEarth Guardians, lives in Montana and has visited the forests within the boundary of the Black Ram

Project area several times in the past dozen years or so. He and his family visit the area to enjoy waterfalls, and to become immersed in the sights, sounds, and smells of the wild forest, including centuries-old old-growth trees. He also enjoys seeking out the sights and signs of wildlife, including grizzly bears. Mr. Rissien has witnessed the destruction wrought by damaging logging within the Black Ram Project area, and his ability to enjoy the forest targeted for logging, including the Rampike watershed, will be irreparably harmed by logging the Black Ram project authorizes.

21. The Forest Service's June 21, 2022 approval of the Black Ram Project irreparably harms Plaintiffs' interests and the interests of their members because it increases the risk of harm from, and imminently will result in, the bulldozing of miles of road and logging of thousands of acres within forests, including old and mature forests. Road construction and logging, including and especially logging within the Rampike Creek area, will destroy wildlife habitat and vegetation, and degrade Plaintiffs' members' enjoyment of wildlife, photography, recreation, and the natural and wild character of the Black Ram Project area. This increased risk of, and ongoing, environmental harm injures Plaintiffs' concrete interest in the protection of the forests and wildlife of the Black Ram Project area. Plaintiffs' members plan to return to the Black Ram Project area this year and every year for

the foreseeable future. Accordingly, the legal violations alleged in this complaint cause direct injury to the spiritual, aesthetic, conservation, recreational, scientific, educational, and wildlife preservation interests of the Plaintiffs and their members, supporters, staff, and volunteers.

22. The Forest Service's failure to comply with NEPA harms the Plaintiffs' members and staff by denying them the right to informed decision-making and full disclosure under NEPA, as well as the right to meaningfully participate in the decision-making process. The Forest Service's failure to comply with NEPA in the decision to approve the proposed action increases the risk of an uninformed decision to approve the construction and operation of roads, and creation of massive clearcuts across one of most remote parts of the Kootenai National Forest. In addition, the Forest Service's failure to comply with NEPA increases the risk that the agency has authorized construction and operation of roads and clearing of vast acreages via logging in a manner that will harm wildlife, including the threatened grizzly bear, without understanding the impacts to, or measures needed to mitigate harms to, those species.

23. Plaintiffs' injuries are directly traceable to the Forest Service's failure to comply with NFMA in authorizing the Black Ram Project activities that do not

ensure protection of old growth forest, grizzly bears, and special management areas.

24. Defendant UNITED STATES FOREST SERVICE is a federal agency under the U.S. Department of Agriculture. The Forest Service is responsible for managing the Kootenai National Forest. Forest Service staff, acting in their official capacity, signed a Decision Notice on June 21, 2022, approving the Black Ram Project.

25. Defendant KEITH LANNOM is Deputy Regional Forester for the Northern Region of the U.S. Forest Service, and the Forest Service official responsible for the January 27, 2021 decision rejecting Plaintiffs' objections to the Black Ram Project. Mr. Lannom is sued in his official capacity.

26. Defendant CHAD BENSON is the Supervisor of the Kootenai National Forest. Supervisor Benson signed the Decision Notice approving the Black Ram Project on June 21, 2022. Supervisor Benson is sued in his official capacity.

## LEGAL FRAMEWORK

### I. THE ADMINISTRATIVE PROCEDURE ACT

27. Because NEPA does not include a citizen suit provision, this case is brought in part pursuant to the Administrative Procedure Act (APA), 5 U.S.C. §§ 551-559, 701-706.

28. The APA allows persons and organizations to challenge final agency actions in the federal courts. Id. §§ 702, 704. The APA declares that a court shall hold unlawful and set aside agency actions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Id. § 706(2)(A).

## II. THE NATIONAL ENVIRONMENTAL POLICY ACT

29. Congress enacted NEPA, 42 U.S.C. §§ 4321-4370h, to, among other things, "encourage productive and enjoyable harmony between man and his environment" and to promote government efforts "that will prevent or eliminate damage to the environment." Id. § 4321. As a general matter, NEPA requires that federal agencies analyze and disclose to the public the environmental impacts of their actions. Id. § 4332(2)(C).

30. To this end, the Council on Environmental Quality (CEQ) has promulgated regulations implementing NEPA. Among other things, the rules are intended to "tell federal agencies what they must do to comply with the procedures and achieve the goal of [NEPA]," to "insure that environmental information is made available to public officials and decisions are made and before actions are

taken," and to ensure "better decisions" and "foster excellent action." 40 C.F.R. § 1500.1(a)-(c) (1978).[1]

31. To fulfill its mandates, NEPA requires federal agencies to prepare an environmental impact statement (EIS) for all "major Federal actions significantly affecting the environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4 (1978). Where it is uncertain whether it must prepare an EIS, it must prepare an environmental assessment (EA) to determine whether the action may have significant impacts and thus require preparation of an EIS. 40 C.F.R. § 1508.9 (1978); Idaho Sporting Cong. v. Thomas, 137 F.3d 1146, 1149-50 (9th Cir. 1998).

