Ronni M. Flannery (MT Bar No. 5890)
LAW OFFICE OF RONNI M. FLANNERY
936 South 2nd Street, West
Missoula, MT 59801
(406) 214-5700
rflannery@bresnan.net

Edward B. Zukoski (*Admitted Pro Hac Vice*)
CENTER FOR BIOLOGICAL DIVERSITY
1536 Wynkoop Street, Suite 421
Denver, CO  80202
(303) 641-3149
tzukoski@biologicaldiversity.org

Andrea Zaccardi (*Admitted Pro Hac Vice*)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 469
Victor, ID  83455
(303) 854-7748
azaccardi@biologicaldiversity.org

*Counsel for Plaintiffs*

Marla Fox (*Admitted Pro Hac Vice*)
WILDEARTH GUARDIANS
P.O. Box 13086
Portland, OR 97213
(651) 434-7737
mfox@wildearthguardians.org

*Counsel for Plaintiff WildEarth Guardians*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION**

CENTER FOR BIOLOGICAL
DIVERSITY, YAAK VALLEY FOREST
COUNCIL, and WILDEARTH
GUARDIANS,

        Plaintiffs,

vs.

UNITED STATES FOREST SERVICE;
LEANNE MARTEN, in her official
capacity as Regional Forester for the
Northern Region of the U.S. Forest
Service; CHAD BENSON, in his official
capacity as Supervisor of the Kootenai
National Forest; UNITED STATES FISH
AND WILDLIFE SERVICE; DEB
HAALAND, in her official capacity as
Secretary of the U.S. Department of the
Interior; MARTHA WILLIAMS, in her
official capacity as Director of the U.S.
Fish and Wildlife Service; and ADAM
ZERRENNER, in his official capacity as
Field Supervisor for the U.S. Fish and
Wildlife Service's Montana Ecological
Services Office,

        Federal Defendants.

Case No. 9:22-cv-00114-DWM

**FIRST AMENDED
COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

**INTRODUCTION**

1.      Plaintiffs in this case challenge the U.S. Forest Service's authorization of and the U.S. Fish and Wildlife Service's (Fish and Wildlife Service) Biological Opinion related to the Black Ram Project, which authorizes major commercial logging and road construction in old and mature forests of the Yaak Valley in northwest Montana—despite the growing climate crisis and a dwindling local grizzly bear population—without legally required environmental analyses.

2.      The scenic and remote Yaak Valley is located in Montana's northwest corner, bordering Idaho and Canada, and includes thousands of acres managed by the Kootenai National Forest. The Valley's forests include spruce, sub-alpine and Douglas fir, lodgepole pine, and the deciduous larch. Old and mature trees that have been spared to date from logging still persist in moist pockets, some largely undisturbed for centuries.

3.      The old and mature forests here provide refuge for 190 animal species, including lynx, wolverine, and native trout. A relatively isolated population of about 25 grizzly bears, as of 2017, clings tenuously to life in this area. Last year, Fish and Wildlife Service completed a five-year status review which concluded that the grizzly population in the Cabinet-Yaak recovery zone (which includes those bears in the Yaak Valley and an additional 25 or so bears in

1

the Cabinet Mountains) has the lowest fecundity, lowest genetic diversity, and lowest resiliency of any grizzly population in the lower 48 states.

4.     In 2018, the Kootenai National Forest proposed the Black Ram Project. The Black Ram Project will clearcut forest, destroy and fragment habitat, displace wildlife, alter hydrology, and adversely affect the area's imperiled grizzly population. Specifically, the Black Ram Project permits commercial logging of nearly 4,000 acres, including clearcutting 1,783 acres (more than 3 square miles). One of the clearcuts would be more than 100 acres in size. The Project includes logging 700 acres within old growth and mature forest stands, cutting down centuries-old trees in the Rampike Creek area, removing 57 million board feet of commercial timber, and bulldozing nearly a mile of new permanent road through old growth forest. The Project will involve a total of 3.3 miles of new permanent road construction, and the reconstruction or maintenance of 90.3 miles of road throughout the project area.

5.     To review the Project, the Forest Service prepared a mere environmental assessment, and concluded that this major project would not require preparation of an environmental impact statement as required by the National Environmental Policy Act (NEPA) because the Project would have "no significant impacts." The Forest Service reached this arbitrary conclusion despite the fact that

2

the Project authorizes: the substantial alteration of the forest ecosystem caused by scores of massive clearcuts; damage to habitat for and anticipated harm to the dwindling population of threatened grizzly bears; logging hundreds of acres of old and mature trees; slashing and prescribed burning within inventoried roadless areas; and more than 270 acres of logging within special management areas–areas meant to safeguard river stretches eligible for protection as wild and scenic rivers.

6.    Further, the environmental assessment that the Forest Service relied upon to approve the Black Ram Project failed to take a "hard look" at the carbon and climate impacts of removing hundreds of thousands of trees from the Forest (including hundreds of acres of old and mature trees). Trees, particularly large and old trees, are champions of carbon storage, yet the Forest Service dismissed the impacts of logging these forests on carbon storage as "infinitesimal" based on a years-old cut-and-paste "Carbon Report" that ignored years of science and agency guidance, and failed to address the climate pollution caused by cutting, hauling, and processing timber.

7.    The Forest Service also failed to take a "hard look" at the Project's impacts to grizzly bears. The agency failed to address the fact that as of 2017 the Yaak ecosystem population of approximately 25 bears is genetically isolated from

3

those in the Cabinet Mountains, meaning that impacts to even one female grizzly in the Yaak could significantly harm the recovery of this population.

8.   The Forest Service violated the National Forest Management Act (NFMA) by authorizing a project that is inconsistent with the Kootenai National Forest's 2015 Forest Plan. The Forest Plan includes components designed to protect old growth forest, grizzly bears, and special management areas. Activities authorized by the Black Ram Project decision are inconsistent with these plan components.

9.   Following consultation as required by the Endangered Species Act (ESA), see 16 U.S.C. § 1536, on September 15, 2021, the Fish and Wildlife Service issued a Biological Opinion and Incidental Take Statement in connection with the Project (2021 Biological Opinion), which the agency amended on August 26, 2022 (2022 Biological Opinion). The 2022 Biological Opinion is flawed in several respects. First, Fish and Wildlife Service failed to rely upon the best available science to formulate an accurate baseline to assess impacts by erroneously relying upon an incorrect baseline of the grizzly bear population in the Cabinet-Yaak Recovery Zone and ignored the lack of genetic connectivity between bears in the Yaak and those in the Cabinets. Second, Fish and Wildlife Service ignored its own science showing that the population trend for bears in the Cabinet-

4

Yaak area is in decline—not increasing as the 2022 Biological Opinion alleges.

Third, the agency improperly ignored the impacts on reproductive female grizzly

bears in the area to reach its conclusion that the Project will not jeopardize grizzly

bears. For these reasons, the 2022 Biological Opinion and Incidental Take

Statement are arbitrary and capricious and violate requirements of the ESA.

10.     Because the Forest Service's approval of the Black Ram Project and

the Fish and Wildlife Service's 2022 Biological Opinion in connection with the

Project violate federal law, this Court should vacate the Forest Service's approval,

vacate the 2022 Biological Opinion, and enjoin logging activities and construction

or re-construction of roads in connection with the Project.

11.     The Forest Service approved the Project on June 21, 2022. The Forest

Service stated in its media release that no harvest will occur until calendar year

2023 and only after additional core habitat is secured for grizzly bears. Other

activities authorized by the decision have already begun.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331 (federal question jurisdiction), 1346 (United States as a defendant),

5 U.S.C. §§ 701-706 (Administrative Procedure Act's judicial review provisions),

and 16 U.S.C. §§ 1540(c), (g)(1)(C) (action arising under the ESA and citizen suit

provision). This Court may order relief pursuant to 28 U.S.C. § 2201 (declaratory judgment) and § 2202 (further relief), and 5 U.S.C. §§ 702 and 706.

13.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because: plaintiff Yaak Valley Forest Council is based in Lincoln County, Montana; the lands at issue in this suit are located in Lincoln County, Montana; Federal Defendant Kootenai National Forest is located in Lincoln County, Montana; the office of Federal Defendant Chad Benson is located in Lincoln County, Montana; and a substantial part of the events giving rise to Plaintiffs' legal claims occurred in Lincoln County, Montana. See 28 U.S.C. § 1391(e)(1); D. Mont. L.R. 1.2(c)(5), 3.2(b).

14.    Plaintiffs provided Defendants with 60 days' written notice of Plaintiffs' intent to sue on June 30, 2022 and on September 23, 2022, as required by 16 U.S.C. § 1540(g)(2)(C).

## **PARTIES**

15.    Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (the Center) is a non-profit environmental organization dedicated to the preservation, protection, and restoration of biodiversity, native species, and ecosystems. The Center is headquartered in Tucson, Arizona, with offices in a number of states, including Montana. The Center uses science, policy, and law to advocate for the conservation

6

and recovery of species on the brink of extinction and the habitats they need to survive. The Center has and continues to actively advocate for increased protections for species and their habitats in Montana. The Center has over 89,000 members, more than 500 of whom live in Montana, and some of whom recreate within the Black Ram Project area.

16.     Plaintiff WILDEARTH GUARDIANS is an American West-based non-profit environmental advocacy organization dedicated to protecting and restoring the wildlife, wild places, wild rivers, and health of the American West. WildEarth Guardians is headquartered in Santa Fe, New Mexico, and has offices in Missoula, Montana and throughout the western U.S. WildEarth Guardians has over 6,800 members, and over 197,000 members and supporters, many of whom live in western Montana, and some of whom recreate within the Black Ram Project area.

17.     Plaintiff YAAK VALLEY FOREST COUNCIL (Forest Council) is a non-profit community organization working to ensure that the natural and human communities of northwest Montana are healthy and resilient. Its mission is to protect the last roadless areas in the Yaak Valley and Kootenai National Forest; maintain and restore the ecological integrity of our geographical zone by conserving habitat for native and sensitive species; encourage and support the development of local economies based on stewardship principles, value-added

forest products, habitat conservation and ecological restoration; and educate local residents on the value of protected and restored landscapes for community and economic development. The Forest Council is dedicated to cultivating and encouraging meaningful dialogue between historically polarized groups by bringing them to the same table to find common ground on ecologically sound, stewardship-based forestry management practices. Forest Council members and supporters work in, use, and enjoy the Kootenai National Forest and the lands of the Black Ram Project area for recreation, nature study, photography, and spiritual renewal.

