# Exhibit 5
# Buckhorn Project Final EIS

United States
Department of
Agriculture

Forest
Service

April 2014

# Buckhorn Project

## Final Environmental Impact Statement



## Three Rivers Ranger District
## Kootenai National Forest
## Lincoln County, Montana

The U.S. Department of Agriculture (USDA) prohibits discrimination in all its programs and activities on the basis of race, color, national origin, gender, religion, age, disability, political beliefs, sexual orientation, or marital or family status. (Not all prohibited bases apply to all programs.) Persons with disabilities who require alternative means for communication of program information (Braille, large print, audiotape, etc.) should contact USDA's TARGET Center at (202) 720-2600 (voice and TDD). To file a complaint of discrimination, write USDA, Director, Office of Civil Rights, Room 326-W, Whitten Building, 14th and Independence Avenue, SW, Washington, DC 20250-9410 or call (202) 720-5964 (voice and TDD). USDA is an equal opportunity provider and employer.

# Buckhorn Project
# Final Environmental Impact Statement

**Lead Agency:** USDA Forest Service

**Responsible Official**
Pam Gardner, Forest Supervisor
Kootenai National Forest Service
31374 US Highway 2
Libby, MT 59923

**Responsible for EIS Preparation:**
Kirsten A. Kaiser, District Ranger
Three Rivers Ranger District
12858 US Highway 2
Troy, MT 59935

**For Further Information Contact:**
Sarah Canepa, NEPA Coordinator
Three Rivers Ranger District
(406) 295-4693

Abstract: This Final Environmental Impact Statement (FEIS) displays the status of the analysis since the release of the Buckhorn Draft Environmental Impact Statement (DEIS) in February 2014. Chapter 4 of this FEIS discusses the modifications that have been made to Alternative 2, the agency preferred alternative, since receipt of public comments on the DEIS and errata to the DEIS. Chapter 5 provides a public involvement and collaboration summary, displays a list of comments received on the DEIS, and provides a list of the recipients of the FEIS. This document also includes a map of Alternative 2, with modifications, and three appendices that show the modifications made to proposed treatments, design features, and monitoring for Alternative 2.

# Table of Contents

## Chapter 4 – Purpose and Need

Introduction ... 1
Modifications to Alternative 2 ... 1
DEIS Errata ... 5

## Chapter 5 – Public Involvement

Public Involvement and Collaboration Summary ... 15
Response to Comments on the DEIS ... 16
Road Side Screening and Leave Islands ... 16
NEPA and General Comments ... 21
Forest Vegetation ... 33
Wildlife ... 34
Fisheries/Water ... 41
Soils ... 43
Noxious Weeds ... 44
Fire/Fuels ... 45
Air Quality ... 46
Literature Cited in the Response to Comments ... 47
List of Recipients ... 49

## MAPS

Map of Alternative 2, with modifications ... M-A

## APPENDICES

Appendix 1 - Treatment Summary Table, Alternative 2, with modifications ... 1-1
Appendix 2 – Design Features, Alternative 2, with modifications ... 2-1
Appendix 3 – Monitoring Plan, Alternative 2, with modifications ... 3-1

**GIS DISCLAIMER**

The Forest Service uses the most current and complete data available. GIS data and product accuracy may vary. They may be: developed from sources of differing accuracy, accurate only at certain scales, based on modeling or interpretation, incomplete while being created or revised, etc. These maps are to be used as a reference only, and are not intended for use in site-specific planning. Using GIS products for purposes other than those, for which they were created, may yield inaccurate or misleading results. The Forest Service reserves the right to correct, update, modify, or replace GIS products without notification. For more information, contact Three Rivers Ranger District.

# Chapter 4 – Changes between Draft and Final

## Introduction

The Buckhorn Project Draft Environmental Impact Statement (DEIS) was released to the public for comment on February 7, 2014. The DEIS disclosed the analysis of effects related to the environmental impacts of four alternatives, no action alternative, the proposed action, an alternative that addressed concerns about the size of regeneration harvest units, and an alternative that addressed concerns about 560 acres of proposed harvest in conflict with proposed legislation of the Forest Jobs and Recreation Act.

This Final Environmental Impact Statement (FEIS) displays the status of the analysis since the release of the DEIS. Chapter 4 discusses the modifications that have been made to Alternative 2, the agency preferred alternative, since receipt of public comments on the DEIS and errata to the DEIS. Chapter 5 provides a public involvement summary, displays a list of comments received on the DEIS, provides agency responses to these comments, and provides a list of the recipients of the FEIS. This document also includes the following:

Map - Alternative 2 with modifications
Appendix 1 - Treatment Summary Table for Alternative 2, with modifications;
Appendix 2 - Design Features for Alternative 2, with modifications,
Appendix 3 - Monitoring Plan for Alternative 2, with modifications;

The FEIS only includes those appendices where modifications were made, the reader should refer to the DEIS for further information about environmental effects.

## Modifications to Alternative 2

In response to public comment and additional resource concerns identified in the field, the following modifications have been made to Alternative 2, the agency preferred alternative.

1. In response to public comments requesting additional leave islands and roadside screening in units along open roads, district specialist have reviewed the unit design and location to determine further actions to contribute roadside screening. The following activities are proposed in harvest units 1, 10, 12, 13, 14A, 15, 16, and 16A, when the existing conditions and operator feasibility allow:
    - Screening would occur through leave islands, retention of hardwoods and brush; and where species composition, slope, aspect and fuel accumulations will assist to provide screening;
    - Retention of small diameter residual trees would occur within view of roadways to “break up and soften” the view of harvest and fuel treatment activities;
    - Landings would be located off roads and within harvest units to reduce their visual impact;
    - The timber sale administrator and the purchaser/field representatives will work together, based on site-specific skid patterns and landing locations, to provide roadside screening that could be maintained through the active logging operations;
    - Prescribed burning of harvest units would avoid ignitions directly into the roadside screening areas. Radiant heat and existing ground fuels may make it difficult to

prevent mortality of the screening vegetation but ignition patterns (identified on site specific burn plans) are designed to minimize mortality.

These proposed changes would be included in the Design Features (FEIS Appendix 2) to be addressed during implementation of the project.

2. In response to public comment requesting more information about the monitoring of huckleberry response to prescribed burning, the team has added monitoring item #10 that commits the district to monitoring huckleberry plants in conjunction with whitebark pine monitoring in the prescribed burns. This proposed change will be included in the Monitoring Plan (FEIS Appendix 3)

3. In response to public comment requesting a commitment from the district to notify the public of prescribed burn activities, the team has included a design feature that explains the general procedures that the district uses to notify the public and local residents prior to prescribed burning activities These proposed changes would be included in the Design Features (FEIS Appendix 2).

4. In the DEIS, Unit 14 was originally analyzed for summer tractor harvest. Additional field review by specialist identified concerns about high soil moisture and subsurface water flow in Unit 14. In response to these concerns, the team has proposed that three separate units be created from the harvest unit that was originally analyzed as Unit 14 and that the reconfiguration of these units would look as follows:
   - Unit 14A would be a 10 acre unit with required winter logging with excavator piling prescribed for fuels treatment.
   - Unit 14B would be a 23 acres unit with underburning prescribed for fuels treatment.
   - Unit 14 would be a 245 acre unit with required winter logging where portions will have excavator piling and portions will have underburning for fuels treatment.

   These changes in logging methods will decrease the expected project soil disturbance from 9 percent to 6 percent, with an expected cumulative soil disturbance in these units decreasing from 12 percent to 9 percent. The unit reconfiguration is shown in the FEIS, Appendix 1-Activity Summary, and FEIS, Map of Alternative 2 with modifications.

Table 4.1 below displays a comparison of the activities by alternative.

It is the decision maker's determination that the changes to Alternative 2 are minor and within the scope and context of the environmental effects disclosed in the EIS and project file. It is sufficient and appropriate to file the DEIS (February 2014) with the FEIS (April 2014) as the final documentation for this project (40 CFR 1500.4(m)).

**Table 4.1 – Comparison of Proposed Activities by Alternative**

| Proposed Activities | | Alt. 1 (No Action) | Alt. 2 (Modifications) | Alt. 3 | Alt. 4 |
|---|---|---|---|---|---|
| Regeneration Harvest* | (acres) | 0 | 1,250 | 876 | 668 |



FS-047275

| Proposed Activities | | Alt. 1 (No Action) | Alt. 2 (Modifications) | Alt. 3 | Alt. 4 |
|---|---|---|---|---|---|
| Intermediate Harvest** | (acres) | 0 | 13 | 13 | 13 |
| **Total Harvest** | **(acres)** | **0** | **1,263** | **889** | **681** |
| **Total Harvest Volume** | **(MMBF/CCF)** | **0** | **15.7/30,438** | **10.5/20,463** | **8.3/16,078** |
| Yard Tops and Excavator Pile | (acres) | 0 | 513 | 287 | 185 |
| Yard Tops and Underburning | (acres) | 0 | 750 | 602 | 498 |
| **Total Fuels Treatment** | **(acres)** | **0** | **1,263** | **889** | **681** |
| **Total Prescribed Burning without harvest** | **(acres)** | **0** | **11,623** | **11,623** | **11,623** |
| Temporary Roads | (miles) | 0 | 1 | 1.1 | 0.5 |
| Best Management Practices | (miles) | 0 | 23 | 23 | 16 |
| **Total Harvest Related Road Work** | **(miles)** | **0** | **24** | **24.1** | **16.5** |
| Intermittent Stored Service | (miles) | 0 | 23 | 23 | 23 |
| Decommissioning | (miles) | 0 | 9 | 9 | 9 |
| **Total Road Stabilization Work** | **(miles)** | **0** | **32** | **32** | **32** |
| **Roads to be Added to the NFS System** | **(miles)** | **0** | **9** | **9** | **9** |
| **Forest Plan Management Area 12 Amendment for Open Road Density (ORD)*** ** | | **No** | **Yes** | **No** | **Yes** |

*Regeneration Harvest Prescriptions: Seedtree Cut, Shelterwood Cut, Clearcut with Reserves

**Intermediate Harvest Prescriptions: Improvement Cut

*** See DEIS p.14, 34, and 276-292 for discussion on the Forest Plan Amendment to MA 12

Table 4.2 below displays a comparison of the alternatives and their ability to meet the purpose and need objectives identified for the Buckhorn Project.

**Table 4.2 – Comparison of Purpose and Need Objectives by Alternative**

| Purpose and Need Objective | | Alt. 1 (No Action) | Alt. 2 (Modifications) | Alt. 3 | Alt. 4 |
|---|---|---|---|---|---|
| **Promote resilient vegetation conditions by managing towards characteristic landscape level vegetation patterns, structure, patch size, fuel loading, and species composition.** | | | | | |
| Promote White Pine and Western Larch | (acres) | 0 | 1,694 | 1,320 | 1,112 |
| Improve Huckleberry Habitat Areas | (acres) | 0 | 11,376 | 11,231 | 11,306 |
| Improve Big Game Forage | (acres) | 0 | 12,873 | 12,499 | 12,291 |
| Characteristic Patch size in (number of burn and harvest units that achieve this) | (acres) | 0 | 12,619 (26 units)* | 11,596 (17 units) | 12,005 (21 units) |
| **Maintain or improve water quality and native aquatic species habitat** | | | | | |
| BMP work on haul roads | (miles) | 0 | 23 | 23 | 23 |
| Intermittent Stored Service | (miles) | 0 | 23 | 23 | 23 |

| Purpose and Need Objective | Alt. 1 (No Action) | Alt. 2 (Modifications) | Alt. 3 | Alt. 4 |
|---|---|---|---|---|
| Decommissioning (miles) | 0 | 9 | 9 | 9 |
| **Provide wood products to contribute to local and regional economies** | | | | |
| Timber Volume (MMBF/CCF) | 0 | 15.7/30,438 | 10.5/20,463 | 8.3/16,078 |

*Harvest units that achieve this Purpose and Need include = 9, 9a, 9b, 10, 11, 12, 13, 14, 15, 16, 16a, 19

All burn units except G-1 achieve this Purpose and Need and are common to Alternatives 2, 3, and 4. Burn unit G-1 was determined not to restore a characteristic patch size but would benefit wildlife habitat and address fuel loading.

Table 4.3 below displays a comparison of the alternatives in responding to key issues.

**Table 4.3 – Comparison of Alternative by Measurement Indicators**

| Key Issues | Alt. 1 (No Action) | Alt. 2 (Modifications) | Alt. 3 | Alt. 4 |
|---|---|---|---|---|
| **Issue #1 - Effects of large openings** | | | | |
| **Measurement Indicator 1:** Number of regeneration openings greater than 40 acres proposed in MA 11 (big game winter range) and MA 12 (big game summer range) | 0 | 9 | 0 | 4 |
| **Measurement Indicator 2:** The cover/forage ratio in MA11 and 10 (big game winter range). Forest Plan Standard 30/70 (see Chapter 3, Wildlife) | 87/13 | 84/16 | 85/15 | 85/15 |
| **Measurement Indicator 3:** The cover/forage ratio in MA 12 (big game summer range) Summerfield Recommendation 60/40 (See Chapter 3, Wildlife) | 88/12 | 81/19 | 85/15 | 86/14 |
| **Issue #2 – Effects of timber harvesting on the proposed Three Rivers Special Management Area in the Forest Jobs and Recreation Act of 2013** | | | | |
| **Measurement Indicator:** Acres of timber harvest proposed in the Three Rivers Special Management Area of the Forest Jobs and Recreation Act of 2013 (FJRA). | 0 | 582 | 343 | 0 |

# DEIS Errata

This section contains a listing of minor corrections to the Buckhorn Project DEIS and additional information that supports the environmental analysis. Underlined and italicized print indicates a specific correction. These changes were reviewed by the Responsible Official and were determined to not affect the conclusions presented in the DEIS.

## DEIS, Chapter 3 p. 191

Table 3.39 had two column headings labeled incorrectly and should read as follows:

**Table 3. 1 - Existing critical habitat PCE conditions[1] within the Buckhorn project area LAUs**

| LAU Name (Number) | LAU Total Acres | *Multistory Forage*[2] | *Stand Initiation Forage*[3] | Matrix (Movement)[4] |
|---|---|---|---|---|
| Baldy (14403) | 34,168 | 22,725 (66%) | 3,381 (10%) | 4,298 (13%) |
| Thunder (14406) | 33,719 | 18,498 (55%) | 5,172 (15%) | 7,102 (21%) |

[1] Habitat types presented are only those that contribute to the critical habitat PCE. Other habitat types that have the potential to develop habitat conditions preferred by snowshoe hares, but are currently unsuitable are also found within the project area. These habitats comprise the remaining 11 and 9 percent of the Baldy and Thunder LAUs, respectively.
[2] Young stand where the vegetative growth is sufficient to protrude above the snow and provides winter snowshoe hare habitat.
[3] Mature multistory stands that include many age classes and vegetation layers that provide winter snowshoe hare habitat.
[4] Habitat types that do not support snowshoe hares but allow for lynx movement between associated patches of boreal forest.

## DIES, Chapter 3, p. 194

The last sentence on p. 194 that continues on to 195 should read as follows:

> Depending on the alternative, between *181* to *492* acres of regeneration harvest could contribute early successional habitat to the landscape mosaic and provide preferred snowshoe hare habitat conditions in about 15 years.

## DEIS, Chapter 3, p. 230

The first sentence should read as follows:

> The silvicultural prescription for all harvest units is to leave *existing* snags *as well as large diameter live trees* showing existing wildlife use, preferably in groups or in proximity to leave trees.

## DEIS, Chapter 3, p. 230

In the third paragraph under the heading ***Grizzly Timber Sale Road Reconstruction*** a road number was misidentified and should read as follows:

> Approximately 0.3 mile of Road 435*X* is located within the Spread Creek watershed.

## DEIS, Chapter 3, p. 412-417

The Noxious Weeds analysis provides information about the Regulatory Framework for noxious weed management. This information is updated to include:

The principal statutes governing or supporting the management of aquatic and terrestrial invasive species on the National Forest System include but are not limited to, the following statutes. Except where specifically stated, these statutes apply to the entire National Forest System.

**Organic Administration Act of 1897** (16 U.S.C. §§473 et seq.). Authorizes the Secretary to establish regulations governing the occupancy and use of national forests and to protect national forests from destruction.

**Knutson-Vandenberg Act of June 9, 1930** (16 U.S.C. 576, 576a-576b). Section 3 of the Act, codified at 16 U.S.C. 576b. Provides that the Secretary may require any purchaser of national forest timber to make deposits of money in addition to the payments for the timber, to cover the cost to the United States of planting, sowing with tree seeds, and cutting, destroying or otherwise removing undesirable trees or other growth, on the national forest land cut over by the purchaser, in order to improve the future stand of timber, or protecting and improving the future productivity of the renewable resources of the forest land on such sale area.

**Bankhead-Jones Farm Tenant Act of 1937** (7 U.S.C. §§1010 et seq.) Title III of the Act. Authorizes the Secretary to develop a program of land conservation and land utilization in order to correct maladjustments in land use. This statute applies only to national grasslands and land utilization projects.

**Anderson-Mansfield Reforestation and Revegetation Act of October 11, 1949** (16 U.S.C. 581j (note), 581j, 581k). Requires the agency to accelerate and provide a continuing basis for the needed reforestation and re-vegetation of National Forest System lands and other lands under Forest Service administration or control.

**Granger-Thye Act of 1950** (16 U.S.C. §§580h). Authorizes the Secretary to use a portion of grazing fees for range improvement projects on National Forest System lands. Specific projects mentioned are artificial re-vegetation, including the collection or purchase of necessary seed and eradication of poisonous plants and noxious weeds, in order to protect or improve the future productivity of the range. Section 11 of the Act authorizes the use of funds for rangeland improvement projects outside of National Forest System lands under certain circumstances.

**Sikes Act (Fish and Wildlife Conservation) of September 15, 1960** (16 U.S.C. 670g-670l, 670o, P.L. 86-797), as amended. Section 201. Directs the Secretary of Agriculture to plan, develop, maintain, coordinate, and implement programs for the conservation and rehabilitation of wildlife, fish and game species, including specific habitat improvement or species management [including invasive species management] projects, on lands and waters under the Secretary's jurisdiction. The Act also provides for carrying out wildlife and fish conservation programs on Federal lands and waters including authority for cooperative State-Federal plans and authority to enter into agreements with States to collect fees to fund the programs identified in those plans.

**Multiple-Use Sustained-Yield Act of 1960** (16 U.S.C. §§528 et seq.). Authorizes the Secretary to: administer National Forest System lands for outdoor recreation, range, timber, watershed, and wildlife and fish purposes; to develop the surface renewable resources for multiple use and sustained yield of several products and services to be



FS-047279

obtained from these lands, without impairment of the productivity of the land; and, to cooperate with interested State and local governmental agencies and others in the development and management of the national forests. The Act also recognizes and clarifies Forest Service authority and responsibility to manage wildlife and fish on national forests.

**The Endangered Species Act** (ESA) of 1973 (16 U.S.C. §§1531 et seq.). Provides for the conservation of threatened and endangered species of plants and animals. Section 7 of the Act requires Federal agencies to ensure that actions they authorize, fund, or carry out are not likely to jeopardize the continued existence of any threatened or endangered species or result in the destruction or adverse modification of the species' critical habitat. This section also requires Federal agencies to consult with the U.S. Fish and Wildlife Service (for non-marine species) or the National Oceanic and Atmospheric Administration's National Marine Fisheries Service whenever an agency action is likely to affect a threatened or endangered species or result in the destruction or adverse modification of its critical habitat.

**Forest and Rangeland Renewable Resources Planning Act** (RPA) of 1974 as amended by the National Forest Management Act (NFMA) of 1976. Section 6 of the Act codified at 16 U.S.C. §§1600 et seq. Provides for the Secretary to promulgate regulations, under the principles of the Multiple-Use Sustained-Yield Act of 1960, specifying guidelines for land management plans developed to achieve the goals of the Program. The guidelines should provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives.

Further, within the multiple-use objectives of a land management plan adopted pursuant to this section, provide, where appropriate, to the degree practicable, for steps to be taken to preserve the diversity of tree species similar to that existing in the region controlled by the plan.

**Surface Mining Control and Reclamation Act of 1977** (30 U.S.C. 1201, 1201 (note), 1236, 1272, 1305). Section 515. Directs the establishment on the mined areas, and all other lands affected, of a diverse, effective and permanent vegetative cover of the same seasonal variety native to the area of land to be affected and capable of self-regeneration and plant succession at least equal in extent of cover to the natural vegetation on the area; except that introduced species may be used in the re-vegetation process where desirable and necessary to achieve the approved post mining land use plan.

**Cooperative Forestry Assistance Act of 1978** (16 U.S.C. 2101 (note), 2101-2103, 2103a, 2103b, 2104-2105. Section 3 (16 U.S.C. 2102). Details the assistance that may be given to State foresters or equivalent State officials and State extension directors, in the form of financial, technical, educational, and related assistance. Section 8 (16 U. S. C. 2104) details actions that may be taken directly on the National Forest System, in cooperation with other Federal departments on other Federal lands, and in cooperation with State foresters, or equivalent State officials, subdivisions of States, agencies, institutions, organizations, or individuals on non-federal lands to: enhance the growth and maintenance of trees and forests; promote the stability of forest related industries and employment associated therewith through the protection of forest resources; aid in forest fire prevention and control; conserve forest cover on watersheds, shelterbelts, and

windbreaks; protect outdoor recreation opportunities and other forest resources; and extend timber supplies by protecting wood products, stored wood, and wood in use.

**The North American Wetland Conservation Act 1989** (16 U.S.C. 4401 (note), 4401-4413, 16 U.S.C. 669b (note)). Section 9 (U.S.C. 4408). directs Federal agencies to cooperate with the Director of the U.S. Fish and Wildlife Service to restore, protect, and enhance the wetland ecosystems and other habitats for migratory birds, fish and wildlife within the lands and waters of each agency to the extent consistent with the mission of such agency and existing statutory authorities.

**Consolidated Appropriations Resolution, 2003**. Section 323 of the Act, codified at 16 U.S.C. 2104. Provides authority to the Forest Service to enter into stewardship contracts with public or private entities or persons to perform services to achieve land management goals for the National Forest System lands that meet local and rural community needs. Stewardship agreements may be entered into for other land management goals such as the following: removal of vegetation or other activities to promote healthy forest stands, reduction of fire hazards; watershed restoration and maintenance; restoration and maintenance of wildlife and fish habitat; prevention and control of invasive species; and reestablishing native plant species.

**Healthy Forests Restoration Act of 2003** (H.R. 1904), (16 U.S.C. 6501-6502, 6511-18, 6541-42, 6571-78). Provides improved statutory processes for hazardous fuel reduction projects on certain types of at-risk National Forest System and Bureau of Land Management lands and also provides other authorities and direction to help reduce hazardous fuel and restore healthy forest and rangeland conditions on lands of all ownerships.

