# Exhibit 11
# Knotty Pine Project Decision Notice

United States Department of Agriculture

# Knotty Pine

## Decision Notice and Finding of No Significant Impact



**Kootenai National Forest, Three Rivers Ranger District, Lincoln County, Montana**
**March 2022**

For More Information Contact:
Lisa Osborn, Project Leader or Kirsten Kaiser, District Ranger
Three Rivers Ranger District
12858 US Highway 2
Troy, MT 59935
(406) 295-4693
Email: lisa.osborn@usda.gov or Kirsten.a.kaiser@usda.gov

Cover Photo: Elk grazing in the Knotty Pine Project Area along the Rocky Draw road in Rocky Pine (previous harvest area) Unit 17

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.
Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at http://www.ascr.usda.gov/complaint_filing_cust.html and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov.

USDA is an equal opportunity provider, employer and lender.

# Introduction

This proposal is the result of the need to move the existing resource conditions in this project area toward the desired conditions as stated in the Kootenai National Forest Land Management and Resource Plan (2015 Forest Plan). Forestwide management goals, as well as specific management area direction, represent the desired condition that management actions are designed to achieve. The proposed activities were analyzed in the context of the 2015 Forest Plan.

During May 2020, the Three Rivers Ranger District mailed a letter to residents and interested individuals asking for their input on desired activities in the project area and existing conditions. The IDT used this public feedback to help develop the proposed action. In response to this initial feedback, the IDT developed design features for public safety, cultural resource and wetland/water feature protection and features to limit potential impacts to the cougar ridge ski area; leave islands for wildlife; and project-specific monitoring of noxious weeds; The IDT also dropped the prescribed burn that was proposed on Abe Lincoln Mountain. All of these aforementioned changes were the result of public feedback received during this initial public outreach effort and associated 30-day comment period.

Scoping occurred in September 2020 and as a result of comments received during this 30-day scoping period, the following changes were made to Alternative 2; Harvest Unit 70 was dropped and Non-harvest Fuels Units X and W were added.

The Environmental Assessment (EA) went out for comment in April 2021. We received many EA Comments and those comments resulted in changes to the October 2021 EA. The changes included dropping the Yaak Overnight Group Site Rental proposal and Harvest Unit 35.

The decision maker made additional changes to the Knotty Pine Project after reviewing objection concerns. Specifically, all the permanent road construction will be changed to temporary road construction and these roads will be rehabilitated after project completion. One undetermined road, 2331B will now be a temporary road instead of being added to the national forest system. Please see the Public Involvement, Scoping and EA comments section of this EA for more information related to public involvement and collaboration efforts.

The Decision Notice and Finding of No Significant Impact incorporates the Knotty Pine Project Environmental Analysis (EA) and all supporting documents and appendices. The January 2021 Knotty Pine EA is located under the Analysis tab under the Project Documents banner at https://www.fs.usda.gov/project/?project=57657.

# Purpose and Need

Based on field review of the area and analysis of the existing data by the Three Rivers Ranger District's resource specialists, the following purpose and need for treatment were identified to help move the landscape toward the desired condition:

1. Promote resilient vegetation conditions by managing for landscape-level vegetation patterns, structure, patch size, fuel loading, and species composition.

The composition, structure, and pattern of forest stands across the landscape differ from the desired conditions described in the 2015 Forest Plan and as a result, many forest stands are susceptible to insects, diseases, drought and wildfires. Relative to current conditions, the desire is that the stands contain more

tree species that demonstrate the following traits: less susceptibility to being killed by forest insects and disease, more resistance to fire, more tolerance of drought, relatively long-lived, and more productive. For these reasons, the Knotty Pine project proposes to shift away from forests dominated by some species namely Douglas-fir, grand fir, western hemlock, and western redcedar, and shift towards more western larch, western white pine, and ponderosa pine, which are under-represented in the project area. There is also a need to reduce tree densities and canopy layers in some stands in order to increase stand health and lower crown fire potential. Additionally, compared to the desired condition of the 2015 Forest Plan, the project area is over-represented in the quantity of stands in the medium (10-15 inches diameter at breast height (DBH)) size class and under-represented in the quantity of stands in the seedling/sapling (0-5 inches DBH) size class. The majority of proposed treatments (78%) within this project area are in the medium size class and all proposed treatment will either move the landscape toward the desired condition, or maintain them within the desired range. It is also desired that treatments are within the representative range of patch size acres historically by biophysical setting.

2. Reduce the potential for high intensity wildfire while promoting desirable fire behavior characteristics and fuel conditions in the wildland urban interface (WUI).

Approximately 76 percent of the project area is in the WUI which includes hundreds of private homes along Highway 2, Old Highway 2, Yaak Highway, the Lime Creek and Pine Creek drainages. All proposed commercial timber harvest is in the WUI. In some places, large quantities of forest fuels on National Forest System lands occur next to homes and private property. Hazardous fuels also occur immediately adjacent to National Forest System roads that are important for serving as emergency egress routes for evacuating people from the area and ingress for firefighter personnel and equipment when wildfires or other emergencies occur.

The 2015 Forest Plan directs us to reduce hazardous fuels within the WUI and to manage forest vegetation in these areas to decrease the risk for large wildfires. Given the hazardous fuels conditions in the project area and the risks to homes, infrastructure and natural resource values, there is a need to reduce the potential for intense wildfires that could have severe impacts. See pages 21-22 of the 2015 Forest Plan for a detailed description of the desired fuel conditions.

3. Provide forest products that contribute to the sustainable supply of timber products from National Forest System Lands.

A desired condition in the 2015 Forest Plan says suitable timberlands are part of a regularly scheduled timber harvest program and the production of timber from these lands contributes toward ecological, social and/or economic sustainability.

The 2015 Forest Plan recognizes that communities surrounding the Kootenai Forest have important social and economic ties to National Forest System lands. Forest products that result from management activities contribute to the local economy and to the sustainability of the forest products industry. The local forest products industries help provide the necessary infrastructure to accomplish restoration goals, objectives and desired conditions that are outlined in the 2015 Forest Plan.

There is a need to produce timber products from this project area, based on the 2015 Forest Plan, and the desire to help sustain local economies, while meeting other resource objectives and restoration needs described in the September 2020 scoping notice.

4. Enhance big game winter range conditions and improve wildlife forage habitat.

The proposed harvest treatments will create openings to benefit elk, deer, and bears by providing a greater abundance and distribution of important habitat. In the Knotty Pine project area this habitat that includes shrubs, grasses and forbs is less than desired in the project area. Page 30 of the 2015 Forest Plan contains a desired condition that states by trending towards the desired conditions for vegetation, habitat is provided for native fauna adapted to open forests and early seral habitats, or whose life/natural history and ecology are partially provided by those habitats. Also on page 30 of the 2015 Forest Plan is the wildlife objective to maintain or restore wildlife habitat on 1,000 to 5,000 acres of KNF lands, annually, with an emphasis on restoration of habitats for threatened and endangered listed species and sensitive species.

The environmental assessment documents the analysis of two alternatives to meet this need.

# Biological Opinion

The Forest initiated informal discussions for consultation with the Fish Wildlife Service (FWS) during regularly scheduled Level 1 team meetings in 2021. The Forest submitted their Knotty Pine consultation package to the FWS including the biological assessment (BA) and accompanying maps. The FWS began review of the Proposed Action in November of 2021. The Knotty Pine biological opinion is located in the project file.

The FWS completed the Biological Opinion and the Forest received it on March 18, 2022. The Biological Opinion considered the Knotty Pine project's effects on the federally listed, proposed, and candidate species including: grizzly bear (*Ursus arctos horribilis*), Canada lynx *(Lynx canadensis*), designated Canada lynx critical habitat, bull trout (*Salvelinus confluentus*), bull trout critical habitat, white sturgeon (*Acipenser tranmontanus*), Spalding's campion (*Silene spaldingii*) and whitebark pine (*Pinus albicaulis*).

## Findings

The Forest determined that the proposed project will have no effect on bull trout, designated bull trout critical habitat, white sturgeon, or Spalding's campion.

The Forest made a determination that the proposed action will not jeopardize the continued existence of whitebark pine. Pursuant to the requirements of 7(a)(4) of the Act and 50 C.F.R. § 402.10, the Forest assessed the effects of their proposed action and made a no jeopardy determination for whitebark pine (proposed). The FWS reviewed the biological assessment related to whitebark pine and concur with this determination.

The Forest determined in the biological assessment that the proposed project may affect, not likely to adversely affect Canada lynx and designated Canada lynx critical habitat, and may affect, and is likely to adversely affect grizzly bear.

### Canada lynx

The FWS stated "In summary, any effects to lynx as a result of the Knotty Pine Project will be insignificant to Canada lynx. The Service concurs with the Forest's determination that the proposed action is *not likely to adversely affect* threatened Canada lynx. The Service bases its concurrence on the information and analysis in the biological assessment prepared by Sean Hill, Wildlife Biologist, and information in our files."

## Canada lynx critical habitat

The FWS stated "In summary, we reviewed: the biological assessment for the Knotty Pine Project, the effects of the action, cumulative effects within the action area; the 2013 BO with 2021 errata; the information we relied upon to develop the BO; and information in our files. We anticipate any effects to lynx critical habitat from project-related activities to be insignificant. Following review of those documents and the status of lynx critical habitat, the environmental baseline for the action area, and the effects of project as proposed, including the cumulative effects, the Service concurs that the Knotty Pine Project not likely to adversely affect designated Canada lynx critical habitat."

## Grizzly Bear

The FWS stated, "After reviewing the current status of grizzly bears, the environmental baseline for the action area, the effects of the action, and the cumulative effects, it is the Service's opinion that the effects of the proposed action on grizzly bears are not likely to jeopardize the continued existence of the grizzly bear. No critical habitat has been designated for this species; therefore, none will be affected. Implementing regulations for section 7 (50 C.F.R. § 402) define "jeopardize the continued existence of" as to "engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." Our conclusion is based on, but not limited to, the information presented in the biological assessment (USFS 2021), correspondence during this consultation process, information in our files, and informal discussions between the Service and the Forest."

The March 18, 2022, biological opinion from the USFWS stated on page 53: "this level of anticipated take is not likely to result in jeopardy to the species. The amount of incidental take described in the biological opinion is low. Further, the FWS anticipates no mortality of grizzly bears, but rather some low level of effect on the normal reproductive potential and/or feeding patterns of individual female grizzly bears in the area. The best information indicates the overall status of the CYE grizzly bear population is stable to increasing. Considering the grizzly bear recovery strategies (U.S. Fish and Wildlife Service et al. 2013; U.S. Fish and Wildlife Service 1993) and the size, status, and distribution of the combined GYE, NCDE, SE and CYE grizzly bear population, incidental take of grizzly bears in the action area will not affect the recovery of the grizzly bear population in the conterminous United States as listed under the Act. Further, impacts on the grizzly bear population as a whole (all ecosystems) as a result of the proposed action, including anticipated levels of incidental take, will not appreciably reduce the survival or the recovery of the species in the conterminous United States."

The Knotty Pine biological opinion provides one reasonable and prudent measure to minimize incidental take resulting from the proposed Knotty Pine project. The reasonable and prudent measure is nondiscretionary; this measures is found in the design feature section of this decision.

# Decision

Based upon my review of alternative analysis as well as communication and consultation with the public, Tribes and agencies I have decided to implement EA alternative 2. Management actions are described in detail in the EA appendix B (Harvest and Non-harvest Treatment Summary), the EA Transportation section on pages 28 -29 and the summary of actions found below.

# A summary of the actions in my decision include:

**Table 1. Harvest Treatments**

| Commercial Vegetation Treatment | Alt. 1 Acres | Selected Alternative Alt.2 Acres |
|---|---|---|
| Improvement Cut | 0 | 898 |
| Commercial Thin | 0 | 291 |
| Shelterwood Cut | 0 | 749 |
| Seed-tree Cut | 0 | 14 |
| Clearcut with Reserves | 0 | 1,001 |
| Total commercial vegetation treatments | | 2,953 |
| Harvest followed by excavator piling and prescribed burning | 0 | 2,288 |
| Harvest followed by under burning[1] | 0 | 411 |
| Prescribed burning after commercial treatment | 0 | 2,699 |

[1]Under burning is a prescribed burn under a forest canopy where fire is applied generally to most of an area within well-defined boundaries for reduction of fuel hazard, as a resource management treatment, or both.

**Table 2. Fuel Treatments**

| Non-harvest treatments | Alt. 1 Acres | Selected Alternative Alt. 2 Acres |
|---|---|---|
| Non-harvest ladder fuels reduction – remove fuels and hand or excavator pile, then burn the piles | 0 | 70 |
| Ecosystem burning[1] | 0 | 4,687 |
| Precommercial Thinning | 0 | 2,099 |
| Total Non-harvest vegetation treatments | 0 | 6,856 |

[1]Ecosystem burning is the controlled application of fire to the landscape under specific environmental conditions to emulate a low or mixed severity fire.

**Table 3. Activities in the WUI and IRAs**

| Proposed Activities | Alt. 1 Acres | Selected Alternative Alt. 2 #of Units/ Acres |
|---|---|---|
| Harvest Treatment in the WUI | 0 | 79/ 2,953 |
| Precommercial Thinning in the WUI | 0 | 82/ 1,491 |
| Non-harvest fuels treatment in the WUI | 0 | 22/ 4,235 |
| Harvest Treatment in the IRAs | 0 | 0/0 |
| Non-harvest fuels treatments in the IRAs | 0 | 5/ 1,365 |

**Table 4. Activities in Old Growth**

| Proposed Activity | Alt. 1 Acres | Selected Alternative Alt. 2 Acres |
|---|---|---|
| Harvest Treatment within Old Growth | 0 | 57 |
| Harvest Treatment in Recruitment Potential Old Growth | 0 | 98 |
| Ecosystem Burning[1] within Old Growth | 0 | 41 |

| Proposed Activity | Alt. 1 Acres | Selected Alternative Alt. 2 Acres |
|---|---|---|
| Ecosystem Burning[1] within Recruitment Potential Old Growth | 0 | 132 |

[1]Ecosystem burning is the controlled application of fire to the landscape under specific environmental conditions to emulate a low or mixed severity fire.
All proposed treatments in old growth will retain old growth characteristics and are consistent with the 2015 Forest Plan.

**Table 5. Roadwork**

| Road Actions | Alt. 1 Miles | Selected Alternative Alt. 2 Miles |
|---|---|---|
| Haul Route Road Reconstruction/ Maintenance | 0 | 35 |
| Temporary road construction* | 0 | 2.2 |
| Add 9 segments of undetermined roads to the NFSR | 0 | 3.76 |
| Road storage for in-kind replacement of core | 0 | 4.04 |

*There will be no permanent road construction in the project.

## Recreation Improvements

### Additions to the Cougar Ridge Cross Country Ski Area

Alternative 2 will improve Cougar Ridge Cross-Country Ski Area to increase non-motorized winter use on the District.

The following items will be added to Cougar Ridge Cross-Country Ski Area:

- Increase size of current parking area to accommodate visitor parking. This will extend the parking lot to the west approximately 65 feet. Increased parking will require leveling the soil with a small dozer or other mechanized equipment. Base material and crushed gravel will be hauled in with the use of a dump truck and fill will be deposited from approved pit locations. The use of a small dozer or other mechanized equipment will be required to spread the new fill material. The removal of about 10 mature (merchantable) trees will be necessary to create the increased parking space.
- The current trail consists of a 3 mile out and back route for non-motorized winter users. This proposal will consist of adding multiple loop opportunities to accommodate beginners and more advanced skiers on this trail system.
    - Two loops, A and B near the parking area will be approximately 0.8 miles in length and on gentle terrain adjacent to the parking area and Hwy 508. The loops will also require some machine blading to create a level surface suitable for winter grooming. Any graded surface will be re-seeded with the Forest's required seed mix.
    - Three loops (for more advanced skiers) will be created by grooming existing roads within this area. The following closed NFSRS 3952, 3952A, 2338I, 2338H, 14367, and 4438 will be groomed for winter non-motorized use from December 1st through March 30th. To complete the upper loop a small dozer or excavator will be used to construct 0.8 miles of trail to connect NFSRs 14367 to 2338H. If we use mechanized equipment, the upper loop work will be completed between December 1 and March 30, see the Terms and Conditions section under the Wildlife: Grizzly Bear section of the Design Features, appendix A. To complete the lower loop a small dozer or excavator will be used to construct 0.3 miles of trail to connect NFSR 4438 to

the parking area. The existing roads will require some clearing of non-merchantable (< 6 inches) trees to maintain a useable corridor that meets required trail design specifications for a Trail Class 3 Cross-Country Ski trail (U.S. Department of Agriculture 2016). Chainsaws and an excavator will be used to clear the proposed trails and pile material. The material will be burned to avoid creating a hazardous fuels build-up adjacent to the trail system. In total these loops will add approximately 6 miles to the existing non-motorized trail system

- ♦ Two small sledding runs are proposed behind the parking/pavilion location. These sledding runs will be approximately 185 feet long and approximately 20 feet wide. Development of this opportunity will involve the removal of about 8 mature (merchantable) trees and several smaller, less than 6 inches trees. A small excavator or dozer will be required to install tree curbing along the sides of the runs to keep sledders confined to the run.

- An SST (vault style "sweet smelling toilet") is proposed adjacent to the current parking area. This addition will be a pro-active step to keeping the site clean and sustainable moving into the future as the site receives more use. Vault excavation will require the use of an excavator for site prep and setting of the structure.
- A small pavilion (warming hut ) will also be constructed. Much of the structural material needed for the pavilion will be available from the trees removed in the parking expansion and clearing of the pavilion site that will include an additional five to six trees. This pavilion will be approximately 20 feet wide and 20 feetlong, with open walls. The base for this structure will consist of a concrete pad or footings and utilize trees removed from site for posts and beam material. The pavilion social area will be compliant with FSORAG (Forest Service Outdoor Recreation Accessibility Guidelines, U.S. Department of Agriculture 2015). This site will be available for day-use opportunities beyond the winter season.

### New trail proposed along Yaak River

A new non-motorized hiking trail along the Yaak River starting at the Yaak Falls campground following the river downstream for about 2 miles. The Yaak River trail segments were identified to provide low elevation snow free hiking access for a family friendly opportunity. Trails in the Yaak Geographic Area were primarily constructed to access lookout towers nearly a century ago to protect America's timber commodity. Most historic trails weren't designed for family friendly day-use opportunities and they are a time commitment and can be difficult to access. The new trail opportunity will add approximately 1.3 miles of new trail to the system

Prior to final layout, district specialists will once again visit and review the trail's location. Preservation through interpretation (placement of signs) may be used to educate the public on the importance of historic areas.

## Reasons for Decision

When compared to the no action alternative, alternative 2 will treat the most acres to promote resilient vegetation conditions, create more big game forage opportunities, provide more wood products, and reduce the potential for high intensity wildfires by treating more acres than alternative 1.

My criteria for making a decision on this project are based on:

- Achievement of the project's purpose and need.
- Other alternative considered.

- Comments and input received from the public as well as Tribal and agency communication and consultation.
- How the project makes progress toward meeting the desired conditions and other Plan components included in the 2015 Forest Plan.

## Achievement of the project's purpose and need

The purpose and need for the Knotty Pine Project and the desired condition are based upon the 2015 Forest Plan standards, goals and objectives, and review of the project area by the interdisciplinary team (IDT).

As summarized in Table 6 below, alternative 2, is the most responsive to the purpose and need statements for the Knotty Pine Project.