32. In evaluating whether to prepare an EIS, agencies address whether impacts may be "significant" by considering the "context" and "intensity" of a proposal's impact. 40 C.F.R. § 1508.27 (1978). Determining "intensity" requires the evaluation of numerous factors, including: (a) the "unique characteristics of the geographic area;" (b) the "degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks;"

[1] Although the Council on Environmental Quality amended its NEPA regulations in 2020, those regulations "apply to any NEPA process begun after September 14, 2020. An agency may apply the regulations in this subchapter to ongoing activities and environmental documents begun before September 14, 2020." 40 C.F.R. § 1506.13 (2020). Because the Black Ram NEPA process began in 2018, and because the Forest Service throughout the NEPA process relied on CEQ's 1978 NEPA regulations, those regulations apply to the Black Ram decision.

(c) "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts;" and (d) "[t]he degree to which the action may adversely affect an endangered or threatened species." 40 C.F.R. § 1508.27(b) (1978).

33. NEPA requires that agencies "succinctly describe the environment of the area(s) to be affected or created by the alternative under consideration." 40 C.F.R. § 1502.15 (1978). NEPA also requires the action agency to set an appropriate baseline detailing the nature and extent of the resources in the area: "The concept of a baseline against which to compare predictions of the effects of the proposed action and reasonable alternatives is critical to the NEPA process." Council on Environmental Quality, *Considering Cumulative Effects under the National Environmental Policy Act* 41 (January 1997). "Without establishing ... baseline conditions ... there is simply no way to determine what effect [an action] will have on the environment and, consequently, no way to comply with NEPA." Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci, 857 F.2d 505, 510 (9th Cir. 1988).

34. An EA must also identify the direct, indirect, and cumulative impacts of each reasonable alternative, including a project's ecological, aesthetic, economic, social, and health effects. 40 C.F.R. §§ 1508.7 (1978) (defining

cumulative impact), 1508.8 (1978) (defining environmental effects); 1508.9(b) (1978) (requiring EAs to disclose the "environmental impacts of proposed action and alternatives"). Direct impacts are those impacts "caused by the action and [that] occur at the same time and place." Id. § 1508.8(a) (1978). Indirect impacts are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." Id. § 1508.8(b) (1978). Cumulative impacts are "the impact[s] on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." Id. § 1508.7 (1978).

## III. THE NATIONAL FOREST MANAGEMENT ACT

35. Congress enacted NFMA in 1976, 16 U.S.C. § 1600 et seq., which governs the Forest Service's management of the national forests. NFMA establishes a two-step process for forest planning. First, the Forest Service must develop, maintain, and revise a Land and Resource Management Plan (LMP or Forest Plan) for each national forest. 16 U.S.C. § 1604(a); 36 C.F.R. pt. 219; Neighbors of Cuddy Mountain v. U.S. Forest Serv., 137 F.3d 1372, 1376 (9th Cir.

1998). The Forest Plan guides natural resource management activities forest-wide, setting standards, management goals and objectives, and monitoring and evaluation requirements.

36. Second, once a forest plan is in place, NFMA requires that the Forest ensure site-specific decisions are consistent with the broader Forest Plan. 16 U.S.C. § 1604(i). Project decisions must "strictly comply with a forest plan's standards, which are considered binding limitations." Oregon Nat. Desert Ass'n v. United States Forest Serv., 957 F.3d 1024, 1035 (9th Cir. 2020) (internal citations omitted).

37. The Forest Service approved the Kootenai National Forest's Forest Plan in 2015. The Kootenai Forest Plan includes forest-wide plan components for timber harvesting and vegetation management. It also contains management-area plan components, including components specific to river segments identified for inclusion as part of the Wild and Scenic Rivers System.

38. The Kootenai Forest Plan adopts the 2011 Amendments for Motorized Access Management within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones ("Access Amendment"). The Access Amendment sets standards regarding access management, including road construction, reconstruction, and decommissioning, in the Selkirk and Cabinet-Yaak grizzly bear recovery zones

within the Kootenai National Forest. The Access Amendment adopts specific parameters for each Bear Management Unit ("BMU") within the Kootenai. BMUs approximate the size of a female grizzly bear's home range and include all habitat components necessary for grizzly bear survival and reproduction. Grizzly bears that inhabit BMUs are considered critical to the recovery of the species.

## FACTUAL BACKGROUND

### I. THE BLACK RAM PROJECT

39. The Forest Service proposed the Black Ram Project in 2018 in order to "manage the forest stands in the Project Area to maintain or improve their resilience to disturbances such as drought, insect and diseases outbreaks, and wildfires." Forest Service, Black Ram Environmental Assessment (June 2022) at 1. The Forest Service states that the project's purpose and need is to "help move the landscape toward the desired condition." Id.