18.     The Center, WildEarth Guardians, and the Forest Council (collectively, "Plaintiffs") have longstanding interests in the preservation and recovery of grizzly bears in the Northern Rocky Mountains region, including the Yaak Valley and the broader Cabinet-Yaak ecosystem in northwest Montana. Over a period of years, Plaintiffs have invested in the protection and recovery of grizzly bears in the region through a variety of actions including public outreach and education, investment in conflict reduction measures, scientific analysis, advocacy, and when necessary, litigation.

19.     Over the past four years, Plaintiffs have participated actively in available public processes concerning the Black Ram Project and its effects on

8

forests, grizzly bears, and the climate crisis, including by filing extensive comments on the draft environmental assessment issued by the U.S. Forest Service on the Project, and filing two sets of objections to Forest Service proposed decisions on the Project.

20.     Members and staff of the Plaintiffs' organizations regularly use and enjoy the lands impacted within the Black Ram Project area for a variety of purposes, including wildlife and wildflower viewing, photography, recreation, and aesthetic appreciation of the area's natural, wild values. The Plaintiffs' members and staff are concerned with protecting the wildlife, scenery, air quality, and other natural values of the Black Ram area.

21.     For example, Pam Fuqua, a member of Center for Biological Diversity, and a member and former staffer of the Yaak Valley Forest Council, lives on private property that is within the boundary of the Black Ram Project area, and that is directly across a road from one of the forest stands the project authorizes for logging. She visits forest stands the project will cut down on a weekly basis to enjoy their current, scenic, unspoiled, natural values, and to seek out and observe wildlife, including grizzly bears, and their sign. Her ability to enjoy these areas, and to find the wildlife she enjoys, will be irreparably harmed by

9

the Forest Service's authorization of logging and road construction in connection with the Black Ram Project.

22.     Anthony South, a staff member of the Yaak Valley Forest Council since 2014, grew up in Lincoln County, Montana, and has been camping, hiking, fly-fishing, and photographing landscapes and wildlife in the Black Ram Project area since 2005. He particularly enjoys his visits to the Northwest Peaks Scenic Area; accessing the area requires him to pass directly adjacent to Black Ram cutting units. In addition, he has visited the vast majority of areas authorized for logging and burning in the project area. On his many visits, he has enjoyed the area's abundant wildlife, and has viewed lynx, bobcat, deer, elk, wolves, marmots, grizzlies, and odd, rare species like the jumping slug. From the high peaks, he has viewed areas that will become glaring clearcuts if the Black Ram Project proceeds. He returns to the Black Ram area for work—to evaluate water quality in streams impacted by previous logging projects—and for recreation and renewal many times each year and intends to do so for the foreseeable future. Mr. South's ability to enjoy his regular visits to observe the project area's wildlife and natural scenery, and to feel the serenity of the wildlands, will be irreparably harmed by the 10 years of logging, noise, and road construction the Black Ram Project authorizes, and the clearcuts, destroyed habitat, and dried landscapes logging will leave behind.

23.    Adam Rissien, a member and employee of WildEarth Guardians, lives in Montana and has visited the forests within the boundary of the Black Ram Project area in the past, including in the summers of 2021 and 2022. He and his family visit the area to become immersed in the sights, sounds, and smells of the wild forest, including centuries-old old-growth trees. He and his family also enjoy seeking out the sights and signs of wildlife, including grizzly bears. Mr. Rissien has plans to return to the Project area in the summer of 2023. Mr. Rissien has witnessed the destruction wrought by damaging logging within the Black Ram Project area, and his ability to enjoy the forest targeted for logging, including the Rampike watershed, will be irreparably harmed by logging the Black Ram Project authorizes.

24.    The Forest Service's June 21, 2022 approval of the Black Ram Project irreparably harms Plaintiffs' interests and the interests of their members because it increases the risk of harm from, and imminently will result in, the bulldozing of miles of road and logging of thousands of acres within forests, including old and mature forests. Road construction and logging, including and especially logging within the Rampike Creek area, will destroy wildlife habitat and vegetation, and degrade Plaintiffs' members' enjoyment of wildlife, photography, recreation, and the natural and wild character of the Black Ram Project area. This increased risk

11

of, and ongoing, environmental harm injures Plaintiffs' concrete interest in the protection of the forests and wildlife of the Black Ram Project area. Plaintiffs' members plan to return to the Black Ram Project area this year and every year for the foreseeable future. Accordingly, the legal violations alleged in this complaint cause direct injury to the spiritual, aesthetic, conservation, recreational, scientific, educational, and wildlife preservation interests of the Plaintiffs and their members, supporters, staff, and volunteers.

25.    The Forest Service's failure to comply with NEPA harms the Plaintiffs' members and staff by denying them the right to informed decision-making and full disclosure under NEPA, as well as the right to meaningfully participate in the decision-making process. The Forest Service's failure to comply with NEPA in the decision to approve the proposed action increases the risk of an uninformed decision to approve the construction and operation of roads, and creation of massive clearcuts across one of most remote parts of the Kootenai National Forest. In addition, the Forest Service's failure to comply with NEPA increases the risk that the agency has authorized construction and operation of roads and clearing of vast acreages via logging in a manner that will harm wildlife, including the threatened grizzly bear, without understanding the impacts to, or measures needed to mitigate harms to, those species.

26.     Plaintiffs' injuries are also directly traceable to the Forest Service's
failure to comply with NFMA in authorizing the Black Ram Project activities that
do not ensure protection of old growth forest, grizzly bears, and special
management areas.

27.     Plaintiffs' and their members' interests are further harmed by Fish and
Wildlife Service's issuance of the 2022 Biological Opinion because it does not rely
on the best available science and does not adequately assess the negative impacts
to grizzly bears from the Black Ram Project. Because the 2022 Biological Opinion
ignores important aspects of the Project that may impact grizzly bears in the
project area and thereby fails to properly determine whether the Project will
jeopardize grizzly bears and what mitigation measures would be necessary to
prevent jeopardy, Plaintiffs' interests in seeing survival and recovery of grizzly
bears in and around the project area are directly harmed by issuance of the
inadequate 2022 Biological Opinion.

28.     Defendant UNITED STATES FOREST SERVICE is a federal agency
under the U.S. Department of Agriculture. The Forest Service is responsible for
managing the Kootenai National Forest. Forest Service staff, acting in their official
capacity, signed a Decision Notice on June 21, 2022, approving the Black Ram
Project.

13

29.     Defendant LEANNE MARTEN is Regional Forester for the Northern Region of the U.S. Forest Service. On January 27, 2021, Deputy Regional Forester Keith Lannom, who was then supervised by the Regional Forester for the Northern Region, issued a decision rejecting Plaintiffs' objections to the Black Ram Project. Regional Forester Marten is sued in her official capacity.

30.     Defendant CHAD BENSON is the Supervisor of the Kootenai National Forest. Supervisor Benson signed the Decision Notice approving the Black Ram Project on June 21, 2022. Supervisor Benson is sued in his official capacity.

31.     Defendant UNITED STATES FISH AND WILDLIFE SERVICE is a federal agency within the Department of Interior. Fish and Wildlife Service is responsible for administering the ESA with respect to terrestrial wildlife, such as grizzly bears, and ensuring that agency decisions comply with the ESA and other laws.

32.      Defendant DEB HAALAND is the Secretary of the United States Department of the Interior. In this role, Secretary Haaland has supervisory responsibility over Fish and Wildlife Service. Secretary Haaland is sued in her official capacity.

14

33.     Defendant MARTHA WILLIAMS is the Director of Fish and

Wildlife Service and is charged with ensuring agency decisions comply with law.

Director Williams is sued in her official capacity.

34.     Defendant ADAM ZERRENNER is the Field Supervisor for Fish and

Wildlife Service's Montana Ecological Services Office located in Helena,

Montana. Supervisor Zerrenner signed the 2022 Biological Opinion for the Black

Ram Project on August 26, 2022. Supervisor Zerrenner is sued in his official

capacity.

## LEGAL FRAMEWORK

## I.    THE ADMINISTRATIVE PROCEDURE ACT

35.     Because NEPA does not include a citizen suit provision, this case is

brought in part pursuant to the Administrative Procedure Act (APA), 5 U.S.C. §§

551-559, 701-706.

36.     The APA allows persons and organizations to challenge final agency

actions in the federal courts. Id. §§ 702, 704. The APA declares that a court shall

hold unlawful and set aside agency actions found to be arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law. Id. § 706(2)(A).

37.     An action is arbitrary and capricious "if the agency has relied on

factors which congress has not intended it to consider, entirely failed to consider an

15

important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

## II.     THE NATIONAL ENVIRONMENTAL POLICY ACT

38.     Congress enacted NEPA, 42 U.S.C. §§ 4321-4370h, to, among other things, "encourage productive and enjoyable harmony between man and his environment" and to promote government efforts "that will prevent or eliminate damage to the environment." Id. § 4321. As a general matter, NEPA requires that federal agencies analyze and disclose to the public the environmental impacts of their actions. Id. § 4332(2)(C).

39.     To this end, the Council on Environmental Quality has promulgated regulations implementing NEPA. Among other things, the rules are intended to "tell federal agencies what they must do to comply with the procedures and achieve the goal of [NEPA]," to "insure that environmental information is available to public officials and citizens before decisions are made and before

actions are taken," and to ensure "better decisions" and "foster excellent action." 40 C.F.R. § 1500.1(a)-(c) (1978).[1]

40.     To fulfill its mandates, NEPA requires federal agencies to prepare an environmental impact statement (EIS) for all "major Federal actions significantly affecting the environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4 (1978). Where it is uncertain whether it must prepare an EIS, it must prepare an environmental assessment (EA) to determine whether the action may have significant impacts and thus require preparation of an EIS. 40 C.F.R. § 1508.9 (1978); Idaho Sporting Cong. v. Thomas, 137 F.3d 1146, 1149-50 (9th Cir. 1998).