**The National Historic Preservation Act of** 1966 (16 U.S.C. §§470 et seq.). Requires agency heads to assume responsibility for the preservation of historic properties owned or controlled by the agency and to develop a preservation program for the identification, evaluation, and nomination of historic properties to the National Register. Management activities to protect and preserve historic properties and cultural sites may include actions to prevent and control invasive species threatening or impacting those areas. The Act requires agency heads to evaluate the effects of an undertaking on property that is included or eligible for inclusion in the National Register and to afford the Advisory Council a reasonable opportunity to comment on the undertaking. Defines undertaking to include permitting activities or Federal financial assistance under the jurisdiction of an agency.

**The Plant Protection Act of 2000** (7 U.S.C. 7701 et seq) as amended by the Noxious Weed Control and Eradication Act of 2004 (P.L. 108-412). Among other provisions, the Plant Protection Act authorizes the Secretary of Agriculture to prohibit or restrict the importation, entry, exportation, or movement in interstate commerce of any plant, plant product, biological control organism, noxious weed, article, or means of conveyance, if the Secretary determines that the prohibition or restriction is necessary to prevent the introduction into the United States or the dissemination of a plant pest or noxious weed within the United States. The Act defines the term "Noxious Weed".

**Wyden Amendment** (P.L. 109-54, Section 434). Authorizes the Forest Service to enter into cooperative agreements to benefit resources within watersheds on National Forest System lands. Agreements may be with willing Federal, Tribal, State, and local governments, private and non-government entities, and landowners to conduct activities on public or private lands. Under this authority, the Forest Service may enter into agreements to support or conduct invasive species management activities on aquatic and terrestrial areas owned by local and State governments, Tribes, other Federal agencies, and private individuals or organizations, to benefit and protect the National Forest System and other resources within a watershed at risk from invasive species.

**Clean Water Act of 1977** (33 U.S.C. 1251, 1254, 1323, 1324, 1329, 1342, 1344; 91 Stat. 1566). This act amends the Federal Water Pollution Control Act of 1972. Section 313 is strengthened to stress Federal agency compliance with Federal, State and local substantive and procedural requirements related to the control and abatement of pollution to the same extent as required of nongovernmental entities. Invasive species management to improve watershed condition supports the Act's charge to maintain the ecological integrity of our nation's waters, including the physical, chemical and biological components.

**National Environmental Policy Act of 1969** (16 U.S.C. 4321). Requires agencies to analyze the physical, social, and economic effects associated with proposed plans and decisions, to consider alternatives to the action proposed, and to document the results of the analysis. The provisions of NEPA and the Council on Environmental Quality implementing regulations apply to invasive species management (FSM 1950; FSH 1909.15).

**Wilderness Act of 1964** (16 U.S.C. §§1131 et seq.). Authorizes the Secretary to administer certain congressionally designated National Forest System lands as wilderness. Directs the protection and preservation of these wilderness areas in their natural state, primarily affected by nature and not man's actions. Integrated pest management actions [including aquatic and terrestrial invasive species] in Wilderness are authorized to meet provisions of the Act and consistent with Forest Service policy and guidance for Wilderness management.

**Federal Insecticide, Fungicide, and Rodenticide Act** (FIFRA), (7 U.S.C. s/s 136 et seq.). Describes pesticide regulations and requirements related to hazardous material use and worker protection standards for employees in the planning and application of pesticides.

The authority to manage for invasive species on National Forest System lands and other lands under Forest Service control is delegated from the Secretary of Agriculture to the Under Secretary for Natural Resources and Environment at Title 7, Code of Federal Regulations (CFR), section 2.20 (7 CFR 2.20). This authority has been delegated in turn from the Under Secretary for Natural Resources and Environment to the Chief of the Forest Service at Title 7, Code of Federal Regulations, section 2.60 (7 CFR 2.60). Title 36, Code of Federal Regulations (including Parts 221, 222, 228, 241, 251, 261, 290, 292, 293, 296, and 297) provides additional authorities to manage and regulate invasive species across the National Forest System, including establishing requirements and prohibitions to prevent and control aquatic and terrestrial invasive species. In addition,

Forest Service regulations at 36 CFR 222.8 acknowledge the Agency's obligation to work cooperatively in identifying invasive species (including noxious weeds) problems and initiating control programs in aquatic and terrestrial areas of the National Forest System.

**Policy on Noxious Weed Management. Departmental Regulation 9500-10** (DR 9500-10) (January 18, 1990)). Establishes U.S. Department of Agriculture (USDA) policy to manage and coordinate noxious weed activities among USDA agencies in order to improve the quality and ecological conditions of crop and rangeland in the United States.

**Policy on the Management of Wildlife, Fish, and Plant Habitat. Departmental Regulation 9500-4 (DR 9500-4)**. Guides the management of Wildlife, Fish, and Plant Habitat on public lands.

**Gypsy Moth Policy (USDA) of 1990**. Departmental Regulation 5600-001 (DR 5600-001). This regulation establishes the Departmental Gypsy Moth Policy. It assigns responsibilities to USDA agencies and defines agency roles to avoid unnecessary duplication and to provide maximum coordination of USDA activities dealing with the gypsy moth. The Forest Service plays a significant role in the management of Gypsy Moths in the United States.

**Departmental Regulation 9500-4**. USDA policy on wildlife, fish, and plant habitat management on National Forest System lands and waters. This regulation provides that the Department will promote the concept and use of integrated pest management practices in carrying out its responsibilities for pest control, and will seek to alleviate damage by plant and animal pests to farm crops, livestock, poultry, forage, forest and urban trees, wildlife, and their habitats. Departmental agencies, through management and research programs, will develop or assist in developing new techniques and methodologies for the prevention of damage to agricultural or forestry production. The agencies also will strive to reduce potential depredation through improved management of USDA programs. Pest control techniques and considerations will be incorporated into appropriate management and education programs.

**Native Plant Materials Policy** (FSM 2070). Forest Service manual direction on the use of native plant materials in re-vegetation, rehabilitation, and restoration of both aquatic and terrestrial ecosystems across the National Forest System.

**Pesticide Use Management and Coordination Policy** (FSM 2150). Provides agency policy and guidance on the use of pesticides as part of an integrated pest management approach. Additional guidance provided in the Pesticide Use Management Handbook (FSH 2109).

**Executive Order 13112 issued February 3, 1999** (E.O. 13112). Directs Federal agencies to: (1) identify actions that may affect status of an invasive species; (2)(a) prevent introduction of such species; (b) detect and control such species; (c) monitor population of such species; (d) provide for restoration of native species; (e) conduct research on invasive species and develop technologies to prevent introduction of such species; (f) promote public education of such species; and (3) not authorize, fund, or carry out actions likely to cause the introduction or spread of invasive species in the United States or elsewhere unless the benefits of the action clearly outweigh the harm and the agencies take steps to minimize the harm.


FS-047283

**Executive Order 10046 issued March 24, 1949** (E.O. 10046). Permanently withdrew all public domain lands within Land Utilization Projects (many in the West are now national grasslands) boundaries from all forms of appropriation under the public land laws, except the mining and mineral leasing laws, and reserved them for use, administration, and disposition by the U.S. Department of Agriculture in accordance with provisions of Title III of the Bankhead-Jones Farm Tenant Act.

**Executive Order 11246 issued September 24, 1965** (E.O. 11246). Requires entities doing business on behalf of the Forest Service to comply with Title VI of the Civil Rights Act and applicable USDA regulations.

### Additional Information added to Buckhorn EIS:

NEPA regulations in 40 CFR 1502.16 require a discussion of project energy requirements and natural or depletable resource requirements, along with conservation potential of alternatives and mitigation measures in an EIS. The following presents discussion to meet that requirement.

Energy (fuel) would be required to perform management activities proposed in all action alternatives, including but not limited to: harvesting and transportation of timber products, conducting fuels treatments such as excavator piling, implementing, prescribed burning activities, road reconstruction activities, road decommissioning and storage. The proposed project would not involve construction or maintenance of any new facilities.

The project would potentially effect water and soil resources, fish habitat, and wildlife habitat as is disclosed in Chapter 3 of the DEIS. The Forest Service has developed design features to minimize the effects of proposed activities to these resources (DEIS p.51-57, the FEIS, Appendix 2). The timber sale activities will also require the implementation of Best Management Practices to protect soil and water resources (DEIS Appendix F).

**This Page Intentionally Left Blank**

# Chapter 5- Public Involvement

## Public Involvement and Collaboration Summary

The following section summarizes the public involvement in the Buckhorn Project since it was first scoped with the public in February 2013. More detailed information about public involvement and collaboration is included in the DEIS p.19-20 and the project file.

### Proposed Action Scoping

Site-specific public comments on the Buckhorn proposed action were requested during February 2013 through public scoping notices in the *Daily Inter Lake* and display ads in the *Western News* and *Kootenai Valley Record.* Also a letter requesting comments was mailed to interested individuals, groups, officials, and landowners in the vicinity of the project area. On February 5, 2013, a notice was published in the *Federal Register* to inform the public that an Environmental Impact Statement would be prepared to analyze proposed activities in the Buckhorn project area. Comments from 35 different parties were received through letters, emails, phone calls, and requests to meet with interdisciplinary team members. The comments received during the scoping period were used to help develop alternatives to the proposed action and to guide the environmental analysis.

#### Public Presentations and Meetings with members of the public following the Proposed Action Scoping period

The district ranger made several presentations to local community groups in the Yaak and Troy communities, encouraging members of the public to provide comments and contact the team if they wanted to learn more detailed information about the project. The team organized a public open house and field trip in the Yaak to hear public comment and answer questions about proposed activities.

#### Field trips with the Public and Kootenai Forest Stakeholders Coalition

The team also held field trips with members of the public and the Kootenai Forest Stakeholders Coalition, at their request, to discuss proposed activities and design features that the public wanted to see included in the project design and implementation.

#### Discussion with Tribes and Other Agencies

Throughout the Buckhorn Project development process, the team has shared information about proposed activities with the Confederated Salish and Kootenai Tribes and the Kootenai Tribe of Idaho. Communication with Montana Fish, Wildlife and Parks and the U.S. Fish and Wildlife Service has also been ongoing throughout the development process.

The team continued to discuss proposed activities with members of the public and accept public comment until last comment letter was received on September 19, 2013.

### Public Comment on the DEIS

On February 7, 2014 the Forest Service issued a Notice of Availability of the Buckhorn Project DEIS in the *Federal Register* and letters were mailed to interested parties requesting comment on the DEIS. A total of 13 comments were received during the comment period for the DEIS.

Each comment letter was carefully considered by the interdisciplinary team and decision maker. Letters were analyzed to identify substantive comments, which were then discussed by the team and decision maker to determine if modifications needed to be made to the preferred alternative and an appropriate response to each comment.

Table 5.1 lists the commenter and the letter number as it appears in the Response to Comments.

**Table 5. 1 – List of Commenters on the Buckhorn DEIS**

| Letter | Name of Commenter |
|---|---|
| 1 | Kootenai Forest Stakeholders Coalition |
| 2 | Defenders of Wildlife |
| 3 | Cottonwood Law Center |
| 4 | Idaho Forest Group |
| 5 | U.S. Department of Interior |
| 6 | Jim Dickison |
| 7 | Yaak Valley Forest Council |
| 8 | Sue Janssen |
| 9 | Mary Campbell and Pam Fuqua |
| 10 | Judith Ruestow |
| 11 | Dick Artley |
| 12 | Ken and Laurie Wimer |
| 13 | Environmental Protection Agency |

## Response to Comments on the DEIS

The following section provides a summary of substantive comments, as allowed in 40 CFR 1503.4, and responds in detail to those comments. The comments and responses have been organized according to comment subject matter. Where similar comments were received, a single response was provided for multiple comments or representative comments were chosen for a single response.

### Road Side Screening and Leave Islands

***Comment:*** *While our group appreciates the work being put into providing this cover within units, we believe the size of the leave-islands as designed are not likely to provide much benefit to wildlife. We recommend an increase of a ¼ acre up to 5 acres in island size. Larger leave-islands of this size scattered around the units would be much easier to administer and would also lessen the amount of windthrow - thus creating a more effective cover for wildlife. If this larger leave-island approach still proves to offer challenges from an implementation standpoint concerning underburning post-harvest, we recommend focusing on the larger units that are to be excavator piled - specifically, units 9, 14, 15, 16, and 16A*. [1-1]

***Comment:*** *...I was somewhat dismayed at the districts reluctance to include wildlife "islands" and/or "screens" with-in the larger management units. This issue was brought up not only*

*during the field meeting but also in meetings at the office with district personnel. It is a tool that has been used previously in projects such as Rocky Pine Stewardship on larger "landscape" units. I am not only endorsing these practices as an executive member of KFSC but also as a resource manager for Idaho Forest Group. IFG Fully endorses the use of riparian zone protection, adequate retention of old growth, wildlife linkage corridors/screening islands and adequate T and E species core areas. We feel that the agency should be willing to incorporate any and all tools necessary to meet the objectives of "landscape" based management projects to meet all of the above mentioned concerns.* [4-1]

***Comment:*** *Reducing the size to 40 acres does nothing to alleviate the concern of having leave islands within units or wildlife security screening along roadsides. It's not the size of the units that worries us; it's the lack integrating design features within units that provide invaluable safety and security for wildlife within a project area that's heavily frequented by the public and known for an abundance of big game and endangered species.* [7-6]

***Comment:*** *We also recommend that security screening alongside roads be incorporated into the design of the units – for the purpose of diminishing visibility into the regen units post-harvest and thus aiding in reducing bear/human conflicts. Regeneration units 1,9A,10,12,13,14,15,16,17,18,20,& 21 are all located alongside popular forest roads that are open to the public year-round and are highly traveled especially during hunting season but for the purposes of berry picking and firewooding as well.*

*… We also continue to strongly advocate for security screening alongside roads in the units specifically mentioned above. To be clear, we are not suggesting that a continuous buffer of 15 feet of trees be left that run the entire length of every unit alongside the roads. However, the security screening could be left in well-thought-out clumps alongside the road (that extend 15 feet into units) - strategically placed in areas where elongated views into the units would occur or in areas that lack existing topographical screening.* [7-8] [7-9] [10-1]

***Comment:*** *Many of the units on this project are quite large and should provide as many leave islands as possible to mimic naturally occurring landscape events such as non-severe wildfire and most importantly to provide for wildlife security. Vegetation for screening left along roadsides where appropriate also to provide security seems important in light of the fact that road access is an important issue with regard to grizzly bear management and their survival.* [8-1]

***Comment:*** *To reduce the visual impact of the planned clearcuts, as well as to give the animals some security, we would suggest that buffers of trees and shrubs be left along roadsides, and leave islands be incorporated into the units*. [9-1]

**Response:** As has been mentioned in Chapter 4 of this FEIS, in response to these public comments requesting additional leave islands and roadside screening in units along open roads, district specialist have reviewed the unit design and location to determine further actions to contribute roadside screening.

The following activities are proposed in harvest units 1, 10, 12, 13, 14A, 15, 16, and 16A, when the existing conditions and operator feasibility allow:

- Screening would occur through leave islands, retention of hardwoods and brush; and where species composition, slope, aspect and fuel accumulations will assist to provide screening;

- Retention of small diameter residual trees would occur within view of roadways to "break up and soften" the view of harvest and fuel treatment activities;
- Landings would be located off roads and within harvest units to reduce their visual impact;
- The timber sale administrator and the purchaser/field representatives will work together, based on site-specific skid patterns and landing locations, to provide roadside screening that could be maintained through the active logging operations;
- Prescribed burning of harvest units would avoid ignitions directly into the roadside screening areas. Radiant heat and existing ground fuels may make it difficult to prevent mortality of the screening vegetation but ignition patterns (identified on site specific burn plans) are designed to minimize mortality.

These proposed changes would be included in the Design Features to be addressed during the implementation of the project. In addition to the considerations above, the district has conducted field review of the large regeneration units to evaluate visibility from open roads, found it project file.

The Forest Service acknowledges the public concerns regarding wildlife security within the proposed treatment area. There is a distinction between providing for hiding cover within a proposed harvest unit and providing for security habitat within the project area. Because both elk and grizzly bears have negative associations with roads, generally because roads influence the use of an area by humans, it has been recognized that the provision of secure habitat is an important component of habitat management for these species. Secure habitat is identified as areas located beyond a specified distance from open and/or restricted roads, each species has a different specified distance. Therefore, access management is the biggest influence on the abundance and location of security habitat. The Forest manages for security habitat for both species, based on standards for grizzly bear Core and research guidelines for elk Security Habitat. The availability of secure habitat for both species is better than the standard or guideline and would remain so during and post-harvest activities. For security levels for grizzly bear core see p. 126, Tables 3.27 in the DEIS. For levels of elk security habitat see Table 3.46, p.279 in the DEIS..

Harvest units have been designed to "mimic natural occurring landscape events," specifically that of wildfire, which include the irregular shape and variable size of the units and appropriate level of treatment based on current and desired vegetative conditions (e.g., tree age and size, species composition, increased fuel loadings, and potential for a severe wildfire event). Unit design also includes the retention of available hardwoods and shrubs, retention of snags and other wildlife trees, grouping of leave trees especially in areas along roads, unharvested areas associated with rocky or steep terrain, and protection of riparian areas. This is a highly productive area and the reduction in cover would be temporary; shrub establishment would be expected within approximately 5 years and hiding cover provided through conifer recovery would be expected within approximately 15 years. Similarly, outside of the units, cover would continue to be provided in a mosaic of Riparian Habitat Conservation Areas (RHCAs), recovered past harvested units, unharvested areas, and old growth stands. All of these would contribute to cover or features that would provide "diminishing visibility" within the managed area. The amount of cover temporarily reduced during harvest would vary by unit as some units have a good component of healthy western larch to keep as leave trees. Please refer to the grizzly bear and elk analyses for further discussion regarding cover, both existing and post-harvest conditions (DEIS p. 123, 139-142 for grizzly bear and p. 277, 281-284 for elk). When considering both bear

management units (BMU) 13 and 14, which are impacted by proposed activities, harvest would occur on approximately 0.9 percent of the combined BMU acres (0.3 and 1.3 percent for BMU 13 and BMU 14, respectively). From a secure habitat perspective, approximately 62 percent of the entire project area is composed of Core which is higher than existing conditions within each of the individual BMUs separately. Similarly, harvest would occur on approximately 1.7 percent of the Planning Subunit acres used for the elk analysis. Therefore, the larger openings created through timber proposed in the Buckhorn project would result in a minor reduction in available cover within the respective analysis areas and would not impact security.

Comment [4-1] above refers to the screens and islands implemented in the Rocky Pine project. The Rocky Pine project is located within a different habitat type – warm/dry biophysical setting composed of ponderosa pine and Douglas-fir. Historically, fires here would have occurred at a lower intensity and higher frequency that would have left thickets of young trees post-fire. In contrast to Rocky Pine, harvest activities in the Buckhorn project would occur almost entirely within the warm/moist biophysical setting (approximately 99.9 percent). By comparison, the historic fire regime in this habitat type was typified by heterogeneous, infrequent stand replacement fires with some occurrence of mixed severity and low severity underburns on drier sites. See the Forest Vegetation analysis in the DEIS p. 65-103 for more discussion of biophysical settings. Given the current stand species composition and fuels loadings, the potential exists for a high severity fire that would likely leave little vegetation remaining within the burned area. Also, because thickets of smaller trees are generally are not found under the current stand conditions there is little opportunity to retain this type of cover with the proposed harvest units (see Figure 1.5 on p. 8, DEIS).

Biologists from Montana Fish, Wildlife & Parks (MFWP) and U.S. Fish and Wildlife Service (USFWS) were contacted throughout project development and specifically in regards to public concern for big game and grizzly bears. MFWP stated that they manage big game on a population level, and their local biologist shared with the Forest Service that while they recognize that there may be an increase in hunting pressure associated with these harvests units, they expect that effects would be to a few individuals and that it would not negatively impact herd numbers. Additionally, MFWP stated that a vegetative screen of approximately 15 feet from the open roads in the large regeneration harvest units would not their preliminary assessment of effects (Chilton-Radant, 2011). With respect to grizzly bears, personal communication with USFWS found that that there could be some increased risk of human/bear conflicts associated with the reduction in cover. However, the biologist also asked the Forest Service to think about “what is that level of risk when comparing the short-term effects versus the long-term benefits that may result from the proposed activities”. The USFWS biologist also said that it should be acknowledged that human/bear conflicts have also occurred in Core habitat miles from any roads where no recent vegetation management had occurred (Kasworm, 2014).

Public and internal concerns regarding wildlife and the availability of cover within the proposed regeneration harvest units were identified early in the planning process and were incorporated into project design as discussed above and discussed throughout the DEIS. Both elk and grizzly bears are habitat generalists, meaning they are found within and use a variety of habitats. This includes both non-forest and open timbered habitats and the provision of hiding cover is not necessary habitat element that is beneficial for the species’ use of the land, but rather an attempt to compensate for potential human actions. The U.S. Forest Service is a land management agency that is attempting to balance multiple resources, including a diversity of habitat needs even for single species such as grizzly bears and elk (e.g., the balance between management

access, security, cover, and forage). A large component of this balanced management is based on the desired vegetative conditions for the area, which references the historic range of variation, and developing a treatment that is appropriate for the habitat type and conditions. These would also be the conditions under which local wildlife have evolved with. Due to their avoidance of roads, portions of the units within close proximity of the roads are not expected to currently experience regular use by grizzly bears or elk nor would use be expected to appreciably increase following harvest. Also, because very little understory vegetation currently exists in these units (cover is provided by the boles of the trees) it is not expected that 15 feet of unharvested timber would provide adequate cover to break up visibility within the units as is requested. Finally, this screening would not influence the availability of secure habitat which addresses the habitat needs of the species related to open roads and their influence on human use within the project area.

Finally, the Forest Service would like to invite the commenters, including the Kootenai Forest Stakeholders Coalition, to join them in the field to review these units post-harvest to have another discussion about the outcome of the harvest, design features, and wildlife security.