**Table 6. Comparison of Purpose and Need Objectives by Alternative**

| Purpose and Need | Alt. 1 | Alt. 2 |
|---|---|---|
| Promote resilient vegetation conditions for landscape-level vegetation patterns, structure, patch size, fuel loading, and species composition | | |
| Promote early seral tree species including western larch, ponderosa pine, and western white pine (acres) | 0 | 9,827 |
| Contribute to fire's ecological function on the landscape (acres) | 0 | 7,386 |
| Reduce the potential for high intensity wildfire while promoting desirable fire behavior characteristics and fuel conditions. | | |
| Fuels reduction in Harvest and Non-harvest Units (PCT, prescribed burning, and ladder fuels reduction) in the WUI (acres) | 0 | 8,697 |
| Prescribed burning outside the WUI (acres) | 0 | 522 |
| Provide forest products that contribute to the sustainable supply of timber products from National Forest System Lands. | | |
| Timber Volume (MMBF/ CCF)<br>includes both saw and non-saw timber | 0 | 37.7 MMBF<br>74,500 CCF |
| Complete necessary construction, reconstruction and maintenance of roads (Yes/No) | No | Yes |
| Improve big game winter range conditions and promote forage opportunities while maintaining secure habitat for wildlife | | |
| Maintain or increase the wildlife forage component and seedling/sapling age class (acres) | 0 | 1,764 |
| Maintain areas of secure grizzly bear habitat through access management (Yes/No) | Yes | Yes |
| Maintain areas of habitat with no change to elk security (Yes/No) | Yes | Yes |
| Improve the quality and the area of big game winter range forage | No | Yes |

## Other Alternatives Considered

In addition to the selected alternative, I considered the no action alternative. A comparison of these alternatives can be found in the EA, pages 42-44. Listed below under "Alternatives Suggested by the Public" are alternatives suggested by the public along with the explanation why these alternatives were not carried forward. These suggested alternatives were not brought forward as alternatives by the IDT or the decision maker because alternatives 1 and 2 include the minimum (or no action) or the maximum

treatment for this project area at this time. See the rationale described below in numbers 1 through 5 for why we did carry these alternatives forward.

## No Action

Under the No Action alternative, the 2015 Forest Plan will continue to guide management of the project area.

## Alternatives Suggested by the Public

1. An alternative that has more harvest and prescribed burning treatment acres to improve forest health condition and address the needs of the WUI with protection needed for the safety of property and lives.

   - After review of public, Tribal and agency comment, two years of field review, a review of existing conditions, past harvest, and wildfire occurrence, IRA and private land boundaries in the project area and 2015 Forest Plan direction, the IDT developed the current proposed action. See Figure 1 which displays previous treatment areas, past wildfires, limited road access, and IRAs. The forest vegetation report has more information on desired vegetation conditions.

2. An alternative that focuses on a "protected landscape network" lens, rather than a "timber harvest lens" and is designed to focus "subsequent river management on protecting a river's free-flowing condition and water quality"; and does not include timber harvest in MA2 (Eligible Wild, and Scenic Rivers).

   - Congressional action is required for the designation of rivers as Wild and Scenic; the Forest Service manages these rivers according to 2015 Forest Plan direction. The Yaak and Kootenai Rivers have been designated as MA 2 – Eligible Wild and Scenic Rivers in the 2015 Forest Plan. These rivers are and have been managed to protect their outstanding remarkable scenic and recreational values for the benefit and enjoyment of present and future generations. The Knotty Pine proposed activities will not change the values for which the sections of the Yaak and Kootenai Rivers in the project area have been designated see page 51 of the 2015 Forest Plan. The proposed units have been individually diagnosed and reviewed by a certified silviculturist to prescribe the best silvicultural practice to trend the forest vegetation towards more resistant and resilient conditions. These prescriptions are designed to mimic ecological processes and to meet the purpose and need of the project. Treatment has been designed to reduce the potential impacts from wildfire and insects and disease thereby resulting in the protection of these values.
   - Specifically, in Harvest Units 1, 7, 7A, 8, 9, 11, 12, 13, 18, 63, and 64, vegetation and scenic design features were created to help protect these values, see appendix A - Design Features.

3. An alternative that requires no new temporary or permanent road construction, and that adds no "undetermined" roads to the road system.

   - The Knotty Pine Transportation Report as well as the forest-wide and three project level travel analysis reports support the proposed changes to the transportation system; these reports can be found in the project file. Temporary road construction and the undetermined roads to add to the system fit with the purpose and need of the Knotty Pine project and are carried forward in this EA. See the 5th paragraph in the Introduction section above for an update to the road construction for the Knotty Pine Project.

4. An alternative that requires no timber removal or road construction within existing core in BMU 12.

- An alternative that does not include timber removal or road construction does not respond to the project's purpose and need. The 2015 Forest Plan was used to guide the development of this project which responds to the needs of the vegetation, watershed, wildlife, cultural, and recreation resources. See the Forest Vegetation report for more detailed reasons why forest management activities (i.e. timber removal) are important.
- We are no longer proposing the new system roads in existing core. That road will now be a temporary road and will be rehabilitated after project activities are complete. See the 5th paragraph in the Introduction section above for an update to the road construction for the Knotty Pine Project. .

5. An alternative that does not authorize clearcuts or regeneration harvest units greater than 40 acres in size.

    - Alternative 2 analyzes the even-aged regeneration harvest treatments that will create forest openings larger than 40 acres in size. The National Forest Management Act limits the size of openings created by even-aged silvicultural systems to 40 acres or less, unless Regional Forester approval is obtained to exceed that size (FSM 2471.1). See pages 11, 32-33, and 43 in the Forest Vegetation Report, pages 14 and 22 of the Fire and Fuels Management Report, and pages 8 and 25-26, 132, and 136 of the wildlife report for a discussion on the benefits of openings greater than 40 acres. The Over 40 analysis and approval is located in the Forest Vegetation Project Record.




**Figure 1. Knotty Pine Project Area Map with Past and Current Treatment Areas**

# Public Involvement, Scoping and EA comments

During the October 2019 McCormick Fire District meeting this project was presented to the fire board and shared with the public at the McCormick Fire station.. The Fire Management Officer and acting District Ranger shared a map of the project, communicated that we were interested in hearing from the public about their concerns and management needs, and that scoping was planned for spring of 2020. Additionally, potential fuel treatments were discussed as well as the insect and disease concerns in this area. Some questions from the fire board and public included how the unmerchantable (non-saw) component of the timber sales will be addressed (i.e. chipped or hauled) as well as expressing weeds as a concern.

On May 27, 2020, the Three Rivers Ranger District mailed a letter to residents and interested individuals asking for their input on desired activities in the project area and existing conditions. We received 40 letters and emails. The IDT used this public feedback to help develop the proposed action and throughout the planning process.

In September of 2020, a scoping notice was distributed and mailed to solicit comments on the proposed action from the public, various interest groups, Tribes, and agencies. A legal advertisement was placed in the *Missoulian* on September 30, 2020, and the project details were posted on the Kootenai National Forest's land & resources management project web page. During the summer and fall of 2020 public field trips were cancelled due to Covid-19 so the IDT created a narrated presentation showing and describing the Knotty Pine Proposed Action for the public. This presentation continues to be available on the project webpage and was made available hard copy. Because of these public involvement efforts, a total of 13 comment letters were received. The IDT carefully considered the comments and determined how they will be incorporated into project development.

Collaboration with public interests was a crucial element in Knotty Pine project development and helped the District identify and modify its proposed action.

## Scoping Comment Summary

Scoping occurred in September 2020 and as a result of comments received during this 30-day scoping period Harvest Unit 70 was dropped and Non-harvest Fuels Units X and W were added to Alternative 2;

The public suggested some alternatives during the public scoping period please see the "Alternatives Suggested by the Public during Scoping" heading under the Other Alternative Considered heading above.

## Project Misinformation

Significant misinformation was disseminated by some individuals and groups on social media and other formats prior to the close of the EA comment period and before the April 20, 2021, public meeting. In an effort to provide the public with accurate information, the following points of clarification were shared with the public by phone, in-person, through email, on Forest social media accounts, and at public meetings hosted by the Forest Service.

Following are points of clarification of the many comments we received that were mischaracterizations and based off of misinformation:

The Proposal does NOT include:

- Aerial spraying of chemicals. It does include biocontrol and herbicide application for noxious weeds. See pages 6 -10 of the Noxious Weeds Report.

- Forest Service management on private land.
- A RV park for 150 vehicles. See pages 9-10 of the Access and Recreation Report. See the "How the EA Comments resulted in Changes to the October 2021 EA" section below.

The District extended the comment period to May 7, 2021, so that the local community and other interested parties had more time to review and comment on the EA.

## Below is a summary of our outreach on this project demonstrating project notification to the public

### Summary of public outreach as of April 21, 2021:

As per above, during the October 2019 McCormick Fire District meeting this project was presented to the fire board and shared with the public at the McCormick Fire station.

First Public Comment period- initial public outreach started on May 27, 2020. This was a 30 day comment period. A letter was sent to about 300 local landowners and an email was sent to people who have asked to be on District project mailing lists.

Second Public Comment period – the scoping period occurred from September 30 through October 30, 2020. This was a 30 day comment period. Letters and emails were sent to people that expressed interest in the project. In lieu of a public meeting the team created a narrated power point presentation that was posted to the webpage, emailed and made available hard copy. A Facebook notification of the scoping period was posted August 26, 2020. A legal ad was placed in the *Missoulian* (the Kootenai Forest's newspaper of record).

Third Comment Period -the EA comment period started April 1, 2021, and ended May 7, 2021 (it was extended by one week in response to several public requests). A legal ad was placed in the *Missoulian* (the Kootenai Forest's newspaper of record). Information was posted on Facebook and in the local newspapers. Emails and letters were sent to the project mailing lists.

Social Media- three Facebook posts were made to announce the public meeting on April 20, 2021.

Information Boards- Information boards were erected at the McCormick Fire Hall, Pine Creek Fire Station, Steins Market in Troy and the county refuse site located at Highway 2 and Yaak Highway 508 displaying project information. These boards were maintained and updated from the beginning of October through the end of November 2020.

### April 26, 2021:

Knotty Pine information boards were posted at Steins Market, Yaak Mercantile, McCormick Fire Hall, Pine Creek fire station, and the refuse site at Hwy 2 and Yaak Hwy 508. These information boards, located within the local community and project area, were in place from April through July of 2021.

### May 2021

The May 7, 2021, public meeting announcement was published in the *Western News* on May 4th , the *Kootenai Valley Record* on May 4th, and it was posted three times to the Kootenai Forest webpage on April 30th, May 4th, and May 6th, 202. Information was also sent by email to the project mailing list.

## How the EA Comments resulted in Changes to the October 2021 EA

The Yaak Overnight Group Site Rental proposal has been dropped but it was analyzed by specialists in the EA. Unit 35 was dropped due to additional field reconnaissance but it was analyzed by some specialists in the EA. See the EA appendix G, for the responses to comments that we received.

# Progress toward meeting the Forest Plan and Findings Required by Other Laws and Regulations

Each resource report in the EA provides a section on how this project is consistent with the laws and regulations relevant to that resource. After reviewing each specialist report and the EA, I find my decision to implement alternative 2 complies with all applicable laws, regulations, and policies.

## The National Forest Management Act (NFMA)

This project does not require any Forest Plan amendments. Project activities are consistent with the 2015 Forest Plan for the Kootenai National Forest and project-specific activities described in the NFMA (16 USC 1604 (i)). The EA discusses the Forest Plan and management area standards applicable to the Knotty Pine Project Area.

### Other NFMA Requirements –

I have determined the selected alternative is consistent with the following provisions of the National Forest Management Act and the 2015 Forest Plan:

1. Suitability for Timber Production: No timber harvest, other than salvage sales or sales to protect other multiple-use values, shall occur on lands not suited for timber production (16 USC 1604(k), Forest Plan FW-DC-TBR-02 and FW-DC-TBR-03).

    Timber harvest will occur on sites identified as suitable for timber production (Forest Vegetation Report, pages 41-43, 47). Timber harvest will occur where harvest is allowed but are outside of timber production lands. These treatments are designed to follow the purpose and need to help move the landscape towards the desired condition (Forest Vegetation Report, pages 42, 46-47, Scenic Report pages 9, 11-12),

2. Timber Harvest on National Forest Lands (16 USC 1604(g)(3)(E)): A Responsible Official may authorize site-specific projects and activities to harvest timber on National Forest System lands only where:

    **a.** Soil, slope, or other watershed conditions will not be irreversibly damaged (16 USC 1604(g)(3)(E)(i), Forest Plan FW-DC-SOIL-02 and FW-GDL-SOIL-04).

    Features of the selected alternative described in this decision and the EA will ensure that soil, water, and watershed resources will be protected. See the Soils Report pages 14-26, and Water Resource Report, pages 28-29.

    **b.** There is assurance that the lands can be adequately restocked within five years after final regeneration harvest (16 USC 1604(g)(3)(E)(ii), Forest Plan FW-STD-TBR-03).

    Technology and professional knowledge were applied to assure that adequate stocking will occur within five years after final harvest (Forest Vegetation Report, pages 41, 44).

    **c.** Protection is provided for streams, streambanks, shorelines, lakes, wetlands, and other bodies of water from detrimental changes in water temperatures, blockages of water courses, and deposits

of sediment, where harvests are likely to seriously and adversely affect water conditions or fish habitat (16 USC 1604(g)(3)(E)(iii), Forest Plan FW-STD-RIP-03).

See the Aquatic Resources Report, pages 15, 17-19 for protections of streams and RCHAs.

**d.** The harvesting system to be used is not selected primarily because it will give the greatest dollar return or the greatest unit output of timber (16 USC 1604(g)(3)(E)(iv), Forest Plan FW-STD-TBR-05).

The selected timber harvest is governed by objectives to improve forest resilience and other resource conditions. Our monitoring efforts have determined that timber harvest can improve or maintain resources while ensuring economic viability. See the Forest Vegetation Report, page 39, 41.

3. Clearcutting and Even-aged Management (16 USC 1604(g)(3)(F)): Insure that clearcutting, seed tree cutting, shelterwood cutting, and other cuts designed to regenerate an even-aged stand of timber will be used as a cutting method on National Forest System lands only where:

**a.** For clearcutting, it is determined to be the optimum method, and for other such cuts it is determined to be appropriate, to meet the objectives and requirements of the relevant land management plan (16 USC 1604(g)(3)(F)(i), Forest Plan FW-STD-TBR-07).

Clearcutting with reserves will occur on about 1,876 acres. Even-aged management will occur and was found to be appropriate to meet Forest Plan direction. See the Forest Vegetation Report, pages 43-45 for additional details.

**b.** The interdisciplinary review as determined by the Secretary has been completed and the potential environmental, biological, esthetic, engineering, and economic impacts on each advertised sale area have been assessed, as well as the consistency of the sale with the multiple use of the general area (16 USC 1604(g)(3)(F)(ii)).

Potential environmental, biological, esthetic, engineering, and economic impacts have been assessed in detail and are summarized in the EA and documented in more detail in the EA resource reports. The timber harvest is consistent with the multiple use of the general area described in the Forest Plan for Management Area 6 and other forestwide components.

**c.** Cut blocks, patches, or strips are shaped and blended to the extent practicable with the natural terrain (16 USC 1604(g)(3)(F)(iii), Forest Plan FW-GDL-AR-01).

The selected alternative will meet the Forest Plan scenic integrity objectives, which were developed to emulate the appearance of areas that have undergone changes through the natural processes of fire and insects and disease, see the Scenic Report. Design features are intended to minimize short term impacts and meet Forest Plan direction for scenery, see the EA, page 73-74 and the Scenic Report pages 12, 14-16.

**d.** Cuts are carried out according to the maximum size limit requirements for areas to be cut during one harvest operation, provided, that such limits shall not apply to the size of areas harvested as a result of natural catastrophic conditions such as fire, insect and disease attack, or windstorm (FSM R1 supplement 2400-2001-2 2471.1, 16 USC 1604(g)(3)(F)(iv), Forest Plan FW-STD-TBR-02).

Direction provided in the Region 1 supplement to FSM 2471.1 has been followed and we have Regional Forester approval of the units that will exceed the 40-acre opening size limitation. The scoping comment period from September 30 through October 30,2020

was the first 30 day comment period and the EA comment period from March 31 through May 7,2021 was the second comment period of 30 days for the Knotty Pine Project in regard to harvest units over 40 acres.

**e.** Such cuts are carried out in a manner consistent with the protection of soil, watershed, fish, wildlife, recreation, and esthetic resources, and the regeneration of the timber resource (16 USC 1604(g)(3)(F)(v)).

Cuts will be carried out in a manner that will protect soil (Soils Report, pages 14-16), water, (Water Resources Report, pages 14-15, 17-21, 26-27, 29-30), aquatics resources (Aquatic Resources Report, pages 19-21), wildlife (Wildlife Report, pages 14, 41, 51, 59-60, 64, 72, 92, 141, 158), scenery (Scenic Report, pages 9, 12, 14-16), and the regeneration of the timber resource (Forest Vegetation Report, pages 30-32, 38, 41-45, 47).

**4.** Stands of trees are harvested according to requirements for culmination of mean annual increment of growth (16 USC 1604(m), Forest Plan FW-STD-TBR-04).

The project meets this requirement (Forest Vegetation Report page 44).

**5.** Construction of temporary roadways in connection with timber contracts, and other permits or leases: Unless the necessity for a permanent road is set forth in the forest development road system plan, any road constructed on land of the National Forest System in connection with a timber contract or other permit or lease shall be designed with the goal of reestablishing vegetative cover on the roadway and areas where the vegetative cover has been disturbed by the construction of the road, within ten years after the termination of the contract, permit, or lease either through artificial or natural means. Such action shall be taken unless it is later determined that the road is needed for use as a part of the National Forest Transportation System (16 USC 1608(b)).

In consideration of 16 USC 1608(b), temporary roads shall be designed with the goal of reestablishing vegetative cover on the roadway and areas where the vegetative cover has been disturbed by the construction of the road, within 10 years after the termination of the timber sale contract either through artificial or natural means. Such action shall be taken unless later travel analysis determines the road is needed for use as a part of the National Forest Transportation System.

**6.** Standards of roadway construction: Roads constructed on National Forest System lands shall be designed to standards appropriate for the intended uses, considering safety, cost of transportation, and impacts on land and resources (16 USC 1608(c), Forest Plan FW-DC-AR-07).

The Transportation system analysis in the Access and Recreation Report, the Knotty Pine Transportation Report as well as the forest-wide report and three project level travel analysis reports, provided valuable site-specific information upon which my decision is based. I have determined the project meets the requirements of 16 USC 1608 (b) and (c).

**7.** Provide for diversity of plant and animal communities (16 USC 1604[g][3][B], Forest Plan GOAL-WL-01)

The vegetation management approach in the 2015 Forest Plan is one that provides for ecosystem diversity by providing the ecological components, patterns, and processes at multiple scales on the landscape, and thereby provides the full spectrum of habitats and conditions needed for all of the biological organisms associated with the various ecosystems (USDA Forest Service 2013). This includes the goal that "the KNF manages wildlife habitat through a variety of methods (e.g., vegetation alteration, prescribed

burning, invasive species treatments, etc.) to promote the diversity of species and communities and to contribute toward the recovery of threatened and endangered terrestrial wildlife species" (Forest Plan, GOAL-WL-01).

In addition, the 2015 Forest Plan provides management direction in the form of vegetation and wildlife desired conditions, coarse woody debris and snag guidelines, and old growth standards and guidelines. The companion approach to ecosystem diversity (coarse filter) is the "fine filter" approach in which conservation strategies are used for individual species or groups of species to contribute to species diversity. The fine filter approach narrows the focus to those species that require habitat that maybe outside the range of variation and are not covered under the coarse filter. The 2015 Forest Plan provides fine filter management direction in the form of grizzly bear, lynx, and other species-specific standards and guidelines.

Based on consideration of consistency with the Forest Plan, the monitoring and design features of the Knotty Pine Project decision, analysis of effects, and the biological assessments/evaluations (in the project record), I find this decision will continue to provide for a diversity of species and communities.

## Clean Water Act and Montana State Water Quality Standards

Montana has developed numeric or narrative criteria for various pollutants that may impact these beneficial uses. The pollutant of primary concern with land management operations is sediment, and the beneficial use of most concern in these waters is generally fish. No increases of sediment or suspended sediment are allowed above naturally occurring concentrations which will render the waters harmful, detrimental, or injurious to fish (ARM 17.30.623). The Forest Service addresses this requirement through application of best management practices (BMPs).

Upon review of the Knotty Pine Project EA and the project file, I find that the activities associated with the Selected Alternative will comply with the Clean Water Act and Montana State Water Quality standards. My decision includes project design features (EA appendix A) and best management practices (EA appendix E) which are designed to protect the water resource and achieve water quality standards. In addition, Forest Plan RHCAs will be established along all wetlands and stream courses that are in or adjacent to treatment areas.