### II. THE PROJECT AREA

40. The Black Ram Project area covers 95,000 acres in the northwest corner of Montana, and is bordered on the west by mountains near the Idaho-Montana border, and on the north by the US-Canada border. On the area's western extent, the Northwest Peaks Scenic Area overlooks the project with three peaks topping out at over 7,000 feet above sea level. From the peaks, the area descends

toward the project's low point along the Yaak River at about 3,000 feet in elevation. The large vertical relief results in the area hosting a variety of ecosystems and habitat niches. Imperiled species, including the Canada lynx, wolf, and grizzly bear call the project area home.

41. Over 13,000 acres of the project area harbor "old growth" forest stands, which are characterized by large, old trees, interspersed with snags and downed timber. Id. at 117. These complex ecosystems have been largely undisturbed by logging for over a century. Forests in general, and old growth and mature forests in particular, are important tools in combating climate change because they can store significant volumes of carbon.

42. The project area also hosts numerous recreation opportunities, including 28 miles of the Pacific Northwest National Scenic Trail, one of only eleven designated national scenic trails in the United States, which runs from Glacier National Park to the Pacific Coast in Washington. Id. at 19. The Forest Service has concluded that segments of West Fork Yaak and Yaak River within the project area are eligible for protection as Wild and Scenic Rivers. Id. at 191. Nearly 19,000 acres inventoried roadless areas occur in the area, where they are managed pursuant to the protective Roadless Area Conservation Rule. Id. at 154, 160.

## III. THE IMPERILED STATE OF GRIZZLY BEARS IN THE YAAK AREA

43. One of the project area's rarest and most elusive inhabitants is the grizzly bear. Grizzlies once ranged throughout western North America, from central Mexico to Alaska. In the lower 48 states alone, there were an estimated 50,000 grizzly bears. But as European settlers moved west around the turn of the 19th Century, their persecution of grizzly bears caused dramatic population declines and substantial habitat loss. By the 1930s, grizzlies had been extirpated from 98% of their former range.

44. In 1975, two years after the Endangered Species Act's enactment, the U.S. Fish & Wildlife Service listed grizzly bears across the lower-48 United States as a threatened species. Amendment Listing the Grizzly Bear of the 48 Coterminous States as a Threatened Species, 40 Fed. Reg. 31,734 (July 28, 1975). The Fish & Wildlife Service has long recognized that in order to conserve and recover grizzly bears, it must reduce human-caused mortality and curb habitat loss.

45. In 1993, the Fish & Wildlife Service issued an updated Grizzly Bear Recovery Plan which designated distinct "recovery zones" for grizzly bear recovery in the lower 48 states, one of which is the Cabinet-Yaak Ecosystem (CYE). The agency has determined that conserving and recovering grizzly bears in each of the recovery zones is essential to the conservation of the species. The CYE

is a roughly 2,600-square-mile area of primarily federal public lands in northwest Montana and northeastern Idaho, and includes the Black Ram Project area. The Fish & Wildlife Service has established a population size of 100 individuals as a minimum recovery goal for the Cabinet-Yaak grizzly population.

46. Today, the population in the CYE falls far short of that goal of 100 individual grizzlies. See, e.g., Kootenai National Forest, Black Ram Project Biological Opinion (Sept. 15, 2021) at 9. According to the Fish & Wildlife Service, a population with fewer than 50-100 adults faces a high risk of extinction. Indeed, the current grizzly bear population in the Cabinet-Yaak ecosystem persists only due to augmentation–translocation of bears from elsewhere.

47. Today, human killing of grizzly bears in the Cabinet-Yaak ecosystem poses a leading threat to the grizzly population's survival and a major obstacle to significant population growth. The risk of human-caused grizzly bear mortality increases proportionally with increased human presence in grizzly habitat. Most of these killings involve poaching, hunters misidentifying grizzlies as black bears, or people shooting grizzly bears because of a real or perceived need for self-defense. From 2007-2019, more than 70% of known grizzly deaths in the Cabinet-Yaak ecosystem were caused by humans. See Kasworm et al. (2020); Kootenai National Forest, Black Ram Biological Opinion (Sept. 15, 2021) at 8.

48. In March 2021, the Fish & Wildlife Service published a five-year status review of the grizzly bear's status to evaluate the need for continued protection of the grizzly in the conterminous 48 states. U.S. Fish & Wildlife Service, Grizzly Bear in the Lower-48 States, 5-Year Status Review: Summary and Evaluation (Mar. 2021) ("Five-Year Status Review"). The review concluded that the Cabinet-Yaak population of grizzlies is the most vulnerable of the four populations in the lower 48, with a current resilience of "low," due to the very low population numbers, low genetic diversity, and low fecundity of females. Id. at 7-9. The summary explains the tenuous nature of the grizzly population in the Cabinet Yaak ecosystem:

> The grizzly bear population in the CYE currently has low resiliency (Table 2, above). Despite high population trends and high and moderate adult female survival, the CYE currently has a very low numbers of bears, although this factor could improve as bears reproduce and expand in the future (Table 2, above). The CYE is a smaller ecosystem that is still slowly recovering from being close to historical extirpation, particularly in the Cabinets portion of the ecosystem …. This ecosystem also has a less diverse assortment of foods, particularly in the form of ungulate protein, although body fat levels indicate that individuals are relatively healthy (Kasworm et al. 2020a, pp. 55–56). Large intact blocks of land are also somewhat limiting in the CYE due to its overall smaller size. Even though there are large protected areas within the CYE (with 44 percent designated as Wilderness or IRAs), as well as additional protections outside the CYE recovery zone and conservation efforts on private lands that improve security for grizzly bears, habitat standards for motorized route densities have not yet been met in the CYE recovery zone,

> which limits the availability of large intact blocks of land in the CYE (Service 2021, pp. 220–221).

Id. at 8-9 (emphases added).

49. The Status Review also indicates that Forest Service grizzly management in the Cabinet-Yaak ecosystem is less protective than elsewhere:

> Federal land managers have adopted land management plans that contain legally binding and enforceable science- and research-based measures and management practices designed specifically to conserve the grizzly bear in the lower-48 States, though these measures are not yet fully implemented in the CYE ….

Id. at 20. This is a reference to the fact that National Forests in the Cabinet-Yaak ecosystem have not yet complied with land management plan motorized access components, and as a result these forests are failing to provide habitat for grizzlies that is secure from motor vehicle disturbance.

50. The Status Review concluded that in almost every future scenario the Fish & Wildlife Service reviewed, the Cabinet-Yaak ecosystem will inhibit overall grizzly bear recovery.

> Into the foreseeable future, the CYE and SE [Selkirk Ecosystem] have moderate to very low levels of resiliency, and only achieve high resiliency with the significantly improved conservation under Scenario 5 (Service 2021, p. 244). As a result, the CYE and SE only contribute moderate, to low, to very low levels of resiliency under four out of the five future scenarios (Service 2021, p. 244).

Id. at 21.

51. The situation for the bears in Yaak Valley is even more precarious than the Fish & Wildlife Service's review indicates because the Yaak population of grizzlies is genetically isolated from the grizzly population in the Cabinet Mountains. The Yaak grizzlies thus function as a subpopulation standing at roughly half the size of the overall Cabinet-Yaak population. Katherine C. Kendall, et al., Density, Distribution, and Genetic Structure of Grizzly Bears in the Cabinet-Yaak Ecosystem, at 325, Journal of Wildlife Mgmt. 80(2) (2016) ("Our results indicated the grizzly bears in the Cabinet and Yaak regions were separate populations split along the Hwy 2 corridor" and "suggest[ed] complete spatial and reproductive isolation between these 2 populations, at least in recent generations"). According to Kendall, et al. 2016, just 18-22 grizzlies persist in the Yaak, id. at 314, which places that isolated group at serious risk of extirpation.

52. The Fish & Wildlife Service has acknowledged that "populations with fewer than 50 to 100 adult[] [grizzlies]," such as the population in the Yaak, "are at high risk of extinction."[2] The agency has cited one study that indicated the

[2] U.S. Fish & Wildlife Serv., Biological Opinion on the Effects to Grizzly Bears, Bull Trout, and Bull Trout Critical Habitat from the Implementation of Proposed Actions Associated with Plan of Operation for the Revett RC Resources Inc. Rock Creek Copper/Silver Mine, at A-16 (2006) ("2006 Rock Creek Mine BiOp") (emphasis added) (citation omitted); see also Proctor, et al., Population Fragmentation and Inter-Ecosystem Movements of Grizzly Bears in Western Canada and the Northern United States, at 31, Wildlife Monographs 180:1–46

likelihood of extinction for a grizzly bear population of 50 individuals with vital rates similar to the CYE population was 85 percent.[3]

## IV. THE BLACK RAM PROJECT'S IMPACTS

53. The Black Ram Project approved 1,783 acres of clearcuts, including 17 clearcuts larger than 40 acres in size. Black Ram Final EA at 13; Black Ram Decision Notice, Appx. A, at 1-3. One of the clearcuts approved would be 101 acres, the size of more than 75 football fields. Decision Notice, Appx. A, at 2 The project involves a total of 3,902 acres of commercial logging, and an additional 7,553 acres of fuel treatments (burning and removing small trees). Decision Notice at 7. The project will require up to 10 years' worth of intrusion by workers and vehicles engaged in logging, road construction and reclamation, and burning. Final EA at 279.

54. The Black Ram Project authorizes logging within 579 acres of old growth forest, and burning another 343 acres. It would also fragment old growth with 0.8 miles of new road construction, and impact an additional 440 acres of mature forest, known as "recruitment potential old growth," with logging and

---

(2012) ("[P]opulations fewer than 50-100 adults are at higher risk of extirpation") (citations omitted).