41.     In evaluating whether to prepare an EIS, agencies address whether impacts may be "significant" by considering the "context" and "intensity" of a proposal's impact. 40 C.F.R. § 1508.27 (1978). Determining "intensity" requires the evaluation of numerous factors, including: (a) the "unique characteristics of the

---

[1] Although the Council on Environmental Quality amended its NEPA regulations in 2020, those regulations "apply to any NEPA process begun after September 14, 2020. An agency may apply the regulations in this subchapter to ongoing activities and environmental documents begun before September 14, 2020." 40 C.F.R. § 1506.13 (2020). Because the Forest Service "relied on Council on Environmental Quality's 1978 regulations throughout the NEPA process for the [Black Ram] Project," ECF No. 21, ¶ 30 (Answer to Complaint) (Sept. 22, 2022), those regulations apply to the Black Ram Project decision. See Bair v. Cal. Dep't of Transp., 982 F.3d 569, 577 n.20 (9th Cir. 2021) ("Because [the agency] applied the previous [1978] regulations to the Project, so do we").

geographic area;" (b) the "degree to which the possible effects on the human

environment are highly uncertain or involve unique or unknown risks;"

(c) "[w]hether the action is related to other actions with individually insignificant

but cumulatively significant impacts;" and (d) "[t]he degree to which the action

may adversely affect an endangered or threatened species." 40 C.F.R. § 1508.27(b)

(1978).

    42.    NEPA requires that agencies "succinctly describe the environment of

the area(s) to be affected or created by the alternative under consideration." 40

C.F.R. § 1502.15 (1978). NEPA also requires the action agency to set an

appropriate baseline detailing the nature and extent of the resources in the area:

"The concept of a baseline against which to compare predictions of the effects of

the proposed action and reasonable alternatives is critical to the NEPA process."

Council on Environmental Quality, *Considering Cumulative Effects under the*

*National Environmental Policy Act* 41 (January 1997). "Without establishing . . .

baseline conditions . . . there is simply no way to determine what effect [an action]

will have on the environment and, consequently, no way to comply with NEPA."

Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci, 857 F.2d 505, 510 (9th Cir.

1988).

43.     An EA must also identify the direct, indirect, and cumulative impacts

of each reasonable alternative, including a project's ecological, aesthetic,

economic, social, and health effects. 40 C.F.R. §§ 1508.7 (1978) (defining

cumulative impact), 1508.8 (1978) (defining environmental effects); 1508.9(b)

(1978) (requiring EAs to disclose the "environmental impacts of proposed action

and alternatives"). Direct impacts are those impacts "caused by the action and

[that] occur at the same time and place." Id. § 1508.8(a) (1978). Indirect impacts

are "caused by the action and are later in time or farther removed in distance, but

are still reasonably foreseeable." Id. § 1508.8(b) (1978). Cumulative impacts are

"the impact[s] on the environment which results from the incremental impact of

the action when added to other past, present, and reasonably foreseeable future

actions regardless of what agency (Federal or non-Federal) or person undertakes

such other actions. Cumulative impacts can result from individually minor but

collectively significant actions taking place over a period of time." Id. § 1508.7

(1978).

## III.    THE NATIONAL FOREST MANAGEMENT ACT

44.     Congress enacted NFMA in 1976, 16 U.S.C. § 1600 et seq., which

governs the Forest Service's management of the national forests. NFMA

establishes a two-step process for forest planning. First, the Forest Service must

develop, maintain, and revise a Land and Resource Management Plan (Forest Plan) for each national forest. 16 U.S.C. § 1604(a); 36 C.F.R. pt. 219; Neighbors of Cuddy Mountain v. U.S. Forest Serv., 137 F.3d 1372, 1376 (9th Cir. 1998). The Forest Plan guides natural resource management activities forest-wide, setting standards, management goals and objectives, and monitoring and evaluation requirements.

45.     Second, once a forest plan is in place, NFMA requires that the Forest Service ensure site-specific decisions are consistent with the broader Forest Plan. 16 U.S.C. § 1604(i). Project decisions must "strictly comply with a forest plan's standards, which are considered binding limitations." Oregon Nat. Desert Ass'n v. United States Forest Serv., 957 F.3d 1024, 1035 (9th Cir. 2020) (internal citations omitted).

46.     The Forest Service approved the Kootenai National Forest's Forest Plan in 2015. The Kootenai Forest Plan includes forest-wide plan components for timber harvesting and vegetation management. It also contains management-area plan components, including components specific to river segments identified for inclusion as part of the Wild and Scenic Rivers System.

20

## IV.   THE ENDANGERED SPECIES ACT

47.     Enacted in 1973, the Endangered Species Act is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." Tenn. Valley Auth. v. Hill, 437 U.S. 153, 180 (1978).

48.     The ESA is meant to provide a means to conserve the ecosystems upon which endangered and threatened species depend and to provide a program to conserve listed species. 16 U.S.C. § 1531(b). To "conserve" means "to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary," id. § 1532(3), i.e., to bring about the recovery of a species listed as endangered or threatened. See id. § 1532(6), (20) (definitions of "endangered species" and "threatened species").

49.     To receive the full protections of the ESA, a species must first be listed by the Secretary of Interior as "endangered" or "threatened" pursuant to ESA section 4. See id. § 1533. An "endangered species" is "any species which is danger of extinction throughout all or a significant portion of its range." Id. § 1532(6). A "threatened species" is "any species which is likely to become endangered within the foreseeable future throughout all or a significant portion of its range." Id. § 1532(20).

50.     Section 7 of the ESA requires each federal agency, in consultation with a federal wildlife agency (Fish and Wildlife Service for terrestrial mammals such as the grizzly bear) to insure that any proposed action is not likely to jeopardize the continued existence of a listed species, or result in the destruction or adverse modification of critical habitat. Id. § 1536(a)(2). To "jeopardize the continued existence of" under the ESA means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.[2]

51.     To carry out these mandates, the action agency (here, the Forest Service) must first ask Fish and Wildlife Service whether any listed or proposed species may be present in the area of agency action. 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12. If listed or proposed species may be present, the action agency must prepare a "biological assessment" to determine whether the listed species

---

[2] All citations are to the ESA regulations in effect prior to passage of new regulations in 2019. FWS states in the 2022 Biological Opinion that it relied on the pre-2019 regulations but notes "the analysis and conclusions would d have been the same, irrespective of which regulations applied." 2022 Biological Opinion at 3-4.

may be affected by the proposed action. 16 U.S.C. § 1536(c)(1); 50 C.F.R.

§ 402.12.

52.     If an agency determines that its action "may affect" but is "not likely

to adversely affect" a listed species or its critical habitat, the regulations permit

"informal consultation," during which Fish and Wildlife Service must concur in

writing with the agency's determination. 50 C.F.R. §§ 402.14(a), (b). If the agency

determines that the action is "likely to adversely affect" a listed species or critical

habitat, or if Fish and Wildlife Service does not concur with the agency's "not

likely to adversely affect" determination, the agency must engage in "formal

consultation" with Fish and Wildlife Service. Id. §§ 402.02, 402.14(a).

53.     During consultation, Fish and Wildlife Service must review all

relevant information, evaluate the current status and environmental baseline of the

species or critical habitat, and evaluate the effects and cumulative effects of the

proposed action on the listed species and their critical habitat. 16 U.S.C. §

1536(b)(3)(A); 50 C.F.R. § 402.14(g)(1)-(3). For purposes of the ESA, "'[e]ffects

of the action' refers to the direct and indirect effects of an action on the species or

critical habitat, together with the effects of other activities that are interrelated or

interdependent with that action, that will be added to the environmental baseline."

50 C.F.R. § 402.02. "The environmental baseline includes the past and present

23

impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process." Id. "Indirect effects are those that are caused by the proposed action and are later in time, but still are reasonably certain to occur." Id. "Interrelated actions are those that are part of a larger action and depend on the larger action for their justification," while "[i]nterdependent actions are those that have no independent utility apart from the action under consideration." Id. "Cumulative effects are those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." Id.

54.    Throughout its analysis, Fish and Wildlife Service must utilize the "best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d).

55.    After Fish and Wildlife Service evaluates the current status of the listed species and the proposed action's impacts on the species using the best scientific and commercial data available, Fish and Wildlife Service reaches a "biological opinion as to whether the action, taken together with cumulative

effects, is likely to jeopardize the continued existence of listed species . . . ." 16

U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.14(d), (g)(4). If Fish and Wildlife Service

concludes that the proposed action "will jeopardize the continued existence of" a

listed species, the biological opinion must outline "reasonable and prudent

alternatives." 16 U.S.C. § 1536(b)(3)(A).

56.     Section 9 requires that agencies ensure that the prosed action does not

result in the "take" of any listed species. Id. § 1538(a)(1)(B). "Taking" under the

ESA "means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or

collect, or attempt to engage in any such conduct." Id. § 1532(19). The "take"

prohibited by Section 9 need not be the result of purposeful action. Nat'l Wildlife

Fed. v. Burlington Northern Railroad, 23 F.3d 1508, 1509 (9th Cir. 1994) (trains

accidentally hitting and thereby taking grizzly bears constitutes an ESA violation).

57.     Fish and Wildlife Service has the authority to issue an "incidental take

statement" if Fish and Wildlife Service concludes that an action is not likely to

jeopardize the continued existence of a listed species or result in the destruction or

adverse modification of critical habitat, either as proposed or through the

implementation of the reasonable and prudent alternatives described in the

biological opinion. 50 C.F.R. § 402.14(i). The incidental take statement must

specify the amount or extent of such incidental taking on the listed species; any

25

"reasonable and prudent measures" that Fish and Wildlife Service considers necessary or appropriate to minimize such impact; and the "terms and conditions" with which the action agency must comply to implement those measures. 16 U.S.C. § 1536(b)(4); 50 C.F.R. §§ 402.14(i)(1)(i), (ii), & (iv). Taking of listed species without the coverage of an incidental take statement is a violation of the ESA. 16 U.S.C. § 1538.