***Comments****: The KFSC team also recommends that roadside security screening be incorporated into the Buckhorn project. The conservation members of the group feel strongly that the larger regeneration units located next to year-round open roads need to have clumps or strips of trees alongside roads that remain post-harvest. This sort of security screening would provide an effective break-up / a visual buffer that would greatly reduce the opportunity for poaching (both of big game and grizzly bears). The concern for poaching is high in Buckhorn due to the abundance of wildlife within the project area, coupled with the fact that management is designed to stimulate browse - which will increase the likelihood of foraging opportunities within units. The KFSC team is not seeking to have a strip of trees remain along every inch of every unit. All we're asking for the District to consider is to leave clumps of trees along open roads where topographical screening is absent and an extended view into the unit would remain post-harvest. The KFSC team made a very similar request in the Rocky Pine and South Fork project and there has been a great willingness on the part of our timber partners to agree to this sort of design feature within units.* [1-2]

***Comment:*** *To be clear, the YVFC is not opposed to hunting or the lawful harvest of big game on our National Forest - we are talking about the increased opportunity for poaching that will occur without some simple measures in place post-management.*

*The YVFC is asking the District to please reduce the very real threat of poaching by incorporating feasible measures (leave-islands & security screening along roadways) within timber harvest prescriptions.* [7-10] [7-11] [7-12]

**Response:** The Forest Service acknowledges public concerns regarding the perceived risk of increased poaching of grizzly bears associated with the proposed regeneration harvest units located along open roads. This concern is associated with the concern regarding the availability of wildlife cover as addressed in the response to comments [1-1], [4-1], [7-6], [7-8], [7-9], [8-1], and [9-1]. First and foremost, it is important to acknowledge that poaching of any species, grizzly bears or others, is an illegal activity no matter what amount of cover the habitat is providing. As a land management agency, we have no control over an illegal act such as poaching or the motivation that drives an individual to commit such an act. Hunting seasons and associated regulations are the responsibility of Montana Fish, Wildlife & Parks.

Although there is a potential risk of increased visibility associated with the removal of cover, the potential level of risk is minimized through the application of the Buckhorn Project's design features as well as other non-project actions. As described in the above Response to Comments [1-1], [4-1], [7-6], [7-8], [7-9], [8-1], and [9-1], cover would be provided within units through design features, project design and natural features of the landscape, such as topography, that would reduce the visibility within a unit. Cover would also be provided in adjacent units in the form of recovered past harvest units, unharvested areas, and old growth habitats. The temporary reduction in cover would result in no more than approximately one percent within a BMU and is a minor reduction at this scale. Implementation of the 2011 Access Amendment which sets standards for Core, open motorized route density, and total motorized route density provides for secure habitat for grizzly bears within the BMUs with both BMUs currently at levels better than standards. Also, management for Canada lynx in areas where management units overlap would limit treatments within young regenerating and multistory forests that provide cover. In the conversation with the U.S. Fish and Wildlife Service regarding this concern, it was emphasized that public information and education programs are important in reducing the risk of poaching or misidentification of grizzly bears. As an agency, and in cooperation with the state, we continue to provide public information and education programs such as a public bear education workshop co-hosted by USFS, MFWP and US FWS on March 12, 2013, at the Yaak Community Center. Montana Fish, Wildlife & Parks also requires a bear identification test for hunters before a black bear hunting license can be obtained.

The commenters refer to the provision of screening and "islands" in the Rocky Pine project. As discussed in the response regarding cover, the two projects differ in the types of habitat proposed for treatment. While the existing condition in Rocky Pine contains understory vegetation, including thickets of small trees, the habitat type in Buckhorn generally does not. Also, the habitat types have different historic fire regimes and different composition of fire tolerant/intolerant tree species which influence the type and availability of vegetative cover that may be expected to remain following a wildfire.

Although removal of cover may increase visibility within the harvest units, there is no known correlation between reduced cover/percent cover and the probability of a grizzly bear being poached. Also, grizzly bears have been killed, whether by poaching or mistaken identity, in remote areas of Core habitat that is not associated with open or even restricted roads. Due to their avoidance of roads, portions of the units within close proximity of the roads are not expected to currently experience regular use by grizzly bears nor would use be expected to appreciably increase following harvest. In addition, because very little understory vegetation currently exists in these units (cover is provided by the boles of the trees) it is not expected that 15 feet of unharvested timber would provide an "effective break-up/ a visual buffer" that would reduce the level of risk of poaching. Secure habitat is being provided through application of Access Management direction and standards and risk of poaching is further reduced through design and natural features that provide cover within and adjacent to units.

## NEPA and General Comments:

***Comment:*** *I am familiar with the proposed project area and I support the management prescriptions and activities proposed. These activities will help to restore much of the area to a healthy forest and create habitat to sustain wildlife. In general, too much of the National Forest has not been managed and is ripe for catastrophic fires. This is a major concern to me as much of my property is bordered by National Forest land.* [6-1]

***Response:*** Thank you for your support of the proposed management activities. We will keep you informed as the project progresses.

***Comment:*** *The YVFC was expecting our initial scoping request to relocate the 600 acres from treatment to appear as an "alternative considered but not studied in detail" in the Buckhorn DEIS, not a fully developed alternative. But it is interesting to note that the replacement acres for these 600 acres were not "studied in detail." The YVFC made it very clear in our scoping letter that the overlapping 600 acres should be relocated within the project area - not just simply dropped from project entirely, as the agency's reasoning for developing alternative 4 on page 45 of the DEIS suggests. It was important to the YVFC from the very beginning that no matter how the issue was to be resolved that there be no loss in the total harvested acres within the project.* [7-1]

**Response**: As you know, the Forest Service scoped the Buckhorn Proposed Action beginning January 23, 2013. At this time we received multiple comments from members of the public asking the Forest Service to relocate the 560 acres of timber harvest identified in the proposed action outside of the boundaries of the Three Rivers Special Management Area as identified in the Forest Jobs and Recreation Act of 2013 (FJRA) to resolve the conflict between the proposed activities and the proposed legislation that had language which stated:

> Senate Bill 37, p. 44, lines 1-5 "In general, except as provided in subparagraph (B) or as authorized under subsection (c), timber harvesting hall not be permitted within an area designated by subsection (a)".

Because of the high level of public concern regarding this issue, the team identified the conflict between the Proposed Action and the FJRA as a "key issue" in the issue development process and proceeded with development of an alternative to resolve this issue.

The YVFC suggested some specific areas where they believed there would be other opportunities for management. The IDT spent several months exploring these areas for resource management opportunities that would meet the purpose and need identified for the Buckhorn Project Area. Several possibilities were explored by the IDT and are displayed in the Alternative Considered but not Studied in Detail to Explore Harvest Outside of the Forest Jobs and Recreation Act (DEIS p.24-25, Map M-6). On p. 24-25 of the DEIS, the Forest Service describes the resource concerns that arose during initial review of these areas which made the potential relocation of these acres unfeasible at this time.

The Forest Service then, looked for other ways to address this "key issue" in the alternative development process, one of which was to remove the acres in the area of concern. Alternative 4 was developed because it would remove the 560 acres that were originally proposed within the boundaries of the Three Rivers Special Management Area, thereby eliminating the conflict between Alternative 2 and the proposed legislation.

At the time that the YVFC had provided the Forest Service with a request to resolve the conflict between the project and the proposed legislation through language changes in the bill, shown in the DEIS on p.22 and restated below, project specialists had completed their analysis of the environmental effects of Alternative 4.

> "On pg. 50 of Senate Bill 37 after line 11. The statement reads: (E) TIMBER HARVEST - Timber harvest is limited, and may only occur within the USFS suitable timber base of

> the Three Rivers and Roderick Special Management Areas for the purposes of improving wildlife habitat; or to maintain or restore forest resiliency, composition and/or structure."

At this point in the planning process, the decision maker determined that it was important to include discussion of this key issue used in the alternative development process in the analysis, and to acknowledge that proposed language had been drafted to resolve the conflict between proposed legislation and Buckhorn proposed action.

***Comment**: The DEIS provides a footnote at the bottom of page 22 that includes some of the modified language in FJRA, but fails to include the other provisions for timber harvest in FJRA for the purposes of fire, insect, and disease control. Worded in the manner that it was in the DEIS, the above quoted statement gives the impression that the agency is still limited in their rationale for proposing harvest under FJRA, when in fact, the opposite is true. If our organization is going to be specifically cited by name in a public document, we would appreciate that our words, intent, and actions be accurately represented in their entirety and not meagerly referenced to in a footnote.*

*To be absolutely clear, from the YVFC's perspective, alternative 4 in the Buckhorn DEIS is completely unnecessary. Either FJRA becomes law or it doesn't. If it were to pass, we have been completely assured by Senator Tester's senior staff that it would most certainly include provisions that remove conflict within the overlap acres and would allow alternative 2 (the preferred alternative) to proceed forward.* [7-2]

**Response:** As was discussed above in the Response to Comment [7-1], while the Forest Service recognizes that the YVFC worked with the authors of the proposed legislation to resolve this issue and eliminate the conflict, at the time that the modified language in the bill was shared with the Forest Service, this key issue had already been used in the alternative development process as an issue identified by several public comments received in the Proposed Action scoping phase.

***Comment:** From our perspective, the Buckhorn project was already shaped and developed by the agency at the time it was released for public scoping, leaving very little room for additional input from the public. Typically on projects the size of Buckhorn, the public is given a heads-up by the District before scoping - to initiate a dialogue with the public, to find out exactly what within the project area is important to folks. This 'pre-scoping' period never happened with Buckhorn. And within the Buckhorn project area, there's a great deal of important factors from a cross-section of the public - from motorized recreation to IRAs, etc. We understand that the District was in the middle of changing Rangers during the initial stages of Buckhorn and that inevitably during a switchover some items are bound to fall through the cracks - but public involvement should not be one of them. We believe the more input the agency gets upfront from the public, the smoother the project can develop for the long run. For example, the issue with overlapping acres within FJRA could have been recognized and addressed long before the scoping process even began - saving the District a lot of time and energy.* [7-3]

**Response:** The Forest Service recognizes the value of sending information out to the public that informs them of the potential for management activities in an area prior to scoping a Proposed Action with the public. We agree that a "Request for Information" prior to project development can help identify potential issues and resource concerns early in the process. These comments and concerns help to inform the Forest Service as the agency develops a proposed action for the public to provide additional comments on.

Although the Forest Service did not conduct a "Request for Information" mailing prior to the release of the Buckhorn Proposed Action on February 5, 2013, following the comment period for the Proposed Action, the Forest Service continued to meet with members of the public and accept comment on proposed activities until September 19, 2013, when we received our last comment letter. Public participation during this period included meetings held at the request of members of the public, field trips held between the team and members of the public concerned about road decommissioning and storage work, a public open house and field trip held by the Forest Service to share information and invite additional comment on the project, and a field trip held with the Kootenai Forest Stakeholders Collaborative to meet and discuss the proposed vegetation management. More than seven meetings and field trips were held with the public and numerous informal conversations were held with interested members of the public to receive comment and discuss potential changes prior to the release of the DIES.

Based off of the public input received, the team modified the types of decommissioning and road storage activities that would occur to accommodate non-motorized users and over-the-snow use on existing road beds. Public concerns led to timber marking guides that worked to address some of the public concerns about visibility into the regeneration units. Public concern over prescribed burning also lead to the inclusion of information in the DEIS to described how prescribed burns would be implemented over time and how local residents would be notified. These changes are described in more detail below in the Response to Comment [7-4].

***Comment:*** *Another example of how little the Buckhorn project has been shaped or influenced by public input and the scoping process is to compare the scant differences between the Proposed Action and the Preferred Alternative. The changes between the two are listed on page 27 of the DEIS, along with a statement, This Alternative [2] was modified based on public comment and additional field review." Yet out of the seven changes listed, not one is based upon public comment.* [7-4]

**Response:** As the commenter mentions, the DEIS lists the changes that were made to the Proposed Action between the scoping period and the DEIS. This list identifies the changes to the project that are evident by comparing a map of the Proposed Action and a map of Alternative 2, but it does not do an adequate job describing the project design changes that were included to address public concern.

These changes are described elsewhere in the document and some examples are show below. A couple of these changes were described in the above response but will be listed again here with reference to their location in the DEIS:

- (DEIS p. 25) A member of the public asked the Forest Service to "Develop an alternative that excludes prescribed burning in the presence of whitebark pine regeneration." The DEIS goes on to explain the survey process and modifications made to the project in response to this resource concern shared between the public and the team.
- (DEIS, p. 56) Design features identify specific measures that will be used during the implementation of prescribed burns to protect whitebark pine individuals and populations.
- (DEIS, p. 26) 38 Members of the public expressed concern that decommissioned and stored roads would not be usable by non-motorized recreation and snowmobiles. The

DEIS discusses the meetings that were held between concerned members of the public and team members to identify roads of recreational interest where watershed work could be designed to accommodate their use until vegetation returned to the site.

- (DEIS, p. 53) Design features identify which roads will have specific design features to address public concern for access on decommissioned roads.
- (DEIS, p. 56-57) Design features identify measures that will be taken during the implementation of prescribed burns to address public concern regarding smoke and fire behavior.
- (DEIS, p. 57) Identify measures to reduce the spread of noxious weeds and addresses existing populations which is a concern shared by the public and the forest service.

***Comment:*** *In our 2nd scoping letter on Buckhorn dated July 26th, 2013, the YVFC specifically asked the District to consider incorporating leave islands and roadside security screening as design features to the larger regeneration units. Beyond our letter, this recommendation was also explicitly addressed with District staff in person during two field trips that occurred on July 24 & 25, 2013. We are also acutely aware that we were not the only group to make such a request. Yet this concern is not clearly cited in the DEIS. Instead, the DEIS only offers this generic statement:*

> *The public expressed concern that large openings resulting from regeneration harvest could affect wildlife habitat security in the project area (DEIS, 21).*

*This rather vague remark does not encompass the concern as stated by the YVFC in letters or in person. How can a valid public concern that was expressed by more than one group be entirely missing from documentation in the DEIS?* [7-5]

**Response:** As was explained to the commenter in a meeting held with the Kootenai Forest Stakeholders Coalition, the concern expressed by the commenter and others was discussed by the team to determine the most appropriate way to provide cover for wildlife within and adjacent to the larger regeneration units proposed in Alternative 2. Discussions were also held with Montana Fish, Wildlife and Parks biologist and US Fish and Wildlife Service biologist to hear if they had concerns regarding cover for wildlife along open roads. In the DEIS p. 139-141, the wildlife analysis discusses the clumps of trees that will be left "especially in areas with fewer, quality leave trees available and along open roads" to provide greater cover for wildlife use. The DEIS goes on to discuss the considerations the team gave to the topography of the landscape and how this could help to break up sight distances in the regeneration units. The team worked to incorporate wildlife security and hiding cover into the design of the project not only in response to public comment but to address the needs for wildlife recognized by specialists.

The issue of road side screening and leave islands is discussed in greater detail above in Response to Comments [1-1], [4-1], [7-6], [7-8], [7-9], [8-1], and [9-1].

***Comment:*** *The DEIS goes on to state:*

> *The team also designed the harvest units to provide movement between the openings in all of the alternatives. This would provide cover for animal movement between openings and create the appearance of a natural disturbance (DEIS, 21).*

*We appreciate the thought that went into the layout between the units with wildlife corridors in mind and endorse the approach. But we argue that the "design" of the units had already been laid out at the onset of the project - it was not something developed by the agency in response to public scoping comments, as the above statement implies*. [7-7]

**Response:** The comment quoted above from DEIS document was intended to demonstrate that the team was considering movement corridors and hiding cover for wildlife throughout the project, not just in response to public comment. The team discussed wildlife movement corridors and hiding cover at great length during the development of the Proposed Action which is described in the DEIS on p.9-12.

This internal knowledge and consideration for wildlife in conjunction with comment received on the Proposed Action and the Draft Environmental Impact Statement has led to the development of additional design features to address the concerns about wildlife. The DEIS discusses on p. 29-20, p. 139-140, and p. 285 -286 how clumps of trees will be left in the regeneration units to provide wildlife hiding cover and to break up the visual effects of the regeneration harvest. In response to comments receive on the DEIS, the team has included additional design features to provide visual screening along open road ways (see Response to Comments [1-1], [4-1], [7-6], [7-8], [7-9], [8-1], and [9-1] , and Chapter 4 of this FEIS).

***Comment:*** *The list of the thirteen funding dependent activities on page 58 of the DEIS is an unfortunate reality of the budgetary crisis that is plaguing the USFS nationwide. Weeds, monitoring, restoring landings, road maintenance, planting trees, fighting mistletoe, and culvert replacement - every one of these items becomes an even more expensive item to address if left untended till a later date. Beyond the financial burden of punting these activities into the future, there is also a considerable amount of ecological risk associated with the items not being tended to now.*

*The list on page 58 is also a great reason for the District to place Buckhorn into Stewardship contracting and we strongly encourage the District to explore this possibility. Stewardship contracting is an appealing tool at the ready for the District and it is one way to ensure that important restoration needs of a project are accomplished.* [7-13]

**Response:** The district will explore all potential funding sources for implementation of the resource enhancement activities listed on page 58 of the Buckhorn DEIS. Potential funding sources could include the tools available through Stewardship Contracting (Integrated Resource Timber Contract, Integrated Resource Commercial Services Contract, Integrated Resource Construction Contract and Service Contract), Stewardship Agreement, collections from stumpage value under the Knutson-Vandenberg Act (both for essential reforestation and other sale area improvement activities), appropriated funds, partnership agreements, and private funding.

The list of activities included in the Buckhorn DEIS provides an opportunity for the team to identify a need for the resource work to occur and to analyze the potential effects of these activities. By analyzing these items in the NEPA document the Forest Service has more opportunity to utilize different funding sources. The heading of "Funding Dependent" only serves to acknowledge that these activities will not likely occur as part of the timber sale but are recognized by the Forest Service as valuable activities.

***Comment:*** *Ecosystem management is intended to strike a balance between ecologic, social, and economic values - and if the bulk of the restorative efforts of a project are removed, then it's no*

*longer a "project" but most certainly still a timber sale. Ecosystem management directly correlates with adaptive management - the idea that management should be based upon best available science and monitored for results, being able to tweak the system as eco-response and field data is collected. Three of the thirteen work items on page 58 involve monitoring. We believe the monitoring scheduled for soils, slash treatment, and huckleberries would be extremely valuable (if not required) information in order to base future management decisions.*

*As stated earlier in this letter, the YVFC supports the stated purpose and need for the Buckhorn project. However, we would like to bring to the District's attention that fulfillment of the stated purpose and need on Buckhorn is reliant upon implementing the funding dependent resource improvement work listed on page 58. .. How exactly does the District intend to "apply timber harvest" that promotes western white pine, improves huckleberry and provides long-term forage needs if the activities of actually planting western white pine, spraying weeds, and monitoring huckleberry are not implemented? The planting of western white pine is called for in 23 of the 24 harvest prescriptions in alternative 2 (DEIS, Appendix A), how does WP get promoted if it is not planted? How does native forage for wildlife improve if it is outcompeted and overrun by noxious weeds? How do we know if the vigor/extent of huckleberry and other native plants has improved if they go unmonitored? And ultimately, will the timber harvest still be "applied" if the funding for the activities on page 58 never comes through? If so, would the agency still be meeting the stated purpose and need of the project?* [7-14]

**Response:** As was mentioned in the Response to Comment [7-13] above, the Forest Service included the list of "Funding Dependent Resource Improvement Work" in the DEIS because some of these activities must be analyzed in the NEPA process to be eligible for certain funding sources. By including them into the NEPA process we can utilize a variety of funding sources to accomplish this work, including, but not limited to: stewardship contracting, Knutson-Vandenberg funds from a timber sale, partnership agreements and private funding. The Forest Service is open to creative partnerships that will allow us to accomplish multi-resource objectives on the ground.

***Comment:*** *We have no disagreement with most of Alternatives 2, 3, or 4 with respect to prescribed burning and timber harvesting to improve forest health and wildlife habitat but not at the expense of human use. There are methods to address road issues without their removal and still have them useable with little or no modification for present or future use. Our fears are the intended or unintended consequences of increasing Inventoried roadless Areas by road removal, denying future use by snowmobiles or other mechanical or mechanized use. [12-1] [12-6]*

*It appears that your decommissioning plan is intended to increase several of the existing IRA's within the Buckhorn Project Area.* [12-2]

**Response:** There are approximately 9 miles of road proposed for decommissioning and approximately 23 miles of road proposed for intermittent stored service which is discussed in detail on p. 37-42 of the DEIS and Appendix C. As is described in the document none of the roads proposed for treatment are currently open to wheeled motorized use currently and this will not change with this project. These roads are open to non-motorized use and over-the-snow motorized use and this will not change with this project. While we frequently receive public comment requesting additional wheeled motorized access in the forest, we are limited in our ability to open roads for wheeled motorized use because of our requirement to manage roads in accordance with the 2011 Forest Plan Amendments for Motorized Access Management within the

Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones (2011 Access Amendment). As is described in the DEIS, the team identified roads suitable for decommissioning based on their future need for resource management. Where it was determined that a road was no longer needed, it was identified for decommissioning, and where it was determined that the Forest Service might have future need for the road it was identified as suitable for Intermittent Stored Service. This project does not propose any changes to the boundaries of the Inventoried Roadless Areas within the project area.

***Comment:*** *We believe the Map provided in the Buckhorn Project Proposed Action and its Legend to be misleading and a dishonest approach to this project. To use the terminology "Watershed Work Roads" to describe roads planned to be decommissioned and removed from inventory is deceptive at best to all stakeholders and the general public. Certainly terminology that is more descriptive in defining the scope of the planned action should be used: such as "Roads to be removed" or "Roads to be decommissioned".* [12-3]

**Response:** A similar comment was made during the Proposed Action scoping period, which resulted in the team changing the way that watershed work was described in the maps produced for the Buckhorn DEIS. On maps M-3, M-4, M-5, and M-7 in the DEIS, the watershed work is identified as decommissioning passive, decommissioning active, storage active, and storage passive to help the reader identify what type of work will be conducted on what portion of each roadway. Additionally, Appendix C, describes what type of work will occur on the different segments of road proposed for treatment.

***Comment:*** *We do approve of the plan to improve the health of the forest and promote the desired species of White Pine, Western Larch, White Bark Pine, and Huckleberry stands through the practice of prescribed burning and timber harvest. However the primary focus should be for Forest Health and to benefit humans with consideration for Grizzly and Black Bears, not the elimination or reduction of use by humans for the benefit of bears.* [12-4]

**Response:** As the DEIS explains on p. 6-7, the desired condition for the project area is one where:

> "The browse and forage species in the understory of harvest units would increase. The huckleberry component would also increase and provide berry picking opportunities for humans as well as forage for wildlife, especially for black and grizzly bears. Natural openings would be maintained through the use of fire and would improve huckleberry production….
>
> Humans would continue to have a presence in and around the project area, using the forest for recreational activities and utilizing forest products from the project area."

***Comment:*** *Request for changes to be made to the final NEPA document: Include a discussion and supporting data showing whether the majority of the people in the area support or reject logging in the Kootenai National Forest. If the Responsible Official ignores the will of the people and continues to spend their tax dollars on something they don't want, then include a discussion justifying why it's necessary to do so.* [11-14]

**Response:** The Forest Service has provided multiple opportunities for the public to provide comment on the proposed activities in the Buckhorn Project. Some public comments have asked for more active management in the project area and some comments have asked for less

management in the project area. All of these comments were considered by the team and have been shared with the responsible official to consider prior to making a decision.