## Clean Air Act

After reviewing the specialist reports of the EA, I find that the activities in the Selected Alternative will be coordinated to meet the requirements of the State Implementation Plans, Smoke Management Plan, and Federal Air Quality requirements (Fire and Fuels Report, pages 21-22, 24).

## Consideration of Relevant and Applicable Science

My decision is based on the relevant and applicable science and includes a review of the science presented by the public. This science is discussed throughout the EA, in Response to Comments, and in the project file documentation.

## National Historic Preservation Act, American Indian Religious Freedom Act, and Native American Graves Protection and Repatriation Act

As described in the cultural resource section of the EA and in FONSI Intensity factor 8), the selected alternative complies with this act.

## Government to Government Relations

The Forest Service consulted with the Confederated Salish and Kootenai Tribes and the Kootenai Tribe of Idaho during the analysis process. The intent of this consultation has been to remain informed about the tribal concerns regarding the American Indian Religious Freedom Act and other tribal issues. In addition, the Salish, Kootenai, and Upper Pend d'Oreilles have rights under the Hellgate Treaty of 1855 (July 16, 1855). These rights include the "right of taking fish at all usual and accustomed places, in common with citizens of the Territory, and of erecting temporary buildings for curing; together with the privilege of hunting, gathering roots and berries, and pasturing their horses and cattle upon open and unclaimed land." The federal government has trust responsibilities to Tribes under a government-to-government relationship to insure that the Tribes reserved rights are protected. Consultation with the Tribes throughout the project planning helped insure that these trust responsibilities were met.

## The Endangered Species Act

In accordance with the Endangered Species Act, Section 7, I requested formal consultation with regard to the project effects to grizzly bear. I submitted a biological assessment to the Fish, Wildlife Service (FWS) on April 27, 2021. The project received FWS concurrence on March 18, 2022. The biological opinion findings can be found in the Biological Opinion section of this document and in the project file. I have completed formal consultation with regard to the project effects to grizzly bear. The activities in the Selected Alternative with the determination of likely to adversely affect grizzly bears are consistent with the 2015 Forest Plan and are covered by the Incidental Take Statement issued as a result of that consultation. I have also received concurrence with regards to our determination for effects to Canada lynx, Canada lynx critical habitat, and whitebark pine (proposed).

## Administration of the Forest Development Transportation System- Roads Policy- 36 CFR Part 212 et al.

A roads analysis has been prepared for the Knotty Pine project area (Access and Recreation Report), see the Knotty Pine Transportation Analysis Report, and the Forest-wide Transportation Analysis Report, located in the project file. Should the Forest re-enter this project area for future management, it is likely the District will go through a new travel analysis process, at which time it may identify different roads and actions to be implemented through a NEPA decision. I have determined that the Selected Alternative, which includes the addition of 3.8 miles of existing road to the NFS roads system, the 2.2 miles of temporary road, and the storage of 4 miles of closed road complies with the Roads Policy.

## Migratory Bird Treaty Act of 1918; Executive Order 13186 of January 2001

The Selected Alternative is in compliance with the Migratory Bird Treaty Act of 1918 (See Wildlife Report). Upon review of the information in the Wildlife Report (pages 80-81, 88-89, 96, 150-153, 156-161) I find that the Selected Alternative complies with this Executive Order.

## Roadless Area Conservation Rule

I have considered the effects of prescribed burning in Non-harvest Fuels Units F, H, and T in the Buckhorn Ridge Inventoried Roadless Areas and have determined this activity to be consistent with the 2001 Roadless Area Conservation Rule (35 CFR 294 Subpart B).

### Environmental Justice

I have considered the effects of the proposed action and it is not expected to negatively affect the civil rights of consumers, minority groups, low-income groups, women, or American Indian tribes. This project is compliant with EO 12898, "Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations." This project was designed to contribute to the economic well-being of local communities (see the EA purpose and need for the proposal on pages 6-7 and the Economics Report on page 6). Environmental justice issues were considered in all steps of the NEPA process including public participation, alternative development, determining the affected environment, project design, and analysis of environmental consequences. At no step were minority, low-income, or Tribal populations negatively affected by any of the proposed actions in any of the alternatives.

### Executive Order 13751–Invasive Species

The selected alternative will meet this order because it includes provisions for minimizing weed introduction and spread, and we will continue to control State and County-listed noxious weeds in the project area (Noxious Weeds Report pages 3-7, 10-12).

### Compliance with Other Laws, Regulations, and Policies

Compliance with other laws, regulations, and policies are listed in various sections of the project file, the 2015 Forest Plan, and the resource reports (primarily in the " Relevant Laws, Regulations and Policy or Regulatory Framework and Consistency" discussion at the end of each report).

# Tribal and Agency Consultation and Coordination

Communication and consultation with these entities began prior to project development and continued throughout the process. The IDT, District Ranger and Forest Supervisor communicated and consulted with the Confederated Salish and Kootenai Tribes (CSKT), the Kootenai Tribe of Idaho (KTOI), Montana Fish, Wildlife, and Parks and the U.S. Fish and Wildlife Service. These discussions have influenced the design of proposed activities and design features to benefit habitat conditions

## Tribal Consultation

On May 27 and September 30, 2020, letters were sent to the Kootenai Tribe of Idaho (KTOI) and the Confederated Salish Kootenai Tribe regarding the Knotty Pine Project. There has been ongoing communications with the Tribes throughout the project development, see the project file for more information. KTOI members went on a field trip to the project area on May 21, 2021, with two District employees.

## Montana Department of Natural Resources (DNRC) and County Commissioners

This project is supported by local residents and County Commissioners and is a candidate for cross-boundary restoration opportunities identified in the Montana Forest Action Plan. Additionally, this project reflects the objectives of the Memorandum of Understanding (MOU) between the County, Forest Service, Natural Resources Conservation Service (NRCS) and Department of Natural Resources and Conservation (DNRC) to increase forest restoration and wildfire mitigation treatments across ownership boundaries. This project will also include a timber sale using Good Neighbor Authority.

These comments resulted in the addition of Non-harvest Fuels Units X and W to help protect private lands within the project area from wildfire

## Montana Fish, Wildlife and Parks

The District has discussed this project with Montana Department of Fish, Wildlife, and Parks biologists (MDFWP). The District provided information regarding the proposed vegetation management and recreation activities on winter range and the potential impacts that may result. MDFWP provided recommendations to ameliorate potential impacts. Discussions will continue throughout the analysis of the project.

## U.S. Fish and Wildlife Service

The District has communicated and consulted on this project with the U.S. Fish and Wildlife Service research and consultation biologists. The focus of these discussions has been on potential impacts to bears and their habitats. Topics of discussion included bear activity in the project area, screening cover along roads, and potential recreation impacts. Project design features, for example, contribute to meeting some of the regulatory agency concerns. Consultation included a submission of a project biological assessment, further correspondence as needed, and the receipt of a biological opinion from the Service.

## Montana State Historic Preservation Office (SHPO)

On January 4 2021 a letter was sent to SHPO regarding the Knotty Pine Project. Project design features have been identified to respond to agency concerns. The Forest received SHPO concurrence on January 5, 2022.

# Finding of No Significant Impact

As the responsible official, I am responsible for evaluating the effects of the project relative to the definition of significance established by the CEQ Regulations (40 CFR 1508.13). I have reviewed and considered the environmental assessment and documentation included in the project file. In my decision, I have considered both context and intensity of impacts (40 CFR 1508.27) and have determined the management actions included in the decision for the Knotty Pine Project do not constitute a major federal action and will not have a significant effect on the quality of the human environment. As a result, no environmental impact statement will be prepared. My rationale is as follows, organized by sub-section of the CEQ definition of significance cited above. Before making my determination, I carefully reviewed and considered the following information:

- The direct, indirect, and cumulative effects of these actions as documented in the Knotty Pine Project environmental assessment and specialist reports, January 2022.
- The analysis documentation in the project file of the Knotty Pine Project.
- Comments received during all comment periods for this project.
- Information received from Tribes and other agencies.
- Past experiences with similar activities and projects.

The following is a summary of the project analysis to determine significance, as defined by Forest Service Handbook 1909.15_05. “Significant”, as used in NEPA, requires consideration of both context and intensity of the expected project effects.

## Context

For the action alternatives, the context of the environmental effects is based on the environmental analysis in the environmental assessment. The analysis of effects did not identify any effects that will impact the quality of the human environment outside of the project area, with the exception of possible smoke related impacts to air quality. All of the proposed activity types have been conducted before on the Kootenai National Forest, and the effects have been localized to the project area or wildlife habitat analysis areas immediately adjacent and affected by the proposed activities. Economic benefits from employment opportunities and commercial timber products have been mostly experienced in the local communities surrounding the Kootenai National Forest. Therefore, the context of this project will not have measurable effects on regional, national, or global environments.

## Intensity

Intensity is a measure of the severity, extent, or quantity of effects, and is based on information from the effects analysis of this EA and the references in the project record. The effects of this project have been appropriately and thoroughly considered with an analysis that is responsive to concerns and issues raised by the public, agencies and Tribes. The agency has taken a hard look at the environmental effects using relevant scientific information and knowledge of site-specific conditions gained from field visits and data. My finding of no significant impact is based on the context of the project and intensity of effects using the ten factors identified in 40 CFR 1508.27(b).

### 1) Impacts may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on the balance the effects will be beneficial.

I considered the past, ongoing, and reasonably foreseeable actions in conjunction with beneficial and adverse impacts associated with activities as presented in the Knotty Pine EA. These impacts are within the range of effects identified in the 2015 Forest Plan. I conclude that the specific direct, indirect, and cumulative effects of the selected alternative, alternative 2, are not significant and this action does not rely on beneficial effects to override any adverse environmental effects.

Impacts associated with the decision to implement alternative 2 are discussed in the EA and are listed in each resource report, for example, “Fire and Fuels Report” effects sections are found on pages 13-21.

There may be short-term adverse impacts during project implementation or for a period after activity completion, but these impacts are not anticipated to persist over the long-term.

Predicted impacts to resources were identified early in the development of the proposed action and design features and monitoring will be integrated into project activities to minimize or avoid short-term impacts as much as possible.

This analysis showed that over the long-term, the selected alternative management actions will help move the project area toward the goals and objectives described in the Forest Plan and support the purpose and need for this project.

### 2) The degree to which the proposed action affects public health or safety.

All of the management actions included in this decision have been implemented before on the Kootenai National Forest without compromising public health. There are no circumstances or conditions associated

with my decision to indicate there will be unusual or substantial risks to public health and safety. No proposed activities have been identified as being detrimental to public health. Smoke from prescribed burning activities was identified as a public health concern during the comment period, see the EA response to comment 30. As mentioned above under the Clean Air Act this project will meet the requirements of the State Implementation Plans, Smoke Management Plan, and Federal Air Quality requirements.

During some project activities, certain trails will be closed to the public.

The District will notify the public when trail closure and log hauling occurs using methods such as social media, and signs located at the trailheads and road junctions. Please see the design features in appendix A, for details about the road and trail closures. All prescribed burning will meet State Air Quality requirements. Standard provisions will be included in all timber sale contracts to protect the safety of others.

## 3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

Historical and cultural resources have been identified, and design features have been established in the event unknown historic or cultural resources are discovered to ensure adequate protection of these resources occurs. If previously unknown heritage resources are encountered during implementation of the project, activities at the site will be halted and the district ranger will be notified immediately. Activities will not resume until adequate protective measures are developed and specified in the field. Based on the cultural analysis and the findings of the cultural resource inventory, there are no adverse effects to historic properties expected as a result of implementing alternative 2. Consultation has occurred with the Confederated Salish and Kootenai Tribes and the Kootenai Tribe of Idaho regarding this project.

There are no parklands, prime farmlands, or ecologically critical areas within the project area based upon the specific management area designations. Riparian areas will be avoided and the appropriate buffers applied for fish-bearing streams; permanently flowing non-fish bearing streams; ponds, lakes, reservoirs and wetlands greater than one acre; and seasonally flowing or intermittent streams, wetlands less than one acre, landslides and landslide prone areas. It is expected that project related sediment impacts to stream channels, floodplains, and wetland areas will be negligible with the application of buffers and use of road improvement BMPs, see appendix E. Any floodplains and wetlands found during implementation will also be protected by project design features, see appendix A and buffers. No municipal watersheds exist within the project area. There are some water rights and special use permits located in the project area. We have addressed these concerns by responding to the individual landowners who have contacted us and have made site visits in both 2020 and 2021. Additional information based on these site visits is available in the January EA, see response to comments 121 -125 and the Water Resources Report.

There are some unique characteristics within the project area, such as the Yaak and Kootenai Rivers (scenic and recreation management area),the Yahk Mining District and Yaak Falls special areas. Due to project design, layout, and design features, no significant adverse effects to these unique characteristics are expected. Management Area direction compliance is discussed in the Compliance with the Land Management Plan Section of the following resource reports: Access and Recreation Report on pages 24-26; Fire and Fuels Report on page 24; Forest Vegetation Report on pages 46-47; Scenic Report pages 14-16.

## 4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

All of these management actions have been conducted many times in similar conditions on the Kootenai National Forest and other lands managed by the Forest Service. From past projects, the effects are well known and no significant impacts to the human environment are expected. Although there is public concern over the effects the proposed action may have and the level of the significance of these effects, I find that the analysis and findings documented in the environmental assessment indicate that there is not a level of scientific dispute or controversy over the actions proposed that will require the preparation of an environmental impact statement.

## 5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

These methods of vegetation management, road management, trail improvement, watershed and wildlife activities have all occurred numerous times on the Kootenai National Forest and on other lands managed by the Forest Service. These are not unique or new actions that involve high levels of uncertainty. The project file demonstrates relevant scientific information, consideration of responsible opposing views, and the acknowledgement of incomplete or unavailable information, scientific uncertainty, risk, and a review of monitoring associated with past activities. The analysis shows the effects of these management activities are well known and understood. The effects of these actions are not uncertain, and do not involve unique or unknown risks as documented in the environmental assessment.

## 6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

This action is in compliance with the 2015 Forest Plan direction and will help achieve desired conditions put forth in the Forest Plan. The selected alternative does not represent a decision about future actions in this project area. Any future proposals will be subject to NEPA requirements and will require a new decision.

## 7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts.

I have again reviewed the impacts of the management actions in consideration of past, ongoing, and reasonably foreseeable actions described in the environmental impacts section of the environmental assessment and in each resource report. All relevant and known cumulative actions and effects have been identified and analyzed and there will be no significant cumulative effects as a result of this project. The effects of the action are limited to the local area and there are no other effects that will add to the effects of the proposed action.

## 8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in the National Register of Historic Places or may cause loss or destruction of significant cultural or historical resources.

The action will have no significant adverse effect on districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places (NRHP). All NRHP eligible or unevaluated sites were field verified and site records were updated to reflect any changes in site

conditions or where old spatial data could be updated with new, high-accuracy GPS data. Additionally, all areas within the area of potential effect with a high to moderate probability for the presence of historic properties that had not been recently surveyed (within 20 years) were surveyed by Forest Service archaeology crews. Consultation is completed with the Montana State Historic Preservation Office. Consultation has also occurred with the Confederated Salish and Kootenai Tribes and the Kootenai Tribe of Idaho regarding this project. Based on this information, I conclude that this action will not cause loss or destruction of significant scientific, cultural, or historical resources.

## 9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act.

The degree to which endangered or threatened species or critical habitat will be affected has been indicated in the proposed, threatened, endangered, and sensitive plant species and wildlife analyzes. See Table 7 for the status of endangered, threatened or proposed species in the Knotty Pine project area.

**Table 7. Threatened, Endangered and Proposed Species in the Knotty Pine Project Area**

| Species | Determination* | Report /Page number |
|---|---|---|
| Grizzly Bear (*Ursus arctos horribilis*) Threatened | MALAA | Wildlife Report page 36 |
| Canada Lynx (*Lynx canadensis*) Threatened | MANLAA | Wildlife Report pages 56-57 |
| Canada Lynx Critical Habitat | MANLAA | Wildlife Report page 67 |
| Spalding's (catchfly) now campion (*Silene spaldingii*) Threatened | No Effect | Proposed, Threatened, Endangered Plant Species Report pages 2, 10-11 |
| White sturgeon (*Acipenser transmontanus*) Endangered | No Effect | Aquatic Resources Report page 1 and Table 7 |
| Bull Trout *(Salvelinus confluentus)* Endangered | No Effect | Aquatic Resources Report page 1 and Table 7 |
| Bull Trout Critical Habitat | No Effect | Aquatic Resources Report page 1 and Table 7 |
| Whitebark Pine (*Pinus albicaulis*) Threatened | NLJ | Proposed, Threatened, Endangered Plant Species Report pages 2, 5, 10-11 |

*Determination Key: MALAA = May Affect, Likely to Adversely Affect and MANLAA = May Affect, Not Likely to Adversely Affect and NLJ= Not likely to Jeopardize the Continued Existence.

### Significance with regard to the NEPA and the ESA

The proposed action will not significantly affect any threatened, endangered, or proposed species or designated critical habitat that may be present on the Kootenai National Forest, as identified by the U.S. Fish and Wildlife Service. The resource sections in the environmental assessment and the specialist reports describe the occurrence and potential effects of the proposed activities to Endangered Species Act-listed species and critical habitat. The potential impacts are summarized below.

Determinations regarding Endangered Species Act (ESA) effects include the word “adversely”. In this project an action may have an adverse effect according to the ESA definition, yet not rise to the level of significance as described in the NEPA.

The Biological Assessment (BA) and Biological Opinion (BO) for grizzly bear, Canada lynx, Canada lynx critical habitat, and whitebark pine are in the project file. Consultation with the FWS is completed.

### Grizzly bear

The proposed action may affect, and is likely to adversely affect grizzly bears. This determination is based on: 1) project activities may cause temporary disturbance and avoidance of the affected areas; 2) entries into existing core for routine forest management may result in short-term adverse disturbance effects to grizzly bears; 3) core will be maintained in the BMU; 4) open motorized route density will temporarily increase during implementation; however, proposed activities will be compliant with FW-STD-WL-02; 5) the in-kind replacement of core for harvest will maintain the existing core standard in BMU 12. Furthermore, 6) harvest-related impacts to OMRD and TMRD are temporary and road status will return to the designated condition upon completion of activities; 7) vegetation management treatments will move stands towards desired vegetation and fire tolerant conditions characteristic of the area; 8) the treatments will encourage increased production of forage species for grizzly bears and other wildlife; 9) all harvest units are outside high-quality spring habitat; 10) there will be no change to open, motorized public road access; 11) availability of large core areas and maintenance of movement area habitats accommodates potential bear movement from project activity areas; 12) project activities will not result in a source of bear attractants; and 13) no increased risk of bear mortality is expected on federal lands as a result of the proposed action; authorized activities on federal lands are not known to cause mortality.

### Canada lynx

Then proposed action (Alternative 2) may affect, and is not likely to adversely affect Canada lynx. This determination is based on: 1) lynx are generally considered tolerant of human activity; 2) proposed harvest will occur outside the LAU; 3) proposed actions will move stands towards desired vegetative conditions characteristic of the area, including increased habitat diversity; 4) prescribed fire is proposed within stands that currently do not provide lynx foraging habitat (i.e., stem exclusion, and other mature, non-foraging structure) which could improve lynx winter foraging opportunities in approximately 15 years; and 5) precommercial thinning will retain hare foraging structure; 6) treatments will reduce the risk of severe fire within the treated and surrounding areas; 7) there will be a minor increase of early stand initiation habitat within the Thunder LAU and will remain well below the standards for VEG S1 and VEG S2; 8) activities will retain ample and well-distributed movement area habitat; 9) large areas of the project LAUs will remain free of activity to accommodate potential short-term disturbance from activity areas; 10) the Project Area units are a very small portion of the LAU; and 11) lynx mortality is extremely unlikely.