[3] *See* 2006 Rock Creek Mine BiOp at A-14.

burning. Decision Notice at 7-8. The project will also clearcut hundreds of acres of forest within the Rampike Creek area, which boasts trees as old as 230 years but which the Kootenai National Forest has concluded do not meet the agency's definition of "old growth." Final EA, Appx. A, at 86.

55. Within river stretches eligible for protection as wild and scenic rivers and protected by special management provisions of the Kootenai Forest Plan, the project also authorizes 454 acres of logging (including 274 acres of intermediate or regeneration (clearcut) logging, 177 acres of "slashing" trees up to 22 inches in circumference, and 3 acres of "fuel breaks," which may result in the complete eradication of trees), and an additional 200 acres of "ecosystem burning." Final EA at 12.

56. The Black Ram Project authorizes slashing of understory vegetation on up to 200 acres, and 2,300 acres of prescribed burns, within inventoried roadless areas, which the Forest Service admits would impact roadless area values. Id. at 94, 154.

57. The project also authorizes logging and burning—including 11 timber harvest units—adjacent to over 7 miles of the Congressionally-designated Pacific Northwest National Scenic Trail. Id. at 201, 233. Logging would make it

impossible for views along the Trail to meet Forest Plan "high" scenic integrity objective for up to 15 years. Id. at 234.

58. The Forest Service admits that while logging will immediately degrade old growth and mature forests, bear habitat and other values, the threats such logging attempts to forestall or ameliorate–insect or disease epidemics, and wildfire–may never occur.

> While these events [e.g., wildfire, insect or disease epidemics] might occur, extreme conditions are not predictable, so it cannot be said, with reasonable certainty, whether these events would have an effect versus the action alternatives.

Id. at 128.

59. The Forest Service concluded that the project is "likely to adversely affect" grizzlies. Kootenai National Forest, Black Ram Biological Assessment at 1, 40.

## V. THE FOREST SERVICE'S REVIEW AND APPROVAL OF THE BLACK RAM PROJECT

60. In July 2018, the Kootenai National Forest issued a "scoping" notice initiating its review of the Black Ram Project.

61. Following scoping, in July 2019, the Kootenai National Forest issued an environmental assessment (EA) on the project for public review. Each of the Plaintiff organizations provided comments on the EA.

62. The Kootenai National Forest issued what the agency labeled a "final EA" and draft Decision Notice on approving the project on December 10, 2019.

63. Pursuant to 36 C.F.R. § 218.8, each of the Plaintiff organizations filed an objection to the final EA and draft Decision Notice in January 2020. The Forest Service canceled this objection period on February 18, 2020 without resolving the objections.

64. On September 28, 2020, the Forest Service issued a new draft Decision Notice, continuing to rely on the December 2019 "final" EA. Pursuant to 36 C.F.R. § 218.8, each of the Plaintiff organizations filed an objection to the final EA and draft Decision Notice in November 2020.

65. On January 27, 2021, Deputy Regional Forester Keith Lannom issued a decision on all of the objections, including those of Plaintiff organizations, asserting that "the [Black Ram] project complies with all applicable laws and the Kootenai National Forest Plan (2015). The Forest Supervisor may sign the Decision Notice for this project as soon as he is in receipt of the Biological Opinion. My review constitutes the final administrative determination of the Department of Agriculture."

66. Following the denial of all objections, the Forest Service moved to conclude consultation with the U.S. Fish & Wildlife Service. On September 15,

2021, the Fish & Wildlife Service issued its Biological Opinion on the project, in which the Fish & Wildlife Service stated that "the effects of the proposed Black Ram Project on grizzly bears are not likely to jeopardize the continued existence of the grizzly bear," though the agency anticipated "adverse effects to female grizzly bears from the Black Ram Project associated with proposed temporary increases in" road density during the 10 years the project is being implemented. Black Ram Biological Opinion at 46, 51.

67. On June 21, 2022, the Kootenai National Forest issued a new and Final EA. That same day Supervisor Chad Benson signed the Decision Notice and Finding of No Significant Impact (FONSI) approving the Black Ram Project and concluding that the Forest Service need not prepare an environmental impact statement. The Forest Service stated that the changes in the 2022 EA that were made after the pre-decisional objection process were minor, and were the result of public comments and corrections related to technical errors, omissions, or clarifications.

68. The 4Final EA failed to address baseline conditions of the project area concerning grizzly bears, including, inter alia, failing to address the fact that the Yaak ecosystem bear population is effectively isolated from the Cabinet ecosystem population, and that impacts to even one female grizzly in the Yaak population

could have significant impacts on the recovery of the Yaak and Cabinet-Yaak population of bears, particularly given that the tiny populations in both the Yaak and the Cabinet-Yaak. As noted above, the Fish & Wildlife Service has acknowledged that populations with fewer than 50 to 100 adult grizzlies, such as the population in the Yaak, are at high risk of extinction.