## FACTUAL BACKGROUND

## I.   THE BLACK RAM PROJECT

58.    The Black Ram Project area covers 95,000 acres in the northwest corner of Montana, and is bordered on the west by mountains near the Idaho-Montana border, and on the north by the US-Canada border. On the area's western extent, the Northwest Peaks Scenic Area overlooks the project with three peaks topping out at over 7,000 feet above sea level. From the peaks, the area descends toward the project's low point along the Yaak River at about 3,000 feet in elevation. The large vertical relief results in the area hosting a variety of ecosystems and habitat niches. Imperiled species including the Canada lynx, wolf, and grizzly bear call the project area home.

59.    Over 13,000 acres of the project area harbor "old growth" forest stands, which are characterized by large, old trees, interspersed with snags and

downed timber. Black Ram Final Environmental Assessment (June 2022) at 117
(Final EA). These complex ecosystems have been largely undisturbed by logging
for over a century. Forests in general, and old growth and mature forests in
particular, are important tools in combating climate change because they can store
significant volumes of carbon.

60.     The project area also hosts numerous recreation opportunities,
including 28 miles of the Pacific Northwest National Scenic Trail, one of only
eleven designated national scenic trails in the United States, which runs from
Glacier National Park to the Pacific Coast in Washington. Id. at 19. The Forest
Service has concluded that segments of West Fork Yaak and Yaak River within the
project area are eligible for protection as Wild and Scenic Rivers. Id. at 191.
Nearly 19,000 acres inventoried roadless areas occur in the area, where they are
managed pursuant to the protective Roadless Area Conservation Rule. Id. at 154,
160.

## II.    THE IMPERILED STATE OF GRIZZLY BEARS IN THE YAAK AREA

61.     One of the project area's rarest and most elusive inhabitants is the
grizzly bear. Grizzlies once ranged throughout western North America, from
central Mexico to Alaska. U.S. Fish and Wildlife Service, Grizzly Bear in the
Lower-48 States, 5-Year Status Review: Summary and Evaluation (Mar. 2021)

("Five-Year Status Review"), at 3. In the lower 48 states alone, there were an estimated 50,000 grizzly bears. Id. But as European settlers moved west around the turn of the 19th Century, their persecution of grizzly bears caused dramatic population declines and substantial habitat loss. Id. By the 1930s, grizzlies had been extirpated from 98 percent of their former range. Id.

62.    In 1975, two years after the Endangered Species Act's enactment, Fish and Wildlife Service listed grizzly bears across the lower-48 United States as a threatened species. Amendment Listing the Grizzly Bear of the 48 Coterminous States as a Threatened Species, 40 Fed. Reg. 31,734 (July 28, 1975). Fish and Wildlife Service has long recognized that in order to conserve and recover grizzly bears, it must reduce human-caused mortality and curb habitat loss. U.S. Fish and Wildlife Service, Revised Grizzly Bear Recovery Plan (1993) ("Recovery Plan"), at ii.

63.    In 1993, Fish and Wildlife Service issued an updated Grizzly Bear Recovery Plan which designated distinct "recovery zones" for grizzly bear recovery in the lower 48 states, one of which is the Cabinet-Yaak Ecosystem. Id. at 81-98. The agency has determined that conserving and recovering grizzly bears in each of the recovery zones is essential to the conservation of the species. Id. at 15. The Cabinet-Yaak Ecosystem is a roughly 2,600-square-mile area of primarily

federal public lands in northwest Montana and northeastern Idaho, and includes the Black Ram Project area. Id. at 83. Fish and Wildlife Service has established a population size of 100 individuals as a minimum recovery goal for the Cabinet-Yaak grizzly population. 1993 Recovery Plan at 83.

64.    Today, the population in the Cabinet-Yaak Ecosystem falls far short of that goal of 100 individual grizzlies. See, e.g., 2022 Biological Opinion at 9. Based on outdated data and a flawed methodology that overestimates the population, as explained further below, the Forest Service and Fish and Wildlife Service estimate a population of 60 grizzly bears in the Cabinet-Yaak Ecosystem. Id.; Final EA at 300.

65.    Fish and Wildlife Service has acknowledged that "populations with fewer than 50 to 100 adult[] [grizzlies]," such as the population in the Yaak, "are at high risk of extinction."[3] The agency has cited one study that indicated the

---

[3] U.S. Fish & Wildlife Serv., Biological Opinion on the Effects to Grizzly Bears, Bull Trout, and Bull Trout Critical Habitat from the Implementation of Proposed Actions Associated with Plan of Operation for the Revett RC Resources Inc. Rock Creek Copper/Silver Mine, at A-16 (2006) ("2006 Rock Creek Mine Biological Opinion") (emphasis added) (citation omitted); see also Proctor, et al., (2012), Population Fragmentation and Inter-Ecosystem Movements of Grizzly Bears in Western Canada and the Northern United States, at 31, Wildlife Monographs 180:1–46 ("[P]opulations fewer than 50-100 adults are at higher risk of extirpation") (citations omitted).

likelihood of extinction for a grizzly bear population of 50 individuals with vital rates similar to the Cabinet-Yaak Ecosystem population was 85 percent.[4]

66.    Indeed, the current grizzly bear population in the Cabinet-Yaak Ecosystem persists only due to augmentation–translocation of bears from elsewhere. Five-Year Status Review at 8-9.

67.    Today, human killing of grizzly bears in the Cabinet-Yaak Ecosystem poses a leading threat to the grizzly population's survival and a major obstacle to significant population growth. 2022 Biological Opinion at 12. The risk of human-caused grizzly bear mortality increases proportionally with increased human presence in grizzly habitat. Most of these killings involve poaching, hunters misidentifying grizzlies as black bears, or people shooting grizzly bears because of a real or perceived need for self-defense. From 2007-2020, 75 percent of known grizzly deaths in the Cabinet-Yaak Ecosystem were caused by humans. See Kasworm et al. (2021), Cabinet-Yaak Grizzly Bear Recovery Area 2020 Research and Monitoring Progress Report, at 36.

---

[4] See 2006 Rock Creek Mine Biological Opinion at A-14 (citing Procter, et al., (2004), A comparative analysis of management options for grizzly bear conservation in the U.S. – Canada trans-border area, Ursus 15(2): 145-160).

68.     In March 2021, Fish and Wildlife Service published a five-year status review of the grizzly bear's status to evaluate the need for continued protection of the grizzly in the conterminous 48 states. Five-Year Status Review. The review concluded that the Cabinet-Yaak population of grizzlies is the most vulnerable of the four populations in the lower 48, with a current resilience of "low," due to the very low population numbers, low genetic diversity, and low fecundity of females. Id. at 7-9. The summary explains the tenuous nature of the grizzly population in the Cabinet Yaak ecosystem:

> The grizzly bear population in the CYE currently has low resiliency (Table 2, above). Despite high population trends and high and moderate adult female survival, the CYE currently has a very low numbers of bears, although this factor could improve as bears reproduce and expand in the future (Table 2, above). The CYE is a smaller ecosystem that is still slowly recovering from being close to historical extirpation, particularly in the Cabinets portion of the ecosystem . . . . This ecosystem also has a less diverse assortment of foods, particularly in the form of ungulate protein, although body fat levels indicate that individuals are relatively healthy (Kasworm et al. 2020a, pp. 55–56). Large intact blocks of land are also somewhat limiting in the CYE due to its overall smaller size. Even though there are large protected areas within the CYE (with 44 percent designated as Wilderness or IRAs), as well as additional protections outside the CYE recovery zone and conservation efforts on private lands that improve security for grizzly bears, habitat standards for motorized route densities have not yet been met in the CYE recovery zone, which limits the availability of large intact blocks of land in the CYE (Service 2021, pp. 220–221).

Id. at 8-9.

69.    The Status Review also indicates that Forest Service grizzly

management in the Cabinet-Yaak Ecosystem is less protective than elsewhere:

> Federal land managers have adopted land management plans that
> contain legally binding and enforceable science- and research-based
> measures and management practices designed specifically to conserve
> the grizzly bear in the lower-48 States, though these measures are not
> yet fully implemented in the CYE . . . .

Id. at 20. This is a reference to the fact that National Forests in the Cabinet-Yaak

Ecosystem have not yet complied with land management plan motorized access

components, and as a result these forests are failing to provide habitat for grizzlies

that is secure from motor vehicle disturbance. Id.

70.    The status review concluded that in almost every future scenario that

Fish and Wildlife Service reviewed, conditions in the Cabinet-Yaak Ecosystem

will inhibit overall grizzly bear recovery.

> Into the foreseeable future, the CYE and SE [Selkirk Ecosystem] have
> moderate to very low levels of resiliency, and only achieve high
> resiliency with the significantly improved conservation under
> Scenario 5 (Service 2021, p. 244). As a result, the CYE and SE only
> contribute moderate, to low, to very low levels of resiliency under
> four out of the five future scenarios (Service 2021, p. 244).

Id. at 21.

71.    The situation for the bears in Yaak Valley is even more precarious

than Fish and Wildlife Service's review indicates because the Yaak population of

grizzlies is genetically isolated from the grizzly population in the Cabinet

Mountains. The Yaak grizzlies thus function as a subpopulation standing at roughly half the size of the overall Cabinet-Yaak population. Katherine C. Kendall, et al., (2016), Density, Distribution, and Genetic Structure of Grizzly Bears in the Cabinet-Yaak Ecosystem, at 325, Journal of Wildlife Mgmt. 80(2) ("Our results indicated the grizzly bears in the Cabinet and Yaak regions were separate populations split along the Hwy 2 corridor" and "suggest[ed] complete spatial and reproductive isolation between these 2 populations, at least in recent generations"). According to Kendall, et al., (2016), just 18-22 grizzlies persist in the Yaak, id. at 314, which places that isolated group at serious risk of extirpation.

## III.   THE BLACK RAM PROJECT'S IMPACTS

72.    The Black Ram Project approved 1,783 acres of clearcuts, including 17 clearcuts larger than 40 acres in size. Final EA at 13; Black Ram Decision Notice (June 2022), Appx. A, at 1-3 (Decision Notice). One of the clearcuts approved would be 101 acres, the size of more than 75 football fields. Decision Notice, Appx. A, at 2. The Project involves a total of 3,902 acres of commercial logging, and an additional 7,553 acres of fuel treatments (burning and removing small trees). Decision Notice at 7. The Project will require up to 10 years' worth of intrusion by workers and vehicles engaged in logging, road construction and reclamation, and burning. Final EA at 279.