The mission of the USDA Forest Service is to "sustain the health, diversity, and productivity of the Nation's forests and grasslands to meet the needs of present and future generations." The activities proposed in the Buckhorn project are consistent with this mission.

***Comments:*** *Request for changes to be made to the final NEPA document: Please assure that there are explicit, clear discussions in Chapter 3 each time the Responsible Official indicates planned mitigation will reduce/eliminate the predicted resource damage caused by sale implementation or the damage will be "short term." These discussions should include the following:*

- *the enforcement process to assure the purchaser has correctly applied the mitigation according to USFS specifications,*
- *a description of the mitigation implementation and effectiveness monitoring plan,*
- *a description the baseline resource conditions before project implementation that will be monitored to assure the mitigation is effective, and*
- *outside experts and information sources used to determine the appropriate mitigation for the specific condition at hand.* [11-15]

**Response:** The DEIS p. 51-58 includes site specific design features developed by the team to reduce potential impacts to resources from project activities. The DEIS also includes a monitoring plan in Appendix E designed by the team to determine the effectiveness of implementation measures. Both the monitoring plan and the design features are included in the *Draft* Record of Decision.

***Comments:*** *Request for changes to be made to the final NEPA document: Add an easily identified section that provides the public with specific information concerning the collaborative group used for project design recommendations. This will include:*

1. *the names of the collaborative group members and who they represent.*
2. *a section explaining to the public why you chose to allow a collaborative group to provide recommendations. This should include discussions of:*
    a. *whether you allowed collaborative group input to supersede public scoping comments as required by NEPA,*
    b. *how public scoping comments were used in relation to collaborative group input,*
    c. *why you decided to engage any collaborative group during scoping in the first place and*
    d. *how you determined that the collaborative group members represented the large proportion of the general public that oppose national forest development.*
3. *why you expected the collaborative group to provide information that the public scoping comments will not provide and why you anticipated that public scoping comments would not provide the information.*
4. *reasons why the collaborative group was not formed from a random draw of the interested public who submitted scoping comments.*
5. *the selection criteria for the collaborative group.* [11-16]

**Response:** The Forest Service works with both members of the public and organized collaborative groups when they choose to participate in the project planning and public involvement process. In the Buckhorn Project, the team was asked to hold meetings and field trips to talk to different parties regarding specific issues that interest them or to answer questions about proposed activities. The Forest Service considered both written and verbal comments provided by members of the public and did not place greater value on comments provided by individuals or organizations. On p. 19-20 the DEIS discusses the types of public involvement that were provided and the comments received on the project prior to the release of the DEIS.

***Comments:*** *Request for changes to be made to the final NEPA document: Ranger Kaiser, if you choose not to allow the public to read your responses to their comments online then consider this a FOIA for these responses. Please assure that I receive them (hardcopy or preferably electronic) within a day or 2 of the date the final EA is released and the objection period begins. Consider this an official FOIA request. Your FOIA person will know what to do.* [11-17]

**Response:** No EA has been prepared for the Buckhorn Project. The Forest Service will prepare a Final Environmental Impact Statement that includes these comments and the Forest Service response. These documents will be posted on the Buckhorn Project website for the public to view and hard copies will be available upon request. The Kootenai National Forest Freedom of Information Act Coordinator has responded to this request.

***Comment:*** *Request for changes to be made to the final NEPA document: Please analyze an alternative in detail in the final NEPA document that does not construct any new roads (temp or system). If you choose not to honor my request, please include an analysis comparing the adverse effects of a little volume reduction v. the benefits to the ecosystem if no roads are constructed. If you choose not to analyze this tradeoff and disclose the results to the public then ask yourself why your need to satisfy your obsession with volume is a higher priority than passing down undeveloped ecosystems to future unborn children.* [11-18]

**Response:** The three action alternatives analyzed in the DEIS do not proposed any new permanent road construction. The action alternatives propose temporary road construction to conduct timber harvest activities and these temporary roads will be recontoured following use for harvest activities. Alternative 1, the no action alternative, analyzes the effects of not conducting the proposed activities and under this alternative no permanent or temporary roads would be constructed.

***Comment:*** *Request for changes to be made to the final NEPA document: Ranger Kaiser, please review this project in light of the Opposing Viewpoint Attachments and respond to the science conclusions as they relate to the proposed Buckhorn timber sale. Include these responses with the final NEPA document for all to see. Then evaluate the draft ROD (and modify it) if the Proposed Action will cause resource harm that was not acknowledged in the final NEPA document.* [11-24]

**Response:** The documents attached with this comment letter have been reviewed by the IDT for applicability and relevance to the proposed activities and the affected resources in the Buckhorn Project Area. This literature review can be found in the project file or is available upon request.

***Comment:*** *Request for changes to be made to the final NEPA document: Please either:*

*1) remove the following statement from the P&N: "Provide wood products to contribute to local and regional economies." (DEIS at page i)*

*OR*

*2) include the following papers (referenced above) in their entirety in an appendix to the NEPA document. Line-officers should not withhold such important information before describing the selected alternative in the decision document.*

> *"The Economic Impact of Trails-Forest Recreation's Growing Impact"*
> *"Seeing Forests for their Green: Economic Benefits of Forest Protection, Recreation, and Restoration",*
> *"The Economic Impact of Preserving Washington's Roadless National Forests"* [11-20]

**Response:** The team has reviewed these articles as part of a literature review referred to in the Response to Comment [11-24]. These sentiments have been noted and will be considered by the responsible official when making a decision.

***Comment:*** *Request for changes to be made to the final NEPA document: Please rewrite the final NEPA document to include a complete economic analysis. An economic analysis of a proposed USFS timber sale showing the public whether the sale is below cost is not the same as an analysis to determine the profitability to the purchaser. This must include projected revenues and agency costs associated with the timber sale (including overhead and travel costs). Costs associated with sale administration throughout the life of the sale must be included. Please leave the profit analysis to the purchaser. That's their job.* [11-21]

**Response:** On p. 496-503 the DEIS includes an analysis of the economic effects of the project, including project feasibility, financial efficiency, and economic impacts for all alternatives in accordance with 40 CFR 1502.23.

***Comment:*** Request for changes to be made to the final NEPA document: *Include a disclosure in Chapter 3 that some scientific research indicates exposure to glyphosate-containing herbicides causes major health problems (especially in children) and list the problems.*

*Include information about alternatives to herbicides and why these alternatives were not used in lieu of herbicides. If the alternatives to herbicides weren't used because of extra cost, indicate the cost difference between the alternatives and herbicides. If the alternatives are less effective than herbicides include data and information supporting the claim.*

*Include the full text of the 2007 Kootenai National Forest invasive plant management Record of Decision in an Appendix to the final EIS and indicate which herbicides will be applied.* [11-22]

**Response:** The commenter refers to the chemical glyphosate, more commonly known by its trade name Roundup. The 2007 Kootenai National Forest Invasive Plant Management ROD approves the use of Roundup for spot applications because it is a non-selective herbicide. There currently are no plans to use Roundup in the Buckhorn Project Area. Herbicides used to control noxious weeds in the project area is used in accordance with the 2007 Kootenai National Forest Invasive Plant Management ROD and applied according to manufacturer's directions. The 2007 Invasive Plant ROD also discusses alternative methods of controlling noxious weeds and how they were considered. A copy of the 2007 Invasive Plant ROD and DEIS can be found on the Kootenai National Forest website or in the project file.

***Comment:*** *Request for changes to be made to the final NEPA document: Please identify and discuss the methods and procedures used by the Responsible Official to insure that presently*

*unquantified environmental amenities and values are given appropriate consideration. So the lay public can find this important information, please include this information under an easily identifiable heading.* [11-23]

**Response:** The Forest Service has interpreted this comment to mean that the commenter would like to know how we have considered values such as sense of place, views of the landscape, and value placed on Inventoried Roadless Areas. The DEIS has analyzed the potential effects to visuals and scenic resources on p. 489-496. The DEIS also discusses the potential effects of proposed activities on the wilderness characteristics of the Inventoried Roadless Areas on p. 473-482. The recreation analysis provided on p. 482-489 of the DEIS discusses some of the ways that the public is known to use the project area for a variety of purposes.

***Comment:*** *Request for changes to be made to the final NEPA document: Ranger Kaiser, please review this project in light of the Opposing Viewpoint Attachments and respond to the science conclusions as they relate to the proposed Buckhorn timber sale. Include these responses with the final NEPA document for all to see. Then evaluate the draft ROD (and modify it) if the Proposed Action will cause resource harm that was not acknowledged in the final NEPA document.* [11-24]

**Response:** The documents attached with this comment letter have been reviewed by the IDT for applicability and relevance to the proposed activities and the affected resources in the Buckhorn Project Area. This literature review can be found in the project file or is available upon request. This FEIS and draft ROD have identified changes that have been made between the DEIS and the FEIS to protect resources and respond to public comment, please see Chapter 4 of this FEIS for more details.

***Comment:*** *(e) Energy requirements and conservation potential of various alternatives and mitigation measures.*

*(f) Natural or depletable resource requirements and conservation potential of various alternatives and mitigation measures.*

*(g) Urban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential of various alternatives and mitigation measures.*

*Request for changes to be made to the final NEPA document: Please include a discussion of (e), (f) and (g) in final NEPA document.* [11-25]

**Response:** As the commenter points out, NEPA regulations in 40 CFR 1502.16 requires a discussion of project energy requirements and natural or depletable resource requirements, along with conservation potential of alternatives and mitigation measures in an EIS. This discussion can be found on p. 11 of this FEIS.

Energy (fuel) would be required to perform management activities proposed in all action alternatives, including but not limited to: harvesting and transportation of timber products, conducting fuels treatments such as excavator piling, implementing, prescribed burning activities, road reconstruction activities, road decommissioning and storage. The proposed project would not involve construction or maintenance of any new facilities.

The project would potentially effect water and soil resources, fish habitat, and wildlife habitat as is disclosed in Chapter 3 of the DEIS. The Forest Service has developed design features to

minimize the effects of proposed activities to these resources (DEIS p.51-57, the FEIS, Appendix 2). The timber sale activities will also require the implementation of Best Management Practices to protect soil and water resources (DEIS Appendix F).

The Forest Service has surveyed for and analyzed the potential effects to historic and cultural resources in the project area (DEIS p. 503-508). On p. 507 it discusses the known historic structure and sites in the project area and the potential effects of management activities on this structure, which is the only building on NFS land within the project area. Infrastructure on NFS lands such as roads, culverts, and bridges has been considered for reuse and utilization in the planning of the project. Design features have been developed to reduce potential impacts to resources and additional work items have been identified to enhance resources in the project area (DEIS, p. 51-57).

## Forest Vegetation

***Comment:*** *...include a trade-off analysis that weighs public acceptance of clearcutting vs. the regeneration success of seed tree and shelterwood prescriptions*,[11-2] [11-8] *…provide data and maps demonstrating that cut blocks, patches, or strips are shaped and blended to the extent practicable with the natural terrain*,[11-3] [11-9]*…provide data and text demonstrating that clearcutting is the optimum silvicultural prescription for the area.* [11-5] [11-10]

**Response:** A tradeoff analysis that weighs public acceptance of clearcutting vs. the regeneration success of seedtree and shelterwood prescriptions was not completed in the analysis for this project because it was not relevant in determining the appropriate type of regeneration harvest for each unit. The silvicultural prescriptions have been prepared by a certified silviculturist and the regeneration harvest units larger than 40 acres were approved by the Regional Forester on March 11, 2014.

As is described in the DEIS p. 9-12, the project was designed to have large irregularly shaped units to mimic fire and provide a variety of interior and edge habitat to benefit multiple wildlife species, see Chapter 3, Wildlife Analysis, for specific discussion about the effects to wildlife species. The district conducted a scenic resources analysis to determine the visual impacts to the forest user as a result of the proposed activities, this discussion can be found on p. 489-495 of the DEIS.

The project file for the DEIS includes the silvicultural diagnosis chart which describes stand conditions and contrasts varying alternative harvest methods and explains why the selected harvest method is desirable. More detailed information including stand data is included in the silvicultural diagnosis for the proposed clearcuts. This information shows that clearcutting is the optimal silvicultural system to be used to meet objectives. The primary factors considered when determining whether a clearcut is appropriate (assuming the area selected meets project and landscape objectives) are as follows:

1. If there are not enough healthy trees that are expected to sustain themselves for the next 20 years or better at a density of 80+ $ft^2$ of basal area (approximate full-stocking) then a regeneration harvest could be the harvest method.
2. If the above conditions are accurate and there are at least 15-30 quality/ desirable (good form and vigor and a seral species) then a seedtree or shelterwood harvest could be considered.

3. If there are less than 15-30 quality/desirable trees per acre then a clearcut could be prescribed because the area would not have enough seedtrees to regenerate the stand and planting would occur after the clearcut was implemented. Clearcuts proposed in the project would have 5-20 leave trees per acre plus 4-12 snags/acre so they would appear similar to a seedtree harvest.

On p. 21-22 of the *Draft* ROD the Forest Service discusses its consideration of clearcutting and even-aged management techniques in the Buckhorn Project.

***Comment:*** *Information on current and project climate change impacts are included in the Draft EIS Vegetation Resource section. The EPA appreciates the inclusion of climate change as related to forest health and the proposed project. We would like to include this project in our onging inter agency discussion on how the USFS is progressing in efforts to better reduce the impacts of project activities on climate change, monitor for specific effects of climate change on forest resoruces, and include project specific quantified analysis and disclosure of greenhouse gas (GHG) emissions as additional GHG emission guidance from the Council on Environmental Quality is developed.* [13-6]

**Response:** Thank you for your comment. You are welcome to use the project as part of your discussions.

## Wildlife

***Comment:*** *The DEIS will only assess proposed activities "in relation to their impacts to the persistent snow conditions and trapping" (p. 202) since the US Fish and Wildlife Service's (USFWS) 2013 proposed ruling deemed that land management activities (or any other human activities) will not threaten wolverines or their habitat. The USFWS finding that human activities do not threaten the survival of the species does not excuse the US Forest Service (USFS) from evaluating the degree of impact that may result from a particular project.* [2-1]

**Response:** The North American Wolverine analysis (p. 201-206 of the DEIS) evaluated the degree of impact of proposed activities within the context of those factors identified in the USFWS's proposed ruling as threats to the conservation of wolverines: climate change (i.e., persistent snow conditions) and trapping. The locations of proposed land management activities were described in relation to persistent snow areas found within the project area, that they would not affect the snow conditions on the landscape available for wolverine use, and that they would not impact state trapping regulations related to wolverines (p. 203-204). Therefore, potential effects and level of impact related to human activity and habitat manipulation are consistent with those described under the proposed species ruling for land management activities and are not considered threats to the conservation of the species. "Land management activities (principally timber harvest, wildland firefighting, prescribed fire, and silviculture) can modify wolverine habitat, but this generalist species appears to be little affected by changes to the vegetative characteristics of its habitat" (USFWS 2013b, p. 7888). Additionally, disturbance associated with project activities or resulting from the project are not expected to threaten the population. From p. 202 of the DEIS, "Individuals have been shown to travel through, spend time within (including reproduce), and survive in areas of high human use and disturbance (e.g., areas of concentrated recreational activities, developments, habitat alteration) (ibid). Currently, there appears to be no evidence that the activities listed above (e.g., snowmobiling, skiing, timber harvest, and mining) translate to threats to characteristics of subpopulations and populations or population persistence (ibid). USFWS (2013b) cited ongoing research into the impacts of high levels of recreational use

on wolverines in central Idaho. The cited ongoing research has documented wolverines living in areas of high recreational use (i.e., disturbance) (USFWS 2013b citing Heinemeyer and Squires 2012)." Finally, "The best scientific information available does not substantiate dispersed recreational activities as a threat to wolverine" (USFWS 2013, p. 7878).

***Comment:*** *USFWS' finding that the best scientific information available does not substantiate human activities as a threat to wolverine is premature and is not in accordance with many years of wolverine research. There remains a high level of uncertainty regarding how and to what degree human activities impact wolverines. It remains important that the KNF does not fall short on its obligation to analyze impacts of land management to denning, foraging, and movement habitat rather than only assessing impacts to persistent snow conditions and trapping.* [2-2]

**Response:** USFWS' proposal to list the wolverine as a threatened species under the ESA utilized the best scientific information available in making this determination. The "…negative association with human presence is sometimes interpreted as active avoidance of human disturbance, but it may simply reflect the wolverine's preference for cold, snowy, and high elevation habitat that humans avoid" (USFW 2013b, p. 7877). "Wolverine home ranges generally do not occur near human settlements, and this separation is largely due to differential habitat selection by wolverines and humans (May et al. 2006, pp. 289-292, Copeland et al. 2007, p. 2211)" (USDI 2013 p. 7878). Despite the stated uncertainties regarding the impact of human activities on wolverines, the research regarding wolverine habitat association with persistent snow areas and colder temperatures (i.e., higher elevation habitats in the southern ranges) for denning/reproductive success, foraging, and movement habitat is well established and described under "Taxonomy and Life History" in the proposed ruling (pp. 7866-7868). Buckhorn's proposed land management activities would not impact the environmental conditions that maintain the location or duration of spring snow on the landscape for these life requirements (also see Comment 2-1).

***Comment:*** *We noted that climate change was not adequately considered in cumulative effects analysis for wolverines. The DEIS should include climate change in the cumulative effects analysis for wolverines, as this is certainly will be a part of reasonably foreseeable contributions.* [2-3]

**Response:** The USFWS' 2013 proposed ruling considers the predicted change in climate in context of its influence on the wolverine and determined that it presents the primary threat to the conservation of the species. In compliance with the National Environmental Policy Act (NEPA), the cumulative effects analysis considers the cumulative, or incremental, impacts of the proposed action with the impacts of past, represent, and reasonably foreseeable actions. Since climate change is an environmental condition, it is not a proposed private or agency action to consider under cumulative effects. Rather, because climatic conditions have already changed compared to past conditions and has influenced the existing environmental condition, the availability of persistent snow areas associated with the Buckhorn project area is reflected in the existing condition section of the wolverine analysis on pages 202-203 of the DEIS.

***<u>Comment:</u>*** *On another note, the Buckhorn DEIS notes that "proposed harvest and prescribed fire treatments would improve scavenging and other foraging opportunities by opening up the canopy in dense stands, providing habitat diversity, and trending vegetative characteristics towards desired conditions in the project area" (DEIS p201) and that "proposed treatments…includes the re-establishment and/or improvement of understory vegetation that would benefit future wolverine*

*foraging opportunities" (p203). We are not familiar with research suggesting that open habitats improve scavenging options for wolverines, as rather little is known about habitat characteristics that benefit wolverine foraging. Please reference such information.* [2-4]

**Response:** As described under the wolverine analysis Introduction on page 201, "Wolverines are generally scavengers of carrion, but do prey on small mammals and birds and will eat berries, fruits, and insects (Hornocker and Hash 1981)" which is also documented in Banci (1994) based on a literature review. In Northwest Montana, elk and deer comprised the majority of the wolverines' winter diet (Hornocker and Hash 1981). The DEIS elk analysis (pp. 276-292) describes elks' preference for a diversity and mosaic of habitat types as influenced by the ecological role of fire. Currently, proposed harvest treatments would occur in a homogenous environment of stem exclusion habitat that has little to no understory vegetation present. Treatments would mimic a fire event and would reduce the forest cover, open the canopy and encourage the establishment of forage species, and improve foraging conditions for resident big game species that in turn could provide scavenging opportunities in the form of carrion in the future.

Ramirez and Hornocker (1981) studied the effects of vegetation succession on small mammal prey and what that could mean to populations of wolverines. Their "study indicates that clearcuts provide diverse habitats for small mammals through different stages of succession, much as wildfire formerly did" (p. 402). Populations of small mammal species (e.g., mice, voles, and chipmunks) would vary depending on the species' habitat associations, the existing vegetative condition, and the proposed treatments. A maintenance or increase of generalist and non-forest species populations could be expected following harvest (e.g., Kirkland 1990, Sullivan and Sullivan 2001, and Zwolak 2009). For example, Columbian ground squirrels are associated with open habitats, including meadows and clearcuts in coniferous forests (NatureServe 2014) as "an abundance of grasses and sedges and sufficient soil depth for establishing burrows appear to be important factors" making up their habitat (Ramirez and Hornocker 1981). Also, Fuller et al. (2004) concluded that certain species (e.g., voles, mice, and shrews) benefitted from the development of understory vegetation following a partial harvest because it provided more cover than the existing coarse woody debris offered.

Other prey species noted to be consumed by wolverines include snowshoe hares, bird, and fruits and berries. As noted in the Canada lynx analysis (DEIS pp. 167-187), the stem exclusion habitat condition found within the proposed units does not provide preferred snowshoe hare habitat (i.e., young regeneration and multistory forests). Harvest would create openings that would result in the generation of young trees that would be capable of supporting snowshoe hares within approximately 15 years. The migratory bird analysis (DEIS p. 306-318) describes how the presence of shrubs in the understory appears to be an important component of bird density. Also, in productive Northwest forests, bird species abundance and richness was significantly higher in recently disturbed stands that result in rapid recovery of non-coniferous understory vegetation which decreased over time with conifer replacement and stand maturity. Finally, berry or fruit producing shrubs noted for providing wildlife forage that can be found within the project acres (e.g., mountain ash, serviceberry, huckleberries, and rose) are associated with open forests and openings (Parish et al. 1996).

In summary, harvest would provide a means to simulate a disturbance process that would result in a mosaic of habitat types and conditions that provide for a variety of animal and plant species that could be consumed by a wolverine moving through the area.

***Comment:*** *The DEIS determined that the project is "Not Likely to Jeopardize the Continued Existence" of wolverines (DEIS Table 3.23, p. 115). We would like the opportunity to review and comment on the Biological Assessment that is required to support this "no jeopardy" call as per the requirement in 50 CFR 402.12(k) to prepare a BA for proposed species.* [2-5]

**Response:** A biological assessment for wolverine has been prepared and is posted under the Buckhorn Project Documents on the Kootenai National Forest website http://www.fs.usda.gov/projects/kootenai/landmanagement/projects

***Comment:*** *New research by Sauder and Rachlow (2014) has potential to influence the analysis of impacts to fisher habitat in this DEIS. This research should be examined for inclusion in the Buckhorn project's analyses.* [2-6]

**Response:** The new research provided by the commenter was reviewed and considered for current use. Key findings that were noted include: 1) results emphasize that configuration and proximity of mature habitat is important and not just the abundance of mature habitat; 2) canopy height was a better predictor of fisher mature habitat than canopy cover which has been reported for other studies; 3) fisher home ranges include a small percentage of open habitats, although they generally select against openings and even small increases (i.e., by five percent) could reduce the probability of occupation; 4) metrics measured from multiple use forests did not differ significantly from those of occupied fisher home ranges; and 5) their results are consistent with previous work that suggest that fisher's select home ranges with "a diverse array of available forest conditions" that include mature habitats for resting/denning/predator avoidance as well as young, non-forest, or sparely forested habitats that increase the diversity of small mammals that provide a portion of the fisher diet (e.g., snowshoe hares, microtines, marmots, and ground squirrels).