### Canada lynx designated Critical Habitat

Alternative 2 (the Proposed Action) may affect, and is not likely to adversely affect Canada lynx critical habitat. This determination is based on: 1) vegetation management, both precommercial thinning and prescribed burning, will not reduce currently suitable multistory foraging and young forest (stand initiation) habitat; 2) stands proposed for burning treatments are currently unsuitable habitat and may become suitable in approximately 15 years; 3) there will be no effect to current denning habitat, however pockets of fire mortality are likely to improve future denning site material availability even with consumption of some existing material; 4) matrix habitat may change in canopy cover and species

composition, but there will be no loss; and 5) winter snow conditions will not change as a result of management.

### Whitebark pine

The proposed action may affect, but is not likely to jeopardize the continued existence of whitebark pine. This determination is based upon the following rationale: whitebark pine has not been detected during project unit surveys. It is possible that undetected trees may be impacted; however, such individual trees are likely few in number and not in large stands. Therefore, the chance of loss is negligible. The proposed action may beneficially affect whitebark pine habitat conditions by reversing a negative trend of vegetation encroachment created by the absence of fire and reducing the risk of a stand-replacing fire in the units. The potential, albeit unlikely, impact to a few individuals will be offset by the benefits of returning controlled fire to the project area and thus creating higher-quality habitat conditions for whitebark pine.

### Other Species

The project will have no effect to the Threatened Spalding's (catchfly) now campion (*Silene spaldingii*) , the Endangered white sturgeon (*Acipenser transmontanus*), Endangered bull trout (*Salvelinus confluentus*) or bull trout critical habitat. See the Proposed, Threatened, Endangered Plant Species Report pages 2, 10-11 for Silene spaldingii and the Aquatics Resource Report page 1 for white sturgeon and bull trout.

## 10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

Alternative 2 will not violate Federal, State, and local laws or requirements for the protection of the environment. This action will not have significant impacts on air quality, aquatics and water quality, forest vegetation, cultural and historic resources, inventoried roadless area, proposed, threatened and endangered species, sensitive wildlife species, migratory birds, or soil resources. See the Summary section and Compliance with Land Management Plan and Other Relevant Laws, Regulations, Policies and Plans section for each resource in the resource reports. This decision is in compliance with the applicable Federal, State, and local laws, and requirements:

## Conclusion

After considering the environmental effects described in the EA and specialist reports, I have determined that alternative 2 will not have significant effects on the quality of the human environment considering the context and intensity of impacts (40 CFR 1508.27). Thus, an environmental impact statement will not be prepared.

## Pre-decisional Administrative Review (Objection) Process

This project was subject to review and objection pursuant to 36 CFR 218 regulations (Subparts A and B). Seven written objections were submitted to the reviewing officer within the 45-day calendar period following publication of the legal notice of the objection period in the *Missoulian*, which is the newspaper of record.

There was an objection resolution meeting held on January 14,2022 using Microsoft Teams. The objectors that participated in this meeting included the American Forest Resource Council, Yaak Valley Forest Council, and Peter Leusch. The Forest Service staff included the Reviewing Officer, Deputy Regional Forester; Responsible Official, Forest Supervisor; IDT Leader, District Ranger, Forest Environmental Coordinator, Meeting Facilitator and Note taker.

The Objection Reviewing Officer (ORO) responded to the objections with the above meeting and corresponding official letter dated February 2, 2022.

# Implementation

Implementation of the decision may occur on, but not before, the fifth business day following the end of the objection filing period, depending upon the availability of funding.

Objections were filed so approval of project activities will not occur until the pre-decisional review process is complete and a Decision Notice issued. In accordance with 36 CFR 218, the objection process is now complete, and the project may begin immediately.

## Contact Information

For further information on this decision, contact Kirsten Kaiser, District Ranger, kirsten.a.kaiser@usda.gov, or Lisa Osborn, Project Leader, lisa.osborn@usda.gov, Three Rivers Ranger District, 12858 US Hwy 2, Troy, MT 59935 (406) 295-4693 during normal business hours.

Approved By:

[signature]
Chadwick Benson
Forest Supervisor
Kootenai National Forest

March 24, 2022
Date

# Appendix A – Design Features

To avoid or minimize potential adverse impacts to resources from this project, the following design features will be incorporated into the selected alternative for the Knotty Pine Project.

## Coarse Woody Debris (CWD) Retention Recommendations for Soils and Wildlife

- CWD retention shall follow the guidelines below except within 200 feet of non- Forest Service property. Within 200 feet of non-Forest Service property, unsound decomposing woody material and woody material 7 inches DBH or greater will be the only material left on site,
- The largest diameter material is desired, however material larger than 3 inches in diameter at the small end is considered CWD.

**Table 8. Coarse Woody Debris Retention by Biophysical Settings by Unit**

| Biophysical Setting | Tons per Acre | Unit(s)* |
|---|---|---|
| Warm/Dry (VRUs 1-3) | Drier Sites: 5 - 12 | 19, 20, 21, 24, 33, 40 |
| | Moister Sites: 10 - 20 | 7, 14, 15, 18, 23, 36, 38, 42, 62, 80, 81 |
| Warm/Moist (VRUs 4-6) | 12 - 33 | 1, 2, 3, 4, 5, 6, 7A, 8, 9, 10, 11, 12, 13, 16, 17, 22, 24, 25, 26, 27, 28, 29, 30, 31, 32, 37, 39, 41,, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 63, 64, 65, 66, 67, 68, 69, 71, 72, 73, 74, 75, 76A, 76B, 77, 78, 79 |
| | 17-33 | No Units Apply |
| Subalpine (VRUs 7-10) | Moister Sites: 12-25 | No Units Apply |
| | Drier Sites: 7-15 | No Units Apply |

*Units in Bold are known to be deficient in CWD by at least 1 ton per acre.

## Cultural Resources

- In Harvest Units 2, 7, and 7A, limit harvest operations to frozen or dry soil conditions, a log forwarding system or equivalent Forest Service approved method. In Harvest Unit 8 limit harvest operations to a log forwarding system or equivalent Forest Service approved method to meet multiple resource objectives, see Table 32.
- Post-harvest Archeological survey will be completed by KNF heritage personnel in Units 2, 7, 7A, and 8.
- Upon earth moving activities, if an inadvertent discovery occurs, project work in the area shall stop and KNF heritage personnel and District Ranger will be notified immediately. If human remains are uncovered, all activities in the area will be immediately suspended and the KNF heritage personnel, Tribal Liaison and local law enforcement will be notified. Project work in the area of the inadvertent discovery may resume once KNF Heritage Personnel assess the discovery and appropriate resource protection measures have been implemented.
- Known and identified intact portions of eligible or unevaluated historic properties (e.g. can dumps, foundation remains, ditches) will be flagged and avoided during project implementation.

- New road construction and reconstruction of existing roads beyond standard maintenance (e.g. expanding the road prism, adding pull-outs, or adding new hydraulic features) and landings placed outside harvest units will be assessed by KNF heritage personnel prior to implementation.
- Any areas subject to ground disturbance in association with expansion of trails or parking areas for recreational use will be assessed by KNF heritage personnel prior to implementation.
- The proposed Yaak River trail will include information related to the importance of the avoidance and protection of historical sites and features along the trail.

## Noxious Weeds

Measures will be taken to reduce the potential noxious weed introduction and spread. Weed spraying includes the chip pile on Pine Creek Road, identified and accessible existing landings, powerline corridor segments, and the Pine Creek gravel pit in the Project Area will be conducted in accordance with the April 2007 KNF Invasive Plant Management Record of Decision which include BMPs in appendix E.

- Biocontrols will be used to treat noxious weeds in the project area in coordination with the Montana biocontrol project.
- Pre-treat existing landings and powerline corridors in or adjacent to Units 5, 7, 8, 9, 10, 13, 18, 20, 21, 22, 41, 42, 49, 52, 63, 67, 68, 69, 72, 74, 75, 76A, 77, 78, 80, and 81.
- Accessible roads and pullouts (about 35 miles) utilized for project activities will be pre and post treated with herbicide where feasible.
- The Pine Creek gravel pit will be treated for noxious weeds
- All "Off-Road Equipment" will be cleaned prior to entry on the sale area. This requirement also applies to equipment used in fuels reduction and recreation trail construction activities.
- Where feasible, herbicide will be used to treat all roads prior to reconstruction activities. If not feasible due to lack of access, herbicide will be used to treat cut-slopes and fill-slopes following reconstruction activities.
- To minimize the transport of noxious weeds via machinery, reconditioning/ reconstruction of existing roads needed for timber haul will be held to the minimum necessary standard to protect and maintain the road surface and drainage structures and provide for public safety.
- Surveys for weeds will be conducted before new recreation trails and site construction and monitoring will occur after construction, including the new Cougar Ridge cross country ski area construction, and the new segments of the Yaak river trail. Pre and post activity spraying will occur as needed.
- A rush skeleton weed site occurs on Cougar Ridge Road #2338 at milepost 6.9, near Harvest Unit 39. We can perform road maintenance, blading and brushing but no landing should occur at this site.
- Certified weed-free seed will be required for revegetation. Revegetation will be considered for any site within the treatment area with soil disturbance or vegetative density low enough to allow re-infestation or introduction of other invasive weeds and/or to control erosion.

## Public Safety/ Access Management

- During prescribed burning operations for Non-harvest Fuels Units A, B, and C the Tepee Mountain trail #710 will be closed for public safety. Public notification will occur before and during the burn

operations and information will be posted at the Pine/Newton #208 and Wampoo/Newton trail #209 trailheads.

- During prescribed burning operations for Non-harvest Fuels Units H and T, the Red Top/Murphy Mountain trail #29 will be closed for public safety. Public notification will occur before and during the burn operations and information will be posted at the trailhead.
- During prescribed burning operations for Non-harvest Fuels Unit F the Pine/Newton trail #208 will be closed for public safety. Public notification will also occur at the Wampoo/Newton #209, Newton Gulch #220 and Tepee Mountain #710 trailheads.
- During prescribed burning operations for Non-harvest Fuels Unit D, public notification will occur at the Wampoo/Newton #209 and Tepee Mountain #710 trailheads.
- The Pine/Newton trail #208 will be closed for public safety during harvest operations in Unit 26.
- We will notify the public that the Wampoo/Newton #209 and Tepee Mountain #710 trailheads can be accessed from the Fourth of July #394 and Tepee Mountain #2351 roads during log haul from Units 2, 14, 15, 16, and 17.

## Proposed, Threatened, Endangered, and Sensitive Plant and Animal Species (PTES)

- To provide for the protection of PTES inadvertently discovered during implementation, protection measures will be included.
- In Non-harvest Units H and T, surveys prior to burning activity will be done in those portions of the units above 5,500 ft. to verify the presence or absence of cone-bearing whitebark pine. If cone-bearing whitebark pine are found in these units, prescriptions will be modified to incorporate whitebark pine objectives.

## Permitted Private Uses on Forest Service Administered Lands

All Forest Service responsibilities associated with Special Use or Road Use Permits will be maintained during implementation of project activities.

## Scenic

In Harvest Units 2, 7, 8, 9, 10, 11, 12, 13, 19, 66, 68, 69, 71, and 72, the following will occur:

- Tree marking paint on leave trees in these units will be assessed post-harvest, if needed the District may use brown paint to cover the tree marking paint to reduce the potential visual effects.
- Within 50’ of the highway right of way, stumps will be cut 8 inches or less in height, this does not apply to snags as per the snag retention design feature below. Following monitoring efforts stumps may be cut up to 300’ off the road, if needed.
- Project design for unit openings will not be symmetrical in shape, will avoid straight lines and right angles and follow natural topographic breaks and changes in vegetation, where feasible.
- Designate landings, temporary roads and skid trails to minimize visuals impacts where feasible.
- Post-harvest landing rehabilitation may include scarification, seeding, weed spraying, scattering of slash and planting trees, where feasible.

In Harvest Units 8, 9, 10, and 13 a log forwarding system or equivalent FS approved method is required to meet multiple objectives, see table 2.

# Snag Retention

All snags felled for safety reasons will be left on site and will be cut as high as possible, to retain some value for wildlife use (foraging opportunities or other habitat), where it is safe and reasonable to do so.

# Soils

- Use equipment with a bucket and thumb or other approved equipment for mechanized slash piling and mechanized fire line construction.
- Locate skid trails a minimum of 75 feet apart except where converging in order to reduce soil disturbance.
- Use the appropriate KNF approved seed mix for revegetation of disturbed areas with exposed mineral soil resulting from project activities except for areas scarified for site preparation and on constructed firelines or recreation trails.
- Reuse existing skid trails and other disturbed areas during harvest and machine piling operations where feasible in order to minimize new soil disturbance.
- Rehabilitate (i.e. scarify, recontour, and place slash and duff, etc.) excavated skid trails, temporary roads, and landings constructed for project activities.
- Rehabilitate (i.e. scarify, and place slash and duff, etc.) pre-existing skid trails, temporary roads, and landings used for project activities.
- Scarification shall span the width of the compacted areas and shall be done to the depth of no less than 6 inches, but not to exceed a depth of 14 inches, and must effectively prepare the ground for seeding.
- Post activity soil monitoring will be required in Harvest Units 9, 14, 27, 76A, and 76B.
- Post activity soil monitoring will occur in a selection of Units 15, 31, 63, 74, and 75.
    - ♦ If post activity DSD monitoring results exceeds 15 percent, soil restoration efforts will be conducted to the extent necessary to reduce DSD to 15 percent or less.
    - ♦ Soil restoration efforts will be limited to dry soil condition and may vary by unit as approved by the hydrologist or soils specialist. Restoration may include soil decompaction, recontouring of excavated trails, and/or spreading adjacent top soil, duff and slash over disturbed areas. Decompaction of soils will not mix soil horizons.

**Table 9. Units that require a specific Soil Condition or Harvesting System**

| Soil Condition or Harvesting System | Units |
|---|---|
| Log Forwarding System or Dry1 or Frozen soils2 Required | 23, 73, 7A3, 147, 157,317, 637, 747, and 757 |
| Log Forwarding System Required | 84, 95, 10, 135, 276, 76A6, 76B6, and 788 |

1Dry soils -Under driest summer conditions approximately July 15 through September 15th as determined by the Forest Service

2Frozen Soils - tractor skidding is allowed only over 12 inches or more of settled snow or frozen ground as determined by the Forest Service.

3 For cultural objectives – refer to cultural design features

4For cultural, soils, silvicultural and scenic objectives – Refer to Cultural, Vegetation and Scenic Design Features.

5 For soils, silvicultural and scenic objectives – Refer to Vegetation and Scenic Design Features.
6 For silvicultural and scenic objectives – Refer to Vegetation and Scenic Design Features.
7 For soils objectives
8 For silvicultural objectives – Refer to Vegetation Design Features.
Alternate methods may be considered for approval by the Forest Service if all unit-specific objectives can be met.

## Vegetation

- When existing ground conditions and operational feasibility provide the opportunity in Harvest Units 7*, 8*, 9*, 10*, 13*, 18, 19*, 20, 26, 28, 48, 66*, 68*, 69*, 71*, 72*, and 74 retain small diameter residual trees (hardwoods or conifers) or retain large diameter trees in clumps near or adjacent to roadways to break up and soften the view of harvest and fuel treatment activities.
- Retain one or more leave islands of 0.25-2.0 acres in size in Harvest Units 21, 26*, 27, 28*, 37, 39, 42, 46, 61, 63, 69*, 76A, 76B and 81 for structure and visuals, including natural features such as rocky outcroppings, hardwood patches, and riparian areas. For the units listed in this bullet, some estimated leave island locations have been incorporated in the proposed action. The exact location and size will be implemented during layout where the total area excluded will not decrease, but may shift to fit the ground conditions and islands may be increased or added.
- Timber harvest is proposed in old growth in Harvest Units 42. Prescribed burning in old growth is proposed for Non-harvest Fuels Unit B. All treatments will maintain or improve old growth characteristics as defined by Green et al. (1992). Old Growth monitoring will occur in these units.
- In units 8*, 9*, 10*, 13*, and 78 log forwarding system or equivalent Forest Service approved method is required to meet silvicultural objectives due to unit size, stand specific conditions such as close proximity of leave trees (commercial thin and shelterwood treatments), difficulty minimizing conventional landing size and/or appropriate landing site placement for the given stand objectives. See Table 32.

*Scenic design features also apply.

## Water Quality and Aquatic Species

A site with a known Coeur d' Alene Salamander population, adjacent to the bottom boundary of ecosystem burn unit G, will be excluded during implementation.

## Wildlife: Grizzly Bear

In Bear Management Unit 12, the use of helicopters to ignite prescribed burns will not last more than 2 days per burn season (spring and fall) and not exceed a total of 4 days per bear year (4/1 – 11/30). The use of a helicopter for Non-harvest ecosystem burn units A, B, C, D F, G, H, S, and T will be coordinated by the district fuels specialist and wildlife biologist.

- Only the following activities and associated vehicle use are allowed on gated roads from April 1 through May 1, annually:
  - Burning,
  - Hand slashing and fireline construction, including use of chainsaws,
  - Planting and seeding,
  - Road maintenance.

- Access management activities as displayed in appendix D, the Access Management Plan, will be implemented to ensure that changes to grizzly bear habitat parameters are consistent with FW-STD-WL-02 design elements.
- Place restriction device (gate or barrier) at or within 500 feet of desired location. Select location and/or configuration that will best meet the desired purpose of the device. For example, a gate or barrier may be more effective if placed where there are steep, rocky cut and fill slopes. On flat ground, large boulders or excavation adjacent to or nearby may be desired to minimize potential for bypassing the restriction device. If further than 500 feet from the desired location, discuss with the district wildlife biologist. See also access management plan (appendix D).

## Terms and conditions from the FWS biological opinion

### To implement the reasonable and prudent measure

- Ensure the new Core area is created within the first year of the first timber sale. The intent is to allow bears to begin actualizing those new areas of Core as soon as possible, even if existing Core areas will not be entered until later years.
- Monitor all new closures (berms/barriers) on roads that are being closed for the purpose of creating Core at least twice during the bear year (once in spring/early summer and once in fall per seasonal definitions in the Forest Plan, USFS 2015, p. 149) for 3 years, to ensure effectiveness of closures at reasonably deterring motorized access during the first few years in which bears are learning to actualize those areas as Core. The monitoring of these roads can be included as part of the 30 percent annual monitoring required under the Forest Plan.
- Restrict ski trail clearing activities to hand tools only (no excavators) during the CYE active bear year (1 April – 30 November) for roads or trails that are in, or within 500 meters, of Core. Groomers and other motorized vehicles may only operate during the denning season (1 December – 31 March) within or on roads or trails in or within 500 meters of Core.
- Monitor roads (NFSR 2338H, 2338I, 3952, 3952A, and 14367) associated with the new ski trail loops that bisect Core habitat to ensure effectiveness of closures is maintained with the increase in grooming activities.

### Reporting Requirements – to demonstrate compliance with the terms and conditions for grizzly bears, the Forest shall:

- Provide a project-specific annual report to the Service to show compliance with the Terms and Conditions. This can be included as a section in the Forestwide annual report but needs to clearly address this specific project.
- Notify the Service's Montana Ecological Services Field Office, within 24 hours of any grizzly bear-human conflicts or the management removal or human-caused death of a grizzly bear associated with implementation of the proposed action.

# Resource Improvement Work

The following activities are not required design features or mitigation for project activities. These activities improve existing resource conditions in the project area and respond to the projects purpose and need. Implementation and timing of some of these activities may be dependent upon available funding. Some of the activities listed are appropriate to fund with Knutsen-Vanderberg (KV) funds collected in association with timber sales in the project area, if KV funds are available. Other funding sources may

include Forest Health Protection funds, various grant or partnership funds, and funding through current initiatives such as GAOA, all of which require application and competition for funding. Activities identified with an asterisk will occur as identified in the analysis but are included here to highlight the need to secure funding sources into the future, such as funding for future biocontrol agent collection and release.

- Inter-plant rust resistant western white pine,
- Precommercial Thinning or Timber Stand Improvement work,
- Landing rehabilitation including decompaction, seeding and spreading duff and slash,
- Road signs, mile markers and gate signs installed or replaced,
- Thinning, piling and burning of hazardous fuels in the WUI,
- Design work and construction of the Cougar Ridge Ski area trails, and the Yaak Falls trail,
- Interpretive signs describing the Yahk Mining District,
- Parking area improvements for the Cougar Ridge ski area and group camp site,
- Implement measures to improve site conditions near the end of NFSR 2381,
- Stream crossing removal and stabilization work on NFSR 6121B.
- *Post-harvest surveys of old growth,
- *Monitor effects to soil resources, and units found to exceed 15 percent Detrimental Soil Disturbance from post-harvest monitoring will receive soil restoration which might be funded by KV or another funding source,
- *Enhance soil productivity through restoration activities,
- *Monitor effects of KV funded activities,
- *Additional spraying of noxious weeds or use of biocontrol agents in areas where their concentrations occur,
- *Prescribed burning to reduce fuels and enhance wildlife habitat..