69. The Final EA failed to take a hard look at the impact of the project on grizzly bears because the Forest Service failed to consider, inter alia, that displacement of bears over large areas being logged over a 10-year period could lead to mortality, and that increased vehicle use and increased human presence due to logging during the life of the project, and the increase in road mileage, could lead to more bear mortality due to vehicle strikes, increased poaching or mistaken identity killing during black bear hunting season, or increased killing of bears due to other human-bear interactions.

70. The Final EA also failed to take the required hard look at the cumulative impacts of the Black Ram Project on grizzlies. Specifically, the Forest Service inappropriately limited its cumulative impacts analysis to impacts within the Black Ram Project area, despite the fact that: (1) grizzlies have large home ranges and so bears there will likely travel in and out of the project area, and actions beyond the project area may cumulatively impact bears; and (2) actions in

Canada, which is directly adjacent to the project area and part of the Yaak ecosystem, are likely to impact grizzlies in the Yaak ecosystem together with the Black Ram Project. The Forest Service's decision to ignore the potential for cumulative effects to bears beyond the boundaries of the Black Ram Project area is even more arbitrary because the Forest Service relied on the total bear population in the larger Cabinet-Yaak ecosystem to assert that grizzly populations are stable.

71. The Final EA also failed to analyze the project's impacts on recreation, which in turn will impact grizzlies. For example, the Final EA fails to address the fact that impacts to grizzlies from snowmobiling may increase due to the Black Ram Project's new and improved roads, and due to the fact that the dozens of large clearcuts and other logging and burning will remove dense vegetation and make over-the-snow mechanized travel more attractive and more likely to occur. The Final EA also fails to analyze how increased recreational opportunities through upgraded pedestrian and equestrian trails may increase human-bear conflicts, including on the Pacific Northwest National Scenic Trail.

72. The Final EA evaluated three alternatives: the required "no action" alternative; and two nearly identical action alternatives:

- the proposed action, Alternative 2, which would involve 1,783 acres of clearcuts, 3,904 acres of total commercial logging; 7,553 acres of fuel treatments outside logged areas, including 2,199 acres in inventoried roadless areas; 0.8 miles of road construction in old

growth forest; and 90.3 miles of road reconstruction or maintenance; and

- Alternative 3, which would involve 1,833 acres of clearcuts (103% of that for Alt. 2), 3,577 acres of total commercial logging (92% of that for Alt. 2); 7,553 acres of fuel treatments outside logged areas, including 2,199 acres in inventoried roadless areas (identical to Alt. 2); 0 miles of road construction in old growth forest; and 89.4 miles of road reconstruction or maintenance (99% of that for Alt. 2).

Black Ram Final EA at 13-15. Although the Final EA evaluated two nearly identical alternatives, it failed to review other alternatives proposed by Plaintiffs that would have placed in sharp relief the costs and benefits of the project, including: an alternative that focused treatments in the wildland-urban interface; an alternative that protects moist/wet old-growth forest types; an alternative that focuses treatments in previously-logged stands; and an alternative that would result in more wildlife security and less habitat disruption from road use and construction. The Final EA failed to provide a reasonable basis for rejecting any of these alternatives.

73. To evaluate the Black Ram Project's impacts on climate change, including on carbon storage and sequestration, the Forest Service relied on a "Carbon Report" that ignored the last six years of climate science, and that dismissed the project's impacts on carbon storage as "infinitesimal," without attempting to quantify those impacts. The Forest Service also declined to quantify

or otherwise analyze the greenhouse gas pollution emitted to implement the project itself.

74. Despite the fact that the project would involve numerous massive clearcuts, one more than 100 acres in size, and that the project will harm (and has the potential to significantly impact) grizzly bears, inventoried roadless areas, the Pacific Northwest National Scenic Trail, river segments found eligible for wild and scenic river protection, and many other values, the Forest Service issued a Finding of No Significant Impact and concluded the agency need not prepare an environmental impact statement (EIS).

75. In its media released with the June decision, the Forest Service stated that no harvest will occur until calendar year 2023 and only after additional core habitat is secured for grizzly bears. Other activities authorized by the decision, such as road construction and road closures, may begin within a few weeks. Harm to Plaintiffs' members' interests in protecting the Black Ram Project area is therefore imminent as a result of the Forest Service's decisions.

## FIRST CAUSE OF ACTION

(NEPA & APA Violations: Failure to Take a Hard Look)

76. The allegations in all preceding paragraphs are incorporated herein by reference.

77. NEPA and its implementing regulations require federal agencies, including the Forest Service, to take a "hard look" at the environmental consequences of proposed actions and the reasonable alternatives that would avoid or minimize such impacts or enhance the quality of the human environment. See 42 U.S.C. § 4332(2)(C)(i); 40 C.F.R. Parts 1502 and 1508 (1978). Agencies must take a hard look at the direct, indirect, and cumulative impacts of a proposed agency action and all alternatives in an EA. 40 C.F.R. §§ 1508.7, 1508.8 (1978). The information presented in the EA must be of high quality and include "accurate scientific analysis, and disclose that information and analysis, and its limitations, to the public. 40 C.F.R. § 1500.1(b)–(c) (1978).