73.   The Black Ram Project authorizes logging within 579 acres of old growth forest, and burning another 343 acres. Decision Notice at 7. It would also fragment old growth with 0.8 miles of new road construction, and impact an additional 440 acres of mature forest, known as "recruitment potential old growth," with logging and burning. Id. at 7-8. The Project will also clearcut hundreds of acres of forest within the Rampike Creek area, which boasts trees as old as 230 years but which the Kootenai National Forest has concluded do not meet the agency's definition of "old growth." Final EA, Appx. A, at 86.

74.   Within river stretches eligible for protection as wild and scenic rivers and protected by special management provisions of the Kootenai Forest Plan, the Project also authorizes 454 acres of logging (including 274 acres of intermediate or regeneration (clearcut) logging, 177 acres of "slashing" trees up to 22 inches in circumference, and 3 acres of "fuel breaks," which may result in the complete eradication of trees), and an additional 200 acres of "ecosystem burning." Final EA at 12.

75.   The Black Ram Project authorizes slashing of understory vegetation on up to 200 acres, and 2,300 acres of prescribed burns, within inventoried roadless areas, which the Forest Service admits would impact roadless area values. Id. at 94, 154.

76.     The Project also authorizes logging and burning—including 11 timber harvest units—adjacent to over 7 miles of the Congressionally-designated Pacific Northwest National Scenic Trail. Id. at 201, 233. Logging would make it impossible for views along the Trail to meet Forest Plan "high" scenic integrity objective for up to 15 years. Id. at 234.

77.     The Forest Service admits that while logging will immediately degrade old growth and mature forests, bear habitat and other values, the threats such logging attempts to forestall or ameliorate—insect or disease epidemics, and wildfire—may never occur.

> While these events [e.g., wildfire, insect or disease epidemics] might occur, extreme conditions are not predictable, so it cannot be said, with reasonable certainty, whether these events would have an effect versus the action alternatives.

Id. at 128.

78.     The Forest Service concluded that the Project is "likely to adversely affect" grizzlies. Kootenai National Forest, Black Ram Biological Assessment (2020), at 1, 40.

79.     The Black Ram Project will occur near, and have overlapping impacts on grizzly bears and other values with, a trio of projects that, together with the Black Ram Project, impact a contiguous landscape of 240,000 acres of the Kootenai National Forest in the Cabinet-Yaak grizzly bear recovery zone. The

35

three projects include: the Knotty Pine Project (approved March 2022); the Lower

Yaak, O'Brien, Sheep Project (Lower Yaak) (approved circa 2016), and the

Buckhorn Project (approved circa 2014).

## IV.   THE FOREST SERVICE'S REVIEW AND APPROVAL OF THE BLACK RAM PROJECT

80.     In July 2018, the Kootenai National Forest issued a "scoping" notice

initiating its review of the Black Ram Project.

81.     Following scoping, in July 2019, the Kootenai National Forest issued

an EA on the project for public review. Each of the Plaintiff organizations

provided comments on the EA.

82.     The Kootenai National Forest issued what the agency labeled a "final

EA" and draft Decision Notice on approving the project on December 10, 2019.

83.     Pursuant to 36 C.F.R. § 218.8, each of the Plaintiff organizations filed

an objection to the final EA and draft Decision Notice in January 2020. The Forest

Service canceled this objection period on February 18, 2020 without resolving the

objections.

84.     On September 28, 2020, the Forest Service issued a new draft

Decision Notice, continuing to rely on the December 2019 Final EA. Pursuant to

36 C.F.R. § 218.8, each of the Plaintiff organizations filed an objection to the final

EA and draft Decision Notice in November 2020.

85.     On January 27, 2021, Deputy Regional Forester Keith Lannom issued a decision on all of the objections, including those of Plaintiff organizations, asserting that "the [Black Ram] project complies with all applicable laws and the Kootenai National Forest Plan (2015). The Forest Supervisor may sign the Decision Notice for this project as soon as he is in receipt of the Biological Opinion. My review constitutes the final administrative determination of the Department of Agriculture."

86.     Following the denial of all objections, Fish and Wildlife Service issued the 2021 Biological Opinion.

87.     On June 21, 2022, the Kootenai National Forest issued a new and Final EA. That same day Supervisor Chad Benson signed the Decision Notice and Finding of No Significant Impact approving the Black Ram Project and concluding that the Forest Service need not prepare an environmental impact statement. The Forest Service stated that the changes in the 2022 EA that were made after the pre-decisional objection process were minor, and were the result of public comments and corrections related to technical errors, omissions, or clarifications.

88.     Following issuance of the 2021 Biological Opinion and the June 21, 2022 Decision Notice, on June 30, 2022, Plaintiffs sent a 60-day notice of intent to sue to Fish and Wildlife Service and the Forest Service pursuant to section 11(g) of

37

the ESA, 16 U.S.C. § 1540(g). The 60-day notice alleged several violations of the ESA and the APA.

89.     On August 26, 2022, Fish and Wildlife Service issued the amended 2022 Biological Opinion and Incidental Take Statement. The agency noted that the 2022 Biological Opinion supersedes the 2021 Biological Opinion. Fish and Wildlife Service states in the 2022 Biological Opinion that it "does NOT incorporate any new information, nor does it change any of our determinations or decisions regarding the Black Ram Project," but that the 2022 BiOp "serves to clarify our rationale." 2022 Biological Opinion at 4 (emphasis in original).

90.     The Forest Service did not issue a new decision notice or EA following issuance of the amended 2022 Biological Opinion.

91.     The Final EA failed to address baseline conditions of the project area concerning grizzly bears, including, inter alia, failing to address the fact that the Yaak ecosystem bear population is effectively isolated from the Cabinet ecosystem population, and that impacts to even one female grizzly in the Yaak population could have significant impacts on the recovery of the Yaak and Cabinet-Yaak population of bears, particularly given that the tiny populations in both the Yaak and the Cabinet-Yaak. As noted above, Fish and Wildlife Service has

38

acknowledged that populations with fewer than 50 to 100 adult grizzlies, such as the population in the Yaak, are at high risk of extinction.

92. The Final EA failed to take a hard look at the Project's impacts on grizzly bears because the Forest Service failed to consider, inter alia, that displacement of bears over large areas being logged over a ten-year period could lead to mortality, and that increased vehicle use and increased human presence due to logging during the life of the Project, and the increase in road mileage, could lead to more bear mortality due to vehicle strikes, increased poaching or mistaken identity killing during black bear hunting season, or increased killing of bears due to other human-bear interactions.

93. The Final EA also failed to take the required hard look at the cumulative impacts of the Black Ram Project on grizzlies. Specifically, the Forest Service inappropriately limited its cumulative impacts analysis to impacts within the Black Ram Project area, despite the fact that: (1) grizzlies have large home ranges and so bears there will likely travel in and out of the project area, and actions beyond the project area may cumulatively impact bears; and (2) actions in Canada, which are directly adjacent to the project area and part of the Yaak ecosystem, are likely to impact grizzlies in the Yaak ecosystem together with the Black Ram Project. The Forest Service's decision to ignore the potential for

cumulative effects to bears beyond the boundaries of the Black Ram Project area is

even more arbitrary because the Forest Service relied on the total bear population

in the larger Cabinet-Yaak Ecosystem to assert that grizzly populations are stable.

94.    The Final EA evaluated three alternatives: the required "no action"

alternative; and two nearly identical action alternatives:

- the proposed action, Alternative 2, which would involve 1,783
  acres of clearcuts, 3,904 acres of total commercial logging; 7,553
  acres of fuel treatments outside logged areas, including 2,199 acres
  in inventoried roadless areas; 0.8 miles of road construction in old
  growth forest; and 90.3 miles of road reconstruction or
  maintenance; and

- Alternative 3, which would involve 1,833 acres of clearcuts (103%
  of that for Alt. 2), 3,577 acres of total commercial logging (92% of
  that for Alt. 2); 7,553 acres of fuel treatments outside logged areas,
  including 2,199 acres in inventoried roadless areas (identical to
  Alt. 2); 0 miles of road construction in old growth forest; and 89.4
  miles of road reconstruction or maintenance (99% of that for
  Alt. 2).

Final EA at 13-15. Although the Final EA evaluated two nearly identical

alternatives, it failed to review other alternatives proposed by Plaintiffs that would

have placed in sharp relief the costs and benefits of the Project, including: an

alternative that focused treatments in the wildland-urban interface; an alternative

that protects moist/wet old-growth forest types; an alternative that focuses

treatments in previously-logged stands; and an alternative that would result in more

40

wildlife security and less habitat disruption from road use and construction. The Final EA failed to provide a reasonable basis for rejecting any of these alternatives.

95.    To evaluate the Black Ram Project's impacts on climate change, including on carbon storage and sequestration, the Forest Service relied on a "Carbon Report" that ignored the last six years of climate science, and that dismissed the project's impacts on carbon storage as "infinitesimal," without attempting to quantify those impacts. The Forest Service also declined to quantify or otherwise analyze the greenhouse gas pollution emitted to implement the Project itself.

96.    The Final EA omitted from its cumulative impacts analysis the Knotty Pine Project and the Lower Yaak Project, and discounted the cumulative impacts from the Buckhorn Project.

97.    Despite the fact that the Project would involve numerous massive clearcuts, one more than 100 acres in size, and that the Project will harm (and has the potential to significantly impact) grizzly bears, inventoried roadless areas, the Pacific Northwest National Scenic Trail, river segments found eligible for wild and scenic river protection, and many other values, the Forest Service issued a Finding of No Significant Impact and concluded the agency need not prepare an environmental impact statement (EIS).

41

98.     In its media released with the June decision, the Forest Service stated that no harvest will occur until calendar year 2023 and only after additional core habitat is secured for grizzly bears. Other activities authorized by the decision have already begun. Harm to Plaintiffs' members' interests in protecting the Black Ram Project area is therefore imminent as a result of the Forest Service's decisions.

## V.     FISH AND WILDLIFE SERVICE'S BIOLOGICAL OPINION

99.     The purpose of the Biological Opinion is to assess the Project's impacts on grizzly bears and ultimately determine whether the Project is likely to jeopardize the continued existence of grizzly bears or result in the "take" of grizzly bears.