The Buckhorn fisher analysis estimated existing fisher habitat through stand data information on habitat groups and forest type, structure (tree age/size), and canopy cover. Use of tree age and size, rather than just canopy cover, addresses the importance of canopy height in identifying mature habitat that was found in the study. The project area is very productive due to the availability of mesic habitat types and productive soil conditions here and few naturally occurring open areas (i.e., open forest or non-forest habitats) are found below the high elevation ridgelines. Only a very small percentage of open habitat is expected to be currently found within a fisher home range in this project area and these acres were not included in the existing habitat acres totals found in Table 3.42 of the DEIS. Alternative 2 estimates that approximately four percent of the yearlong habitat would become open habitat for no more than five years with the establishment of shrubs and conifer seedlings. This small increase in open habitat is less than the five percent recommended within a landscape (i.e., average fisher home range) and would result in no more than the average 5.4 percent found within occupied home ranges, assuming all harvest would occur within a single home range. Abundant, contiguous mature forest would remain within the project area including larger patches outside of the proposed harvest area connected to smaller patches within the harvest area that would be interspersed with existing winter foraging and temporary open habitats. The Buckhorn project is consistent with the findings of Sauder and Rachlow (2014).

***Comment:*** *The Buckhorn DEIS includes as fisher habitat "young successional forested habitat and past harvest units and other areas of recent disturbance such as wildfire" (p. 226). The KNF should reconsider the lumping of mature forest stands ("yearlong fisher habitat") with sub-*

*optimal young and disturbed forests ("winter foraging habitat") as fisher habitat when quantifying the amount of fisher habitat in the KNF, as it will artificially inflate the amount of fisher habitat available on the landscape. Yet, Sauder and Rachlow (2014) and numerous others indicate that fishers select against such open areas. While some studies have suggested that these open areas may provide habitat for prey species, fishers do not prefer open patches - "an increase in the amount of open area from 5% to 10% reduces the relative probability of occupation by fishers" significantly (Sauder and Rachlow 2014 p. 81).* [2-7]

**Response:** As discussed in the response to comment 2-6, although Sauder and Rachlow (2014) found that fishers select against openings the authors also found that occupied fisher home ranges within the study area include an average of 5.4 percent open habitat which is consistent with levels in California. Also, they state that their results are consistent with previous work that documented the occurrence and use of open habitats within home ranges as it likely offers a greater diversity of potential prey species. Therefore, based on their results it appears that the mere presence of open habitats does not preclude fisher use of a landscape but rather use is influenced by both the amount and its association with other habitats, primarily mature habitats. With respect to the Buckhorn fisher analysis, although the two types of fisher habitats were lumped to provide an overall estimate of habitat acres available within the project area, potential impact of the proposed harvest were considered separately (see DEIS Table 3.42, p. 227, and direct and indirect effects of timber harvest on pp. 230-231).

***Comment:*** *New research from Olson et al. (2014) is the best available science regarding fisher habitat modeling and particularly regarding habitat patch size. Tree height also was a good predictor of fisher habitat. We have included this document, and we ask the KNF to consider the applicability of its findings and methodology to the Buckhorn project. We also suggest it is reviewed for future use in fisher habitat modeling.* [2-8]

**Response:** The new research provided by the commenter was reviewed and considered for current and future use in project analyses for fishers. Tree height was also found as a good predictor of fisher habitat in Sauder and Rachlow (2014) and its relevance to the Buckhorn project is discussed in comment 2-6.

Olson et al. (2014) were attempting to understand how the distribution of fisher may be affected by current and future climate conditions. The modeling calculated the current availability of fisher habitat as well as future availability based on predicted climate change scenarios in consideration of the effects of dispersal and minimum patch size. While they determined that patch size influenced the amount of future habitat, they also found that "varying dispersal appears to limit habitat availability more than minimum patch size, although there is an interaction between the two." The context of this research is looking at the distribution of fishers and suitable habitat at a regional scale, as influenced by climate change, patch size, and dispersal capabilities when moving through unsuitable habitat types (e.g., valley bottoms, agricultural fields, and human development). The research does not evaluate the effects of vegetation management occurring at a smaller landscape scale and thereby limits its applicability for this project analysis.

The Buckhorn project would not result in a conversion of suitable habitat into unsuitable habitat and mature habitat would remain connected through riparian corridors and unharvested timber found between proposed harvest units. Regeneration harvest would temporarily result in an open habitat. Even if a fisher deemed this open habitat as unsuitable until the vegetation recovered, all

proposed units would be less than 1 km in width which is the smallest dispersal distance evaluated by the authors.

***Comment:*** *Additionally, the Buckhorn DEIS repeatedly mentions that current conditions "consists of dense, homogenous stands which provide little diversity for fisher prey species" without citing any evidence to support that this is a current problem limiting fisher populations on the Forest – this would be valuable information to reference.* [2-10]

**Response:** The results of all three studies provided by the commenter state they are consistent with previous research that suggests that a variety of habitat types and structure are found within fisher home ranges and that they appear to provide for different life requirements. These include open and young forests which are believed to provide for a diversity of prey species. For discussions regarding Sauder and Rachlow (2014) and for Schwartz et al. (2013) see comments 2-6 and 2-9, respectively. Olson et al. (2014) states that "This preference for a landcover type that has a variety of trees and shrubs of various sizes may reflect a previously demonstrated fisher preference for a variety of forest structures, successional stages, and plant communities which is thought to maximize hunting opportunities and provide cover from predation (Lofroth et al., 2013; Schwartz et al. 2013)." Within the DEIS fisher analysis, this is discussed in the Affected Environment/Existing Condition section (pp. 225-226) and references Lofroth et al. 2010, Raley et al. 2012, and Jones 1991.

***Comment:*** *In other words, this uncertainty further emphasizes the reason not to assume that open patches can benefit fishers since the majority of fisher habitat models indicate an avoidance of openness, and we ask that the KNF does not overemphasize the hypothesis that Buckhorn thinning and burning activities will 'help' fishers via 'prey species habitat improvement' as this is not scientifically supported at this point.* [2-11]

**Response:** We acknowledge the concern about not overemphasizing the importance of open patches and young forest compared to the well documented importance of mature habitat and associated large structural components. However, based on the literature review above as well as that referenced within the Buckhorn fisher analysis, these habitats appear to play a role within fisher home range selection and use. Therefore, the potential value of these habitat types in providing habitat and structural diversity as well as an element of fisher life requirements cannot be discounted at this time.

***Comment:*** *As a final note, likely the best way to maintain fisher habitat and that of other cavity-dwellers is to retain all snags – not just those showing existing wildlife use ("the silvicultural prescription for all harvest units is to leave any snags showing existing wildlife use...(e.g. old pileated woodpecker nest cavities)" (DEIS p.230)) (emphasis added by commenter).* [2-12]

**Response:** The Forest Service agrees that cavity habitat is important. The sentence should read "The silvicultural prescription for all harvest units is to leave existing snags as well as large diameter live trees showing existing wildlife use, preferably in groups or in proximity to leave trees." This has been corrected in the Errata section in Chapter 4 and supporting information can be found in Chapter 2 Design Features (DEIS p. 55) and the Cavity Habitat analysis (DEIS p. 324). The response to the comment below [8-3] also discusses the provisions that have been put in place to provide snag habitat and meet safety standards.

***Comment:*** *I'd also like to mention how important I feel it is to leave as many snags and potential snags as possible for wildlife. It seems rather than removing snags because they are a hazard,*

*why not make the area around the snag a leave island and just stay away from it. Then it isn't a hazard.* [8-3]

**Response:** All feasible means will be used to maintain snags and cavity habitat. Where available, snags will be designated for retention in amounts meeting or exceeding the 6-12/acre described in the design features. Timber marking crew members will be directed to leave all functional wildlife snags while focusing their attention on the largest, best candidates (western larch, cedar, Douglas-fir and white pine). This includes both dead snags and any tree with signs of wildlife use, such as evidence of foraging or nesting cavities. Trees left for other purposes, such as seed source, structure, and age class diversity, will likely become functional snags over time. If funding is available a large number of mistletoe infected larch (left for snag recruitment) will be girdled following harvest. Snags that are felled for safety purposes will be left on sight as per contract provisions (DEIS, p. 58).

It is not feasible to protect all snags with leave islands because other project objectives could not be met. However, efforts will be made to group or clump snags and recruitment snags (the focus is on trees that have a high probability of future use and superior functionality due to stem decays or mistletoe infections) along with healthy leave trees to reduce operator exposure to the hazard they present and increase the chances of them remaining post-harvest. This also increases the effectiveness of the habitat by providing increased security and shelter.

***Comment:*** *The Act does not allow the "take" of birds under and circumstances. Perceived habitat improvement caused by timber sale implementation is not an excuse to take actions resulting in the "loss of adults, fledglings, and nests of neotropical migratory birds." Request for changes to be made to the final NEPA document: Please describe the mitigation that will be applied and/or the sale modifications that will eliminate any chance that there will be a "loss of adults, fledglings, and nests of neotropical migratory birds."* [11-11]

**Response:** The U.S. Fish and Wildlife Service (USFWS) is the lead federal agency for managing and conserving migratory birds in the United States; however, under Executive Order (EO) 13186 all other federal agencies are charged with the conservation and protection of migratory birds and the habitats on which they depend. The EO and the 2008 Memoranda of Understanding (MOU) between the U.S. Forest Service (USFS) and USFWS provide the primary direction for management of migratory birds during project design and NEPA analysis. Under the framework of the established agency-specific MOU, as required by the EO, agencies would:

- support the conservation intent of the migratory bird conventions by integrating bird conservation principles, measures, and practices into agency activities and by avoiding or minimizing, to the extent practicable, adverse impacts on migratory bird resources when conducting agency actions;
- restore and enhance the habitat of migratory birds, as practicable;
- identify where unintentional take reasonably attributable to agency actions is having, or is likely to have, a measureable negative effect on migratory bird populations (emphasis added).

The agencies identified the importance to:

- focus on bird populations;
- focus on habitat restoration and enhancement where actions can benefit specific ecosystem and migratory birds dependent upon them;

- recognize that actions taken to benefit some migratory bird populations may adversely affect other migratory bird populations; and
- recognize that actions that may provide long-term benefits to migratory birds may have short-term impacts on individual birds (emphasis added).

The MOU describes the mission and role of the USFS and states: "Within the National Forest System, conservation of migratory birds focuses on providing a diversity of habitat conditions at multiple spatial scales and ensuring that bird conservation is addressed when planning for land management activities." The USFS is directed to evaluate the effects of proposed actions under the NEPA process that considers, "to the extent practicable," potential adverse effects against long-term benefits, pursue habitat restoration or enhancement, and "identifying and minimizing take that is incidental to otherwise lawful activities" (emphasis added).

The predominant habitat type within the Buckhorn Project is very productive and few open habitat conditions can be found. Proposed treatments would be "managing towards characteristic vegetation patterns, species composition, structure, patch size, and fuel loading" (DEIS p. 314) that would provide habitat diversity within the project area and benefit those migratory bird species associated with more open conditions. A timing restriction for logging activities post June 16 for grizzly bears reduces the potential impacts to individuals as harvest could not occur until the latter portion of the nesting period. Also, "spring conditions such as lingering snow on access roads, rain, and timing of vegetation green-up often limits the ability to conduct spring burning" (DEIS p. 315) during this time.

Management for migratory birds under the Buckhorn project is in compliance with the EO and MOU. These guiding documents emphasize management and analysis with respect to populations rather than individuals, focus on habitat restoration and enhancement, and that is not likely practicable to mitigate all potential effects to migratory bird species associated with lands management activities. In summary, the project "would provide more sustainable neotropical migratory birds habitats in the area as well as greater habitat diversity for more species' utilization" (DEIS p. 315).

## Fisheries/Water

***Comment:*** *Request for changes to be made to the final NEPA document:*

> *provide data, text and maps demonstrating that protection is provided for streams, stream-banks, lakes, wetlands, and other bodies of water from detrimental changes in water temperatures, blockages of water courses, and deposits of sediment* [11-3] [11-1].

**Response:** Stream protections are discussed on p. 339 of the DEIS under the "Kootenai Forest Plan" heading. This section references USDA Forest Service 1995, which is the Inland Native Fish Strategy (INFISH). This document contains the protections that amended the Kootenai Forest Plan in 1995. On p. 346 of the DEIS, third paragraph, there is a reference to the RHCA modification for Unit 4, which describes how a modified Riparian Habitat Conservation Area buffer will protect Meadow Creek adjacent to and downstream of Unit 4.

***Comment:*** *Request for changes to be made to the final NEPA document: Please survey the streams that might be affected by timber sale activity and include the information in the final NEPA document. If you decide not to do these surveys, then please explain how you will*

*determine accurate effects of implementing this timber sale on stream turbidity and temperature without recent "before" measurements.*[11-19]

**Response:** Stream survey summaries are provided in Tables 3.54 (p. 341), 3.55 (pp. 341-342), and 3.56 (p.342). The data sheets for the habitat surveys are found in the fisheries project file and the stream temperature (hobotemp) summaries are also found in the project file. Turbidity measurements are not taken in these streams, as this type of data is difficult to collect in these types of stream systems. However, percent pool tail fines in the habitat survey data has successfully been used as a surrogate for turbidity information.

***Comment:*** *Our group supports the decision in the DEIS of doing the watershed work necessary and keeping a majority of this road open for winter motorized (snowmobile) use, while decommissioning the smaller piece of it that would be unused by the snowmobilers. This was a common-sense solution to the future of this road and the team is appreciative of the District for actively engaging our group on a field trip with the District hydrologist to find resolution.* [1-3]

**Response:** Thank you for your support for these activities.

***Comment:*** *The EPA also appreciates that the Draft EIS has identified several indicators of aquatic resource health (eg. sediment loading, stream geomorphology condition, impacts from roads and structures found in old roads and trails, etc.). We note that additional information is referenced in Appendix I- Literature Cited which could be included in the body of the Final EIS to add to this discussion of baseline information. The documents that we recommend be referenced are those that most specifically assist in characterizing the current condition of surface water resources in the project area and provide information regarding how they will be maintained or improved. One example is the Kootenai National Forest- Key Consensus-watershed condition evaluation factors (2002). Including information like this can help meet the need for providing baseline information to measure future changes from the proposed action and activities throughout the watersheds of the project area. The information is also important for understanding the current condition of water quality in the project area and informs field monitoring staff when mitigation of direct, indirect and cumulative impacts needs to be implemented.* [13-1]

**Response:** The KNF key consensus watershed condition evaluation factors were developed based on GIS queries for broad scale comparison of larger watersheds across the forest. The water and soil resources analyses include some of the same type of information, such as equivalent clearcut area, road density and road/stream crossing density, but also include much more site specific information such as road conditions and stream channel conditions. In addition the project analysis addressed some watersheds at a smaller scale than the KNF key consensus. In general, the water resources analysis provides similar, but more accurate information regarding cumulative effects and the need for potential mitigation than the KNF key consensus document.

***Comment****: Although the Draft EIS includes riparian habitat conservation areas to protect vegetation, streams, wetlands, springs and seeps, with 100 to 300 foot buffers, from harvesting, it does not provide specific information describing the extent to which such sensitive resources are present in the project area. The EPA recommends that the Final EIS include a qualitative discussion of the presence and existing condition of such resources. The EPA recommends including a detailed map showing their location relative to areas proposed for treatment and access due to road maintenance within the project area.* [13-2]

**Response:** Water features are present that are not shown on the hydrographic layer. These are primarily intermittent streams and seeps. Through extensive field reconnaissance we have identified these features within and adjacent to the harvest units. Road surveys also revealed small streams not shown on the maps. We do not have one map of all of these features, however all features needing protection as required by INFISH or Montana's water quality laws, including the Streamside Management Zone Act (SMZ), are being protected, either by being excluded from the sale area completely or by being identified as an SMZ on the sale area map.

***Comment:*** *The Draft EIS includes specific information on road construction, decommissioning and mitigation of watershed impacts from publicly accessible and non-publicly accessible roads. The EPA recommends the Final EIS and Record of Decision include, or clarify how USFS has assured a commitment to monitor road reconstruction, decommissioning, storage and new road activities to ensure that the BMPs identified in the Draft EIS are performing as intended to protect water resources.* [13-3]

**Response:** All projects are monitored during implementation by the construction Contracting Officer Representative and inspector. Post project monitoring is not comprehensive, but is implemented by interdisciplinary team BMP monitoring. The district and the forest monitor a subset of road activities each year. This monitoring is documented in the KNF's annual monitoring reports, which are available on the Kootenai National Forest website http://www.fs.usda.gov/detail/kootenai/landmanagement/planning/?cid=stelprdb5347363. The effectiveness of BMPs are summarized in the DEIS p. 388.

## Soils

***Comment:*** *provide data and text demonstrating that soil, slope, or other watershed conditions will not be irreversibly damaged by clearcutting* [11-1] [11-7]

**Response:** The Soil Resources chapter in the DEIS describes the anticipated effects of the regeneration harvest units on soils. The level of detrimental soil disturbance expected is displayed by unit by alternative. Detrimental soil disturbance is not irreversible and recovery occurs over a period of years as described on p. 397 under Current Condition and Trend. The possibility of landslides was evaluated by looking at maps, landtypes, aerial photos and field reviews. No areas of landslide risk were identified as documented on p. 404. Effects of the proposed regeneration harvest on water quality, riparian condition, water yield, and sediment yield is described in the effects analysis in the Water Resources section. No significant or irreversible changes to stream channel conditions are expected as summarized by watershed on p. 384-387.

***Comment:*** *We feel that log landings for each unit should be rehabilitated instead of being abandoned as "wastelands" covered in weeds. We know the Forest Service is capable of this kind of work, and it is unacceptable that as work proceeds in the woods, the acreage of these "wastelands" steadily increases across the forest.* [9-4]

**Response:** Because landing piles are usually burned by the Forest Service after the timber purchaser's activities are complete, the inclusion of landing rehabilitation in the timber sale contract has not always been feasible. However, in the timber sale contracts authorized by this Decision we will include special provision C6.633 which will require scarification of the landing areas. We will also require that the landing areas are seeded. Because piles are burned by the Forest Service and not the purchaser, it is likely that this work will be done before the landing

piles are burned. Therefore treatment of the burn pile areas will probably not occur under the timber sale contract. Additional rehabilitation of the burn pile areas will be pursued using other contract mechanisms if an evaluation of the benefit to soil productivity, weed suppression and visuals appears to outweigh the impacts of additional disturbance and cost. This work would be dependent on additional funding.

The District recognizes the need for landing rehabilitation in some areas and was successful in receiving RAC funding this year for landing rehabilitation in older timber sale units across the district. We will be using district personnel to begin this work this summer. Additionally, the purchaser of a district stewardship contract will be performing some landing clean-up after pile burning this year. District personnel will be monitoring activities to determine effectiveness of treatments. We will continue to look for RAC, KV and Stewardship funding opportunities for this type of work.

## Noxious Weeds

***Comments:*** *One of our main concerns regarding logging is the frequency with which units that were heretofor not infested with noxious weeds become infested as a result of logging activity. Too often weed spraying which was part of the plan simply does not get done, and follow up spraying hardly ever gets done. Soil is disturbed and compacted by heavy equipment, native vegetation destroyed, and the forest opened up to winds carrying weed seeds from afar. Meanwhile the Forest Service has gone on to the next project, without looking back to monitor--and mitigate--the consequences of the last one. Our feeling is that logging should be done only when the resources and the commitment exist to ensure that the work is done to prevent weed infestation of the project area. Besides all the usual strategies, we suggest that buffer areas of thick native vegetation along roadsides adjacent to logging units be left. We can personally attest to the effectiveness of this strategy, as a "hedge" of young spruce has largely kept weeds from colonizing our property along the Yaak Road.*[9-2]

**Response:** It is true that the district and agency, as currently funded, has not been able to eradicate weeds on the district. We have learned from past experiences, and continue to improve weed management efforts on the District and Forest. We now have a USFS dedicated, experienced weed spraying crew who keep meticulous records of spraying activities. The fact that weeds are present does not mean that the area was not sprayed. Weed seed can remain viable in the soil for many years and the type of spray we use does not kill seeds. Preventing weeds from infesting disturbed (and even undisturbed) areas on over 609,000 acres is a tall task. Seeds of some weeds are wind-borne and can be transported many miles at great heights unimpeded by roadside vegetation "hedges". We appreciate your personal experience of a weed hedge, but those results have not been identified on NFS land, and furthermore in most of the areas proposed for harvest a natural hedge does not exist other than moderate to light density roadside cut-bank vegetation of Douglas-fir, grand fir and lodgepole pine. Timber sale contract provisions will be included that require cleaning of all off road equipment of weed seed carrying soil and debris to prevent direct distribution of weed seeds into harvest areas. We continue to spray weeds along roads, gravel pits, and within areas of know infestations prior to project activities and post activities.

The district is also very actively involved in release of biological control agents as available for well-established weed species. Unfortunately, biological control for the exotic hawkweeds is not widely available yet. However there is now one species being released on the Forest for

hawkweed. Our hope is that the species thrives and reduces the vigor of exotic hawkweeds on the Forest.

Whether the district actively manages the forest or not disturbance events will continue to occur including fire and wind. These disturbed areas will also be subject to weed infestation. This is not to say weed suppression should not be attempted, because it should, and the District and Forest will do everything within budgetary constraints to reduce the spread of weeds including increasing follow up efforts after timber harvest. However, weed spread would occur at some point whether disturbance is caused by management or by natural events. It is important to the Forest Service to continue to promote development and establishment of effective biological controls for all well-established weed species on the Forest.

***Comment:*** *Also, it seems to go without saying if you are going to manage the landscape to improve wildlife habitat you should do all you can to limit or end the spread of noxious weeds which are becoming a real nightmare. It so sad to see old, abandoned logging roads covered with hawk weed, knapweed, and now St. Johnswort. Yes there are lots of trees growing on these same old roads, but what's really important is the ground cover.* [8-2]

**Response:** We agree that noxious weeds are not good for the environment and can be difficult to suppress. Weeds like the hawkweeds are especially difficult because they don't need disturbance to spread. Wind and animals can disperse seeds, distributing these weeds to remote locations. Timber sale contract provisions will be included that require cleaning of all off road equipment of weed seed carrying soil and debris to prevent direct distribution of weed seeds into harvest areas. We continue to spray weeds along roads, gravel pits, and within areas of know infestations prior to project activities and post activities. Records of past spraying are listed on p.420-421 of the DEIS.