# Appendix B – Harvest and Non-harvest Treatment Units

**Table 10. Alternative 2 Harvest Treatments – All harvest is in the Wildland Urban Interface (WUI)**

| Unit | Harvest Treatment | Silvicultural Prescription | Harvesting Method | Fuels Treatment | MA[1] | Acres by MA | OG RPOG[1] |
|---|---|---|---|---|---|---|---|
| 1* | Regeneration | Shelterwood | Tractor | Slash/Pile | 2,6 | 3, 91 | No |
| 2* | Regeneration | Shelterwood | Tractor | Slash/Pile | 3 | 51 | No |
| 7 | Regeneration | Shelterwood | Tractor | Slash/Pile | 2 | 19 | No |
| 7A | Regeneration | Shelterwood | Tractor | Slash/Pile | 2 | 19 | No |
| 8* | Regeneration | Shelterwood | Log Forwarding | Slash/Pile | 2,6 | 27, 37 | No |
| 9* | Regeneration | Shelterwood | Log Forwarding | Slash/Pile | 2,6 | 6, 2 | No |
| 10 | Regeneration | Shelterwood | Log Forwarding | Slash/Pile | 6 | 3 | No |
| 11 | Regeneration | Clearcut w/ Reserves | Tractor | Slash/Pile | 2 | 12 | No |
| 12 | Regeneration | Clearcut w/ Reserves | Tractor | Slash/Pile | 2,6 | 14, 1 | No |
| 13 | Regeneration | Shelterwood | Log Forwarding | Slash/Pile | 2,6 | 2, 6 | No |
| 16* | Regeneration | Clearcut w/ Reserves | Tractor | Slash/Pile | 6 | 76 | No |
| 17* | Regeneration | Clearcut w/ Reserves | Tractor | Slash/Pile | 6 | 57 | No |
| 21* | Regeneration | Shelterwood | Tractor | Slash/Pile | 6 | 40 | No |
| 22* | Regeneration | Clearcut w/ Reserves | Tractor | Slash/Pile | 6 | 32 | No |
| 23* | Regeneration | Shelterwood | Tractor | Slash/Pile | 6 | 15 | No |
| 25 | Regeneration | Clearcut w/ Reserves | Tractor | Slash/Pile | 6 | 21 | No |
| 26* | Regeneration | Clearcut w/ Reserves | Tractor | Slash/Pile | 6 | 81 | No |
| 27* | Regeneration | Shelterwood | Log Forwarding | Slash/Pile | 6 | 26 | No |
| 28* | Regeneration | Shelterwood | Tractor | Slash/Pile | 6 | 9 | No |
| 29 | Regeneration | Clearcut w/ Reserves | Tractor | Slash/Pile | 6 | 9 | No |
| 30 | Regeneration | Clearcut w/ Reserves | Tractor | Slash/Pile | 6 | 33 | No |
| 31 | Regeneration | Shelterwood | Tractor | Slash/Pile | 6 | 45 | No |
| 32 | Regeneration | Shelterwood | Tractor | Slash/Pile | 6 | 37 | No |
| 37* | Regeneration | Clearcut w/ Reserves | Tractor | Slash/Pile | 6 | 127 | No |
| 39* | Regeneration | Clearcut w/ Reserves | Tractor | Slash/Pile | 6 | 224 | No |
| 44* | Regeneration | Clearcut w/ Reserves | Tractor | Slash/Pile | 6 | 46 | No |
| 45 | Regeneration | Clearcut w/ Reserves | Tractor | Slash/Pile | 6 | 16 | No |

| Unit | Harvest Treatment | Silvicultural Prescription | Harvesting Method | Fuels Treatment | MA[1] | Acres by MA | OG RPOG[1] |
|---|---|---|---|---|---|---|---|
| 47 | Regeneration | Shelterwood | Tractor | Slash/Pile | 6 | 29 | No |
| 50 | Regeneration | Clearcut w/ Reserves | Tractor | Slash/Pile | 6 | 11 | No |
| 51 | Regeneration | Clearcut w/ Reserves | Tractor | Slash/Pile | 6 | 22 | No |
| 53 | Regeneration | Clearcut w/ Reserves | Tractor | Slash/Pile | 6 | 13 | No |
| 55* | Regeneration | Clearcut w/ Reserves | Tractor | Slash/Pile | 6 | 31 | No |
| 57 | Regeneration | Clearcut w/ Reserves | Tractor | Slash/Pile | 6 | 21 | No |
| 58 | Regeneration | Clearcut w/ Reserves | Tractor | Slash/Pile | 6 | 19 | No |
| 60 | Regeneration | Shelterwood | Tractor | Slash/Underburn | 6 | 9 | No |
| 61* | Regeneration | Clearcut w/ Reserves | Tractor | Slash/Pile | 6 | 80 | No |
| 63* | Regeneration | Clearcut w/ Reserves | Tractor | Slash/Pile | 2,6 | 9, 53 | No |
| 64* | Regeneration | Shelterwood | Tractor | Slash/Pile | 2,6 | 15, 5 | No |
| 65* | Regeneration | Shelterwood | Tractor | Slash/Pile | 6 | 18 | No |
| 67 | Regeneration | Clearcut w/ Reserves | Tractor | Slash/Pile | 6 | 5 | No |
| 68 | Regeneration | Shelterwood | Tractor | Slash/Pile | 6 | 19 | No |
| 69* | Regeneration | Shelterwood | Tractor | Slash/Pile | 6 | 87 | No |
| 71 | Regeneration | Shelterwood | Tractor | Slash/Pile | 6 | 10 | No |
| 73 | Regeneration | Clearcut w/ Reserves | Tractor | Slash/Pile | 6 | 7 | No |
| 74 | Regeneration | Clearcut w/ Reserves | Tractor | Slash/Pile | 6 | 11 | No |
| 75 | Regeneration | Seedtree | Tractor | Slash/Pile | 6 | 14 | No |
| 76A* | Regeneration | Shelterwood | Log Forwarding | Slash/Pile | 6 | 43 | No |
| 76B* | Regeneration | Clearcut w/ Reserves | Log Forwarding | Slash/Pile | 6 | 23 | No |
| 77 | Regeneration | Clearcut w/ Reserves | Tractor | Slash/Pile | 6 | 9 | No |
| 79 | Regeneration | Clearcut w/ Reserves | Tractor | Slash/Pile | 6 | 14 | No |
| **Total** | **Regeneration** | | | | | **1,764** | |
| 5 | Intermediate | Improvement | Tractor | Slash/Pile | 6 | 14 | No |
| 6 | Intermediate | Commercial Thin | Tractor | Yard Tops | 6 | 39 | No |
| 14 | Intermediate | Improvement | Tractor | Slash/Pile | 6 | 36 | No |
| 15 | Intermediate | Improvement | Tractor | Slash/Pile | 6 | 36 | No |
| 18 | Intermediate | Improvement | Tractor | Yard Tops | 2,6 | 22, 62 | No |
| 19 | Intermediate | Improvement | Tractor | Slash/Underburn | 6 | 40 | No |
| 20 | Intermediate | Improvement | Tractor | Slash/Pile | 6 | 29 | No |

| Unit | Harvest Treatment | Silvicultural Prescription | Harvesting Method | Fuels Treatment | MA[1] | Acres by MA | OG RPOG[1] |
|---|---|---|---|---|---|---|---|
| 24 | Intermediate | Improvement | Tractor | Yard Tops | 6 | 17 | No |
| 33 | Intermediate | Commercial Thin | Tractor | Slash/Underburn | 6 | 67 | No |
| 34 | Intermediate | Improvement | Tractor | Yard Tops | 6 | 80 | No |
| 36 | Intermediate | Commercial Thin | Tractor | Slash/Pile | 6 | 11 | No |
| 38 | Intermediate | Improvement | Tractor | Yard Tops | 6 | 10 | RPOG |
| 40 | Intermediate | Improvement | Tractor | Slash/Underburn | 6 | 130 | No |
| 41 | Intermediate | Improvement | Tractor | Slash/Underburn | 6 | 34 | No |
| 42 | Intermediate | Improvement | Tractor | Slash/Pile | 6 | 85 | 57 in OG<br>28 in RPOG |
| 46 | Intermediate | Improvement | Tractor | Slash/Pile | 6 | 103 | No |
| 48 | Intermediate | Improvement | Tractor | Slash/Pile | 6 | 19 | No |
| 49 | Intermediate | Improvement | Tractor | Slash/Pile | 6 | 12 | No |
| 52 | Intermediate | Commercial Thin | Tractor | Slash/Pile | 6 | 95 | No |
| 54 | Intermediate | Commercial Thin | Tractor | Slash/Pile | 6 | 13 | No |
| 56 | Intermediate | Commercial Thin | Tractor | Slash/Pile | 6 | 12 | No |
| 59 | Intermediate | Improvement | Tractor | Slash/Underburn | 6 | 46 | No |
| 62 | Intermediate | Improvement | Tractor | Yard Tops | 6 | 42 | No |
| 66 | Intermediate | Improvement | Tractor | Slash/Pile | 6 | 4 | No |
| 72 | Intermediate | Improvement | Tractor | Slash/Pile | 6 | 17 | No |
| 78 | Intermediate | Commercial Thin | Log Forwarding | Slash/Pile | 6 | 36 | No |
| 80 | Intermediate | Commercial Thin | Log Forwarding | Slash/Pile | 6 | 18 | No |
| 81 | Intermediate | Improvement | Tractor | Slash/Pile | 6 | 60 | RPOG |
| **Total[2]** | **Intermediate** | | | | | **1,189** | |

*Units that result in openings greater than 40 acres

[1] MA= management area, WUI= Wildland Urban Interface, OG= old growth, RPOG= recruitment potential old growth

Note: some units with the designation of OG or RPOG, may have only a portion of the unit in old growth, see tables below for more information

[2]Unit 35 was dropped due to additional ground reconnaissance therefore this number is now 18 acres less than the September 2020 EA.

**Table 11. Non-harvest Fuel Treatment Units for Alternative 2**

| Unit | Non-harvest Treatment | Current Condition | Objective | Fuel Treatment | MA/ WUI* | Acres by MA | Acres in OG or RPOG |
|---|---|---|---|---|---|---|---|
| A | Ecosystem Burn | Mid to high elevation site with dry habitat species. Burned in 1910, and some past harvest history. Forage production stagnant due to canopy closure, tree encroachment into canopy openings, and/or lack of fire. | Apply fire to a fire adapted ecosystem and capture ecosystem benefits of emulated fire while reducing fuel loadings in WUI. Enhance natural openings, create new openings, and stimulate the growth and production of fire-adapted forage/browse species for a variety of wildlife, including conditions suitable for huckleberry production within Core habitat to benefit grizzly bear recovery efforts. | Fuels augmentation, outside of IRA, involving selective slashing of understory less than 10"DBH may precede aerial and/or hand ignition to create a mixed severity fire. | 6 & 5a Yes | 364 & 6 | None |
| B | Ecosystem Burn | Low to mid elevation site with dry habitat species. Burned in 1910 and prescribed burns in 2008, along with some past harvest history. | Apply fire to maintain fire-adapted species and capture ecosystem benefits of emulated fire while reducing fuel loadings in WUI. Fire will thin encroaching conifers and enhance/maintain openings which will improve browse and forage availability in potential big game winter range as well as improve spring foraging opportunities. Maintain and enhance open ponderosa pine/Douglas-fir/western larch stands. | Fuels augmentation, involving selective slashing of understory less than 10"DBH may precede aerial and/or hand ignition to create a low severity fire. | 6 & 2 Yes | 588 & 53 | 41 in OG & 81 in RPOG |
| C | Ecosystem Burn | Low to mid elevation site with dry habitat species. Burned in 1910 and prescribed burns in 2008, along with some past harvest history. | Apply fire to maintain fire-adapted species and capture ecosystem benefits of emulated fire while reducing fuel loadings in WUI. Fire will thin encroaching conifers and enhance/maintain openings which will improve browse and forage availability in potential big game winter range as well as improve spring foraging opportunities. Maintain and enhance open ponderosa pine/Douglas-fir/western larch stands. | Aerial and/or hand ignition to create a low severity fire. | 6 Yes | 353 | None |
| D | Ecosystem Burn | Low to high elevation site. Forage stagnant due to canopy closure, tree encroachment into canopy openings, and/or lack of fire. | Apply fire to a fire adapted ecosystem and capture ecosystem benefits of emulated fire while reducing fuel loadings in WUI. Enhance natural openings, create new openings, and stimulate the growth and production of fire-adapted forage/browse species for a variety of wildlife. | Aerial and/or hand ignition to create a mixed severity fire. | 5a & 6 Yes | 221 & 167 | None |

| Unit | Non-harvest Treatment | Current Condition | Objective | Fuel Treatment | MA/ WUI* | Acres by MA | Acres in OG or RPOG |
|---|---|---|---|---|---|---|---|
| E | Ecosystem Burn | Low elevation site. Harvest unit part of the Rocky Pine Timber Sale, and harvested around 2012. | Maintenance underburn on a Rocky Pine Improvement Harvest Unit. Reduce fuel loading, increase/maintain forage opportunities, and promote nutrient release into the soil. | Hand ignition to create a low severity fire. | 6 & 2 Yes | 4 & 3 | None |
| F | Ecosystem Burn | Low to high elevation site. Forage stagnant due to canopy closure, tree encroachment into canopy openings, and/or lack of fire. | Apply fire to a fire adapted ecosystem and capture ecosystem benefits of emulated fire while reducing fuel loadings in WUI. Enhance natural openings, create new openings, and stimulate the growth and production of fire-adapted forage/browse species for a variety of wildlife. | Aerial and/or hand ignition to create a mixed severity fire. | 5a & 6 Yes | 575 & 3 | 51 in RPOG |
| G | Ecosystem Burn | Low to mid elevation site with dry habitat species. Forage stagnant due to canopy closure, tree encroachment into canopy openings, and/or lack of fire | Apply fire to a fire adapted ecosystem and capture ecosystem benefits of emulated fire while reducing fuel loadings in WUI. Enhance natural openings, create new openings, and stimulate the growth and production of fire-adapted forage/browse species for a variety of wildlife, including conditions suitable for huckleberry production within Core habitat to benefit grizzly bear recovery efforts. | Fuels augmentation, involving selective slashing of understory less than 10"DBH may precede aerial and/or hand ignition to create a mixed severity fire. | 6 & 2 Yes | 965 & 129 | None |
| H | Ecosystem Burn | High elevation site. Forage stagnant due to canopy closure, tree encroachment into canopy openings, and/or lack of fire. | Apply fire to a fire adapted ecosystem and capture ecosystem benefits of emulated fire while reducing fuel loadings in WUI. Enhance natural openings, create new openings, and stimulate the growth and production of fire-adapted forage/browse species for a variety of wildlife, including conditions suitable for huckleberry production within Core habitat to benefit grizzly bear recovery efforts. | Aerial and/or hand ignition to create a mixed severity fire. | 5c & 6 Yes | 325 & 76 | None |
| I | Ecosystem Burn | Low elevation site. Harvest unit part of the Rocky Pine Timber Sale, and harvested around 2012. | Maintenance underburn on a Rocky Pine Improvement Harvest Unit. Reduce fuel loading, increase/maintain forage opportunities, and promote nutrient release into the soil. | Hand ignition to create a low severity fire. | 2 & 6 Yes | 24 & 3 | None |
| J | Ecosystem Burn | Low elevation site. Harvest unit part of the Rocky Pine Timber Sale, and harvested around 2012. | Maintenance underburn on a Rocky Pine Improvement Harvest Unit. Reduce fuel loading, increase/maintain forage opportunities, and promote nutrient release into the soil. | Hand ignition to create a low severity fire. | 6 Yes | 45 | None |

| Unit | Non-harvest Treatment | Current Condition | Objective | Fuel Treatment | MA/ WUI* | Acres by MA | Acres in OG or RPOG |
|---|---|---|---|---|---|---|---|
| K | Ecosystem Burn | Low elevation site. Harvest unit part of the Rocky Pine Timber Sale, and harvested around 2012. | Maintenance underburn on a Rocky Pine Improvement Harvest Unit. Reduce fuel loading, increase/maintain forage opportunities, and promote nutrient release into the soil. | Hand ignition to create a low severity fire. | 6 Yes | 60 | None |
| L | Ecosystem Burn | Low elevation site. Harvest unit part of the Rocky Pine Timber Sale, and harvested around 2012. | Maintenance underburn on a Rocky Pine Improvement Harvest Unit. Reduce fuel loading, increase/maintain forage opportunities, and promote nutrient release into the soil. | Hand ignition to create a low severity fire. | 6 Yes | 15 | None |
| M | Ecosystem Burn | Low elevation site. Harvest unit part of the Rocky Pine Timber Sale, and harvested around 2012. | Maintenance underburn on a Rocky Pine Improvement Harvest Unit. Reduce fuel loading, increase/maintain forage opportunities, and promote nutrient release into the soil. | Hand ignition to create a low severity fire. | 6 Yes | 50 | None |
| N | Ecosystem Burn | Low elevation site. Harvest unit part of the Rocky Pine Timber Sale, and harvested around 2012. | Maintenance underburn on a Rocky Pine Improvement Harvest Unit. Reduce fuel loading, increase/maintain forage opportunities, and promote nutrient release into the soil. | Hand ignition to create a low severity fire. | 6 Yes | 28 | None |
| O | Ecosystem Burn | Low elevation site. Harvest unit part of the Rocky Pine Timber Sale, and harvested around 2012. | Maintenance underburn on a Rocky Pine Improvement Harvest Unit. Reduce fuel loading, increase/maintain forage opportunities, and promote nutrient release into the soil. | Hand ignition to create a low severity fire. | 6 Yes | 7 | None |
| P | Ecosystem Burn | Low elevation site. Harvest unit part of the Rocky Pine Timber Sale, and harvested around 2012. | Maintenance underburn on a Rocky Pine Improvement Harvest Unit. Reduce fuel loading, increase/maintain forage opportunities, and promote nutrient release into the soil. | Hand ignition to create a low severity fire. | 6 Yes | 21 | None |
| Q | Ecosystem Burn | Low elevation site. Harvest unit part of the Rocky Pine Timber Sale, and harvested around 2012. | Maintenance underburn on a Rocky Pine Improvement Harvest Unit. Reduce fuel loading, increase/maintain forage opportunities, and promote nutrient release into the soil. | Hand ignition to create a low severity fire. | 6 Yes | 14 | None |
| R | Ecosystem Burn | Low elevation site. Harvest unit part of the Rocky Pine Timber Sale, and harvested around 2012. | Maintenance underburn on a Rocky Pine Improvement Harvest Unit. Reduce fuel loading, increase/maintain forage opportunities, and promote nutrient release into the soil. | Hand ignition to create a low severity fire. | 6 Yes | 10 | None |
| S | Ecosystem Burn | Low elevation site with dry habitat species. | Maintenance underburn on a 2012 Rocky Pine Ecosystem burn. Reduce fuel loading, increase/maintain forage opportunities, and promote nutrient release into the soil. | Aerial and/or hand ignition to create a low severity fire. | 2 & 6 Yes | 173 & 167 | None |

| Unit | Non-harvest Treatment | Current Condition | Objective | Fuel Treatment | MA/ WUI* | Acres by MA | Acres in OG or RPOG |
|---|---|---|---|---|---|---|---|
| T | Ecosystem Burn | High elevation site. Burned in 1925. Forage stagnant due to canopy closure, tree encroachment into canopy openings, and/or lack of fire. | Apply fire to a fire adapted ecosystem and capture ecosystem benefits of emulated fire. Enhance natural openings, create new openings, and stimulate the growth and production of fire-adapted forage/browse species for a variety of wildlife, including conditions suitable for huckleberry production within Core habitat to benefit grizzly bear recovery efforts. | Aerial and/or hand ignition to create a mixed severity fire. | 5c No | 238 | None |
| U | Ladder Fuels Reduction | Low elevation site that was harvested in the 1970's. | Hand thin and pile to reduce crown bulk densities and ladder fuels for egress and ingress for private property. | Selective hand thinning <5" DBH, handpile, and burn piles. | 6 & 2 Yes | 10 & 5 | None |
| W | Ladder Fuels Reduction | Low elevation site that was harvested in the 1970's. | Hand thin and excavator pile or masticate via boom mounted masticator to reduce crown bulk densities and ladder fuels | Selective thinning <5" DBH, excavator pile and burn piles or masticate and leave chips | 6 Yes | 27 | None |
| X | Ladder Fuels Reduction | Low elevation site that was harvested in the 1970's. | Hand thin and excavator pile or masticate via boom mounted masticator to reduce crown bulk densities and ladder fuels | Selective thinning <5" DBH, excavator pile and burn piles or masticate and leave chips | 6 & 2 Yes | 19 & 9 | None |

*MA= management area and WUI= Wildland Urban Interface

# Appendix C – Timber Harvest History in the Project Area

Table 35 and Table 36 below display harvest history in the Project Area by landowner, harvest type, and decade. Please see the Forest Vegetation section above for more discussion of harvest types. Table 37 shows the past timber sales that have occurred in the Project Area.