78. NEPA also requires environmental analysis to disclose existing conditions in the project area to provide a baseline against which the impacts of alternative courses of action can be compared. Id.

79. The Forest Service failed to take the required "hard look" to consider and disclose the Black Ram Project's direct, indirect, and cumulative impacts, including impacts to the imperiled grizzly bear and impacts to–and from–climate change.

80. For example, the Forest Service failed to disclose baseline conditions of grizzly bears in the project area, including, inter alia, basing the agency's

analysis on the grizzly bear population in the combined Cabinet-Yaak ecosystem, when the Yaak ecosystem population is effectively isolated from the Cabinet ecosystem population. Given that the tiny population in both the Yaak and Cabinet-Yaak are so small that they are subject to extirpation with the loss of even one or two reproducing females, or harm to their reproductive success.

81. Further, the Forest Service failed to take a hard look at the cumulative impacts of the Black Ram Project together with other projects likely to impact grizzlies in the area. For example, the Forest Service inappropriately limited its cumulative impacts analysis to impacts within the Black Ram Project area, despite the fact that: (1) grizzlies have large home ranges and so bears there will likely travel in and out of the project area, and so actions beyond the project area may cumulatively impact bears; and (2) actions in Canada, which is directly adjacent to the project area and part of the Yaak ecosystem, are likely to impact grizzlies in the Yaak ecosystem together with the Black Ram Project.

82. The Forest Service also failed to take a hard look at project's impacts on recreation, which in turn will impact grizzlies. For example, the Final EA fails to address: (1) the fact that increased openings in forest vegetation will likely increase impacts from snow-machines on grizzlies; and (2) how increased recreational opportunities through upgraded pedestrian and equestrian trails, and

how the project's impacts on the Pacific Northwest National Scenic Trail, may increase human-bear conflicts.

83. Climate impacts are among the impacts NEPA requires agencies to consider and disclose. See, e.g., Center for Biological Diversity v. NHTSA, 538 F.3d 1172 (9th Cir. 2008); Mont. Envtl. Info. Ctr. v. United States Office of Surface Mining, 274 F. Supp. 3d 1074 (D. Mont. 2017) (vacating and setting aside mine plan modification in part due to agency's failure to quantify coal mine climate pollution).

84. The Black Ram EA fails to disclose adequately the climate change impacts of the Black Ram Project. Specifically, the EA fails to disclose the impacts of the proposed action alternatives on carbon storage compared to the no action alternative. Further, the EA fails to disclose the climate pollution impacts of project implementation – the use of fossil fuel engines to build roads, cut trees, and remove and transport cut logs to mills – compared to the no action alternative. The EA thus failed to take a "hard look" at the Black Ram Project's climate pollution impacts, in violation of NEPA.

85. The Forest Service's failure to take the required "hard look" at the Black Ram Project's direct, indirect, and cumulative impacts and the agency's failure to accurately disclose the baseline conditions violates NEPA. By relying on

the defective EA and FONSI for its decision, the Forest Service's action is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, which has substantially prejudiced Plaintiffs and accordingly must be held unlawful and set aside. 5 U.S.C. § 706(2)(A).

## SECOND CAUSE OF ACTION

(NEPA & APA Violations: Failure to Prepare an Environmental Impact Statement)

86. The allegations in all preceding paragraphs are incorporated herein by reference.

87. NEPA requires federal agencies to prepare a full environmental impact statement (EIS) before undertaking "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The Ninth Circuit has held that "that an EIS must be prepared if 'substantial questions are raised as to whether a project ... may cause significant degradation to some human environmental factor.'" Idaho Sporting Cong. v. Thomas, 137 F.3d 1146, 1149-50 (9th Cir. 1998) (citations omitted) (emphasis original).

88. In evaluating whether to prepare an EIS, agencies address whether impacts may be "significant" by considering the "context" and "intensity" of a proposal's impact. 40 C.F.R. § 1508.27 (1978). Determining "intensity" requires the evaluation of numerous "significance" factors, including: (a) the "unique

characteristics of the geographic area," including Wild and Scenic Rivers; (b) the degree to which the effects on the quality of the human environment are likely to be highly controversial; (c) the "degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks;" (d) "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts;" (e) "[t]he degree to which the action may adversely affect an endangered or threatened species;" and (f) whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment. 40 C.F.R. § 1508.27(b) (1978).

89. To avoid preparing an EIS, an agency must set forth a "convincing statement of reasons" explaining why the action will have no significant environmental impact. 40 C.F.R. § 1508.13 (1978). If the agency's action may be environmentally significant according to any of the criteria, the agency must prepare an EIS.