100.    The Final EA stated that the Cabinet-Yaak Ecosystem had an estimated population of 55-60 bears in 2017, an estimate that Fish and Wildlife Service adopts in the Biological Opinion. This estimate was calculated based on 2012 data plus an assumed annual population increase of 2.1% and the addition of three surviving bears augmented into the Cabinet Mountains. Kasworm et al. (2018), Cabinet-Yaak Grizzly Bear Recovery Area 2017 Research and Monitoring Progress Report, at 37.

101.    More recently, Kasworm et al. (2020) states that using all methods (DNA sampling in addition to credible observations, photos, and other methods),

42

they detected 54 individual grizzly bears in the CYE during 2018, with two of those bears known dead and another two assumed dead thus equaling a total of 50 identified grizzly bears. Kasworm et al. (2020) at 2.

102.   Using these same methodologies, a year later only 50 individual grizzly bears were identified, with five of those bears known dead, thus equaling a total of 45 known grizzly bears. Kasworm et al. (2021), Cabinet-Yaak Grizzly Bear Recovery Area 2020 Research and Monitoring Progress Report, at 2.

103.   While Fish and Wildlife Service points to a reduced mortality rate since 2006 to support its assumption that the population is growing each year, these reports from 2019 and 2020 show high mortality rates, a fact which the Service ignores. These reports indicate a likely decline in the population, not an increase as the Forest Service and Fish and Wildlife Service rely upon to produce the estimated grizzly bear population used to assess impacts in the Final EA and 2022 Biological Opinion.

104.   Moreover, the estimated annual growth rate of 2.1% used to estimate the population is flawed and unsupported. In calculating the growth-rate estimate, Kasworm et al. (2018) excluded survival and mortality data for the segments of the Cabinet-Yaak grizzly bear population that suffer the highest mortality rates—specifically adult and sub-adult males, management-trapped bears, and

augmentation bears. Kasworm et al. (2018) at 33-35 (summarizing survival rates for various population segments); id. at 10-11, 36 (describing basis for calculating growth rates). Kasworm et al. (2018)'s approach is akin to saying that the resident human population in Montana is growing by 2.1% annually based on an analysis that excludes mortality data for the elderly and chronically ill. Because the growth-rate estimate of 2.1% is based on a flawed methodology that likely overestimates population numbers, the resulting population estimate of 60 bears that relies upon this growth-rate is very likely inflated.

105.   Fish and Wildlife Service acknowledges in its own analysis that "[s]mall sample sizes yield a wide confidence interval around the[] population trend estimates" and that while "there is a 67 percent probability that the population is stable or increasing, . . . there is a 33 percent probability that the population is decreasing." 2022 Biological Opinion at 10. Despite this recognition, throughout its analysis Fish and Wildlife Service ignores the very relevant possibility that the Cabinet-Yaak population trend may not be increasing and continues to rely upon an outdated population estimate that is based upon a 2.1% growth rate. Fish and Wildlife Service also relies upon the unsupported assumption that the population trend is increasing in its no-jeopardy determination.

106.   Both the Forest Service and Fish and Wildlife Service also fail to consider how Project activities may cumulatively impact Yaak grizzly bears because grizzly bears in the Yaak portion of the Cabinet-Yaak Ecosystem are isolated from grizzly bears it the Cabinet Mountains area.

107.   All Project activities, including logging, prescribed burning, and road construction and reconstruction, will take place only within the Yaak portion of the Cabinet-Yaak Recovery Zone.

108.   The best available science shows that grizzly bears in the Yaak are completely isolated from grizzly bears in the Cabinets, with no connectivity or genetic exchange. Thus, grizzlies in the Yaak and grizzlies in the Cabinets act as two disjunct populations.

109.   Although Fish and Wildlife Service adds a short paragraph to the amended 2022 Biological Opinion noting that recent data indicates potential increasing connectivity, this data is referencing possible connectivity between bears in the Yaak and bears in Canada, not bears in the Yaak with those in the Cabinets. In any event, Fish and Wildlife Service's new acknowledgement that bears in the Cabinets are isolated from the bears in the Yaak area does not appear in any analysis discussing actual impacts to bears, including the jeopardy analysis. Fish and Wildlife Service thereby ignores the import of this information even

45

though the Black Ram Project is likely to disproportionately impact the small grizzly bear population in the Yaak Valley.

110.   The last population estimate for the Cabinet-Yaak Recovery Zone was 50 bears in 2019, five of which were known dead by the end of the year, leaving just 45 bears. Kasworm et al. (2021), at 2. Of these, 27 bears were detected in the Yaak, including 16 males, 7 females, and 4 of unknown sex. Id. It is unclear how many females remain in the Yaak, as it is possible one or more of the five grizzlies killed in 2019 included female bears in the Yaak.

111.   Moreover, on November 30, 2020, Montana Fish, Wildlife and Parks issued a press release stating that along with Fish and Wildlife Service that they were investigating the death of an adult female grizzly bear in the Yaak after finding the bear's carcass approximately four miles south of the Black Ram Project area.

112.   With so few females, the loss of one or more females in the Yaak could significantly impact this small grizzly bear population, but Fish and Wildlife Service does not discuss this reality or the risk this may have on the recovery of the struggling Yaak population. Fish and Wildlife Service does report, however, in the 2022 Biological Opinion that there are currently two known reproducing females that use the action area.

113.   Fish and Wildlife Service admits that the Project will displace grizzly bears but says it cannot estimate how many bears may be displaced. Fish and Wildlife Service has previously recognized that displacement of females and especially females with cubs may be of particular concern and that an increase in road density, even if temporary, can reduce grizzly bear fitness and survival. An increase in road density may also impact a female grizzly bear's feeding, sheltering, fitness, and reproductive capacity. Moreover, displaced females with cubs reduces cub survival because the risk of encountering infanticidal adult males increases and movement decreases the ability for cubs to maximize energy for growth and development.

114.   Given the large size and destructive nature of the Project for up to a ten-year period, many grizzly bears may leave the area in search of more secure habitat.

115.   Some bears displaced by the Black Ram Project may leave the Yaak Valley.

116.   Fish and Wildlife Service never analyzed whether the Black Ram Project could lead to extirpation of grizzly bears in the Yaak portion of that ecosystem or what that would mean for recovery of grizzly bears in the Cabinet-Yaak Recovery Zone as a whole.

117.   By only assessing impacts against the entirety of the grizzly bear population in the Cabinet-Yaak Ecosystem while ignoring impacts to the small disjunct population of grizzly bears residing in the Yaak, Fish and Wildlife Service's analysis superficially underestimates the impacts that the Black Ram Project could have on the Yaak Valley grizzly bear population.

118.   Even without these crucial analyses, however, Fish and Wildlife Service concludes that the Black Ram Project will not jeopardize grizzly bears.

## FIRST CAUSE OF ACTION
(NEPA & APA Violations: Failure to Take a Hard Look)

119.   The allegations in all preceding paragraphs are incorporated herein by reference.

120.   NEPA and its implementing regulations require federal agencies, including the Forest Service, to take a "hard look" at the environmental consequences of proposed actions and the reasonable alternatives that would avoid or minimize such impacts or enhance the quality of the human environment. See 42 U.S.C. § 4332(2)(C)(i); 40 C.F.R. Parts 1502 and 1508 (1978). Agencies must take a hard look at the direct, indirect, and cumulative impacts of a proposed agency action and all alternatives in an EA. 40 C.F.R. §§ 1508.7, 1508.8 (1978). The information presented in the EA must be of high quality and include "accurate

scientific analysis, and disclose that information and analysis, and its limitations, to the public. 40 C.F.R. § 1500.1(b)–(c) (1978).

121.   NEPA also requires environmental analysis to disclose existing conditions in the project area to provide a baseline against which the impacts of alternative courses of action can be compared. Id.

122.   The Forest Service failed to take the required "hard look" to consider and disclose the Black Ram Project's direct, indirect, and cumulative impacts, including impacts to the imperiled grizzly bear and impacts to–and from–climate change.

123.   For example, the Forest Service failed to disclose baseline conditions of grizzly bears in the project area, including, inter alia, basing the agency's analysis on the grizzly bear population in the combined Cabinet-Yaak ecosystem, when the Yaak ecosystem population is effectively isolated from the Cabinet ecosystem population. Given that the tiny population in both the Yaak and Cabinet-Yaak are so small that they are subject to extirpation with the loss of even one or two reproducing females, or harm to their reproductive success, the Forest Service was required to consider the risk of permanently harming the recovery of grizzly bears in the Yaak Valley.

124.   Further, the Forest Service failed to take a hard look at the cumulative impacts of the Black Ram Project together with other projects likely to impact grizzlies in the area. For example, the Forest Service inappropriately limited its cumulative impacts analysis to impacts within the Black Ram Project area, despite the fact that: (1) grizzlies have large home ranges and so bears there will likely travel in and out of the project area, and so actions beyond the project area may cumulatively impact bears; and (2) actions in Canada, which is directly adjacent to the project area and part of the Yaak ecosystem, are likely to impact grizzlies in the Yaak ecosystem together with the Black Ram Project.

125.   Regarding actions near and adjacent to the Black Ram Project area, and that will impact grizzly bears and other values within and beyond that project area, the Forest Service also inappropriately omitted from its cumulative impacts analysis two logging projects (the Knotty Pine Project and the Lower Yaak Project), and improperly discounted the cumulative impacts from the Buckhorn Project. These three projects, together with the Black Ram Project, impact a contiguous landscape of 240,000 acres of the Kootenai National Forest in the Cabinet-Yaak grizzly bear recovery zone.

126.   The Buckhorn Project area abuts the southern boundary of the Black Ram Project area. Buckhorn approved the removal of more than 15 million board

feet of commercial timber, and project implementation is ongoing. The Knotty

Pine Project area is located adjacent to and south of the Buckhorn Project, and is

less than 10 miles south of the southern boundary of the Black Ram Project.

Knotty Pine involves more than 5,000 acres of logging, including 2,900 acres of

commercial logging. The Forest Service is currently implementing Knotty Pine.

Conservation groups have challenged Knotty Pine in litigation before this court.