## Fire/Fuels

***Comment:*** *The KFSC team supports the prescribed burning proposed on the Buckhorn project. However, as mentioned at last week's meeting, our group has concerns as to the feasibility of implementing the burns, which seemed to be reciprocated by the District.*

*The KFSC team also stresses the importance of executing the burns in coordination with similar burns planned on the Idaho side of Buckhorn ridge by the IPNF. A cautious approach is recommended along with an urging for monitoring post-burning. Our concern being that a stated reason for the burning is to increase abundance of huckleberry on the landscape. Huckleberry can take anywhere between 5 -10 years to respond post treatment - so we encourage monitoring as a way to ensure that the amount of huckleberry is not depleted before subsequent burns are initiated.* [1-4]

**Response:** The Forest Service also recognizes that it will be a challenge will be to accomplish all the proposed landscape burns within the time period specified due to the complexities of landscape scale burning, disclosed this on p. 35-36 of the DEIS. However, every effort will be made to successfully implement the proposed prescribed burning and to achieve this. Three Rivers Ranger District is seeking funding and partnerships with other districts and organizations that support wildlife enhancement efforts. The Three Rivers District intends to coordinate the timing of burning closely with Idaho Panhandle National Forest (DEIS, p. 35).

Huckleberry monitoring will be conducted in conjunction with the whitebark pine monitoring as listed on Monitoring Item #10 Appendix 3 of the FEIS. Locations of burn units will be staggered from year to year to reduce potential impacts to a common ridge/watershed or other resources, including the quantity and health of huckleberry plants.

***Comment:*** *We urge the District to move through prescribed fire operations in Buckhorn with monitoring that not only measures the "success" of the burns on the landscape, but to possibly partner with other agencies (USF&G, MTFW&P, and IDF&G) to monitor the affect the burns will have on wildlife. One of the stated reasons for returning fire to the forest is to increase browse and forage opportunities for big game and grizzly bear (DEIS, 34). If the USFS were to partner with agencies that monitor wildlife, correlations between management of habitat and associated effects on elk or bear could be made - which would be very useful documentation for future management considerations.* [7-15]

**Response:** As was mentioned above in the Response to Comment [1-4], the district will monitor huckleberry and whitebark pine in the prescribed burn units to help determine species response to management activities. The Forest Service is open to creative partnerships that would enhance monitoring efforts and provide additional information to partner agencies and organizations.

***Comment:*** *We heartily endorse the planned prescribed burns in the project.* [9-3]

**Response:** We appreciate your endorsement of the proposed burns, thank you for your support.

***Comment:*** *Request for changes to be made to the final NEPA document: Analyze a Dr. Cohen methods alternative in detail. If the P&N was written to exclude alternatives to the Proposed Action that do not involve logging modify it too. The goal as described in the P&N should not be fuels reduction. It must be to take action to reduce the risk of damage to homes and the risk of injury in the WUI. Fuels reduction logging would be one action alternative.* [11-12] [11-13]

**Response:** Alternative 1, the no action alternative, does not propose logging and is a viable alternative that could be chosen by the Responsible Official. The Buckhorn Project seeks to promote resilient forest conditions, one aspect of which is to achieve more characteristic fuel loading in the project area. While Buckhorn is not considered to be a fuels reduction project, per se, it is possible that one of the by-products of proposed activities is the reduction of fuels on the landscape to modify fire behavior in the event of a wildfire, but it is not one of the primary objectives (see Fire/Fuels analysis in DEIS on p.446-461). The team has reviewed Dr. Cohen's work, but did not find his work to be directly applicable to the Buckhorn Project because we are not treating fuels on private lands as much of Dr. Cohen's work recommends.

## Air Quality

***Comment:*** *The Draft EIS does not include information on what specific pollutants, other than PM 10 and PM 2.5, would be emitted, in what quantities, and how those emissions may impact air quality and air quality related values (AQRVs). Prescribed fire activity may cause degradation of air quality and visibility in the region, especially a large prescribed area such as this. The EPA acknowledges the individual burn plans prepared for this activity would quantify expected emissions; however, the EPA recommends that the Final EIS provide a qualitative discussion of criteria pollutants anticipated to be emitted by project activities and how the emissions are predicted to impact air quality and AQRVs in the project area and surrounding communities.* [13-4]

**Response:** The National Ambient Air Quality Standards regulated pollutants of burning of brush and forest vegetation includes particulate matter, carbon monoxide, carbon dioxide, ozone, nitrogen dioxide and lead (if it's present in the existing vegetation from auto exhaust or acid rain sources). Carbon dioxide, ozone, nitrogen dioxide and lead are either non-existent or produced in "negligible quantities during prescribed fires and wildfires in the west" and may be monitored if the project is in or near a non-attainment area for CO or ozone (http://fsweb.mtdc.wo.fs.fed.us/nepa/index.htm ).

The primary pollutants of concern are carbon monoxide, which due to rapid dilution is primarily a hazard to ground personnel conducting burning operations, and particulate matter. Particulate Matter (PM) contributes to regional haze and respiratory health, which is why it is regulated by the Montana/Idaho Airshed Group. They help burners meet state regulatory requirements using the EPA's Interim Air Quality Policy on Wildland and Prescribed Fire as guidance. The role of the Smoke Management Unit is to forecast smoke dispersion conditions and coordinate the members proposed burning and associated smoke emissions in order to prevent adverse smoke impacts. This regulation takes into account the cumulative effects from all burners contributing to the airshed in conjunction with weather forecast and meteorologist to ensure public health standards are not compromised in the project area or local communities.

***Comment:*** *The EPA recommends the Final EIS include a commitment to directly notify the populated areas close to pending burns through, at a minimum, notices in local newspapers. This is especially important for the residents in nearby communities and the Wildfire Urban Interface area downwind of the burn areas.* [13-5]

**Response:** As a general practice, the Three Rivers Ranger District posts news releases in local papers and the paper of record that include maps and descriptions of the planned prescribed burns on the district twice a year, one for spring burning and one for fall burning. In addition to the news releases, the district prepares a newsletter to the public that includes a map and description of the anticipated prescribed burning activities. Each individual burn plan contains a list of personal contacts to be made prior to ignition, which includes local land owners and residence of the general area where smoke may be visible. In response to this comment, a design feature explaining the public notification process has been added to the design features (FEIS, Appendix 2).

## Literature Cited in the Response to Comments

Fuller, A., D. Harrison, and J. Lachowski. 2004. "Stand scale effects of partial harvesting and clearcutting on small mammals and forest structure." Forest Ecology and Management 191: 373-386.

Kasworm, W (US Fish and Wildlife biologist). 2014. Personal Communication to M. Rockwell, wildlife biologist, three Rivers Ranger District, Troy, Montana. March 28, 2014

Kirkland, G. 1990. "Patterns of initial small mammal community changes after clearcutting of temperate North American forests." Oikos 59(3): 313-320.

May, R., A. Landa, J. van Dijk, J.D.C. Linnell, and R. Andersen. 2006. "Impact of infrastructure on habitat selection of wolverines Gulo gulo." Wildlife Biology 12: 285-295.

NatureServe. 2014. Columbian ground squirrel ecology. Accessed from

http://explorer.natureserve.org/servlet/NatureServe?sourceTemplate=tabular_report.wmt&loadTemplate=species_RptComprehensive.wmt&selectedReport=RptComprehensive.wmt&summaryView=tabular_report.wmt&elKey=103644&paging=home&save=true&startIndex=1&nextStartIndex=1&reset=false&offPageSelectedElKey=103644&offPageSelectedElType=species&offPageYesNo=true&post_processes=&radiobutton=radiobutton&selectedIndexes=103644 on March 27, 2014. 11 p.

Olson, L., J. Sauder, N. Albrecht, R. Vinkey, S. Cushman, and M. Schwartz. 2014. "Modeling the effects of dispersal and patch size on predicted fisher (Pekania [Martes] pennanti) distribution in the U.S. Rocky Mountains." Biological Conservation 169: 89-98.

Parish, R., R. Coupé, and D. Lloyd. 1996. Plants of Southern Interior British Columbia. Lone Pine Publishing, Vancouver, BC/Edmonton, AB/Redmond, WA. Pp. 49-99.

Ramirez, P., and M. Hornocker. 1981. "Small mammal populations in different-aged clearcuts in Northwestern Montana." Journal of Mammalogy 62(2): 400-403.

Sauder, J., and J. Rachlow. 2014. "Both forest composition and configuration influence landscape-scale habitat selection by fishers (Pekania pennanti) in mixed coniferous forests of the Northern Rocky Mountains." Forest Ecology and Management 314: 75-84.

Schwartz, M., N. DeCesare, B. Jimenez, J. Copeland, and W. Melquist. 2013. "Stand- and landscape-scale selection of large trees by fishers in the Rocky Mountains of Montana and Idaho." Forest Ecology and Management 305: 103-111.

Sullivan, T., and D. Sullivan. 2001. "Influence of variable retention harvest of forest ecosystems. II. Diversity and population dynamics of small mammals." Journal of Applied Ecology 38: 1234-1252.

Zielinksi, W., R. Truex, G. Schmidt, F. Schlexer, K. Schmidt, and R. Barrett. 2004. "Resting habitat selection by fishers in California." Journal of Wildlife Management 68: 475-492.

Zwolak, R. 2009. "A meta-analysis of the effects of wildfire, clearcutting, and partial harvest on the abundance of North American small mammals." Forest Ecology and Management 258: 539-545.

## List of Recipients

The following is a list of recipients to whom this Final EIS or notice of availability has been sent. Additional copies of this Final EIS are available upon request from the Three Rivers Ranger District in Troy, Montana.

### Local Government and Elected Officials

Lincoln County Commissioners
Boundary County Commissioners

### Federal Agencies

Advisory Council on Historic Preservation
Northwest Power Planning Council
Environmental Protection Agency - Region 8
US Army Corps of Engineers - Northwest Division
US Coast Guard
US Department of Homeland Security - Border Patrol
USDA - Animal and Plant Health Inspection Service
USDA - Natural Resource Conservation Service
USDA-National Agricultural Library
USDI – Fish and Wildlife Service
US Department of Energy

### Organizations

Alliance for the Wild Rockies
Kootenai Forest Stakeholder Coalition
Kootenai Valley Resource Initiative
Idaho Forest Group
Montana Wilderness Association
The Lands Council
Yaak Valley Forest Council

### State Agencies

Montana Department of Environmental Quality
Montana Department of Fish, Wildlife and Parks

### Native American Tribes and Organizations

Confederated Salish and Kootenai Tribe
Kootenai Tribe of Idaho
Kootenai Salish Tribal Liaison

### Individuals

Artley, Richard
Bier, Jeff
Brown, Ron
Byars, Bob
Chandler, Gary
Fortier, Phil
Fuqua, Pam
Higgins, Ron
Hoff, George
Janssen, Sue
Johnson, Jim
Johnson, Tony
Kuropat, Betty and Ed
Linehan, Tim
Murphy, Dennis
McAfee, Sean
Public, Jean
Ruestow, Judith
Shelton, Russ
Stehlick, Linda
Strohl, Dan
Wandler, Jerry
Weatherbee, Fred
Wimer, Ken and Laurie







## Legend

- Project Area
- Streams
- Open Roads
- Other Roads*
- Inventoried Roadless Area
- Non FS lands

**Alternative 2**
**Proposed Activities**

- Improvement Harvest
- Regeneration Harvest
- Prescribed Burns
- Haul Routes
- Temporary Roads

**Watershed Work ****

- Decommissioning - Active
- Decommissioning - Passive
- Storage - Active
- Storage - Passive

*Other roads are gated, barriered, or impassable, due to vegetation.

** All watershed work is occuring on roads currently closed to wheeled motorized use.

0 0.5 1 Miles

N S E W

GMA - 15 Apr 2014

## Buckhorn FEIS

## Alternative 2 with modifications

M - A

FS-047321

# Appendix 1 – Treatment Summary Table, Alternative 2 with modifications

## Harvest Treatment Summary Table

| Unit # | Management Area | Acres | Alternative 2 with modifications | | | Purpose and Need | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Existing Condition | Proposed Treatment | Objectives | Promote White Pine and Western Larch | Improve Huckleberry Production | Improve Big Game Forage | Provide Wood Products | Characteristic Patch Size |
| 1 | 12 | 35 | Mixed conifer C, WH, GF, WL, WP, ES. Low vigor, small crowns. High stem disease occurrence. Dead WP and LP. In WUI. | Regenerate – Seedtree cut via winter tractor leaving WL, DF, WP. Underburn below road and exc pile above. Natural regen, interplant WP | Initiate regeneration. Salvage dead and dying trees, reduce fuel load, increase productivity by fully stocking stand, promote huckleberry and forage. | X | X | X | X | |
| 2 | 12 | 33 | Mixed conifer WL, WH, C, GF, LP, DF, WP. Portions are LP dominated. Declining health and mortality in WP, LP. In WUI | Regenerate-Shelterwood cut via tractor leaving WL, DF, WP. Underburn, Natural regen, interplant WP | Initiate regeneration. Salvage dead and dying trees, reduce fuel load, increase productivity by fully stocking stand, promote huckleberry and forage. | X | X | X | X | |
| 3 | 11 | 15 | Varied with dense C, WL, ES, WP and more open areas where WP was salvaged. RR in patches in DF and C. High stem disease occurrence. In WUI | Regenerate-Shelterwood cut via tractor leaving WL, DF, C, A, ES. Spot exc pile, plant WL, WP | Initiate regeneration. Salvage dead and dying trees, reduce fuel load, reduce fuel load, increase productivity by fully stocking stand, promote huckleberry and forage. | X | X | X | X | |
| 4 | 11 | 5 | Mixed conifer WL, DF dominated. Many small WL that are suppressed. Dense understory/ladder fuels in places. In WUI | Regenerate – Seedtree cut via tractor leaving WL, DF. Underburn. Natural regen, interplant WP | Initiate regeneration to improve overall health and vigor, reduce fuel load, Provide forage | X | | X | X | |



FS-047322

| Unit # | Management Area | Acres | Alternative 2 with modifications | | | Purpose and Need | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Existing Condition | Proposed Treatment | Objectives | Promote White Pine and Western Larch | Improve Huckleberry Production | Improve Big Game Forage | Provide Wood Products | Characteristic Patch Size |
| 4A | 11 | 6 | Mixed conifer WL, DF dominated. Many small WL that are suppressed. Dense understory/ladder fuels in places. In WUI | Regenerate – Seedtree cut via tractor leaving WL, DF. Underburn. Natural regen, interplant WP | Initiate regeneration to improve overall health and vigor, reduce fuel load, Provide forage | X | | X | X | |
| 5 | 12 | 13 | Mixed conifer WL dominated with LP, C, DF 4-10" dbh. Low vigor due to density and tough growing site. In WUI | Improvement cut via tractor. Yard tops. Future underburn as part of D. | Reduce density to improve growing conditions, reduce fuel load, | X | | | X | |
| 6 | 11 | 24 | LP dominated with WL, DF and small area of C, WH at east end. Scattered MPB mortality in LP and condition is in decline. In WUI | Regenerate-seedtree cut via tractor leaving WL, DF. Underburn, Natural regen interplant WP, | Initiate regeneration. Salvage declining LP, start stand over to improve overall health and vigor. Provide forage | X | | X | X | |
| 8 | 11 | 23 | WL, DF dominated. Heavy DMT in WL. Rocky soils. Heavy ladder fuels. In WUI | Regenerate-shelterwood cut via tractor leaving WL, DF. Underburn, Natural regen, interplant WP | Initiate regeneration to improve overall health and vigor, reduce fuel load, Provide forage | X | X | X | X | |
| 9 | 12 | 101 | Mixed conifer GF, C, WH, WL, WP, DF, LP. WP, LP mortality throughout – heavy in places. Moderate to heavy fuel loading. Partly in WUI | Regenerate-clearcut with reserves via winter tractor leaving WL, DF, WP. Exc pile hakf/underburn half, Plant WL, DF, WP | Initiate regeneration to improve overall health and vigor, and re-establish WP, WL. Reduce fuel load, Provide forage. Mimic natural patch size and shape | X | X | X | X | X |
| 9A | 12 | 3 | Mixed conifer GF, C, WH, WL, WP, DF, LP. WP, LP mortality throughout – heavy in places. Moderate to heavy fuel loading. Partly in WUI | Regenerate-clearcut with reserves via winter tractor leaving WL, DF, WP. Exc pile, Plant WL, DF, WP | Initiate regeneration to improve overall health and vigor, and re-establish WP, WL. Reduce fuel load, Provide forage. Mimic natural patch size and shape | X | X | X | X | X |

| Unit # | Management Area | Acres | Alternative 2 with modifications | | | Purpose and Need | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Existing Condition | Proposed Treatment | Objectives | Promote White Pine and Western Larch | Improve Huckleberry Production | Improve Big Game Forage | Provide Wood Products | Characteristic Patch Size |
| 9B | 12 | 4 | Mixed conifer GF, C, WH, WL, WP, DF, LP. WP, LP mortality throughout – heavy in places. Moderate to heavy fuel loading. Partly in WUI | Regenerate-clearcut with reserves via winter tractor leaving WL, DF, WP. Exc pile, Plant WL, DF, WP | Initiate regeneration to improve overall health and vigor, and re-establish WP, WL. Reduce fuel load, Provide forage. Mimic natural patch size and shape | X | X | X | X | X |
| 10 | 12 | 94 | Previous mgmt removed dominant WL, WP, C. Now dominated by WH, GF, C, and some WL, WP, DF, ES. Many dead WP and GF. Low stocking in areas. | Regenerate-seedtree cut via winter tractor leaving WL, DF, WP. underburn, Natural regen, interplant WP. | Initiate regeneration to improve overall health and vigor, and re-establish WP, WL. Promote huckleberry and forage. Mimic natural patch size and shape | X | X | X | X | X |
| 11 | 12 | 144 | In south half previous mgmt removed many dominant WL, WP, C. Now dominated by WH, GF, C, and some WL, WP, DF, ES. Many dead WP and GF. Low stocking in areas. North ¼ GF, WL, C, WP dominated and condition may allow for intermediate treatment. Rest of unit is mixed conifer C, GF, with areas of very high fuel loads from dead WP, GF. And very good/healthy large WL, DF, and some WP. | Regenerate - Seedtree cut via winter tractor leaving WL, DF, WP. Underburn, Natural regen, interplant WP | Initiate regeneration to improve overall health and vigor, and re-establish WP, WL. Promote huckleberry and forage. Mimic natural patch size and shape | X | X | X | X | X |

| Unit # | Management Area | Acres | Alternative 2 with modifications | | | Purpose and Need | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Existing Condition | Proposed Treatment | Objectives | Promote White Pine and Western Larch | Improve Huckleberry Production | Improve Big Game Forage | Provide Wood Products | Characteristic Patch Size |
| 12 | 11, 12 | 68 | Previous mgmt removed many dominant WL, WP, C. Now dominated by WH, GF, C, and some WL, LP, WP, DF, ES. Many dead WP and GF. South ¼ is C, GF, ES, LP dominated and in poor health generally. LP is fading/small crowns. Scattered, good/healthy large WL, DF, and some WP. in WUI | Regenerate - Seedtree cut via tractor leaving WL, DF, WP. Underburn, Interplant WL, DF, WP. | Initiate regeneration to improve overall health and vigor, and re-establish WP, WL. Promote forage. Mimic natural patch size and shape | X | | X | X | X |
| 13 | 12 | 45 | Previous mgmt removed many dominant WL, WP, C. Now dominated by WH, GF, C, and some WL, LP, WP, DF, ES. Many dead WP and GF. Scattered, very good/healthy large WL, DF, and some WP. in WUI | Regenerate - Seedtree cut via tractor leaving WL, DF, WP. Underburn, Interplant WL, DF, WP. | Initiate regeneration to improve overall health and vigor, and re-establish WP, WL. Promote forage. Mimic natural patch size and shape | X | | X | X | X |
| 14 | 12 | 245 | Previous mgmt removed many dominant WL, WP, C. Now dominated by WH, GF, C, and some WL, LP, WP, DF, ES with many dead WP and GF in south 1/3. Center 1/3 is WL, DF, LP, WP. Northern 1/3 varies with dominance of DF, LP, ES. Scattered, very good/healthy large WL, DF, and some WP. | Regenerate - Seedtree cut via tractor leaving WL, DF, WP. Underburn half and exc pile half. Interplant WL, DF, WP. | Initiate regeneration to improve overall health and vigor, and re-establish WP, WL. Promote forage. Mimic natural patch size and shape | X | | X | X | X |

| Unit # | Management Area | Acres | Alternative 2 with modifications | | | Purpose and Need | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Existing Condition | Proposed Treatment | Objectives | Promote White Pine and Western Larch | Improve Huckleberry Production | Improve Big Game Forage | Provide Wood Products | Characteristic Patch Size |
| 14A | 12 | 10 | Previous mgmt removed many dominant WL, WP, C. Now dominated by WH, GF, C, and some WL, LP, WP, DF, ES with many dead WP and GF in south 1/3. Center 1/3 is WL, DF, LP, WP. Northern 1/3 varies with dominance of DF, LP, ES. Scattered, very good/healthy large WL, DF, and some WP | Regenerate - Seedtree cut via winter tractor leaving WL, DF, WP. Underburn half and exc pile half. Interplant WL, DF, WP. | Initiate regeneration to improve overall health and vigor, and re-establish WP, WL. Promote forage. Mimic natural patch size and shape | X | | X | X | X |
| 14B | 12 | 23 | Previous mgmt removed many dominant WL, WP, C. Now dominated by WH, GF, C, and some WL, LP, WP, DF, ES with many dead WP and GF in south 1/3. Center 1/3 is WL, DF, LP, WP. Northern 1/3 varies with dominance of DF, LP, ES. Scattered, very good/healthy large WL, DF, and some WP | Regenerate - Seedtree cut via tractor leaving WL, DF, WP. Underburn half and exc pile half. Interplant WL, DF, WP. | Initiate regeneration to improve overall health and vigor, and re-establish WP, WL. Promote forage. Mimic natural patch size and shape | X | | X | X | X |
| 15 | 12 | 101 | Previous mgmt removed some scattered dominant WL, WP, C. Mixed conifer with WL, LP, AF, C, GF, WP. Many dead WP. Generally in very poor health with abundant stem disease, DMT, and WPBR. Very heavy fuel loads with dead WP. Scattered, very good/healthy large WL, DF, and some WP. | Regenerate - Seedtree cut via tractor leaving WL, DF, WP. Exc pile. Interplant WL, DF, WP. | Initiate regeneration to improve overall health and vigor, and re-establish WP, WL. Promote forage. Mimic natural patch size and shape. Reduce fuel loads. | X | | X | X | X |