**Table 12. Harvest History by Decade on USFS land within the Knotty Pine Project Area**

| Decade | Intermediate Harvest (Acres) | Regeneration Harvest (Acres) | Total Harvest Acres |
|---|---|---|---|
| 1940 | No Records Available | No Records Available | - |
| 1950s | 193 | 73 | 266 |
| 1960s | 898 | 3,615 | 4,513 |
| 1970s | 1,413 | 1,380 | 2,793 |
| 1980s | 396 | 1,750 | 2,146 |
| 1990s | 273 | 3,088 | 3,361 |
| 2000s | 1,072 | 353 | 1,425 |
| 2010s | 728 | 78 | 806 |
| USFS Total | 4,973 | 10,337 | 15,310 |

Harvest History data is not complete, especially prior to 1950.

**Table 13. Harvest History by Decade on Stimson land within the Knotty Pine Project Area**

| Decade | Intermediate Harvest (Acres) | Regeneration Harvest (Acres) | Total Harvest Acres |
|---|---|---|---|
| 1940 | No Records Available | No Records Available | - |
| 1950s | No Records Available | No Records Available | |
| 1960s | No Records Available | No Records Available | |
| 1970s | No Records Available | No Records Available | |
| 1980s | 0 | 0 | 0 |
| 1990s | 0 | 165 | 165 |
| 2000s | 120 | 300 | 420 |
| 2010s | | | 234 |
| Private Total | 120 | 465 | 819 |

**Table 14. Past Timber Sales on National Forest System Lands within the Knotty Pine Project Area**

| Sale Name | Fiscal Year Completed | Acres |
|---|---|---|
| Unknown name | 1954 | 12 |
| Unknown name | 1956 | 254 |
| Unknown name | 1961 | 388 |
| FOUR 4 JULY-CYCLONE | 1961-1974 | 413 |
| Unknown name | 1962 | 61 |

| Sale Name | Fiscal Year Completed | Acres |
|---|---|---|
| Unknown name | 1963 | 13 |
| Unknown name | 1964 | 422 |
| WAMPOO | 1964-1966 | 199 |
| Unknown name | 1965 | 216 |
| Unknown name | 1966 | 710 |
| Unknown name | 1967 | 482 |
| Unknown name | 1968 | 1363 |
| Unknown name | 1969 | 253 |
| Unknown name | 1970 | 544 |
| Unknown name | 1971 | 371 |
| Unknown name | 1972 | 211 |
| Unknown name | 1973 | 60 |
| Unknown name | 1974 | 36 |
| Unknown name | 1975 | 324 |
| Unknown name | 1976 | 350 |
| Unknown name | 1977 | 579 |
| CYCLONE FORKS CEDAR | 1977 | 22 |
| HAYSTACK | 1977-1980 | 294 |
| Unknown name | 1978 | 29 |
| Unknown name | 1979 | 135 |
| BLACK DIAMOND | 1979 | 48 |
| COYOTE FLATS | 1979-1982 | 70 |
| Unknown name | 1980 | 2 |
| ABE FACE PULP | 1981 | 14 |
| CABIN CEDAR | 1981 | 32 |
| CYCLONE CDR PROD #2 | 1981 | 5 |
| OPRY HALL | 1981 | 105 |
| TWIGHANGLE CEDAR | 1982 | 5 |
| PINE CREEK | 1982-1984 | 60 |
| PINE CK CROSSING | 1982 | 11 |
| Unknown name | 1983 | 46 |
| CYCLONE CEDAR | 1983 | 14 |
| KINGSLEY CRATERS | 1983-1884 | 28 |
| COUGAR RDG BLOWDOWN | 1984 | 111 |
| GOBBLER'S KNOB XMAS | 1984 | 16 |
| COUGAR RIDGE | 1984-1986 | 436 |
| FERREL CREEK | 1984-1985 | 44 |
| FERREL CK D2 | 1985 | 19 |
| HIGHWAY TWO | 1986-1987 | 156 |
| CLAM FLATS | 1986 | 36 |
| WAMPOO-JULY PEST CON | 1987-1988 | 106 |
| FOURTH OF JULY | 1987-1991 | 432 |

| Sale Name | Fiscal Year Completed | Acres |
|---|---|---|
| CROSS WINDY | 1987 | 136 |
| RED TOP CYCLONE | 1989-1994 | 1399 |
| PYROMANIA SALVAGE | 1989 | 5 |
| TEEPEE XMAS TREE | 1991 | 16 |
| SYLVANITE SPEC SALV | 1992 | 30 |
| FOURTH CYCLONE SALV | 1993-1994 | 1224 |
| TEN LEFT SALVAGE | 1993 | 87 |
| LOWER FRIDAY SALV | 1993 | 127 |
| 16 SALVAGE | 1993 | 24 |
| 31 SPECIAL SALVAGE | 1993 | 227 |
| FIG NEWTON SALVAGE | 1994 | 66 |
| FRINGE BENEFIT | 1994 | 33 |
| VIEW TWO RE-AD | 1995 | 11 |
| ROCK BOTTOM SALVAGE | 1996 | 26 |
| BOLE KNOWS SALVAGE | 1997 | 6 |
| SALOON SALVAGE | 1997 | 57 |
| PINING AWAY SSTS | 1997 | 14 |
| BLOWN PINE SALVAGE | 1997 | 1 |
| TIDY UP SALVAGE | 1998 | 9 |
| TIDY BOLE SALVAGE | 1998-1999 | 13 |
| BLUE LIGHT SPECIAL S | 1998 | 29 |
| TOO VYOU SALVAGE RE- | 1998 | 5 |
| TWISTEN KITTEN SSTS | 1999 | 32 |
| CAT SCRATCH SSTS | 1999 | 39 |
| SCOUTS HONOR | 2000 | 92 |
| JEANNE'S LAST REVIEW | 2000 | 59 |
| 16 POODLES | 2000 | 11 |
| PINE | 2001-2004 | 1027 |
| HEY 19 SSTS RE-AD | 2001 | 13 |
| PINE POWER SSTS | 2000-2001 | 32 |
| Unknown name | 2003 | 1 |
| LUCKY 13 | 2003 | 41 |
| SHORT CURTAIN SALVAGE | 2005 | 153 |
| ROCKY PINE FUELS STEWARDSHIP | 2008-2012 | 756 |
| FERREL FLATS | 2011 | 20 |
| FLEDGED OUT | 2015 | 30 |
| **TOTAL HARVEST ON FS LAND** | | **15,388** |

# Appendix D- Access Management Plan and Map

| MAP INDEX | ROAD | LOCATION Milepost (MP) | PROPOSED ACTION | TIMING | REASON FOR ACTION | WHO |
|---|---|---|---|---|---|---|
| 1 | 4607 | MP 0 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security | Purchaser |
| 1A | 4607A | MP 0 | Public motorized use restricted via gate on 4607 (map index 1) | During Road Work and Harvest Activities | Wildlife Habitat Security | Purchaser |
| 1B | 4607B | MP 0 | Public motorized use restricted via gate on 4607 (map index 1) | During Road Work and Harvest Activities | Wildlife Habitat Security | Purchaser |
| 2 | 2338 | MP 0 | Public motorized use restricted; lock gate nights and weekends 12/1 - 6/30 | During Road Work and Harvest Activities | Wildlife Habitat Security | Purchaser |
| 3 | 4438 | MP 0 | Remove Barrier & Install Gate | During Road Reconstruction | Harvest Access | Purchaser |
| 3 | 4438 | MP 0 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security | Purchaser |
| 4 | 2336A | MP 0 | Remove Barrier & Install Gate | During Road Reconstruction | Harvest Access | Purchaser |
| 4 | 2336A | MP 0 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security | Purchaser |
| 5 | 2336A | MP 0.99 | Remove Barrier & Install Gate | During Road Reconstruction | Harvest Access | Purchaser |
| 5 | 2336A | MP 0.99 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security | Purchaser |
| 6 | 2336B | MP 0 | Remove Barrier & Install Gate | During Road Reconstruction | Harvest Access | Purchaser |
| 6 | 2336B | MP 0 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security | Purchaser |
| 6A | 2369 | MP 0.8 | Public motorized use restricted via gate on 2336B | During Road Work and Harvest Activities | Wildlife Habitat Security | Purchaser |
| 7 | 2369 | MP 0 | Remove Barrier & Install Gate | During Road Reconstruction | Harvest Access | Purchaser |

| MAP INDEX | ROAD | LOCATION Milepost (MP) | PROPOSED ACTION | TIMING | REASON FOR ACTION | WHO |
|---|---|---|---|---|---|---|
| 7 | 2369 | MP 0 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security | Purchaser |
| 8 | 749B | MP 0 | Remove Barrier & Install Gate | During Road Reconstruction | Harvest Access | Purchaser |
| 8 | 749B | MP 0 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security | Purchaser |
| *10 | 2338G | MP 0 | Remove Barrier & Install Gate | During Road Reconstruction | Harvest Access | Purchaser |
| 10 | 2338G | MP 0 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security | Purchaser |
| 11 | 749 | MP 2.16 | Remove Barrier & Install Gate | During Road Reconstruction | Harvest Access | Purchaser |
| 11 | 749 | MP 2.16 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security | Purchaser |
| 12 | 2343 | MP 2.2 | Public motorized use restricted via gate on 749 (map index 11) | During Road Work and Harvest Activities | Wildlife Habitat Security | Purchaser |
| 13 | 2343A | MP near pvt boundary | Install Barrier on FS land near the private land boundary | During Road Reconstruction | Wildlife Habitat Security | Purchaser |
| *15 | 14329 | MP 1.95 | Remove Barrier & Install Gate | During Road Reconstruction | Harvest Access | Purchaser |
| 15 | 14329 | MP 1.95 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security | Purchaser |
| 16 | 2338J | MP 0 | Remove Barrier & Install Gate | During Road Reconstruction | Harvest Access | Purchaser |
| 16 | 2338J | MP 0 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security | Purchaser |
| 17 | 14329B | MP 1.01 | Remove Barrier & Install Temporary Gate | During Road Reconstruction | Harvest Access | Purchaser |
| 17 | 14329B | MP 1.01 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security | Purchaser |

| MAP INDEX | ROAD | LOCATION Milepost (MP) | PROPOSED ACTION | TIMING | REASON FOR ACTION | WHO |
|---|---|---|---|---|---|---|
| 17 | 14329B | MP 1.01 | Install Barrier | Upon Project Completion | Wildlife Habitat Security | Purchaser |
| 17A | 14329B | MP 0.82 | Install Barrier | Upon Project Completion | Wildlife Habitat Security | Purchaser |
| *19 | 14329 | MP 0 | Remove Barrier & Install Gate | During Road Reconstruction | Harvest Access | Purchaser |
| 19 | 14329 | MP 0 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security | Purchaser |
| 19A | 14329A | MP 0 | Public motorized use restricted via gates on 14329 (map index 15 and 19) | During Road Work and Harvest Activities | Wildlife Habitat Security | Purchaser |
| 20 | 3953 | MP 0 | Remove Barrier & Install Temporary Gate | During Road Reconstruction | Harvest Access | Purchaser |
| 20 | 3953 | MP 0 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security | Purchaser |
| 20 | 3953 | MP 0 | Install Barrier | Upon Project Completion | Wildlife Habitat Security | Purchaser |
| 20A | 3950 | MP 1.0 | Remove Barrier | During Road Reconstruction | Harvest Access | Purchaser |
| 20A | 3950 | MP 1.0 | Public motorized use restricted via gate on 3953, MP 0 (map index 20) | During Road Work and Harvest Activities | Wildlife Habitat Security | Purchaser |
| 20A | 3950 | MP 1.0 | Will be barriered via berm on 3953 (map index 20) | Upon Project Completion | Wildlife Habitat Security | Purchaser |
| 21 | 3954 | MP 0 | Remove Barrier & Install Temporary Gate | During Road Reconstruction | Harvest Access | Purchaser |
| 21 | 3954 | MP 0 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security | Purchaser |
| 21 | 3954 | MP 0 | Install Barrier | Upon Project Completion | Wildlife Habitat Security | Purchaser |
| 22 | 3955 | MP 0 | Remove Barrier & Install Temporary Gate | During Road Reconstruction | Harvest Access | Purchaser |

| MAP INDEX | ROAD | LOCATION Milepost (MP) | PROPOSED ACTION | TIMING | REASON FOR ACTION | WHO |
|---|---|---|---|---|---|---|
| 22 | 3955 | MP 0 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security | Purchaser |
| 22 | 3955 | MP 0 | Install Barrier | Upon Project Completion | Wildlife Habitat Security | Purchaser |
| 23 | 2392 | MP 0.23 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security | Purchaser |
| 23A | 2392A | MP 0 | Public motorized use restricted via gate on 2392 (map index 23) | During Road Work and Harvest Activities | Wildlife Habitat Security | Purchaser |
| 24 | 5992A | MP 0 | Remove Barrier & Install Gate | During Road Reconstruction | Harvest Access | Purchaser |
| 24 | 5992A | MP 0 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security | Purchaser |
| 25 | 2373A | MP 0 | Remove Barrier & Install Gate | During Road Reconstruction | Harvest Access | Purchaser |
| 25 | 2373A | MP 0 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security | Purchaser |
| 26 | 2371 | MP 0 | Remove Barrier & Install Gate | During Road Reconstruction | Harvest Access | Purchaser |
| 26 | 2371 | MP 0 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security | Purchaser |
| 27 | 2356 | MP 0 | Remove Barrier & Install Gate | During Road Reconstruction | Harvest Access | Purchaser |
| 27 | 2356 | MP 0 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security | Purchaser |
| 28 | 2351D | MP 0 | Remove Barrier & Install Gate | During Road Reconstruction | Harvest Access | Purchaser |
| 28 | 2351D | MP 0 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security | Purchaser |
| 29 | 2351F | MP 0 | Remove Barrier & Install Temporary Gate | During Road Construction | Harvest Access | Purchaser |

| MAP INDEX | ROAD | LOCATION Milepost (MP) | PROPOSED ACTION | TIMING | REASON FOR ACTION | WHO |
|---|---|---|---|---|---|---|
| 29 | 2351F | MP 0 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security | Purchaser |
| 29 | 2351F | MP 0 | Install Barrier | Upon Project Completion | Wildlife Habitat Security | Purchaser |
| 30 | 5909 | MP 0 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security | Purchaser |
| *32 | 14312 | MP 0.4 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security | Purchaser |
| 33 | 3951 | MP 0 | Remove Barrier and Install Temporary Gate | During Road Reconstruction | Harvest Access | Purchaser |
| 33 | 3951 | MP 0 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security | Purchaser |
| 33 | 3951 | MP 0 | Install Barrier | Upon Project Completion | Wildlife Habitat Security | Purchaser |
| 34 | 3952 | MP 0 | Remove Barrier and Install Temporary Gate | During Road Reconstruction | Harvest Access | Purchaser |
| 34 | 3952 | MP 0 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security | Purchaser |
| 34 | 3952 | MP 0 | Install Barrier | Upon Project Completion | Wildlife Habitat Security | Purchaser |
| 35 | 1999 | MP 0 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security | Purchaser |
| 36 | 1999A | MP 0 | Public motorized use restricted via gate on 1999 (map index 35) | During Road Work and Harvest Activities | Wildlife Habitat Security | |
| A | 14314 | MP 0 | Install Barrier | Prior to Road Work and Harvest Activities | For In-kind Replacement of Core | USFS |
| B | 2338 | MP 7.2 | Install Barrier | Prior to Road Work and Harvest Activities | For In-kind Replacement of Core | USFS |

| MAP INDEX | ROAD | LOCATION Milepost (MP) | PROPOSED ACTION | TIMING | REASON FOR ACTION | WHO |
|---|---|---|---|---|---|---|
| B | 2335 | MP 0 | Barriered via 2338 MP 7.2 (Map Index B) | Prior to Road Work and Harvest Activities | For In-kind Replacement of Core | USFS |
| B | 2335A | MP 0 | Barriered via 2338 MP 7.2 (Map Index B) | Prior to Road Work and Harvest Activities | For In-kind Replacement of Core | USFS |

*Map index 9, 14, 18, and 31 have been removed because those roads will now be temporary roads and they will be rehabilitated after project activities are completed.




Figure 2. Knotty Pine Access Management Plan Map.

# Appendix E- Best Management Practices (BMP)

## Introduction

Federal agency compliance with pollution control is addressed through Section 313 of the Clean Water Act, Executive Order 12580 (January 23, 1987), National Nonpoint Source Policy (December 12, 1984), USDA Nonpoint Source Water Quality Policy (December 5, 1986) and the Environmental Protection Agency in their guidance "Nonpoint Source Controls and Water Quality Standards" (August 19, 1987). To comply with State and local non-point pollution controls the Forest Service will apply Best Management Practices (BMPs) to all possible non-point sources which may result from proposed management activities as described in the Soil and Water Conservation Practices, Forest Service Handbook (FSH) 2509.22.

BMPs are the primary mechanism for achievement of water quality standards (EPA, 1987). This appendix describes the Forest Service's BMP process in detail and lists the key Soil and Water Conservation Practices that have been selected to be used in the action alternatives. BMPs are site specific and can be applied before, during, or after pollution-producing activities to reduce or eliminate the introduction of pollutants into the receiving watershed (40 CFR 130.2, EPA Water Quality Standards Regulation).

The 2015 Forest Plan states that Best Management Practices will be incorporated into all land use project plans as a principal mechanism for controlling non-point pollution sources, meeting soil and water quality goals, and protecting beneficial uses. To the extent practicable, ditch and surface runoff should be disconnected from streams and other water bodies. Montana State Water Quality Standards require the use of reasonable land, soil, and water conservation practices (analogous to BMPs) as the controlling mechanism for non-point pollution. The use of BMPs is required in the Memorandum of Understanding between the Forest Service and the State of Montana as part of the agency's responsibility as the designated water quality management agency on National Forest System lands. Activities found not to comply with the BMPs or State standards will be brought into compliance, modified, or stopped.

## BMP Implementation Process

The Forest Service non-point source management system consists of the following steps:

BMP Selection and Design - The appropriate BMPs are selected for each project by an interdisciplinary team. BMPs are site specific, and selection and design are dictated by the proposed activity, water quality objectives, and beneficial uses in the watershed. Environmental impacts and water quality protection options are evaluated, and final BMPs are selected that not only protect water quality but meet other resource needs.

BMP Application - The BMPs are translated into contract provisions, special use permit requirements, project plan specifications, and so forth and applied with oversight from resource specialists during layout or implementation.

BMP Monitoring - BMP implementation monitoring is done before, during, and after implementation of proposed activities. Further monitoring is done to evaluate if the BMPs are effective in meeting management objectives and protecting beneficial uses. If monitoring indicates that water quality standards are not being met or beneficial uses are not being protected, corrective action will consider the following:

Is the BMP technically sound? Is there a better practice that is technically sound and feasible to implement?