90. The Forest Service failed to prepare an EIS to analyze the impacts of the Black Ram Project, despite the fact that, among other things: (1) the Black Ram Project may significantly harm unique characteristics of the area, including lands eligible for wild and scenic river designation, inventoried roadless areas, the Pacific Northwest National Scenic Trail, threatened and endangered species

(including the grizzly bear), and their habitat, old growth and mature forest stands; (2) the Black Ram Project's effects on the environment are highly uncertain because the impacts the project seeks to forestall (beetle infestation and wildfire) may never occur; (3) logging mature and old growth forest that is already properly functioning habitat in an attempt to maintain or improve resilience to drought, insect and disease outbreaks, and wildfire is highly controversial and involves a high degree of scientific uncertainty; (4) the Black Ram Project, when combined with past and reasonably foreseeable future neighboring timber sales may result in cumulatively significant impacts on the environment; (5) the Black Ram Project will adversely affect the grizzly bear, a threatened species; and (6) the Black Ram Project is inconsistent with the Kootenai's Forest Plan components imposed for the protection of the environment, threatening a violation of NFMA.

91. The Forest Service's Finding of No Significant Impact and its failure to complete an EIS, despite the fact that the Black Ram Project may significantly affect the quality of the environment, violates NEPA and is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

## THIRD CAUSE OF ACTION

(NFMA & APA Violations: Inconsistent with Forest Plan)

92. The allegations in all preceding paragraphs are incorporated herein by reference.

93. NFMA requires the Forest Service to ensure that its site-specific actions comply with the requirements of the governing Forest Plan. 16 U.S.C. § 1604(i). The Kootenai Forest Plan includes plan components for timber harvesting and vegetation management. It also contains management-area plan components, including components specific to river segments identified for inclusion as part of the Wild and Scenic Rivers System. And it contains the 2011 Access Amendment standards that direct access management to protect the Selkirk and Cabinet-Yaak grizzly bears.

94. The Forest Service failed to ensure the Black Ram Project complies with the Kootenai Forest Plan's desired conditions, standards, and guidelines, in violation of NFMA, including the following failures:

a. Authorizing timber harvest in eligible wild river segments, as prohibited by Forest Plan standard MA2-STD-TBR-01.
b. Authorizing logging within 579 acres of old growth stands and 0.8 miles of new road construction through old growth forest, contrary to Forest Plan desired condition FW-DC-VEG-03, standard FW-STD-VEG-01, and FW-GDL, VEG-02.

95. By failing to ensure compliance with the Kootenai Forest Plan, the Forest's action approving the Black Ram Project through the EA and FONSI and Decision Notice is arbitrary, capricious, an abuse of discretion, and not in accordance with the law, which has substantially prejudiced Plaintiffs, and accordingly must be held unlawful and set aside. 5 U.S.C. § 706(2).

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants and provide the following relief:

1. Declare that Defendants U.S. Forest Service, and Messrs. Lannom and Benson violated NEPA, regulations implementing NEPA, NFMA, and the APA in approving the Black Ram Project;

2. Declare unlawful, set aside, and vacate Defendants U.S. Forest Service's, and Messrs. Lannom's and Benson's Decision Notice, Finding of No Significant Impact, and 2022 Final EA analyzing and/or approving the Black Ram Project;

3. Order the Forest Service to prepare an EIS;

4. Grant Plaintiffs such temporary restraining orders or preliminary injunctions as they may request;

5. Award Plaintiffs costs and reasonable attorney's fees as authorized by the Equal Access to Justice Act, 28 U.S.C. § 2412(d) and any other statute;

6. Retain jurisdiction of this action to ensure compliance with its decree; and

7. Provide such other declaratory and injunctive relief as the Court deems just and proper.

Respectfully submitted this 30th day of June, 2022

s/ *Sarah McMillan*
Sarah McMillan (MT Bar No. 3634)
WILDEARTH GUARDIANS
P.O. Box 7516
Missoula, MT 59807
(406) 549-3895
smcmillan@wildearthguardians.org

Edward B. Zukoski (*Pro Hac Vice Pending*)
CENTER FOR BIOLOGICAL DIVERSITY
1536 Wynkoop Street, Suite 421
Denver, CO 80202
(303) 641-3149
tzukoski@biologicaldiversity.org

Andrea Zaccardi (*Pro Hac Vice Pending*)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 469
Victor, ID 83455
(303) 854-7748
azaccardi@biologicaldiversity.org

*Attorneys for Plaintiffs Center for Biological Diversity,*
*Yaak Valley Forest Council, and WildEarth Guardians*

Marla Fox (*Pro Hac Vice Pending*)
WILDEARTH GUARDIANS
P.O. Box 13086
Portland, OR 97213
(651) 434-7737
mfox@wildearthguardians.org

*Counsel for Plaintiff WildEarth Guardians*