See Center for Biological Diversity v. Forest Service (D. Montana 22-CV-91-

DLC-KLD). The Lower Yaak Project area abuts the south end of the Knotty Pine

Project and is about 12 miles south of the southern boundary of the Black Ram

Project area. Implementation of the Lower Yaak Project is ongoing, and involves

road construction and removal of 38 million board feet of commercial timber.

Together with the Black Ram Project, these three ongoing projects are likely to

cumulatively impact grizzly bears and a variety of other values.

    127.   Climate impacts are among the impacts NEPA requires agencies to

consider and disclose. See, e.g., Center for Biological Diversity v. NHTSA, 538

F.3d 1172 (9th Cir. 2008); Mont. Envtl. Info. Ctr. v. United States Office of

Surface Mining, 274 F. Supp. 3d 1074 (D. Mont. 2017) (vacating and setting aside

mine plan modification in part due to agency's failure to quantify coal mine

climate pollution).

128.   The Black Ram EA fails to disclose adequately the climate change impacts of the Black Ram Project. Specifically, the Final EA fails to disclose the impacts of the proposed action alternatives on carbon storage compared to the no action alternative. Further, the EA fails to disclose the climate pollution impacts of project implementation – the use of fossil fuel engines to build roads, cut trees, and remove and transport cut logs to mills – compared to the no action alternative. The EA thus failed to take a "hard look" at the Black Ram Project's climate pollution impacts, in violation of NEPA.

129.   The Forest Service's failure to take the required "hard look" at the Project's direct, indirect, and cumulative impacts and the agency's failure to accurately disclose the baseline conditions violates NEPA. By relying on the defective EA and Finding of No Significant Impact for its decision, the Forest Service's action is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, which has substantially prejudiced Plaintiffs and accordingly must be held unlawful and set aside. 5 U.S.C. § 706(2)(A).

## SECOND CAUSE OF ACTION
(NEPA & APA Violations:  Failure to Prepare an Environmental Impact Statement)

130.   The allegations in all preceding paragraphs are incorporated herein by reference.

131.   NEPA requires federal agencies to prepare a full environmental impact statement (EIS) before undertaking "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The Ninth Circuit has held that "that an EIS must be prepared if 'substantial questions are raised as to whether a project . . . <u>may</u> cause significant degradation to some human environmental factor.'" <u>Idaho Sporting Cong. v. Thomas</u>, 137 F.3d 1146, 1149-50 (9th Cir. 1998) (citations omitted) (emphasis original).

132.   In evaluating whether to prepare an EIS, agencies address whether impacts may be "significant" by considering the "context" and "intensity" of a proposal's impact. 40 C.F.R. § 1508.27 (1978). Determining "intensity" requires the evaluation of numerous "significance" factors, including: (a) the "unique characteristics of the geographic area," including Wild and Scenic Rivers; (b) the degree to which the effects on the quality of the human environment are likely to be highly controversial; (c) the "degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks;" (d) "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts;" (e) "[t]he degree to which the action may adversely affect an endangered or threatened species;" and (f) whether the action

threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment. 40 C.F.R. § 1508.27(b) (1978).

133.   To avoid preparing an EIS, an agency must set forth a "convincing statement of reasons" explaining why the action will have no significant environmental impact. 40 C.F.R. § 1508.13 (1978). If the agency's action may be environmentally significant according to any of the criteria, the agency must prepare an EIS.

134.   The Forest Service failed to prepare an EIS to analyze the Project's impacts, despite the fact that, among other things: (1) the Black Ram Project may significantly harm unique characteristics of the area, including lands eligible for wild and scenic river designation, inventoried roadless areas, the Pacific Northwest National Scenic Trail, threatened and endangered species (including the grizzly bear), and their habitat, old growth and mature forest stands; (2) the Black Ram Project's effects on the environment are highly uncertain because the impacts the project seeks to forestall (beetle infestation and wildfire) may never occur; (3) logging mature and old growth forest that is already properly functioning habitat in an attempt to maintain or improve resilience to drought, insect and disease outbreaks, and wildfire is highly controversial and involves a high degree of scientific uncertainty; (4) the Black Ram Project, when combined with past and

reasonably foreseeable future neighboring timber sales may result in cumulatively significant impacts on the environment; (5) the Black Ram Project will adversely affect the grizzly bear, a threatened species; and (6) the Black Ram Project is inconsistent with the Kootenai's Forest Plan components imposed for the protection of the environment, threatening a violation of NFMA.

135.   The Forest Service's Finding of No Significant Impact and its failure to complete an EIS, despite the fact that the Black Ram Project may significantly affect the quality of the environment, violates NEPA and is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

## THIRD CAUSE OF ACTION
(NFMA & APA Violations: Project is Inconsistent with Kootenai Forest Plan)

136.   The allegations in all preceding paragraphs are incorporated herein by reference.

137.   NFMA requires the Forest Service to ensure that its site-specific actions comply with the requirements of the governing Forest Plan. 16 U.S.C. § 1604(i). The Kootenai Forest Plan includes plan components for timber harvesting and vegetation management. It also contains management-area plan components, including components specific to river segments identified for inclusion as part of the Wild and Scenic Rivers System.

138.   The Forest Service failed to ensure the Black Ram Project complies with the Kootenai Forest Plan's desired conditions, standards, and guidelines, in violation of NFMA, including the following failures:

      a.   Authorizing timber harvest in eligible wild river segments, as prohibited by Forest Plan standard MA2-STD-TBR-01.

      b.   Authorizing logging within 579 acres of old growth stands and 0.8 miles of new road construction through old growth forest, contrary to Forest Plan standard FW-STD-VEG-01.

139.   By failing to ensure compliance with the Kootenai Forest Plan, the Forest's action approving the Black Ram Project through the EA and Finding of No Significant Impact and Decision Notice is arbitrary, capricious, an abuse of discretion, and not in accordance with the law, which has substantially prejudiced Plaintiffs, and accordingly must be held unlawful and set aside. 5 U.S.C. § 706(2).

## FOURTH CAUSE OF ACTION
(ESA Violation: Failure to Use the Best Available Science and Accurate Baseline)

140.   During consultation, Fish and Wildlife Service must review all relevant information available, and in doing so must evaluate the current status and environmental baseline of the listed species. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. §§ 402.14(g)(1), (2).

141.   Further, in analyzing impacts from a project on listed species in a biological opinion, the ESA requires that Fish and Wildlife Service utilize the "best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d).

142.   In the Black Ram Biological Opinion, Fish and Wildlife Service used an estimated population of 60 grizzly bears in the Cabinet-Yaak Ecosystem to assess impacts from the Project. See 2022 Biological Opinion at 9 (citing Kasworm et al. (2021)). This 60 population estimate relies upon a 2.1% growth rate to the midpoint of the population range estimate reported in Kendall et al. (2016) (in which the authors reported a 2012 population estimate of 48-50 bears). This 2.1% growth rate is seriously flawed because it excludes survival and morality data for adult and sub-adult males, management-trapped bears, and augmentation bears. See Kasworm et al. (2021) at 10-12 (calculating the population growth rate based on adult and subadult female survival, yearling and cub survival, age at first parturition, reproductive rate, and maximum age of reproduction). By excluding survival and mortality rates for segments of the bear population that are likely to suffer the highest mortality rates, Fish and Wildlife Service relied on a flawed growth rate that is likely to cause an inflated population estimate. Thus, the

population estimate of 60 bears is not only outdated but is also based upon flawed assumptions that do not reflect the best available science.

143.   Fish and Wildlife Service also ignores recent information from 2018-2020 indicating a likely declining population in the Cabinet-Yaak Ecosystem

144.   Even while relying on an inflated population estimate, Fish and Wildlife Service acknowledges that there is a 33 percent probability that the population is decreasing. Despite this recognition, Fish and Wildlife Service uses the 60 grizzly bear estimate that is derived from a 2.1% growth rate from 2012 numbers to assess impacts from the Project.

145.   Also, despite its own data showing there is a 33 percent probability that the Cabinet-Yaak Ecosystem grizzly bear population is decreasing, Fish and Wildlife Service relies upon the unsupported assumption that the population trend is increasing in its no-jeopardy determination.

146.   Because Fish and Wildlife Service ignores flaws in the methodology used to derive the population estimate and ignores new data showing that the grizzly bear population in the Cabinet-Yaak is likely decreasing, Fish and Wildlife Service has failed to use the best available science and has not produced an accurate baseline against which to assess the Project's impacts, in violation of the

ESA. See 16 U.S.C. § 1536(a)(2); id. § 1536(b)(3)(A); 50 C.F.R. §§ 402.14(d); id.

§§ 402.14(g)(1), (2).

**FIFTH CAUSE OF ACTION**

(ESA and APA Violation: Failure to Consider an Important Factor)

147.   The best available science shows that grizzly bears in the Yaak Valley

and grizzly bears in the Cabinet-Mountains are completely isolated from each other

with no genetic exchange, and thus they function as two disjunct populations.

148.   The Black Ram Project area lies only within the Yaak Valley portion

of the Cabinet-Yaak Recovery Zone and thus will disproportionately impact

grizzly bears in the Yaak.

149.   Fish and Wildlife Service never analyzes the lack of connectivity

between grizzly bears in the Yaak and grizzly bears in the Cabinets, and how the

Project is likely to disproportionately impact grizzly bears in the Yaak.

150.   Fish and Wildlife Service only looked at impacts of the Project on the

entire population of grizzly bears in the Cabinet-Yaak Recovery Zone, never

considering the impacts on the small and isolated population of grizzly bears in the

Yaak Valley.

151.   Fish and Wildlife Service never analyzed whether the Black Ram

Project could lead to or increase the chances of extirpation of grizzly bears in the

Yaak Valley.

59

152.   Fish and Wildlife Service never analyzed what a significant reduction of grizzly bears in the Yaak Valley could mean for recovery of grizzly bears in the Cabinet-Yaak Recovery Zone as a whole.

153.   Because Fish and Wildlife Service failed to acknowledge the disproportionate impacts that the Black Ram Project will have on the isolated Yaak Valley population, or analyze what that could mean for the future of this small grizzly bear population, Fish and Wildlife Service has entirely failed to consider an important aspect of the problem, rendering the Biological Opinion arbitrary and capricious and contrary to law. 5 U.S.C. § 706(2)(A); State Farm, 463 U.S. at 43.