| Unit # | Management Area | Acres | Alternative 2 with modifications | | | Purpose and Need | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Existing Condition | Proposed Treatment | Objectives | Promote White Pine and Western Larch | Improve Huckleberry Production | Improve Big Game Forage | Provide Wood Products | Characteristic Patch Size |
| 16 | 12 | 70 | Previous mgmt removed some scattered dominant WL, WP, C. Mixed conifer dominated by WH, GF with scattered WP, DF, WL, C. Moderate to heavy fuel loading. | Regenerate-clearcut with reserves via tractor leaving WL, DF, WP. Exc pile, Plant WL, DF, WP | Initiate regeneration to improve overall health and vigor, and re-establish WP, WL. Reduce fuel load, Provide forage. Mimic natural patch size and shape | X | X | X | X | X |
| 16A | 12 | 40 | Previous mgmt removed some scattered dominant WL, WP, C. Mixed conifer dominated by WH, GF with scattered WP, DF, WL, C. Moderate to heavy fuel loading. | Regenerate-clearcut with reserves via winter tractor leaving WL, DF, WP. Exc pile, Plant WL, DF, WP | Initiate regeneration to improve overall health and vigor, and re-establish WP, WL. Reduce fuel load, Provide forage. Mimic natural patch size and shape | X | X | X | X | X |
| 17 | 12 | 24 | Previous mgmt removed some scattered dominant WL, WP, C. Mixed conifer dominated by C, WH, GF with scattered WP, DF, WL, C. WP mortality throughout – heavy in places. Moderate to heavy fuel loading. | Regenerate-clearcut with reserves via winter tractor leaving WL, DF, WP. Exc pile, Plant WL, DF, WP | Initiate regeneration to improve overall health and vigor, and re-establish WP, WL. Reduce fuel load, Provide forage. | X | | X | X | |
| 18 | 12 | 13 | Previous mgmt removed some scattered dominant WL, WP, C. Mixed conifer dominated by C, WH, GF, with scattered WP, DF, WL, C. WP mortality throughout – heavy in places. Moderate to heavy fuel loading. | Regenerate-clearcut with reserves via winter tractor leaving WL, DF, WP. Exc pile, Plant WL, DF, WP | Initiate regeneration to improve overall health and vigor, and re-establish WP, WL. Reduce fuel load, Provide forage. | X | | X | X | |

| Unit # | Management Area | Acres | Alternative 2 with modifications | | | Purpose and Need | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Existing Condition | Proposed Treatment | Objectives | Promote White Pine and Western Larch | Improve Huckleberry Production | Improve Big Game Forage | Provide Wood Products | Characteristic Patch Size |
| 19 | 11, 12 | 76 | Previous mgmt removed many dominant WL, WP, C. Now dominated by WH, GF, C, and some WL, LP, WP, DF, ES. Many dead WP and GF. LP is fading/small crowns. Scattered, good/healthy large WL, DF, and some WP. Partly in WUI | Regenerate - Seedtree cut via winter tractor leaving WL, DF, WP. Underburn, Interplant WL, DF, WP. | Initiate regeneration to improve overall health and vigor, and re-establish WP, WL. Promote forage. Mimic natural patch size and shape | X | | X | X | X |
| 20 | 14 | 29 | Mixed conifer dominated by WL, C, LP, DF, ES, GF – very dense. WL is generally in good/healthy – other species in decline. In WUI | Regenerate - Seedtree cut via tractor leaving WL, DF, WP. Underburn, Interplant WL, DF, WP. | Initiate regeneration to improve overall health and vigor, and re-establish WP, WL. Promote forage. Mimic natural patch size and shape | X | | X | X | |
| 21 | 14 | 19 | Mixed conifer dominated by WL, C, LP, DF, ES, GF- very dense. WL is generally in good/healthy – other species in decline. Very heavy down fuel from dead WP, GF and LP. In WUI | Regenerate – clearcut with reserves via tractor leaving WL, DF, WP. Exc pile, plant WL, DF, WP. | Initiate regeneration to improve overall health and vigor, and re-establish WP, WL. Promote forage. Mimic natural patch size and shape | X | | X | X | |
| **Total** | | 1,263 | | | | | | | | |



FS-047328

## Prescribed Burn Treatment Summary

| Unit # | Management Area | Acres | Estimated Canopy Cover Reduction[1] (Percent) | Within IRA or WUI | Existing Condition | Proposed Treatment | Objectives | Implementation Notes | Purpose and Need | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Promote White Pine and Western Larch | Improve Huckleberry Production | Improve Big Game Forage | Create characteristic Patch Size |
| A | 2<br>14 | 479 | 13-26<br>(20-40 in Lodgepole;10-20 in SAF) | Buckhorn Ridge IRA | Higher elevation sites Forage & huckleberry production stagnant due to tree canopy closure, encroachment of trees on brushfield, lack of fire, and/or browse pressure. | Aerial and/or hand ignition will be used to create a mixed severity fire.<br><br>Timeframe: typically late summer/fall | Reintroduce fire to a fire adapted ecosystem, reduce encroachment into natural openings and stimulate forage/browse reproduction; enhance the conditions for optimum huckleberry production to benefit grizzly bear recovery efforts as well as other wildlife species; provide opportunities for whitebark pine regeneration. | Ignition pattern designed to avoid streams, wetlands and spruce basins; however, fire may move into these areas as would occur under natural conditions. | | X | X | X |

[1] Crown reduction will not be uniform. Some areas of the burns may have no tree mortality and therefore no reduction in tree crown cover. Other areas may have high tree mortality with nearly complete crown reduction. The ranges displayed represent the average crown reduction expected across the entire burn unit.

| Unit # | Management Area | Acres | Estimated Canopy Cover Reduction[1] (Percent) | Within IRA or WUI | Existing Condition | Proposed Treatment | Objectives | Implementation Notes | Purpose and Need | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Promote White Pine and Western Larch | Improve Huckleberry Production | Improve Big Game Forage | Create characteristic Patch Size |
| B | 2<br>14<br>18 | 284 | 18-35<br>(30-50 on steep slopes; 5-20 on gentle slopes) | Buckhorn Ridge IRA | Higher elevation sites Forage & huckleberry production stagnant due to tree canopy closure, encroachment of trees on brushfield, lack of fire, and/or browse pressure. | Aerial and/or hand ignition will be used to create a mixed severity fire.<br>Timeframe: typically late summer/fall | Reintroduce fire to a fire adapted ecosystem, reduce encroachment into natural openings and stimulate forage/browse reproduction; enhance the conditions for optimum huckleberry production to benefit grizzly bear recovery efforts as well as other wildlife species; provide opportunities for whitebark pine regeneration. | Ignition pattern designed to avoid streams, wetlands and spruce basins; however, fire may move into these areas as would occur under natural conditions. | | X | X | X |
| C | 2 | 269 | 18-35<br>(30-50 on south slopes; other aspects 5-20) | Buckhorn Ridge IRA | Higher elevation sites Forage & huckleberry production stagnant due to tree canopy closure, encroachment of trees on brushfield, lack of fire, and/or browse pressure. | Aerial and/or hand ignition will be used to create a mixed severity fire.<br>Timeframe: typically late summer/fall | Reintroduce fire to a fire adapted ecosystem, reduce encroachment into natural openings and stimulate forage/browse reproduction; enhance the conditions for optimum huckleberry production to benefit grizzly bear recovery efforts as well as other wildlife species; provide opportunities for whitebark pine regeneration. | Ignition pattern designed to avoid streams, wetlands and spruce basins; however, fire may back into these areas as would occur under natural conditions. | | X | X | X |
| D | 11<br>12 | 85 | 20-30 of tree canopies | WUI | Lower elevation sites Big game winter range Forage production stagnant due to tree canopy closure, lack of fire, and/or browse pressure. | Fuels augmentation involving selective slashing of understory less than 6" DBH may precede hand ignition to create a mixed severity fire.<br>Timeframe: spring/fall | Reintroduce fire on the landscape; thin encroaching conifers with fire and implement fuel augmentation (slashing) where needed; improve browse and forage availability on south/southwest aspects in big game winter range and spring foraging habitat in grizzly bear core habitat. | Ignition pattern designed to avoid streams. | X | | X | X |

| Unit # | Management Area | Acres | Estimated Canopy Cover Reduction[1] (Percent) | Within IRA or WUI | Existing Condition | Proposed Treatment | Objectives | Implementation Notes | Purpose and Need | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Promote White Pine and Western Larch | Improve Huckleberry Production | Improve Big Game Forage | Create characteristic Patch Size |
| E | 11<br>12<br>14<br>19 | 462 | 20-30 of tree canopies | WUI | Lower elevation sites<br>Big game winter range<br>Forage production stagnant due to tree canopy closure, lack of fire, and/or browse pressure. | Fuels augmentation involving selective slashing of understory less than 6" DBH may precede aerial and/or hand ignition to create a mixed severity fire.<br><br>Timeframe: spring/fall | Reintroduce fire on the landscape; thin encroaching conifers with fire and implement fuel augmentation (slashing) where needed; improve browse and forage availability on south/southwest aspects in big game winter range and spring foraging habitat in grizzly bear core habitat. | Ignition pattern designed to avoid streams and wetlands.<br><br>Exclude Coeur d" Alene. Salamander habitat found in rock scree at bottom of the unit. | | X | X | X |
| F | 2<br>14 | 1,776 | 10-20 of tree canopies | Buckhorn Ridge IRA | Higher elevation sites<br>Forage and huckleberry production stagnant due to tree canopy closure, tree encroachment of brushfield, lack of fire, and/or browse pressure. | Aerial and/or hand ignition will be used to create a mixed severity fire.<br><br>Timeframe: typically late summer/fall | Reintroduce fire to a fire adapted ecosystem, reduce encroachment into natural openings and stimulate forage/browse reproduction; enhance the conditions for optimum huckleberry production to benefit grizzly bear recovery efforts as well as other wildlife species; provide opportunities for whitebark pine regeneration. | Ignition pattern designed to avoid streams, wetlands and spruce basins; however, fire may back into these areas as would occur under natural conditions. | | X | X | X |
| G | 10<br>12<br>14 | 287 | 6-12 of tree canopies (50 is non-forested) | WUI | Lower elevation sites<br>Big game winter range<br>Forage production stagnant due to tree canopy closure, lack of fire, and/or browse pressure. | Fuels augmentation involving selective slashing of understory less than 6" DBH may precede aerial and/or hand ignition to create a mixed severity fire.<br><br>Timeframe: spring/fall | Reintroduce fire on the landscape; thin encroaching conifers with fire and implement fuel augmentation (slashing) where needed; improve browse and forage availability on south/southwest aspects in big game winter range and spring foraging habitat in grizzly bear core habitat. | Ignition pattern designed to avoid streams and wetlands. | | X | X | X |

| Unit # | Management Area | Acres | Estimated Canopy Cover Reduction[1] (Percent) | Within IRA or WUI | Existing Condition | Proposed Treatment | Objectives | Implementation Notes | Purpose and Need | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Promote White Pine and Western Larch | Improve Huckleberry Production | Improve Big Game Forage | Create characteristic Patch Size |
| G-1 | 11 | 27 | 5-15 of tree canopies (40 non-forested) | WUI | Lower elevation sites Big game winter range Forage production stagnant due to tree canopy closure, lack of fire, and/or browse pressure. | Fuels augmentation involving selective slashing of understory less than 6" DBH may precede hand ignition to create a mixed severity fire.<br><br>Timeframe: spring/fall | Reintroduce fire on the landscape; thin encroaching conifers with fire and implement fuel augmentation (slashing) where needed; improve browse and forage availability on south/southwest aspects in big game winter range and spring foraging habitat in grizzly bear core habitat. | Ignition pattern designed to avoid streams and wetlands. | | | X | |
| H | 10<br>11 | 231 | 8-18 of tree canopies | WUI | Lower elevation sites Big game winter range Forage production stagnant due to tree canopy closure, lack of fire, and/or browse pressure. | Fuels augmentation involving selective slashing of understory less than 6" DBH may precede aerial and/or hand ignition to create a mixed severity fire.<br><br>Timeframe: spring/fall | Reintroduce fire on the landscape; thin encroaching conifers with fire and implement fuel augmentation (slashing) where needed; improve browse and forage availability on south/southwest aspects in big game winter range and spring foraging habitat in grizzly bear core habitat. | Adjacent to flammulated owl habitat. Where possible, direct fire in a manner that would retain some thickets of young regenerating conifer for forage opportunities. | X | | X | X |
| I | 10<br>11 | 115 | 8-18 of tree canopies | WUI | Lower elevation sites Big game winter range Forage production stagnant due to tree canopy closure, lack of fire, and/or browse pressure. | Fuels augmentation involving selective slashing of understory less than 6" DBH may precede aerial and/or hand ignition to create a mixed severity fire.<br><br>Timeframe: spring/fall | Reintroduce fire on the landscape; thin encroaching conifers with fire and implement fuel augmentation (slashing) where needed; improve browse and forage availability on south/southwest aspects in big game winter range and spring foraging habitat in grizzly bear core habitat. | Within flammulated owl habitat. Where possible, direct fire in a manner that would retain some thickets of young regenerating conifer for forage opportunities. | X | | X | X |

| Unit # | Management Area | Acres | Estimated Canopy Cover Reduction[1] (Percent) | Within IRA or WUI | Existing Condition | Proposed Treatment | Objectives | Implementation Notes | Purpose and Need | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Promote White Pine and Western Larch | Improve Huckleberry Production | Improve Big Game Forage | Create characteristic Patch Size |
| J | 10<br>11<br>12<br>14 | 342 | 5-15 of tree canopies | No | Mid elevation sites Forage and berry production stagnant due to tree canopy closure, lack of fire, and/or browse pressure. | Aerial and/or hand ignition will be used to create a mixed severity fire.<br><br>Timeframe: typically late summer/fall | Reintroduce fire on the landscape; thin encroaching conifers with fire and implement fuel augmentation (slashing) where needed; improve browse and forage availability on south/southwest aspects in big game winter range and spring foraging habitat in grizzly bear core habitat. | | | X | X | X |
| K | 2<br>12<br>14 | 1,744 | 10-25 | Buckhorn Ridge IRA | Higher elevation sites Forage & huckleberry production stagnant due to tree canopy closure, encroachment of trees on brushfield, lack of fire, and/or browse pressure. | Fuels augmentation involving selective slashing of understory 10" DBH or less will precede aerial and/or hand ignition to create a mixed severity fire.<br><br>Timeframe: typically late summer/fall | Reintroduce fire to a fire adapted ecosystem, enhance natural openings and stimulate forage/browse reproduction; enhance the conditions for optimum huckleberry production to benefit grizzly bear recovery efforts as well as other wildlife species; provide opportunities for whitebark pine regeneration. | Ignition pattern designed to avoid streams and wetlands.<br><br>North aspect burning will be supplemented with fuels augmentation activity. | | X | X | X |
| K-1 | 2<br>14 | 351 | 10-30 of tree canopies | Buckhorn Ridge IRA | Higher elevation sites Forage & huckleberry production stagnant due to tree canopy closure, encroachment of trees on brushfield, lack of fire, and/or browse pressure. | Aerial and/or hand ignition will be used to create a mixed severity fire.<br><br>Timeframe: typically late summer/fall | Reintroduce fire to a fire adapted ecosystem, enhance natural openings and stimulate forage/browse reproduction; enhance the conditions for optimum huckleberry production to benefit grizzly bear recovery efforts as well as other wildlife species; provide opportunities for whitebark pine regeneration. | Ignition pattern designed to avoid streams and wetlands. | | | X | X |



FS-047333

| Unit # | Management Area | Acres | Estimated Canopy Cover Reduction[1] (Percent) | Within IRA or WUI | Existing Condition | Proposed Treatment | Objectives | Implementation Notes | Purpose and Need | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Promote White Pine and Western Larch | Improve Huckleberry Production | Improve Big Game Forage | Create characteristic Patch Size |
| L | 2<br>14 | 503 | 10 in tree canopies | Buckhorn Ridge IRA | Higher elevation sites Forage & huckleberry production stagnant due to tree canopy closure, encroachment of trees on brushfield, lack of fire, and/or browse pressure. | Aerial and/or hand ignition will be used to create a mixed severity fire.<br><br>Timeframe: typically late summer/fall | Reintroduce fire to a fire adapted ecosystem, enhance natural openings and stimulate forage/browse reproduction; enhance the conditions for optimum huckleberry production to benefit grizzly bear recovery efforts as well as other wildlife species; provide opportunities for whitebark pine regeneration. | Ignition pattern designed to avoid streams, wetlands and spruce basins; however, fire may back into these areas as would occur under natural conditions. | | X | X | X |
| M | 2 | 1,452 | 3-5<br>(10-20 in tree canopies) | Buckhorn Ridge IRA | Higher elevation sites Forage & huckleberry production stagnant due to tree canopy closure, encroachment of trees on brushfield, lack of fire, and/or browse pressure. | Aerial and/or hand ignition will be used to create a mixed severity fire.<br><br>Timeframe: typically late summer/fall | Reintroduce fire to a fire adapted ecosystem, enhance natural openings and stimulate forage/browse reproduction; enhance the conditions for optimum huckleberry production to benefit grizzly bear recovery efforts as well as other wildlife species; provide opportunities for whitebark pine regeneration. | Ignition pattern designed to avoid streams and wetlands. | | X | X | X |
| N | 2<br>14<br>21 | 2,631 | 10-20 of tree canopies (40 non-forested) | Northwest Peaks IRA | Higher elevation sites Forage & huckleberry production stagnant due to tree canopy closure, encroachment of trees on brushfield, lack of fire, and/or browse pressure. | Aerial and/or hand ignition will be used to create a mixed severity fire.<br><br>Timeframe: typically late summer/fall | Reintroduce fire to a fire adapted ecosystem, enhance natural openings and stimulate forage/browse reproduction; enhance the conditions for optimum huckleberry production to benefit grizzly bear recovery efforts as well as other wildlife species; provide opportunities for whitebark pine regeneration. | Ignition pattern designed to avoid streams, wetlands and spruce basins; however, fire may back into these areas as would occur under natural conditions. | | X | X | X |

| Unit # | Management Area | Acres | Estimated Canopy Cover Reduction[1] (Percent) | Within IRA or WUI | Existing Condition | Proposed Treatment | Objectives | Implementation Notes | Purpose and Need | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Promote White Pine and Western Larch | Improve Huckleberry Production | Improve Big Game Forage | Create characteristic Patch Size |
| O | 2<br>14 | 250 | 10-20 of tree canopies | No | Higher elevation sites Forage & huckleberry production stagnant due to tree canopy closure, encroachment of trees on brushfield, lack of fire, and/or browse pressure. | Aerial and/or hand ignition will be used to create a mixed severity fire.<br><br>Timeframe: typically late summer/fall | Reintroduce fire to a fire adapted ecosystem, enhance natural openings and stimulate forage/browse reproduction; enhance the conditions for optimum huckleberry production to benefit grizzly bear recovery efforts as well as other wildlife species; provide opportunities for whitebark pine regeneration. | Ignition pattern designed to avoid streams and wetlands. | | X | X | X |
| O-1 | 12<br>14<br>18 | 379 | 2-5 of tree canopies (50 non-forested) | No | Higher elevation sites Forage & huckleberry production stagnant due to tree canopy closure, encroachment of trees on brushfield, lack of fire, and/or browse pressure. | Aerial and/or hand ignition will be used to create a mixed severity fire.<br><br>Timeframe: typically late summer/fall | Reintroduce fire to a fire adapted ecosystem, enhance natural openings and stimulate forage/browse reproduction; enhance the conditions for optimum huckleberry production to benefit grizzly bear recovery efforts as well as other wildlife species; provide opportunities for whitebark pine regeneration. | Ignition pattern designed to avoid streams and wetlands. | | X | X | X |
| **Total** | | 11,623 | | | | | | | | | | |

# Watershed Improvement Work

## Intermittent Stored Service (Road Storage)

Road storage work is proposed on roads that are currently closed to public motorized use, but the Forest Service would like to keep them on the National Forest System (NFS). Field work has determined whether active work is needed to improve watershed conditions, or if these roads can be passively decommissioned without active work. The active storage work will include cleaning culverts, providing controlled overflow relief for culverts and removing high risk culverts. Other work will include stabilizing fillslopes by limited recontouring, waterbarring, scarifying the road bed and seeding. Upon completion of the road storage work, barriers will be installed to maintain motorized closure.

| Road # | Road Name | Beginning Milepost | Ending Milepost | Length (miles) | Active/ Passive | Implementation Notes |
|---|---|---|---|---|---|---|
| 524 | Meadow Creek | 6.5 | 6.9 | 0.4 | Active | Remove undersized culvert on Forest Creek. |
| 524 | Meadow Creek | 6.9 | 9.6 | 2.7 | Passive | |
| 524C | Meadow Creek C | 0.0 | 0.9 | 0.9 | Active | Stabilize slide area. |
| 524C | Meadow Creek C | 0.9 | 1.6 | 0.7 | Passive | |
| 591 | Zero Creek Spread Creek | 2.5 | 6.9 | 4.4 | Active | Remove buried log structures and old culverts. Stabilize slide area. |
| 5924 | North Cr Connection | 0.0 | 3.3 | 3.3 | Active | |
| 5924 | North Cr Connection | 3.3 | 4.8 | 1.5 | Passive | |
| 5948 | Hidden Creek | 0.3 | 2.9 | 2.6 | Active | Provide snowmobile access at treated stream crossings. Install barrier at mile post 0.23 to maintain public access to dispersed camp site. |
| 5948 | Hidden Creek | 2.9 | 3.1 | 0.3 | Passive | |
| 5948D | Hidden Creek D | 0.0 | 0.4 | 0.4 | Active | |
| 5948D | Hidden Creek D | 0.4 | 0.6 | 0.2 | Passive | |
| 5971 | South Fork Meadow Basin | 0.0 | 1.3 | 1.3 | Active | |

| Road # | Road Name | Beginning Milepost | Ending Milepost | Length (miles) | Active/ Passive | Implementation Notes |
|---|---|---|---|---|---|---|
| 5971A | South Fork Meadow Basin A | 0.0 | 1.1 | 1.1 | Active | Remove fish barrier culvert on SF Meadow Creek. Provide hiking access. |
| 5977 | Forest Creek | 2.8 | 3.0 | 0.2 | Active | |
| 7483 | No Name | 0.0 | 3.2 | 3.2 | Active | |
| Total Active Storage Miles | | | | 17.6 | | |
| Total Passive Storage Miles | | | | 5.3 | | |
| **Total Miles of Road Storage** | | | | **22.9** | | |

## Road Decommissioning

Road decommissioning work is proposed for roads that have been determined that they are no longer needed for forest management. Decommissioned roads will be removed from the NFS road system. Active decommissioning work will include removing existing stream crossing structures and rebuilding stream channels, recontouring unstable slopes, ripping non-recontoured areas, waterbarring, and placing slash and duff on the road way.

| Road # | Road Name | Beginning Milepost | Ending Milepost | Length (miles) | Active/ Passive | Implementation Notes |
|---|---|---|---|---|---|---|
| 14167A | Thunder Knob A | 0.0 | 0.8 | 0.8 | Passive | |
| 524B | Meadow Creek B | 0.0 | 0.7 | 0.7 | Passive | |
| 524D | Meadow Creek D | 0.0 | 0.7 | 0.7 | Active | Remove culverts that run water and undersized culvert at Forest Creek. |
| 524D | Meadow Creek D | 0.7 | 1.2 | 0.5 | Passive | |
| 5932F | Upper Whitetail F | 0.0 | 1.4 | 1.4 | Passive | |
| 5948B | Hidden Creek B | 0.0 | 0.9 | 0.9 | Active | Remove buried log structures and wood culverts. |
| 5948B | Hidden Creek B | 0.9 | 1.6 | 0.7 | Passive | |

| Road # | Road Name | Beginning Milepost | Ending Milepost | Length (miles) | Active/ Passive | Implementation Notes |
|---|---|---|---|---|---|---|
| 5964C | Meadow Cr Connection C | 0.0 | 0.5 | 0.5 | Passive | |
| 5971 | South Fork Meadow Basin | 1.3 | 2.2 | 1.0 | Passive | |
| 5971B | South Fork Meadow Basin B | 0.0 | 0.3 | 0.3 | Active | |
| 748M | Beetle Creek North Creek M | 0.0 | 1.7 | 1.7 | Active | Recontour slide areas. Provide hiking access. |
| Total Active Decommissioning | | | | 3.5 | | |
| Total Passive Decommissioning | | | | 5.5 | | |
| **Total Proposed Road Decommissioning** | | | | **9.0** | | |

# Appendix 2 - Design Features, Alternative 2 with modifications

To avoid or minimize potential adverse impacts to resources from this project, the following design features will be incorporated into the selected alternative for the Buckhorn Project. Contract provisions are shown in parentheses where applicable.