Was the BMP applied entirely as designated? Was it only partially implemented? Were personnel, equipment, funds, or training lacking which resulted in inadequate or incomplete implementation?

Do the parameters and criteria that constitute water quality standards adequately reflect human-induced changes to water quality and beneficial uses?

Feedback - Feedback on the results of BMP evaluation is both short- and long-term in nature. Where corrective action is needed, immediate response will be undertaken. This action may include: modification of the BMP, modification of the activity, ceasing the activity, or possibly modification of the State water quality standard. Cumulative effects over the long-term may also lead to the need for corrective actions.

# KNF BMP Selection And Design Form (KNF-BMP-1)

Site-Specific Best Management Practices

Soil and water conservation practices from the Forest Service Soil and Water Conservation Handbook (FSH 2509.22) will be applied in all alternatives as specified in Table 38. Abbreviations used in this table can be found below.

COR – Contracting Officer's Representative, ER - Engineering Representative, FP - Kootenai Forest Plan, IDT - Interdisciplinary Team, INFISH - Inland Native Fish Strategy; KNF - Kootenai National Forest, PSF - Pre-sale Forester, RHCA - Riparian Habitat Conservation Area, SAM - Sale Area Map, SMZ - Streamside Management Zone, SPS – Special Project Specification, SWCP - Soil and Water Conservation Practice, TSA - Timber Sale Administrator, TSC - Timber Sale Contract

**Table 15. Kootenai National Forest BMP Table**

| SWCP | SWCP Objective | Monitored Effectiveness | Recommended Best Management Practices by IDT/TSA | Considerations for Best Management Practices | Person(s) Responsible | Contract Provisions |
|---|---|---|---|---|---|---|
| 14.01 | TIMBER SALE PLANNING - To incorporate soil and water resource considerations into Timber Sale Planning | 94% | 1. Unit design, mitigation, and effects analysis was done by IDT.<br>2. TSC will be prepared by PSF that includes Design Criteria.<br>3. Use standard RHCA widths unless site specific adjustment is appropriate (requires documentation of rationale).<br>4. Use existing skid trails where feasible. | IDT has evaluated watershed characteristics and estimated response to proposed activities. EA identifies design criteria to protect soil and water resources. Timber sale contracts will include provisions to meet water quality, soils, and other resource requirements. | IDT; PSF | N/A |

| SWCP | SWCP Objective | Monitored Effectiveness | Recommended Best Management Practices by IDT/TSA | Considerations for Best Management Practices | Person(s) Responsible | Contract Provisions |
|---|---|---|---|---|---|---|
| 14.02 | TIMBER HARVEST UNIT DESIGN - To ensure that timber harvest unit design will secure favorable conditions of water flow, maintain water quality and soil productivity, and reduce soil erosion and sedimentation. | 95% | 1. Effects analysis and unit design were performed by IDT.<br>2. Prescriptions and unit design are consistent with BMP direction.<br>3. Use standard RHCA widths unless site specific adjustment is appropriate (requires documentation of rationale).<br>4. Use existing skid trails where feasible.<br>5. Use suitable logging system for topography, soil type, and season of operation. | Proposed activities were evaluated to estimate the potential watershed response. Prescriptions will be designed to assure an acceptable level of protection for soil and water resources. Management will protect soil/water values by avoiding sensitive areas, adjusting unit boundaries, adding specific BMPs to meet specific SWCPs, applying mitigation, and applying implementation/effectiveness monitoring to trend toward desired conditions. | IDT; PSF | N/A |
| 14.03 | USE OF SALE AREA MAPS (SAMs) FOR DESIGNATING SOIL AND WATER PROTECTION NEEDS - To delineate the location of protected areas and available water sources and ensure their recognition, proper consideration, and protection on the ground. | 93% | 1. Water courses identified and protected using appropriate RHCA/SMZ widths as a minimum.<br>2. Skidding on dry, frozen, or snow-covered soil conditions.<br>3. Designated skid trails in units with previous harvest. | The IDT will identify water courses to be protected, unit boundaries, and other features required by other means such as "C" provisions. Ground verification and preparation of SAMs to be included in TSC will be done by PSF. TSA reviews areas of concern with purchaser before operations. | IDT; PSF; TSA | B(T)1.1<br>B(T)6.5<br>C(T)6.50# |

| SWCP | SWCP Objective | Monitored Effectiveness | Recommended Best Management Practices by IDT/TSA | Considerations for Best Management Practices | Person(s) Responsible | Contract Provisions |
|---|---|---|---|---|---|---|
| 14.04 | LIMITING THE OPERATION PERIOD OF TIMBER SALE ACTIVITIES - To minimize soil erosion, sedimentation, and a loss in soil productivity by insuring that the purchaser conducts his/her operations in a timely manner. | 99% | 1. Identify units located on soils sensitive to compaction and/or displacement.<br>2. Designate units needing harvest on frozen or snow-covered ground.<br>3. All other ground disturbing activities will occur during dry, frozen, or snow-covered conditions to minimize soil compaction and displacement. | If limited operating periods are identified and recommended during the analysis by the IDT, the PSF will prepare a contract that includes provision C(T)6.316 and/or C(T)6.4#. | IDT; PSF; TSA | B(T)6.31<br>B(T)6.311<br>B(T)6.6<br>C(T)6.6<br>C(T)6.316#<br>C(T)6.4# |
| 14.05 | PROTECTION OF UNSTABLE AREAS - To protect unstable areas and avoid triggering mass movements of the soil mantle and resultant erosion and sedimentation. | 96% | 1. Identify unstable landtypes in the planning process.<br>2. Units that need further protection will use alternative yarding techniques, seasonal restrictions, and/or unit boundary adjustments. | If the NEPA analysis concluded that soils/geology in the area were unstable, then BMPs are designed to prevent irreversible soil and water damage. | IDT; PSF; TSA | C(T)6.4# |
| 14.06 | RIPARIAN AREA DESIGNATION - To minimize the adverse effects on riparian areas with prescriptions that manage nearby logging and related land disturbance activities. | 90% | 1. Identify areas with or adjacent to wet areas.<br>2. Use standard RHCA widths unless site specific adjustment is appropriate (requires documentation of rationale).<br>3. SMZ widths will be used as a minimum if modification is proposed.<br>4. Areas found during sale layout will be reported to the Hydrologist and afforded the same protections as those identified during the planning process. | All activities near streams and wetlands in the decision area will comply with the 2015 KNF Forest Plan and the SMZ law (HB-731). These widths will be included on the sale area map and marked on the ground. | IDT; PSF; TSA | B(T)1.1<br>B(T)6.5,<br>C(T)6.4#<br>C(T)6.41#<br>C(T)6.50# |

| SWCP | SWCP Objective | Monitored Effectiveness | Recommended Best Management Practices by IDT/TSA | Considerations for Best Management Practices | Person(s) Responsible | Contract Provisions |
|---|---|---|---|---|---|---|
| 14.07 | DETERMINING TRACTOR-LOGGABLE GROUND - To protect water quality from degradation caused by tractor logging ground disturbance. | 97% | 1. Avoid tractor logging on unstable slopes and sustained slopes greater than 40% (small areas of the unit may have slopes > 40%).<br>2. Areas unsuitable for tractor logging were designated as skyline, forwarder, or winter harvest units; or were dropped from the unit. | IDT (in conjunction with personnel from timber operations) identified tractor-loggable ground during transportation and timber sale planning. The results have been used to determine intensity of and restrictions for land disturbance activities. PSF will prepare a TSC that includes provisions stating areas and conditions under which tractors may operate. | IDT; PSF | C(T)6.4#<br>SAM |
| 14.08 | TRACTOR SKIDDING DESIGN - To minimize erosion and sedimentation and protect soil productivity by designing skidding patterns to best fit the terrain. | 97% | 1. Identify units with designated or dispersed skid trails.<br>2. TSA and purchaser agree on proposed locations before operation.<br>3. Skidding operation minimizes soil displacement and compaction. | IDT has identified sensitive areas during the planning process. The TSA will execute the plan on the ground by locating the skid trails with the timber purchaser or by agreeing to the purchaser's proposed locations prior to operation. | IDT; PSF; TSA | B(T)6.422<br>C(T)6.4# |
| 14.09 | SUSPENDED LOG YARDING IN TIMBER HARVESTING - To protect the soil from excessive disturbance and accelerated erosion and maintain the integrity of the riparian areas and other sensitive areas. | 95%. | 1. Units that have slopes that are unsuitable for or sensitive to ground base skidding will be identified during analysis and listed in the Design Criteria.<br>2. Units with sustained slopes >40% will be designated skyline harvest units. | IDT recognizes the hazards associated with operating on steep and/or rocky slopes. Areas found to be of concern will use appropriate harvest systems that provide for a safe work environment and protect natural resources. | IDT; PSF | B(T)6.42<br>C(T)6.4#<br>C(T)6.50# |

| SWCP | SWCP Objective | Monitored Effectiveness | Recommended Best Management Practices by IDT/TSA | Considerations for Best Management Practices | Person(s) Responsible | Contract Provisions |
|---|---|---|---|---|---|---|
| 14.10 | LOG LANDING LOCATION AND DESIGN - To locate in such a way as to avoid soil erosion and water quality degradation. | 99% | 1. TSA and purchaser agree on landing locations before operation.<br>2. Use suitable number, size, and location of landings.<br>3. Use least excavation needed.<br>4. Do not side-cast material into sensitive areas or waterways.<br>5. Install proper drainage. | TSA must agree to landing locations proposed by the purchaser. Approved landing locations will meet the criteria of: minimal size, least excavation needed, minimum skid roads necessary, no side-cast of material into sensitive areas, and have proper drainage. | PSF; TSA | B(T)6.422<br>C(T)6.422 |
| 14.11 | LOG LANDING EROSION PREVENTION AND CONTROL- To reduce erosion and subsequent sedimentation from log landing through the use of mitigating measures. | 98% | 1. Proper drainage will be installed and maintained during operation.<br>2. Landings will be scarified and seeded upon completion of harvest activities.<br>3. TSA will assess conditions and take necessary steps to ensure soil and water protection. | PSF and TSA assess what is necessary to prevent erosion from landing and to ensure stabilization. It is up to the TSA to request technical assistance as needed. | PSF; TSA | C(T)6.6<br>BT6.64<br>B(T)6.6<br>C(T)6.633# |
| 14.12 | EROSION PREVENTION AND CONTROL MEASURES DURING THE TIMBER SALE OPERATION - To ensure that the purchaser's operations shall be conducted reasonably to minimize soil erosion. | 91% | 1. Designate units with seasonal restrictions.<br>2. Do not operate during wet periods including spring-snowmelt and/or intense or long-duration rain storms.<br>3. TSA ensures that erosion control is kept current and prevents operation when excessive impacts are possible. | PSF and TSA sets purchaser's responsibility to prevent soil/water resource damage in TSC. TSA ensures that erosion control is kept current and prevents operation when excessive impacts are possible. | PSF; TSA | A13<br>B(T)6.6<br>B(T)6.64<br>C(T)6.6<br>C(T)6.601#<br>C(T)6.633# |

| SWCP | SWCP Objective | Monitored Effectiveness | Recommended Best Management Practices by IDT/TSA | Considerations for Best Management Practices | Person(s) Responsible | Contract Provisions |
|---|---|---|---|---|---|---|
| 14.13 | SPECIAL EROSION PREVENTION MEASURES ON AREAS DISTURBED BY HARVEST ACTIVITIES - To prevent erosion and sedimentation on disturbed areas. | 93% | 1. Use waterbars, KNF approved seed, and placed woody debris to stabilize soils on skid trails, landings.<br>2. Scarify or recontour excavated skid trails, temporary roads and compacted landings constructed for the project. Place slash and duff on disturbed areas.<br>3. Scarify previously existing excavated skid trails, temporary roads and compacted landings used for the project.<br>4. BMPs may be adjusted by the TSA to meet operational requirements. | IDT identifies locations needing special stabilization measures. If any such areas are identified, BMPs may be adjusted by the TSA to meet operational requirements. | IDT; PSF; TSA | C(T)6.601#<br>C(T)6.32#<br>C(T)6.633# |
| 14.14 | REVEGETATION OF AREAS DISTURBED BY HARVEST ACTIVITIES - To establish a vegetative cover on disturbed areas to prevent erosion and sedimentation. | 95% | 1. Seed areas of exposed soil with KNF approved seed mix.<br>2. Cover disturbed areas with slash and/or mulch as necessary. | The KNF has established seed mix to be used in the Project Area. TSA is responsible for seeing that revegetation work required by purchaser is done correctly and in a timely manner. The purchaser will be responsible for revegetation immediately after the completion of harvest. Funds will be collected for the district to do follow-up seeding in years two and three after harvest. | IDT; TSA | C(T)6.01#<br>C(T)6.633# |
| 14.15 | EROSION CONTROL ON SKID TRAILS - To protect water quality by minimizing erosion and sedimentation derived from skid trails. | 89% | 1. Ensure proper skid trail location.<br>2. Ensure proper drainage on skid trails; avoid concentrating runoff.<br>3. Recontour, seed, and place woody debris on constructed skid trails and temporary roads.<br>4. Ensure maintenance of erosion control structures by purchaser.<br>5. Ensure adequate erosion control on temporary roads, skid trails, and harvest-disturbed areas within the unit. | Erosion control measures may be recommended by the IDT, but site-specifically adjusted by the TSA. TSA will ensure erosion control measures are applied prior to expected hydrologic events. Maintenance of erosion control structures by the purchaser may be necessary and requested by the TSA. | TSA | C(T)6.6<br>C(T)6.633#<br>B(T)6.6<br>B(T)6.65<br>B(T)6.66 |

| SWCP | SWCP Objective | Monitored Effectiveness | Recommended Best Management Practices by IDT/TSA | Considerations for Best Management Practices | Person(s) Responsible | Contract Provisions |
|---|---|---|---|---|---|---|
| 14.16 | WET MEADOW PROTECTION DURING TIMBER HARVESTING - To avoid damage to the ground cover, soil, and water in meadows. | 87% | 1. Units with, or adjacent to, wet meadows, wetlands, and/or ponds will have buffers clearly identified in the sale map and on the ground.<br>2. Units with unmapped wet areas will be reported to a Hydrologist and afforded the same protection as those identified during the planning process.<br>3. Standard RHCA widths will be adhered to unless modification is in place.<br>4. The SMZ law will be met or exceeded. | IDT has identified areas needing special protection. PSF will verify the areas needing protection and prepare the contract to prevent damage to meadows. The TSA will be responsible for on-the-ground protection of meadows. If meadows are found by the TSA during operations, it is their responsibility to either afford them the proper protection or pursue a contract modification. | IDT; PSF; TSA | B(T)1.1<br>B(T)5.1<br>B(T)6.422<br>B(T)6.61<br>C(T)6.4#<br>C(T)6.62# |
| 14.17 | STREAM CHANNEL PROTECTION (IMPLEMENTATION AND ENFORCEMENT) - Protect natural stream flows; provide unobstructed passage of flows; reduce sediment input; and restore flow if diverted by timber sale activity. | 92% | 1. Use standard RHCA widths unless site specific adjustment is appropriate (requires documentation of rationale).<br>2. SMZ widths will be met or exceeded regardless of RHCA adjustment. | IDT has identified the location of stream channels. PSF will prepare a SAM locating the channels needing protection. Layout crew marks boundaries and trees according to HB-731. TSA will see that TSC items are carried out on the ground. Technical assistance will be consulted as needed. | IDT; PSF; TSA | B(T)1.1<br>B(T)6.5<br>B(T)6.6<br>C(T)6.50#<br>C(T)6.6 |
| 14.18 | EROSION CONTROL STRUCTURE MAINTENANCE - To ensure that constructed erosion control structures are stabilized and working effectively. | 92% | 1. During the period of the TSC, the purchaser is responsible for maintaining their erosion control features. | If work is needed beyond the period of the TSC, the District will pursue other sources of funding. | IDT; PSF; TSA | B(T)6.66<br>B(T)6.67 |

| SWCP | SWCP Objective | Monitored Effectiveness | Recommended Best Management Practices by IDT/TSA | Considerations for Best Management Practices | Person(s) Responsible | Contract Provisions |
|---|---|---|---|---|---|---|
| 14.19 | ACCEPTANCE OF TIMBER SALE EROSION CONTROL MEASURES BEFORE SALE CLOSURE - To assure the adequacy of required erosion control work on timber sales. | 97% | 1. TSA reviews erosion prevention work before each harvest unit is considered complete.<br>2. The inspection will determine if the work is acceptable and will meet the objective of the erosion control feature. | A careful review of erosion prevention work will be made by the TSA before each harvest unit is considered complete. The inspection will determine if the work is acceptable and will meet the objective of the erosion control feature. A feature is considered not acceptable if it does not meet standards or is not expected to protect soil/water resources. Technical assistance will be used as necessary. | TSA | B(T)6.36 |
| 14.20 | SLASH TREATMENT IN SENSITIVE AREAS - To protect water quality by protecting sensitive tributary areas from degradation that will result from using mechanized equipment for slash disposal. | 93% | 1. Where harvest is proposed within riparian areas, slash should be removed with the tree or scattered and not treated.<br>2. Limit mechanical fuels treatment to slopes < 40%.<br>3. Mechanical slash piling should not excessively disturb soil surface.<br>4. Scarification is limited to extent necessary to meet management objectives. | All activities will comply with the 2015 KNF Forest Plan. | TSA; FMO | B(T)6.5<br>C(T)6.50#<br>B(T)6.7<br>C(T)6.7<br>C(T)6.71<br>C(T)6.753 |
| 14.22 | MODIFICATION OF THE TSC - To modify the TSC if new circumstances or conditions indicate the timber sale will cause irreversible damage to soil, water, or watershed values. | 100% | 1. Environmental modification procedure. | If TSC is not adequate to protect soil and water resources, the TSA and Contracting Officer are responsible for recommending modification of the TSC. | TSA | B(T)8.33 |

| SWCP | SWCP Objective | Monitored Effectiveness | Recommended Best Management Practices by IDT/TSA | Considerations for Best Management Practices | Person(s) Responsible | Contract Provisions |
|---|---|---|---|---|---|---|
| 15.01 | GENERAL GUIDELINES FOR TRANSPORTATION PLANNING - To introduce soil and water resource considerations into transportation planning. | 100% | 1. Complete a roads analysis.<br>2. Transportation plans include proper drainage installation and maintenance. | A roads Analysis has been completed. The IDT has evaluated watershed characteristics and estimated the response of soil and water resources to proposed transportation alternatives and activities. | IDT; ER | N/A |
| 15.02 | GENERAL GUIDELINES FOR THE LOCATION AND DESIGN OF ROADS AND TRAILS - To locate and design roads and trails with minimal soil and water impact while considering all design criteria. | 95% | 1. Avoid sensitive landtypes, riparian areas, and wetlands during planning.<br>2. Minimize amount of roads and trails necessary to accomplish work.<br>3. Design roads for drainage efficiency.<br>4. Route road drainage through adequate filtration before entering streams.<br>5. Ensure proper size of stream crossings structures. New or replacement structures should pass the 100-year flow event.<br>6. Ensure culverts conform to natural streambed and slope.<br>7. Ensure ditch relief culverts have stable catch basins, inflow end protected from plugging, and appropriate skew. | The IDT has ensured that the location and design of roads and trails are based on multiple resource objectives. Mitigation measures have been designed to protect the soil and water resources identified in the NEPA process. Contract provisions will be prepared by the ER that meets the soil and water resource protection requirements. | IDT; ER | N/A |