## SIXTH CAUSE OF ACTION
(ESA Violation: Fish and Wildlife Service Fails to Support Its No-Jeopardy Finding)

154.   Section 7 of the ESA requires each federal agency, in consultation with a federal wildlife agency, (Fish and Wildlife Service for the grizzly bear), to insure that any proposed action is not likely to jeopardize the continued existence of a listed species, or result in the destruction or adverse modification of critical habitat. 16 U.S.C. § 1536(a)(2). To "jeopardize the continued existence of" means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both survival and recovery of a listed species

in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.

155.   The Ninth Circuit has made clear that a species may be jeopardized even "if there is no appreciable reduction of survival odds" because "a species can often cling to survival even when recovery is far out of reach." Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv., 524 F.3d 917, 931 (9th Cir. 2008), superseded by statute on other grounds, as stated in Sovereign Inupiat for a Living Arctic v. Bureau of Land Mgmt., 21-CR-20290, 2021 U.S. Dist. LEXIS 1555471, at *75 (D. Alaska Aug. 18, 2021). Thus, Fish and Wildlife Service "must analyze effects on recovery as well as effects on survival." Id. at 932.

156.   Under the ESA, "[r]ecovery means improvement in the status of listed species to the point at which listing is no longer appropriate under the criteria set out in section 4(a)(1) of the Act." 50 C.F.R. § 402.02. Moreover, the regulations make clear that "reducing the reproduction" of a species may constitute jeopardizing the survival or recovery of that species. Id.

157.   As Fish and Wildlife Service recognizes in the Biological Opinion, "[p]ursuant to Service policy, when an action impairs or precludes the capacity of a recovery unit from providing both the survival and recovery function assigned to it, that action may represent jeopardy to the species (U.S. Fish and Wildlife Service

memo, March 6, 2006)." 2022 Biological Opinion at 7. Thus, an agency action that negatively impacts the survival or recovery or grizzly bears in the Cabinet-Yaak Recovery Zone may be sufficient to lead to a positive jeopardy finding, even if the action does not cause jeopardy across the grizzly bear's entire range in the lower 48 States.

158.   There are currently two known reproducing females that use the action area. Fish and Wildlife Service noted that during project implementation, administrative use limits on restricted roads will increase Open Motorized Route Density and Total Motorized Route Density, and "female grizzly bears are expected to experience significant effects to feeding, breeding, or sheltering." 2022 Biological Opinion at 51. Further, Fish and Wildlife Service acknowledged that female grizzly bears may be displaced as a consequence of the Project and that reproductive success for females may be negatively affected for at least 3-5 bear years, potentially affecting reproductive cycles for adult female grizzly bears. Id. at 52-53.

159.   These impacts are of especially significant import for grizzly bears because they have one of the slowest reproductive rates among terrestrial mammals, as a result of a late age of first reproduction, small average litter sizes,

and a long inter-birth interval. Given these factors it may take a female grizzly bear ten or more years to replace herself in a population.

160.   In the Cabinet-Yaak Recovery Zone, several recovery goals set in the 1993 Recovery Plan have not been met including criterial related to occupancy and reproduction by female grizzly bears. Thus, the impact to 1-2 reproductive cycles for at least two currently reproductive adult females using the project area could seriously impair meeting recovery goals.

161.   Despite this information, Fish and Wildlife Service arbitrarily concluded that because impacts will be temporary, the Black Ram Project will not reduce the reproduction of grizzly bears in the recover zone, and therefore, the Project will not lead to jeopardy. See id. at 55 ("Because the Black Ram Project will not reduce the reproduction, numbers, or distribution of grizzly bears throughout the [Cabinet-Yaak Ecosystem] population as well as other grizzly bear populations in the lower 48, we conclude that the level of adverse effects is not reasonably expected to reduce appreciably the likelihood of both the survival and recovery of the listed entity of grizzly bears as a whole."). In reaching this conclusion, not only did Fish and Wildlife Service gloss over the impacts on reproductive females in the project area, but Fish and Wildlife Service ignored its own policy that requires the agency to determine whether project impacts would

63

impact the survival and recovery of grizzly bears in the Cabinet-Yaak Recovery

Zone alone, not just "the listed entity of grizzly bears as a whole."

162.   Fish and Wildlife Service failed to rationally determine, based on a

consideration of all relevant factors, whether the Black Ram Project will jeopardize

the survival of the grizzly bear population in the Cabinet-Yaak Recovery Zone. See

Ctr. for Biological Diversity v. BLM, 698 F.3d 1101, 1121 (9th Cir. 2012). By

applying the incorrect standard to reach its jeopardy conclusion in failing to

consider the survival and recovery impacts to the grizzly bear population in the

Cabinet-Yaak Recovery Zone and by ignoring how impacts to reproductivity will

impair recovery in this recovery zone, Fish and Wildlife Service reached a

jeopardy conclusion that is arbitrary and capricious, in violation of the ESA and

APA. 16 U.S.C. § 1536(a)(2); 5 U.S.C. § 706(2)(A).

163.   Moreover, as described more fully above, Fish and Wildlife Service

failed to rely on the best available science and data in its jeopardy analysis, relying

on the unsupported conclusion that the Cabinet-Yaak grizzly bear population is

increasing. The difference between an increasing population trend, decreasing

population trend, or stagnant level is a key and relevant factor to Fish and Wildlife

Service's no-jeopardy determination. Because Fish and Wildlife Service failed to

consider the best available science in analyzing the Cabinet-Yaak grizzly bear

population trend, Fish and Wildlife Service's no-jeopardy determination is

arbitrary. The facts found do not rationally support Fish and Wildlife Service's

conclusion. 16 U.S.C. § 1536(a)(2); 5 U.S.C. § 706(2)(A); 50 C.F.R. § 402.14(d).

## SEVENTH CAUSE OF ACTION
(ESA and APA Violation: The Forest Service May Not Lawfully Rely on the
Flawed Biological Opinion)

164.   The Forest Service cannot rely on a faulty biological opinion to fulfill

its substantive Section 7 duties to insure it does not jeopardize the continued

existence of a listed species. See Defs. of Wildlife v. Envtl. Prot. Agency, 420 F.3d

946, 976 (9th Cir. 2005) (rev'd on other grounds, Nat'l Ass'n of Home Builders v.

Defs. of Wildlife, 551 U.S. 664 (2007)); Resources Ltd. Inc. v. Robertson, 35 F.3d

1300, 1304 (9th Cir. 1994) ("Consulting with the Fish and Wildlife Service alone

does not satisfy an agency's duty under the Endangered Species Act."). The Forest

Service violates the ESA if it approves or implements an action in reliance on a

legally flawed biological opinion or fails in its approval or implementation

decision "to discuss information that would undercut the [biological] opinion's

conclusion." Ctr. for Biological Diversity v. BLM, 698 F.3d at 1127-28; accord

WildEarth Guardians v. Steele, 545 F.Supp.3d 855, 880 (D. Mont. 2021).

165.   Because the 2022 Biological Opinion was arbitrary and unlawful for

the reasons stated above, the Forest Service's reliance on this inadequate

Biological Opinion in authorizing the Black Ram Project was likewise unlawful.

See Ctr. for Biological Diversity v. BLM, 698 F.3d at 1127-28.

166.   The Black Ram Project Decision Notice and Finding of No

Significant Impact relying on the unlawful Biological Opinion are therefore

arbitrary, capricious, and not in accordance with law and should be set aside

pursuant to the ESA and APA. 16 U.S.C. § 1540(g); 5 U.S.C. § 706(2).

## **PRAYER FOR RELIEF**

Plaintiffs respectfully request that this Court enter judgment in their favor

and against Defendants and provide the following relief:

1.   Declare that Defendants U.S. Forest Service, Regional Forester

Marten in her official capacity, and Forest Supervisor Chad Benson in his official

capacity violated NEPA, regulations implementing NEPA, NFMA, the ESA, and

the APA in approving the Black Ram Project;

2.   Declare that Defendants U.S. Fish and Wildlife Service, Secretary

Deb Haaland in her official capacity, Director Martha Williams in her official

capacity, and Supervisor Adam Zerrenner in his official capacity violated the ESA

and APA in approving the Black Ram Biological Opinion;

3.   Declare unlawful, set aside, and vacate the Defendant U.S. Fish and

Wildlife Service's Biological Opinion;

4.      Declare unlawful, set aside, and vacate the Defendants U.S. Forest Service's Decision Notice, Finding of No Significant Impact, and 2022 Final EA analyzing and/or approving the Black Ram Project;

5.      Order the Forest Service to prepare an EIS;

6.      Grant Plaintiffs such temporary restraining orders or preliminary injunctions as they may request;

7.      Award Plaintiffs costs and reasonable attorney's fees as authorized by the Equal Access to Justice Act, 28 U.S.C. § 2412(d) and any other statute;

8.      Retain jurisdiction of this action to ensure compliance with its decree; and

9.      Provide such other declaratory and injunctive relief as the Court deems just and proper.

Respectfully submitted December 2, 2022.

*/s/ Ronni M. Flannery*
Ronni M. Flannery
LAW OFFICE OF RONNI M. FLANNERY
936 South 2nd Street, West
Missoula, MT 59801
(406) 214-5700
rflannery@bresnan.net

Edward B. Zukoski (*Admitted Pro Hac Vice*)
CENTER FOR BIOLOGICAL DIVERSITY
1536 Wynkoop Street, Suite 421
Denver, CO  80202
(303) 641-3149
tzukoski@biologicaldiversity.org

Andrea Zaccardi (*Admitted Pro Hac Vice*)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 469
Victor, ID  83455
(303) 854-7748
azaccardi@biologicaldiversity.org

*Counsel for Plaintiffs Center for Biological Diversity, Yaak Valley Forest Council, and WildEarth Guardians*

Marla Fox (*Admitted Pro Hac Vice*)
WILDEARTH GUARDIANS
P.O. Box 13086
Portland, OR 97213
(651) 434-7737
mfox@wildearthguardians.org

*Counsel for Plaintiff WildEarth Guardians*