## Design Features in Response to Public Comment

When the existing conditions and operator feasibility allow, the following actions should be implemented in units 1, 10, 12, 13, 14A, 15, 16, and 16A:

- Screening will occur through leave islands, retention of hardwoods and brush; and where species composition, slope, aspect and fuel accumulations will assist to provide screening;
- The retention of small diameter residual trees will occur within view of roadways to "break up and soften" the view of harvest and fuel treatment activities;
- Landings will be located off roads and within harvest units to reduce their visual impact;
- The timber sale administrator and the purchaser/field representatives will work together, based on site-specific skid patterns and landing locations, to provide roadside screening that can be maintained through the active logging operations;
- Prescribed burning of harvest units will avoid ignitions directly into the roadside screening areas. Radiant heat and existing ground fuels may make it difficult to prevent mortality of the screening vegetation but ignition patterns (identified on site specific burn plans) are designed to minimize mortality.

## Water Quality

- Ensure all equipment operated in or adjacent to the waterbody is clean of aquatic invasive species, as well as oil and grease, and is well maintained. Avoid drafting from water bodies with known infestations of aquatic invasive species. (B6.34, B6.35, C6.31)
- Harvest, burning, and road work activities have been designed to meet the federal Clean Water Act and Montana State water quality regulations primarily through the implementation of best management practices (BMPs). See Buckhorn DEIS - Appendix F for a description of the Kootenai National Forest (KNF) BMP program and a table listing BMPs applicable to the proposed timber sale(s) authorized by this analysis.
- Table 2.1 shows the minimum site specific BMPs for the timber sale road work to maintain and protect water resource values. Implemented work may vary from Table 2.1 if equivalent water quality protection can be achieved.
- Some road work in stream channels will require a Montana Stream Protection Act 124 Permit from Montana Fish Wildlife and Parks, a 318 Authorization from Montana Department of Environmental Quality, or an Alternative Practices Permit from Montana Department of Natural Resources and Conservation which will be obtained prior to implementation.

**Table 2.1 – Required Road BMP Work to Maintain and Protect Water Resource Values**

| Road | Stream Location (Milepost) | Tributary to: | Road /Stream Crossing BMP Work |
|---|---|---|---|
| 393 | 0.52 | Yaak | Install 18” culvert. Install ditch relief culvert and drain dip upgrade of crossing. |
| | 1.94 2.40 2.73 2.78 3.83 | SF Meadow | Install ditch relief culverts and road surface cross drains upgrade of stream crossings. |
| | 3.78 | SF Meadow | Replace 24” culvert with squash 36” culvert. Install road surface cross drain. |
| | 3.83 | SF Meadow | Replace 18” culvert with 24” culvert. |
| 435 | 0.91 1.10 1.26, 2.01 | Yaak/Spread/Cody | Install ditch relief culverts and road surface upgrade of stream crossings. |
| 5932 | 0.22 0.43 0.82 1.05[2]1.18[2] | Spread | Install ditch relief culverts and road surface cross drains upgrade of stream crossings. |
| | 2.50[2] | Whitetail | Install sediment basin in ditch upstream of culvert. |
| | 3.00[2] | Whitetail | Construct berm over culvert on outside shoulder to prevent runoff at stream. |
| 5932E (Alternative 2 and 3 only) | 1.20 1.32 | Spread | Install ditch relief culverts and road surface cross drains upgrade of stream crossings. |
| 5932G (Alternative 2 and 3 only) | 14+40 | Yaak | Replace 18” culvert. Install ditch relief culvert and road surface cross drain. |
| | 31+40 | Yaak | Install 18” culvert. Install road surface cross drain. |
| | 32+75 | Yaak | Install ditch relief culvert and road surface cross drain. |
| | 68+00 | Cody/Spread | Replace 18” culvert with 24” culvert. Install road surface cross drain. |
| | 76+95 | Cody/Spread | Install 24” culvert. Install ditch relief culvert and road surface cross drain. |
| | 81+00 | Cody/Spread | Install 18” culvert. Install ditch relief culvert and road surface cross drain. |
| 5955 | 0.96-2.14 | Spread | Skidding from the harvest units onto the road will require crossing the road ditch which carries substantial water flow during periods of high runoff. During harvest operations maintain capacity for runoff in the ditches and take measures to minimize sediment delivery to stream channels that are connected to the ditch at MP 0.96, 1.2, 1.67, 1.89, and 1.92. Where flowing water in the ditch is connected to these stream |

| Road | Stream Location (Milepost) | Tributary to: | Road /Stream Crossing BMP Work |
|---|---|---|---|
| | | | channels an Alternative Practices Permit from Montana DNRC may be required. |
| | 0.96-2.14 | | Minimize disturbance to the ditch and cutslopes. Apply seed as soon as weather conditions permit where road work or logging activities result in disturbed ground. |
| | 0.96 | Spread | Replace 18" culvert with 24" culvert. Construct berm along outside shoulder to prevent runoff at stream crossing. Install three ditch relief culverts and two drain dips between 0.96 and 1.27 to minimize sediment delivery to stream. |
| | 1.67 | Spread | Install 24" culvert to drain perennial spring area. Install drain dip. |
| | 1.89 | Spread | Replace 18" culvert with 24" culvert. |
| | 1.92 | Spread | Install ditch relief culvert and drain dip. |
| 5955 Temp Road | 0.06. 0.14 | Spread | Install 18" culverts. Install road surface cross drains as needed to prevent sediment delivery at crossings. After use remove culverts, recontour slopes to match natural ground and reconstruct stream channels to natural widths and gradients. |
| 5956 | 0.07 | Spread | Replace 18" culvert with 24" culvert and install drain dip. |

## Riparian Habitat Conservation Areas (RHCAs)

- All activities will comply with the Forest Plan as amended by the Inland Native Fish Strategy (INFISH). Perennial and intermittent streams, springs, ponds, wetlands and landslide prone areas in the timber harvest area have been identified and protected by establishing RHCAs around these features. Several springs without connected channels have been identified within the harvest units. These springs will be protected by a combination of leave islands, equipment exclusion zones and marking leave trees. No activities will occur in RHCAs that will retard attainment of riparian management objectives or adversely affect inland native fish.
- RHCAs will be established around any new water features that are found within harvest units during sale preparation or implementation (B2.37).

## Special Provisions for Public Access on Decommissioned and Stored Roadways

- Decommissioning work on the segment of Road 748M east of North Creek, stored service work on Road 5948 that accesses Hidden Creek and stored service work on Roads

5971 and 5971A that access upper South Meadow Creek will be designed to allow for hiking and livestock access along these road segments after the work is completed.
- Stored service work on Road 5948 (Hidden Creek) will be designed to allow for snowmobile access.
- Stored service work on Road 5948 will begin past the existing dispersed campsite location on the south side of Spread Creek. Following work, a barrier will be installed past the existing dispersed campsite to maintain grizzly bear habitat parameters (see Appendix 3 – Access Management Plan for more information).
- Roads treated for decommissioning and storage will be closed to motor vehicles by berms, recontouring, rocks, or slash.

## Soils

- Existing skid trails and other disturbed areas will be reused where possible for harvest operations and machine piling in order to minimize new soil disturbance. (B6.4)
- Any units logged during the winter will be required to have a minimum of 18 inches of settled snow or frozen ground on the active skid trails. (C6.4#)
- Excavated skid trails and temporary roads constructed for the project will be recontoured and have slash placed on the recontoured slopes after use. (C6.632)
- Landing areas will be scarified and seeded following harvest activities (C6.633).
- All units are designated as tractor units and have sustained slopes less than 40% except for Unit 2 which is subject to special design features (see Table 2.2).

**Table 2.2 – Unit Specific Design Features to Maintain and Protect soil resource values**

| Unit | Description |
|---|---|
| **1, 9, 9A, 9B, 10, 11, 14A, 14, 16A, 17, 18, 19** | These units will be required winter harvest because of high water tables and moist soil conditions. Skid trails must be frozen or have a minimum of 18” of settled snow during operations. Excavator piling will be restricted to dry or frozen conditions. (C6.4#) |
| **1** | An equipment exclusion zone 50-60 feet wide will be maintained both above and below the road where an ephemeral channel with primarily subsurface flow exists. The purpose of the equipment exclusion zone is to prevent equipment from intercepting the subsurface flow and compacting the ground. The equipment exclusion zone will apply to all ground-based machinery during logging and slash reduction activities. C6.4#. |
| **2** | Slopes in a portion of this unit exceed 40%. In order to minimize disturbance, which may occur because of the slope steepness, the existing old mining road will be used as a go-back trail for the skidding operation. (B6.4, C6.4#) |
| **9 – below temp road location, 9A, 9B** | Existing skid trails will be used to the fullest extent possible in order to avoid the development of new trails which may channelize water. (B6.4, C6.4#) |
| **9, 9A, 9B** | Where cross drainage will not be effective due to terrain rehabilitate skid trails by pressing slash onto trail surfaces so as to trap sediment and slow runoff. Construct shallow waterbars where slash is not available. (B6.65) |

## Coarse Woody Debris (CWD) Retention Recommendations for Soils and Wildlife

- CWD is defined as material greater than 3 inches in diameter at the small end.
- Retain 12-33 tons of coarse woody debris per acre in all units except:
    - Unit 5 will be 8-16 tons/acre.
    - Unit 8, within 200 feet of private land, will be 3-5 tons/acre.
- The largest diameter material is desired. If available leave 20-30 pieces per acre at least 12 feet long and greater than 12" in diameter, with at least 10 pieces greater than 20 inches in diameter. This will equate to approximately 9-15 tons/acre depending on soundness of pieces. (C6.406#, C6.7#)

## Snag Retention

- An average of 6-12 snags and/or recruitment snags/acre will be retained within harvest units. (C2.303#, C2.358#)
- All snags felled for safety will be left onsite ( C2.303#) and will be cut as high as possible, to retain some use as a snag (e.g. foraging opportunities), where it is safe and reasonable to do so.

## Wildlife

- Protection measures needed for endangered, threatened, proposed and sensitive animals will be included in the contract to provide for the protection of these animals found during implementation (B6.24).
- No raptor nests are known in the project area. Nest protection measures (i.e. timing restrictions, unit boundary adjustments) would be applied if an active nest is identified prior to or during implementation (B6.24).
- A site with a known Coeur d'Alene salamander population will be excluded from Burn E during implementation.
- Some small conifer thickets will be retained during the implementation of Burns H and I to maintain foraging habitat for flammulated owls.
- Treatments have been designed to be consistent with lynx habitat needs for multistory foraging habitat.
- Vegetated movement corridors will remain between harvest units.

### Grizzly Bear

- No harvest, machine piling, machine fireline construction, road reconstruction, road storage, road decommissioning, fuels augmentation activities, or watershed improvement work will occur during the spring bear use period (4/1 – 6/15). (C6.316#)
- Access management activities as displayed in Appendix 3, the Access Management Plan, will be implemented to ensure 2011 Access Amendment habitat parameter standards are met. (C5.12#, C5.41#)
- Currently gated or barriered/impassable roads will remain restricted to wheeled motorized use when project activities occur during the bear year (4/1-11/30). (C5.41#)
- Reconditioning and harvest activities on road 5932G will not occur until roads 5932D, 6135, and 6135A are barriered.

- When the vegetation is removed on road 5948, a barrier will be placed at milepost 0.23, past the dispersed campsite.
- There are three watershed activity areas (road decommissioning and storage work) in the project area – north side of Spread Creek, south side of Spread Creek[1], and South Fork of Meadow Creek. To minimize grizzly bear displacement:
  - Work within each watershed activity area will be completed within a single bear year.
  - Work within each watershed activity area will be completed in separate bear years from the others (i.e., no overlap of watershed work within a given bear year).
  - Watershed work will be planned so as not to conflict with timber harvest activities. Watershed work in the Spread Creek drainage will not occur if any harvest activities (including mechanical piling) are going to occur in Spread Creek drainage in the same bear year (April 1 through November 30).
  - Watershed activity in the South Fork of Meadow Creek area may occur within the same bear year as harvest activities to maintain grizzly bear habitat standards.
- Seed mixes used for project activities will not include clover. (C6.601#)
- After storage work has been completed on Roads 5971 and 5971A, the berm on Road 745 at MP 4.56 will be replaced with a gate and a new berm will be installed at MP 5.99.
- The use of helicopters to ignite prescribed burns will not last more than two days per burn season (spring and fall) and not exceed a total of four days of helicopter use per bear year.

## Endangered, Threatened, Proposed and Sensitive Plants

- Protection measures needed for endangered, threatened, proposed and sensitive plants will be included in the contract to provide for the protection of sensitive plants found during implementation (B6.24)
- Disturbance to any sensitive plant populations observed during sale activity will be avoided through cooperation between sale administrators and sale purchaser.
- The boundary of unit A has been adjusted to exclude the healthy, cone producing population but individuals are present elsewhere in the unit along ridgelines.
- Cone bearing populations of whitebark pine have been located in units A, B, F, M and N. Where feasible, efforts to protect cone producing whitebark pine populations will be implemented. These methods may include fuel pull-back, ring firing or ignition avoidance within and/or proximate to population areas. Key populations have been identified, and will be incorporated into Burn Plans during implementation.
- Monitoring plots will be will be established within proposed activity areas within identified whitebark pine habitat before implementation.

## Fire/Air Quality

- Burn plans will be prepared prior to the use of prescribed fire. These plans will determine the limits of weather conditions and fuel moistures to control fire intensity and meet air quality standards.

[1] Watershed work on roads 591, 591D, and 1591 on the south side of Spread Creek is accessed via road 591 from the Hellroaring drainage to the south.

- All burning operations will be scheduled in accordance with the Memorandum of Understanding for air quality protection between the State of Montana Air Quality Bureau and the Forest Service, which allows burning only when adequate smoke dispersal will occur.
- The prescribed burn treatment summary found in Appendix B provides more detail on objectives and implementation of prescribed burn units.
- Prior to conducting prescribed burns the Three Rivers District will conduct the following activities to notify the local public of burning activities, these include but are not limited to: posting news releases in local newspapers, displaying maps and burn information in spring and fall newsletter, providing information at the local USFS office, and prepare a list of contacts for each prescribed burn to be notified by phone or mail..

## Noxious Weeds

Measures will be taken to reduce the risk of noxious weed introduction and spread. Spraying will be conducted in accordance with the April 2007 KNF Invasive Plant Management Record of Decision.

- The District will spray weeds prior to project activities where concentrations of noxious weeds occur. These locations include but are not limited to:
  - The area between Unit 15 and Road 435
  - Road 5932D prior to being barriered
  - Skid trails in Unit 9
  - Existing landings on 5932E and 5955
- Prior to and after harvest operations, haul roads with current access for spray boom truck or ATV/UTV will be treated by either the District weeds crew or the purchaser. (C6.27#)
- Timber sale contracts will contain Special Provision C6.351#, which requires all off-road vehicles associated with harvest operations to be cleaned and inspected prior to entering the sale area. These actions will also be applied to equipment used in fuels reduction activities.
- Reconditioning of existing roads needed for hauling will be held to the minimum necessary to protect and maintain the road surface and drainage structures, and provide for public safety. Scarification of ditches and catch basins will be done only where necessary to provide for adequate function. Blading of native road surfaces will only be done where necessary for hauling or adequate drainage.
- Where motorized access is available roads to be decommissioned or stored will be treated if needed with herbicide prior to ground disturbing work. Stored roads will be seeded using native seed or the KNF seed mix. Decommissioned roads will be revegetated with native seed or by spreading forest duff to initiate native plant growth.

## Cultural Resources

Protection measures needed for cultural resources will be included in the contract to provide for the protection of historic properties found during implementation. The Forest Service may modify or cancel the contract to protect cultural resources, regardless of when they were identified (B6.24)

### Recreation and Public Safety

Temporary restrictions to snowmobile use and other public use of Road 435 (Spread Creek Road) and Road 745 will be put in place during winter harvest activities for public safety. These roads will be open to the public for snowmobile use and other recreation activities on the weekends and during periods of inactivity.

## Funding Dependent Resource Improvement Work

The following activities are not required project design features or mitigation for project activities. These activities have been designed to improve existing resource conditions. Implementation of these activities is dependent upon available funding. One sources of funding could be Knutsen Vanderberg (K-V) funds in association with the timber sale. Activities will not be implemented until sufficient funding is available.

- Inter-planting of rust resistant western white pine;
- Girdle mistletoe infected western larch in those units being planted with western larch.
- Monitor effects to soil resources from KV-funded activities;
- After landing piles have been burned, landing sites will be restored, weeds will be treated and sites will be seeded with native vegetation to improve visuals;
- Spray noxious weeds in areas where concentrations of noxious weeds occur;
- Remove culvert from abandoned road segment at stream crossing and restore natural channel between Units 13 and 14;
- Perform restoration and drainage work on abandoned road and old skid trail segments in harvest units 9, 10, 11, 15 and 19 after logging is completed;
- Monitor slash treatment work funded by KV;
- Monitor huckleberry production using R1 monitoring protocol.
- Remove culvert from abandoned road segment at stream crossing and restore natural channel between Units 12 and 13;
- Replace two culverts on Road 435 at Runt Creek with one structure sized for 100 year flow and desired aquatic organism passage.
- Replace culvert on Road 435 at Large Creek with structure designed for 100 year flow and desired aquatic organism passage.
- Road maintenance on open roads in the project area to improve access for recreation and management, including but not limited to the following NFS Roads: 745, 435, 5945, 5961, 524, 393, 5955, 748, and 5932.

# Appendix 3 – Monitoring Plan, Alternative 2 with modifications

| ITEM # | RESOURCE | OBJECTIVE | TIMING | METHODOLOGY | RESPONSIBLE |
|---|---|---|---|---|---|
| **1** | Watershed | Monitor implementation and effectiveness of Best Management Practices (BMPs) used for project activities (includes monitoring RHCAs) | During and post project activities | Review a representative sample of timber sale units, road reconstruction, road storage and road decommissioning and complete BMP monitoring reports. | Sale Administrator/Engineering Representative/IDT/ District Staff |
| **2** | Watershed | Monitor the effectiveness of project specific design features | During and post timber sale activities | Review Units 9 and 10 to determine if project activities | Sale Administrator/ IDT/ District Staff |
| **4** | Soils | Monitor detrimental soil disturbance | Post treatment | Randomly sample timber sale units using approved methodology (walk through transects) | Soil Scientist |
| **5** | Soils | Monitor the effectiveness of project specific design features. | Post treatment | Review Units 1, 2, 9, 16A, 17 and 18 to determine effectiveness of design features. | Soil Scientist |
| **6** | Soils/ Silviculture | Monitor coarse woody debris (CWD) to see if recommended amounts were retained | Post treatment | Measure tons per acre of CWD within a representative sample of both burned and piled units. | Soil Scientist/ Silviculturist |
| **7** | Silviculture /Fuels/ Wildlife | Determine whether treatment objectives were accomplished. | Post treatment | Review selected treatment areas. Evaluate silvicultural objectives and prescribe burn objectives. | Fuels Specialist/ Silviculturist/ IDT |
| **8** | Silviculture | Track insect and diseases | Post treatment | Annual insect and disease mortality surveys; ongoing program accomplished by Forest Health Protection (FHP) | R-1 Forest Health Protection |
| **9** | Silviculture/ Botany | Monitor whitebark pine health & survival | Pre and Post treatment | Establish pre, and post, burn monitoring plots in units to validate the effectiveness of design features to minimize impacts to WBP survival, health and vigor within a sampling of prescribed fire treatment areas. | Botany |
| **10** | Silviculture/ Botany | Monitor huckleberry plant health and vigor in response to prescribed fire | Pre and Post treatment | In conjunction with the WBP monitoring described in Item #9, pre, and post, burn monitoring plots for huckleberries will be established to evaluate the health and vigor of huckleberry plants in response to prescribed burning. | Botany |
| **11** | Silviculture | Assure regeneration harvest is stocked with trees in 5 years | Post treatment | Reforestation surveys the 1st, 3rd and 5th year after planting | Silviculture |

| ITEM # | RESOURCE | OBJECTIVE | TIMING | METHODOLOGY | RESPONSIBLE |
|---|---|---|---|---|---|
| **12** | Wildlife | Verify maintenance and retention of cavity habitat | Post-treatment | Representative sample of units taken to determine retention of cavity habitat. | Wildlife Biologist |
| **13** | Noxious Weeds | Monitor noxious weed infestations | Pre-treatment and following timber sale activities | Monitor project area to determine effectiveness of weed spraying. | District Weed Specialist |
| **14** | Wildlife | Determine effectiveness of burning to increase browse | 1- 3 years after burning | Survey selected underburn treatments to determine the species of browse and to what extent burning has stimulated browse and huckleberry production. | WildlifeBiologist/ Fuels Specialist |
| **15** | Wildlife | Monitor the status and effectiveness of closure devices - Gates-EB-Signing | 1-2 times a year | District employees will monitor the status of closure devices and their effectiveness through their daily field work and once a year through the Adopt-a-Road program. | District Access Management Program/ Law Enforcement |