| SWCP | SWCP Objective | Monitored Effectiveness | Recommended Best Management Practices by IDT/TSA | Considerations for Best Management Practices | Person(s) Responsible | Contract Provisions |
|---|---|---|---|---|---|---|
| 15.03 | ROAD AND TRAIL EROSION CONTROL PLAN - To prevent, limit, and mitigate erosion, sedimentation, and resulting water quality degradation prior to the initiation of construction by timely implementation of erosion control practices. | 96% | 1. Seed disturbed areas.<br>2. Install proper ditching and road slope.<br>3. Install proper drainage.<br>4. Incorporate road grade breaks.<br>5. Use minimum road or trail length/width necessary.<br>6. Avoid wet areas or areas of sensitive soil types.<br>7. Slash filter windrows used where needed and feasible. | IDT has established soil/water conservation objectives and mitigation measures. ER will prepare a contract that reflects the objectives. ER will see that erosion control measures are approved and completed in a timely manner. IDT reviews projects to check effectiveness of erosion control features. | IDT; ER | B(T)6.31<br>B(T)6.6<br>B(T)6.312 |
| 15.04 | TIMING OF CONSTRUCTION ACTIVITIES - To minimize erosion by conducting operations during minimal runoff periods. | 98% | 1. Avoid construction during wet periods.<br>2. Follow timing restrictions for aquatic species if applicable. | If limited operating periods are identified and recommended during the analysis by the IDT, the ER will put these measures into contract provisions. Compliance is assured by Contracting Officer or ER. | IDT; ER | B(T)6.31<br>B(T)6.312<br>B(T)6.6<br>SPS 204 |
| 15.05 | SLOPE STABILIZATION AND PREVENTION OF MASS FAILURES - To reduce sedimentation by minimizing the chances for road-related mass failures, including landslides and embankment slumps. | 99% | 1. Avoid construction across unstable areas.<br>2. Construct embankments following approved engineering practices.<br>3. Use minimum road or trail length/width necessary.<br>4. Do not incorporate woody debris incorporated into road-fill. | Road and trail construction in mountainous terrain requires cutting and loading natural slopes which may lead to landslides and/or embankment failures. In areas with intrinsic slope stability problems, appropriate technical resource personnel must be involved in an interdisciplinary approach to route location. | IDT; ER | N/A |

| SWCP | SWCP Objective | Monitored Effectiveness | Recommended Best Management Practices by IDT/TSA | Considerations for Best Management Practices | Person(s) Responsible | Contract Provisions |
|---|---|---|---|---|---|---|
| 15.06 | MITIGATION OF SURFACE EROSION AND STABILIZATION OF SLOPES - To minimize soil erosion from road cutslopes, fill slopes, and travel ways. | 95% | 1. Seed cut and fill slopes.<br>2. Install proper ditching and road slope.<br>3. Install proper drainage.<br>4. Incorporate road grade breaks.<br>5. Install ditch relief culverts before/after stream crossings.<br>6. Construct cut and fill slopes at stable angles. | If the IDT has outlined erosion control measures outside the normal BMPs they will be described in the Design Criteria. Stabilization techniques are included in contract provisions. Compliance is assured by Contracting Officer or ER. | IDT; ER | SPS 203, 204, 206A 210, 412 619, 625, 626 630<br>B(T)5.3, B(T)6.31 B(T)6.6, B(T)6.62 B(T)6.66 B(T)6.312, C(T)6.6<br>C(T)6.601# |
| 15.07 | CONTROL OF PERMANENT ROAD DRAINAGE - To minimize the erosive effects of concentrated water and degradation of water quality by proper design and construction of road drainage systems and drainage control structures. | 94% | 1. Avoid long sustained steep grades.<br>2. Install/maintain adequate surface drainage and ditch relief culverts (inlet clean, skewed).<br>3. Prevent erosion of culvert and bridge fills.<br>4. Maintain ditches.<br>5. New roads/temp roads should be constructed outside SMZs/RHCAs.<br>6. Energy dissipaters place at structure outlets. | If the IDT has outlined erosion control measures outside the normal BMPs they will be described in the Design Criteria. Compliance will be assured by the ER/Contracting Officer. | ER | B(T)5.3<br>C(T)5.31#<br>B(T)6.311<br>B(T)6.6<br>C(T)6.6 |
| 15.08 | PIONEER ROAD CONSTRUCTION - To minimize sediment production and mass wasting associated with pioneer road construction. | 100% | 1. Ensure stable slopes during construction.<br>2. Seed exposed soil.<br>3. Avoid construction during wet periods.<br>4. Use slash filter windrows. | ER/CO will be responsible for enforcing contract specifications. The purchaser is responsible for submitting an operating plan that includes erosion control measures. | ER | B(T)6.6<br>B(T)5.23<br>B(T)6.31<br>B(T)6.312<br>B(T)6.311<br>SPS 204 |

| SWCP | SWCP Objective | Monitored Effectiveness | Recommended Best Management Practices by IDT/TSA | Considerations for Best Management Practices | Person(s) Responsible | Contract Provisions |
|---|---|---|---|---|---|---|
| 15.09 | TIMELY EROSION CONTROL MEASURES ON INCOMPLETE ROADS AND STREAM CROSSING PROJECTS - To minimize erosion of and sedimentation from disturbed ground on incomplete projects. | 96% | 1. Avoid construction during wet periods.<br>2. Use slash filter windrows or silt fence.<br>3. Seed disturbed areas. | IDT has identified project location and mitigation measures in NEPA process. Protective measures will be kept current on all areas of disturbed, erosion-prone areas. ER/CO ensures contract compliance. | IDT; ER | B(T)6.31<br>B(T)6.6<br>B(T)5.23<br>B(T)6.66<br>C(T)6.6 |
| 15.10 | CONTROL OF ROAD CONSTRUCTION, EXCAVATION, AND SIDE-CAST MATERIAL - To reduce sedimentation from unconsolidated excavated and side-cast material caused by road construction, reconstruction, or maintenance. | 96% | 1. Do not side-cast into waterways or sensitive areas.<br>2. Waste material from activities not placed in a problem location.<br>3. Use slash-filter windrows or silt fence. | IDT has identified project location and mitigation measures in NEPA process. Protective measures will be kept current on all areas of disturbed, erosion-prone areas. ER/CO ensures contract compliance. | IDT; ER | B(T)5.3<br>C(T)5.31#<br>SPS 203<br>SPS 204 |
| 15.11 | SERVICING AND REFUELING EQUIPMENT - To prevent contamination of waters from accidental spills of fuels, lubricants, asphalt, or other harmful materials. | 99% | 1. Ensure proper fuel storage and transportation.<br>2. Keep fuel, shop debris, and waste oil from streams, wetlands, ponds, and lakes. | ER/TSA/CO will designate the location, size, and uses of service refueling areas. All projects will adhere to the KNF Hazardous Substance Spill Plan in case of accidents. | ER; TSA | B(T)6.222<br>B(T)6.34<br>B(T)6.341 |

| SWCP | SWCP Objective | Monitored Effectiveness | Recommended Best Management Practices by IDT/TSA | Considerations for Best Management Practices | Person(s) Responsible | Contract Provisions |
|---|---|---|---|---|---|---|
| 15.12 | CONTROL OF CONSTRUCTION IN RIPARIAN AREAS - To minimize the adverse effects on riparian areas from roads. | 98% | 1. Follow the 2015 KNF Forest Plan for construction within riparian areas.<br>2. Use slash filter windrows or silt fence.<br>3. Install/maintain adequate surface drainage and ditch relief culverts.<br>4. Number of stream crossings minimized on new and temp road construction. | Proposed new and temporary roads will adhere to guidelines in the Montana Streamside Management Zone Law (HB-731). All road activities will follow 2015 KNF Forest Plan. All required permits will be obtained. | ER; TSA | B(T)6.5<br>B(T)6.62<br>C(T)6.50#<br>SPS 206<br>SPS 206A |
| 15.13 | CONTROLLING IN-CHANNEL EXCAVATION - To minimize stream channel disturbances and related sediment production. | 96% | 1. Use silt fence to minimize introduced sediment.<br>2. Use minimum amount of road.<br>3. Construct minimum number of crossings.<br>4. Stream channel disturbance minimized, on-site erosion prevented, and sedimentation prevented. | BMP improvements at stream crossings will adhere to the guidelines in Montana Streamside Management Zone Law (HB-731) and the 2015 KNF Forest Plan. All required permits will be obtained. | ER; TSA | B(T)6.5<br>SPS 204<br>SPS 206<br>206A |
| 15.14 | DIVERSION OF FLOWS AROUND CONSTRUCTION SITES - To minimize downstream sedimentation by insuring all stream diversions are carefully planned. | 93% | 1. Divert stream flow around construction.<br>2. Use silt fence to minimize introduced sediment.<br>3. Construct during low-flow. | All required permits will be obtained. Compliance with contract provisions will be done by the ER. | HYD; FB; ER | B(T)6.5<br>B(T)6.31<br>C(T)6.50#<br>C(T)6.6 |

| SWCP | SWCP Objective | Monitored Effectiveness | Recommended Best Management Practices by IDT/TSA | Considerations for Best Management Practices | Person(s) Responsible | Contract Provisions |
|---|---|---|---|---|---|---|
| 15.15 | STREAM CROSSINGS ON TEMPORARY ROADS - To keep temporary roads from unduly damaging streams, disturbing channels, or obstructing fish passage. | 97% | 1. Consult Watershed Personnel on placement.<br>2. Use minimum number of stream crossings.<br>3. Construct during low-flow.<br>4. Follow the 2015 KNF Forest Plan guidelines for construction within riparian areas.<br>5. Stream crossings are installed at right angles, if practical.<br>6. Ensure temporary stream crossings are adequately removed and channel cross-section is restored. | The IDT identifies areas in need of a temporary road during the NEPA process. Proposed stream crossings will adhere to the guidelines in Montana Streamside Management Zone Law (HB-731). All required permits will be obtained. | PSF; TSA | N/A |
| 15.16 | BRIDGE AND CULVERT INSTALLATION - To minimize sedimentation and turbidity resulting from excavation for in-channel structures. | 97% | 1. Install during periods of low flow.<br>2. Use instream sediment retention devices throughout implementation. | IDT has identified project location and mitigation measures in NEPA process. Protective measures will be kept current on all areas of disturbed, erosion-prone areas. TSA ensures contract compliance. All required permits will be obtained. | IDT; TSA; ER | C(T)6.5# |
| 15.17 | REGULATION OF BORROW PITS, GRAVEL SOURCES, AND QUARRIES - To minimize sediment production from borrow pits, gravel sources, and quarries and limit channel disturbance in those gravel sources suitable for development in floodplains. | 98% | 1. Permit sand and gravel removal in RHCAs only if no alternative exists and adverse effects to water resources are minimized or avoided.<br>2. Borrow and gravel pits located and left in a condition to prevent sediment delivery.<br>3. Limit the area of operation to a minimum while providing sufficient area for material processing and stockpiling.<br>4. Phase development where practicable. | Construct and operate borrow pits, gravel sources, and quarries in a manner that minimizes effects to soil and water resources. | ER | B(T)6.5<br>C(T)6.50# |

| SWCP | SWCP Objective | Monitored Effectiveness | Recommended Best Management Practices by IDT/TSA | Considerations for Best Management Practices | Person(s) Responsible | Contract Provisions |
|---|---|---|---|---|---|---|
| 15.18 | DISPOSAL OF RIGHT-OF-WAY AND ROADSIDE DEBRIS - To ensure that debris generated during road construction is kept out of streams and prevent slash and debris from subsequently obstructing channels. | 98% | 1. Debris and slash generated during road construction should not be side-cast into streams. | Proposed road construction will adhere to the guidelines in the Montana Streamside Management Zone Law (HB-731). | ER | Std Spec 201<br>SPS 201 |
| 15.19 | STREAM BANK PROTECTION – To minimize sediment production from stream banks and structural abutments in natural waterways. | 98% | 1. Take precautions to minimize or eliminate disturbance to stream banks.<br>2. Maintain instream structures. | IDT has identified project location and mitigation measures during NEPA process. Protective measures will be kept current on all areas of disturbed soils. TSA and ER ensure contract compliance. | IDT; ER; TSA | Std Spec 619 |
| 15.20 | WATER SOURCE DEVELOPMENT CONSISTENT WITH WATER QUALITY PROTECTION - To supply water for road construction and maintenance and fire protection while maintaining water quality. | 93% | 1. Clean equipment before drafting and when changing between water sources to prevent the spread of aquatic invasive species.<br>2. When drafting water, pumps should be screened to prevent entrainment of fish or other aquatic organisms. | Conduct water drafting at suitable locations and in a manner that avoids or minimizes adverse effects to water quality, fisheries, and other aquatic organisms. | ER; FMO | Std Spec 207 |

| SWCP | SWCP Objective | Monitored Effectiveness | Recommended Best Management Practices by IDT/TSA | Considerations for Best Management Practices | Person(s) Responsible | Contract Provisions |
|---|---|---|---|---|---|---|
| 15.21 | MAINTENANCE OF ROADS - To maintain all roads in a manner that provides for soil and water protection by minimizing rutting, failures, side-cast, and blockage of drainage facilities. | 96% | 1. Road grading sufficient to maintain road surface where necessary.<br>2. Erosion control features maintained in an operational condition.<br>3. Road grading avoids cutting toe of cut-slope.<br>4. Road and/or culvert maintenance did not side-cast sediment into or near a water body. | Road maintenance associated with a timber sale is the responsibility of purchaser. The ER/SA will ensure that the purchaser maintains roads according to the appropriate maintenance level. | ER; TSA | B(T)5.12<br>B(T)5.3<br>B(T)6.6<br>C(T)6.6<br>C(T)5.31#<br>C(T)5.32#<br>B(T)6.31 |
| 15.22 | ROAD SURFACE TREATMENT TO PREVENT LOSS OF MATERIALS - To minimize the erosion of road surface materials and, consequently, reduce the likelihood of sediment production. | 98% | 1. Maintenance of road surface should include proper blading and/or dust abatement.<br>2. Use crush-gravel where necessary. | Protective measures will be kept current on all areas of disturbed, erosion-prone areas. ER ensures contract compliance. | IDT; ER | B(T)5.3<br>C(T)5.31#<br>C(T)5.314# |
| 15.23 | TRAFFIC CONTROL DURING WET PERIODS - To reduce the potential for road surface disturbance during wet weather and reduce sedimentation. | 97% | 1. Road use avoided during wet periods. | Road restrictions and traffic control measures will be implemented on all haul roads during spring break up or considerably wet periods. The decision to restrict a road is made by the ER. Hauling restrictions will be controlled by the TSA. | ER; TSA | B(T)6.6<br>C(T)6.6<br>C(T5).316#<br>C(T)5.41# |

| SWCP | SWCP Objective | Monitored Effectiveness | Recommended Best Management Practices by IDT/TSA | Considerations for Best Management Practices | Person(s) Responsible | Contract Provisions |
|---|---|---|---|---|---|---|
| 15.24 | SNOW REMOVAL CONTROLS - To minimize the impact of snow melt on road surfaces and embankments and reduce the probability of sediment production resulting from snow removal operations. | 97% | 1. Be careful not to leave snow berm at edge of road where possible.<br>2. Where a berm cannot be avoided, ensure proper drainage by opening sections of berm to allow water to leave road surface. | Snow removal will be kept current on all roads associated with winter logging operations. The TSA ensures compliance with contract provisions. | IDT; TSA | C(T)5.316#<br>Std Spec 203.09 |
| 15.25 | OBLITERATION OF TEMPORARY ROADS - To reduce sediment generated from temporary roads by obliterating them at the completion of their intended use. | 97% | 1. Re-contour road fully where feasible.<br>2. Seed exposed soil.<br>3. Pull slash and woody debris back onto rehabilitated road. | This work will be done on all new temporary roads in the decision area. The work will be done by the purchaser with compliance by the TSA. Roads will be left in a condition to provide adequate drainage without further maintenance. | TSA | B(T)6.63<br>C(T)6.6<br>C(T)6.632#<br>C(T)6.633# |
| 18.03 | PROTECTION OF SOIL AND WATER FROM PRESCRIBED BURNING EFFECTS - To maintain soil productivity, minimize erosion, and prevent ash, sediment, nutrients, and debris from entering surface water. | 100% | 1. Follow 2015 KNF Forest Plan Riparian Guidelines for burning in RHCAs.<br>2. Adhere to SMZ Law.<br>3. Where harvest within riparian areas is proposed, either the slash should be removed with the tree or scattered and not treated.<br>4. Limit soil and water quality impact of prescribed fire.<br>5. Adequate erosion protection on fire lines, sufficient until stabilized by vegetation. | Broadcast burning adjacent to riparian areas will adhere to guidelines in the Montana Streamside Management Zone Law (HB-731). Prescribed burn plans identify the conditions necessary to prevent soil damage and meet site preparation objectives. | FMO | N/A |

# Appendix F – Monitoring Plan

| Item # | Resource | Objective | Timing | Methodology | Responsible Official |
|---|---|---|---|---|---|
| 1 | Botany | Monitor sensitive plants | Pre and Post Treatment | Walk through Sensitive plant surveys | Botanist |
| 2 | Cultural Resources | Ensure effectiveness of historic properties protection measures and survey for newly exposed cultural resources | Post-Harvest and Fuels Treatment | Pedestrian survey will be conducted over newly disturbed or exposed surfaces within specified units. Fire line construction will be actively monitored in specified units. | Kootenai NF Heritage personnel |
| 3 | Noxious Weeds | Monitor 10% of herbicide treatment areas on the District yearly | Post treatment | The effects of these treatments are monitored when crews revisit treatment areas and results are documented in databases of record. | District Weed Specialist |
| 4 | Noxious Weeds | Monitor noxious weed infestations in the project area | Pre and Post Treatment | Monitor Project Area to determine effectiveness of weed spraying. Photo monitoring surveys will be completed over the life of the project in some units | District Weed Specialist |
| 5 | Silviculture | Track insect and diseases | Post Treatment | Annual insect and disease mortality surveys; ongoing program accomplished by Forest Health Protection (FHP). | R-1 Forest Health Protection |
| 6 | Silviculture | Assure regeneration harvest units are stocked with trees in 5 years | Post Treatment | Reforestation surveys the 1st, 3rd and 5th year after planting. | Silviculture |
| 7 | Silviculture/ Fuels | Monitor old growth characteristics and effectiveness of harvest and fuels treatments | Pre and Post Treatment | Walk through transects or old growth plots | Silviculturist and Fuels Specialist |
| 8 | Silviculture/ Fuels/ Wildlife | Determine whether fuels treatment objectives were accomplished | Post Treatment | Review selected treatment areas. Evaluate silvicultural objectives and prescribed burn objectives. | Fuels Specialist/ Silviculturist/ IDT |

| Item # | Resource | Objective | Timing | Methodology | Responsible Official |
|---|---|---|---|---|---|
| 9 | Soils | Monitor detrimental soil disturbance and effectiveness of project specific design features. | Post Treatment | Randomly sample timber sale units and associated temporary roads, skid trails and landings using approved methodology. | Soil Scientist |
| 10 | Soils/ Silviculture | Monitor coarse woody debris (CWD) to see if recommended amounts were retained | Post Treatment | Measure tons per acre of CWD within a representative sample of both burned and piled units. | Soil Scientist/ Silviculturist |
| 11 | Watershed | Monitor implementation and effectiveness of Best Management Practices (BMPs) used for project activities (includes monitoring RHCAs) | During and post project activities | Review a representative sample of timber sale units, road reconstruction, road storage and complete BMP monitoring reports. | Sale Admin/ Engineering Representative /IDT/District Staff |
| 12 | Wildlife | Determine effectiveness of burning to increase browse. | 1-3 years after burning | Survey selected underburn treatments to determine the species of browse and to what extend burning has stimulated browse. | Wildlife Biologist/ Fuels Specialist |
| 13 | Scenery | Determine effectiveness of the design features to meet the scenic integrity objective along the roaded PNNST | 2 to 5 years post Project activities | Visual surveys with photo documentation | Recreation |
| 14 | Wildlife- Grizzly bears | Monitor all new closures (berms/barriers) on roads that are being closed for the purpose of creating Core at least twice during the bear year for 3 years. | Spring/ early summer and Fall | Adopt-a-road - Road monitoring system | Wildlife Biologist |
| 15 | Wildlife- Grizzly bears | Monitor roads (NFSR 2338H, 2338I, 3952, 3952A, and 14367) associated with the new ski trail loops that bisect Core habitat to ensure effectiveness of closures | Spring | Adopt-a-road - Road monitoring system | Wildlife Biologist |
| 16 | Wildlife- Grizzly bears | Provide a project-specific annual report to the FWS to show compliance with the BO Terms and Conditions. | Annually | Forestwide annual report | Wildlife Biologist |

# Map 1 – Alternative 2






FS-047729