# Exhibit 18
# June 2022 Notice of Intent to Sue

CENTER for BIOLOGICAL DIVERSITY
Because life is good.

WildEarth GUARDIANS
A FORCE FOR NATURE

YAAK VALLEY FOREST COUNCIL

*Via Email and Certified Mail/Return Receipt Requested*

June 30, 2022

The Honorable Deb Haaland
Secretary of the Interior
U.S. Department of the Interior
1849 C Street NW
Washington, D.C. 20240
doiexecsec@ios.doi.gov

Martha Williams
Director
U.S. Fish and Wildlife Service
1849 C Street NW
Washington, D.C. 20240
Martha_Williams@fws.gov

Jodi L. Bush
Office Supervisor
Montana Ecological Services Office
U.S. Fish and Wildlife Service
585 Shepard Way, Suite 1
Helena, MT 59601-6287
Jodi_Bush@fws.gov

Chad Benson
Forest Supervisor
Kootenai National Forest
U.S. Forest Service
31374 U.S. Highway 2
Libby, MT 59923-3022
Chad.Benson@usda.gov

**Re: U.S. Fish and Wildlife Service's Black Ram Biological Opinion: Notice of Intent to Sue for Violations of the Endangered Species Act for Inadequate Analysis of Grizzly Bear Impacts**

On behalf of the Center for Biological Diversity, WildEarth Guardians, and the Yaak Valley Forest Council, we hereby provide notice, pursuant to Section 11(g) of the Endangered Species Act ("ESA"), 16 U.S.C. § 1540(g), that the U.S. Fish and Wildlife Service ("FWS") and the United States Forest Service ("USFS") are in violation of Section 7 of the ESA, 16 U.S.C. § 1536, with regard to the Biological Opinion for the Effects of the Black Ram Project on Grizzly Bears (Sept. 15, 2021) ("BiOp") and its accompanying Incidental Take Statement ("ITS"), as

well as the Kootenai National Forest Land Management Plan Biological Opinion (Oct. 7, 2020) ("Kootenai BiOp").

## INTRODUCTION

The Black Ram project ("project"), which includes clearcut logging (including logging of old growth and mature forest), extensive road building, and prescribed burning would take place in habitat crucial for the survival of a small and vulnerable population of grizzly bears in the Yaak Valley on the Kootenai National Forest in northwest Montana. Grizzly bears have been using habitat in the project area for decades but are still struggling to survive, with perhaps just 50 grizzly bears in the entire Cabinet-Yaak Recovery Zone, with up to half of those residing in the Yaak Valley. The project is authorized to take up to ten years to complete, significantly affecting grizzly bears and grizzly bear habitat during that time.

In analyzing the effects of the project, the U.S. Fish and Wildlife Service ("FWS") issued a biological opinion and incidental take statement that violate the Endangered Species Act ("ESA") in several respects, including but not limited to the following flaws. First, FWS failed to rely upon the best available science in its analysis. For example, FWS erroneously relied on an incorrect baseline of 60 grizzly bears in the Cabinet-Yaak Recovery Zone and ignored the lack of genetic connectivity between bears in the Yaak and those in the Cabinets. Additionally, FWS ignores its own best available science that the population trend for the Cabinet-Yaak population of bears is not increasing, but is actually in decline. In turn, FWS ignored the disproportionate impacts that the project may have on the small population of grizzly bears in the Yaak Valley.

FWS's ITS is also arbitrary because it does not require a numerical trigger for consultation reinitiation. FWS fails to justify its decision to forgo quantifying incidental take

and the surrogates that FWS relies upon are inadequate because they fail to provide a meaningful trigger for reinitiation. Although FWS acknowledged that grizzly bears may be displaced from the project area during project implementation—including two, known reproductive females in the area—the agency failed to adopt measures to appropriately trigger reinitiation of consultation if project activities lead to more harm to grizzly bears than predicted.

The BiOp and ITS are also arbitrary and capricious because FWS fails to analyze relevant factors. For example, despite the vast logging and road construction, FWS ignored the likelihood that more areas will be open to snowmobiling as a result of the project, potentially disturbing bears as they emerge from their dens. Another example of how FWS failed to analyze or consider relevant factors is the agency's reliance on inadequate conservation and mitigation measures that are not reasonably specific, certain to occur, capable of implementation, or enforceable. FWS cannot rely upon mitigation measures that are not enforceable.

Additionally, FWS fails to support its no-jeopardy conclusion. For example, although FWS is required to consider survival and recovery impacts to grizzly bears in the Cabinet-Yaak Recovery Zone in determining whether the project would jeopardize grizzly bears, FWS glosses over the significance of impacting two reproductive females for up to two reproductive cycles. In doing so FWS applies the incorrect standard to assess jeopardy.

Finally, because the relevant biological opinion and incidental take statement are arbitrary and capricious and violate requirements of the ESA, the Forest Service cannot rely on these flawed documents to satisfy its duty to comply with the ESA.

## THE BLACK RAM PROJECT

Through the Black Ram project, the Forest Service proposes a range of activities in the Yaak Valley on the Kootenai National Forest in northwest Montana, including a combination of

commercial and non-commercial logging, as well as prescribed burning within the 95,412-acre project area. BiOp at i.[1] Specifically, the Forest Service proposes commercial timber logging on 3,902 acres (including pile burning and underburning on 3,581 of those acres) and prescribed burns on 7,553 acres. BiOp at i; DN at 7, Table 2.[2] The logging will include clearcutting of 1,783 acres and logging within approximately 700 acres of old growth and mature forest stands. DN at 6, Table 1; *id.* at 7, Table 4.

To carry out these activities, the Forest Service will use approximately 90 miles of haul route plus more than 3 miles of new, permanent road construction and 0.2 miles of temporary road construction. BiOp at i; DN at 8, Table 5. The project will require the reconstruction or maintenance of 90.3 miles of road throughout the project area, including 0.8 miles of road construction through old growth forest. DN at 8, Tables 4 & 5; Final EA at 14-15, Tables 5 & 6.[3] The Forest Service will also decommission or store approximately 55 miles of road. BiOp at i; DN at 8, Table 5. In addition, to expand recreational opportunities, the Forest Service will thin trees in 14 locations along open roads to create viewpoints and construct 11 miles of new, non-motorized trails. BiOp at 4-5, Table 1.

In the U.S. Fish and Wildlife Service's ("FWS") 1993 Grizzly Bear Recovery Plan, the agency designated the Cabinet-Yaak Ecosystem as a recovery zone for grizzly bears.[4] The Black

---

[1] U.S. Fish and Wildlife Service Montana Ecological Services Office, Endangered Species Act Section 7 Consultation, Effects of the Black Ram Project on Grizzly Bears (Sept. 15, 2021) (hereinafter, "BiOp").

[2] U.S. Department of Agriculture, U.S. Forest Service, Kootenai National Forest, Three Rivers Ranger District, Black Ram Decision Notice and Finding of No Significant Impact (June 21, 2022 (hereinafter, "DN").

[3] United States Department of Agriculture, U.S. Forest Service, Kootenai National Forest, Three Rangers District, Black Ram Environmental Assessment (June 21, 2022) (hereinafter "Final EA").

[4] U.S. Fish and Wildlife Service. 1993. Grizzly bear recovery plan. U.S. Fish and Wildlife Service, Missoula, Montana. 181 pp.

Ram project area lies within this recovery zone. BiOp at 4. The Final EA states that the Cabinet-Yaak Ecosystem had an estimated population of 55-60 bears in 2017. Final EA at 300. This estimate was calculated based on 2012 data plus an assumed annual population increase of 2.1% and the addition of three surviving bears augmented into the Cabinet Mountains. Kasworm et al. 2018.[5] More recently, Kasworm et al. 2020 states that using all methods (DNA sampling in addition to credible observations, photos, and other methods), they detected 54 individual grizzly bears in the CYE during 2018, with two of those bears known dead and another two assumed dead, thus equaling a total of 50 identified grizzlies.[6] Using these same methodologies, Kasworm et al. 2021 only identified 50 individual grizzly bears in 2019, with five of those bears known dead, thus equaling a total of 45 known grizzlies.[7] These reports indicate a potential decline in the population, a fact which USFS and FWS ignore.

Despite this information, the Forest Service and FWS rely on the outdated 55-60 grizzly bear population estimate from 2017 as a baseline to determine impacts from the Black Ram project on the local grizzly bear population. Final EA at 300; BiOp at 48. This is a complete failure to rely on the best available and most up-to-date science. Equally problematic is the fact that both agencies fail to recognize that grizzly bears in the Yaak portion of the Cabinet-Yaak Recovery Zone are isolated from grizzly bears in the Cabinet portion of the recovery zone.[8] The

[5] Kasworm et al. (2018), Cabinet-Yaak Grizzly Bear Recovery Area 2017 Research and Monitoring Progress Report, at 37. Attached as Exh. 1.
[6] Kasworm et al. (2020), Cabinet-Yaak Grizzly Bear Recovery Area 2019 Research and Monitoring Progress Report, at 2. Attached as Exh. 2.
[7] Kasworm et al. (2021), Cabinet-Yaak Grizzly Bear Recovery Area 2020 Research and Monitoring Progress Report, at 2. Attached as Exh. 3.
[8] Kendall et al., Density, Distribution and Genetic Structure of Grizzly Bears in the Cabinet-Yaak Ecosystem, at 325, Journal of Wildlife Mgmt. 80(2) (2016) ("Our results indicated the grizzly bears in the Cabinet and Yaak regions were separate populations split along the Hwy 2 corridor" and "suggest[ed] complete spatial and reproductive isolation between these 2 populations, at least in recent generations"). Attached as Exh. 4.

Forest Service and FWS must use the best available science regarding the population status of bears in the Yaak portion of the ecosystem as a baseline to assess impacts from the Black Ram project to this local bear population. The best available science does not reflect a population of 55-60 bears and further requires the agencies to account for the lack of genetic connectivity from bears in the Yaak and bears in the Cabinets as well as a potential population decline.

Within the recovery zone, the Black Ram project takes place in Bear Management Units ("BMUs") 14 (Northwest Peak) and 15 (Garver), with the large majority of the proposed activities taking place in BMU 15.[9] Final EA at 311-12. BMU 14 includes the northwest corner of Montana and the northeast corner of Idaho while BMU 15 lies entirely within Montana. *Id.* at 300. Tracking shows that more than six individual bears likely reside in the two BMUs, and female grizzly bears with young currently reside in the action area. *Id.*; BiOp at 11, 14. Since 1989, females with young have been documented in BMU 14 for 17 years and BMU 15 for 14 years. BiOp at 14. As FWS acknowledges, "the action area has been an important area for female grizzly bears over the past several decades, and has housed multiple reproductive females that have contributed to the CYE population." *Id.* Moreover, because of the small grizzly bear population in the Cabinet-Yaak Ecosystem, and the even smaller grizzly bear population in the Yaak portion of the ecosystem, "survival and reproduction of each individual female grizzly bear is very important." *Id.* at 10.

**THE ENDANGERED SPECIES ACT**

Enacted in 1973, the Endangered Species Act ("ESA") is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley*

---

[9] BMUs are analysis areas that approximate the lifetime size of a female grizzly bear's home range. BiOp at 4; Final EA at 299-300.

*Auth. v. Hill*, 437 U.S. 153, 180 (1978). The ESA is meant to provide a means to conserve the ecosystems upon which endangered and threatened species depend and to provide a program to conserve endangered and listed species. 16 U.S.C. § 1531(b). To "conserve" means "to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary." *Id.* § 1532(3).

To receive the full protections of the ESA, a species must first be listed by the Secretary of Interior as "endangered" or "threatened" pursuant to ESA Section 4. *Id.* § 1533. A species is "endangered" when it is "in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). A species is "threatened" when it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20).

Section 7 of the ESA requires each federal agency, in consultation with FWS, to insure that any proposed action is not likely to jeopardize the continued existence of a threatened or endangered species, or result in the destruction or adverse modification of its critical habitat. *Id.* § 1536(a)(2). To facilitate compliance with Section 7, the agency must first inquire with FWS to determine whether any listed or proposed species may be present in the area of the proposed action. *Id.* § 1536(c)(1). When a listed or proposed species may be present in the action area, the agency must prepare a "biological assessment" to determine whether the species or their critical habitat may be affected by the action. *Id.* If the agency determines that the proposed action may affect any listed species or critical habitat, it must engage in formal consultation with FWS. 50 C.F.R. § 402.14.

Formal consultation results in the issuance of a "biological opinion," where FWS concludes whether the proposed action is likely to jeopardize a listed species or result in the destruction or adverse modification of critical habitat. *Id.* § 402.14(h). If FWS concludes in the biological opinion that the proposed action is likely to jeopardize a listed species, FWS may recommend reasonable alternatives to avoid the likelihood of jeopardy so that the agency action may proceed. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(2).

During consultation, FWS must review all relevant information, evaluate the current status of the species or critical habitat, and evaluate the effects and cumulative effects of the proposed action on the listed species and their critical habitat. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(g)(1)−(3). For the purposes of the ESA, "'[e]ffects of the action' are all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action. A consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur." 50 C.F.R. § 402.02(d). Moreover, "(e)ffects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action." *Id.* Cumulative effects "are those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." *Id.* Throughout its analysis, the consulting agency must utilize the "best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); 50 C.F.R. §402.14(d). The duty to comply with Section 7(a)(2) remains the action agency's after the issuance of a BiOp. After the completion of consultation, the action agency must determine whether and in what manner to proceed with the action in light of its Section 7 obligations and the BiOp. 50 C.F.R. § 402.15(a).

Section 9 requires that agencies insure that the proposed action does not result in the "take" of any listed species. 16 U.S.C. § 1538(a)(1)(B). "Taking" under the ESA "means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct." *Id.* § 1532(19). The "take" prohibited by Section 9 need not be the result of purposeful action. *Nat'l Wildlife Fed. v. Burlington Northern Railroad*, 23 F.3d 1508, 1509 (9th Cir. 1994) (trains accidentally hitting and thereby taking grizzly bears constitutes an ESA violation).

FWS has the authority to issue an incidental take statement concurrent with a biological opinion if it concludes that incidental take is not likely to jeopardize the continued existence of the species. 50 C.F.R. § 402.14(i). An ITS authorizes the agency to "take" listed species without facing ESA liability. 16 U.S.C. § 1536(o)(2); 50 C.F.R. § 402.14(i)(5). In an ITS, FWS must specify the amount or extent of any incidental "taking" of a species that is anticipated to occur as a result of the action and specify "reasonable and prudent measures" to minimize the impact of such takings, as well as the "terms and conditions" the action agency must follow in implementing such measures. 16 U.S.C. § 1536(b)(4); 50 C.F.R. §§ 402.14(i)(1)(i), (ii) & (iv).

**THE ADMINISTRATIVE PROCEDURE ACT**

The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial relief thereof." 5 U.S.C. § 702. Upon review of agency action, the court shall "hold unlawful and set aside actions . . . found to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law." *Id.* § 706(2)(A). An action is arbitrary and capricious "if the agency has relied on factors which congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its

decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view of the product of agency expertise." *Motor Vehicles Mfrs. Ass'n*, 463 U.S. at 43.

**VIOLATIONS OF THE ESA**

**I. FWS Violated the ESA by Failing to Rely Upon the Best Available Science.**

During consultation, FWS must review all relevant information available, and in doing so must evaluate the current status and environmental baseline of the listed species. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(g)(1), (2). Agencies are required to "use the best scientific and commercial data available" in assessing impacts to protected species during the consultation process. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d). FWS failed to rely upon the best available scientific and commercial data in its analysis. As one example, FWS relies upon a population estimate of 55-60 bears for the Cabinet-Yaak Recovery Zone to assess impacts of the Black Ram project on grizzly bears (*see* BiOp at 48). This population estimate is flawed and does not reflect "the best scientific and commercial data available" or an accurate "environmental baseline," in violation of the ESA.

First, although the Final EA states that the Cabinet-Yaak Ecosystem had an estimated population of 55-60 bears in 2017 (*see* Final EA at 300), Kasworm et al. 2018 explains that the 55-60 population estimate was generated by applying an estimated annual growth rate of 2.1% to the midpoint of the population range estimated reported in Kendall et al. 2016.[10] But this growth-rate of 2.1% is flawed and unsupported. For example, in calculating the growth-rate estimate, Kasworm et al. 2018 excluded survival and mortality data for the segments of the Cabinet-Yaak grizzly bear population that suffer the highest mortality rates—specifically adult

[10] Kasworm et al (2018) at 37.

and sub-adult males, management-trapped bears, and augmentation bears.[11] Kasworm et al. 2018's approach is akin to saying that the resident human population of Montana is growing by 2.1% annually based on an analysis that excludes mortality data for the elderly and chronically ill. Because the growth-rate estimate of 2.1% is based on a flawed methodology that likely overestimates population numbers, the resulting population estimate of 55-60 bears that relies upon this growth-rate is very likely inflated.

Kasworm et al. 2020 and Kasworm et al. 2021 do nothing to cure the deficiencies of the population estimate put forward in Kasworm et al. 2018.[12] The methodology in these reports suffers from the same flaws as those present in Kasworm et al. 2018—mainly discounting survival and mortality data for adult and sub-adult males, management-trapped bears, and augmentation bears.[13]

Moreover, in Kasworm et al. 2020, the authors state that using all methods (DNA sampling in addition to credible observations, photos, and other methods), they detected 54 individual grizzly bears in the CYE during 2018.[14] Using these same methodologies, Kasworm et al. 2021 identified just 50 grizzly bears in 2019, reflecting a potential population decline.[15] By the end of 2018, two bears were known dead and two bears additional were assumed dead; by the end of 2019, another five additional bears were known dead.[16] Importantly, these numbers only

---

[11] *See* Kasworm et al. (2018) at 33-35 (summarizing survival rates for various population segments); *id.* at 10-11, 36 (describing basis for calculating growth rate).
[12] Kasworm et al. (2020). Kasworm et al. (2021).
[13] Kasworm et al. (2020) at 10-12 (calculating the population growth rate based on adult and subadult female survival, yearling and cub survival, age at first parturition, reproductive rate, and maximum age of reproduction); Kasworm et al. (2021) at 10-12 (same).
[14] Kasworm et al. (2020) at 2.
[15] Kasworm et al. (2021) at 2.
[16] Kasworm et al. (2020) at 2; Kasworm et al. (2021) at 2.

reflect known mortalities. Still, FWS relies upon a population estimate of 55-60 individuals to assess project impacts.

FWS's reliance on a scientifically unsupported population estimate of 55-60 grizzly bears in the Cabinet-Yaak Recovery Zone is not based upon the best available science and reflects an improper baseline against which to assess the project's impacts, in violation of the ESA. 16 U.S.C.§§ 1536(a)(2), (b)(3)(A); 50 C.F.R. §§ 402.14(d), 402.14(g)(1), (2).

As a second example, FWS ignores its own best available science that the population trend for the Cabinet-Yaak population of grizzly bears may not be increasing. FWS acknowledges in its own analysis that "[s]mall sample sizes yield a wide confidence interval around the[] population trend estimates" and while "there is a 67 percent probability that the population is stable or increasing," however, "there is a 33 percent probability that the population is decreasing." BiOp at 9. Despite this recognition at the outset, throughout its analysis FWS ignores the very relevant possibility that the Cabinet-Yaak population trend may *not* be increasing. Instead, FWS relies on the unsupported assumption that the population trend is increasing in its no-jeopardy determination. FWS's failure to consider the best available science and data and an accurate baseline violates the ESA. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(g)(1), (2).

**II. FWS Violated the ESA by Failing to Analyze the Project's Impacts on the Isolated Yaak Population of Grizzly Bears.**

As noted above, the Black Ram project takes place in BMUs 14 and 15 within the Cabinet-Yaak Recovery Zone for grizzly bears. Final EA at 311-12; BiOp at 4. All project activities, including logging, prescribed burning, and road construction, will take place only within the Yaak portion of the recovery zone. BiOp at 10. The best available science shows that grizzly bears in the Yaak are completely isolated from grizzly bears in the Cabinets, with no

connectivity or genetic exchange.[17] Thus, grizzlies in the Yaak and grizzlies in the Cabinets act as two disjunct subpopulations. The isolated nature of the local Yaak grizzly bear population is a key and relevant factor that FWS failed to consider.

Despite these important facts, FWS fails to analyze the project's impacts on the local Yaak grizzly bear population. In fact, FWS never even discusses the lack of connectivity between grizzly bears in the Yaak and those in the Cabinets, and the fact that the Black Ram project is likely to disproportionately impact the small grizzly bear population in the Yaak Valley. Instead, FWS relies on a population estimate for the Cabinet-Yaak Recovery Zone as a whole to assess the project's impact on grizzly bears. This approach is problematic for several reasons.

First, as explained above, the population estimate FWS relies upon is flawed and likely inflated. The last population estimate for the Cabinet-Yaak Recovery Zone was 50 bears in 2019, five of which were known dead by the end of that year, leaving just 45 bears.[18] Of these, 27 bears were detected in the Yaak, including 16 males, 7 females, and 4 of unknown sex.[19] There may even be fewer than 7 females, as it is possible one or more of the five grizzlies killed in 2019 was a female bear in the Yaak. Moreover, on Nov. 30, 2020, Montana Fish, Wildlife and Parks issued a press release stating that "[t]he U.S. Fish and Wildlife Service and Montana Fish, Wildlife & Parks are investigating the death of an adult female grizzly bear in the Yaak in northwest Montana," after finding the bear's carcass approximately four miles south of the Black

---

[17] Kendall, et al (2016).
[18] Kasworm et al. (2021) at 2.
[19] *Id.*

Ram project's boundary.[20] This recent event underscores the threat of poaching to the Yaak's small grizzly population and further highlights how, with so few females in the Yaak, the loss of even one female could dramatically impact this tiny population.

Second, FWS relies on a potentially false assumption that the population in the Cabinet-Yaak Recovery Zone is stable or increasing to conclude that grizzlies in the Yaak will not be negatively impacted. *See* BiOp at 48 ("The current population estimate of 55-60 grizzly bears in the CYE remains below the anticipated minimum population of 100 bears . . . but the population is likely stable or increasing . . . and successful augmentation and natural immigrations has led to improved genetic diversity."). As noted above, data shows that the population may have actually dropped from 50 to 45 bears between 2018 and 2019.[21] And although there is no published data on survival and mortalities from 2020 or 2021 yet, as noted above we know of at least one poached female near the Yaak in 2020.

Third, as FWS properly notes, bears are only augmented into the Cabinet area of the recovery zone; no bears have been augmented or added to the population into the Yaak portion. BiOp at 10. Because there is no genetic connectivity between grizzlies in the Cabinets and grizzlies in the Yaak area,[22] augmentation of bears into the Cabinets is unlikely to influence the population estimate or population trend of grizzly bears in the Yaaks.

By assessing impacts against the entirety of the grizzly bear population residing in a disjunct ecosystem, FWS never analyzes whether the Black Ram project could lead to extirpation

---

[20] Montana Fish, Wildlife & Parks, Investigation underway into dead grizzly bear found in the Yaak (Dec. 1, 2020), available at https://www.kpax.com/news/montana-news/investigation-underway-for-grizzly-bear-found-dead-in-northwestern-montana (last viewed June 29, 2022).
[21] Kasworm et al. (2020) at 2; Kasworm et al. (2021) at 2.
[22] Kendall, et al (2016).

of grizzly bears in the Yaak portion of the ecosystem, and what that would mean for recovery of grizzly bears in Yaak Valley and in the recovery zone as a whole. FWS admits that the project is likely to displace grizzly bears, but says it cannot estimate how many bears may be displaced. Given the large size and destructive nature of the project over up to a ten-year period, many grizzlies may leave the area in search of more secure habitat. Although some may seek out core area within the Yaak portion of the ecosystem, some may also seek refuge elsewhere, including habitat to the north in Canada.

FWS has previously recognized that "[d]isplacement may be of particular concern for female grizzly bears . . . . Displaced females with cubs risk encounters with infanticidal adult males, and cub survival is reduced when females move further between forage patches because cubs are unable to maximize energy for growth and development . . . ."[23] Bog Creek BiOp at 40. Moreover, the project will increase road density in the area during project implementation, and FWS has recognized that road density increases, even if temporary, can reduce grizzly bear survival. Specifically, FWS has stated that "[r]oad density can have significant effects to grizzly bear fitness and density *and, ultimately, survival*." *Id.* at 40 (emphasis added). *See also id.* at 49 ("Adverse effects [of temporary increases in road density] may include impacts to female grizzly bear feeding, and sheltering needs, and may result in decreased fitness and impaired reproductive capacity, and may reduce cub survival."). With perhaps only ten female grizzly bears in the Yaak portion of the recovery zone,[24] the loss of even one female or one cub could seriously impact the stability of this tiny population. FWS, however, fails to analyze the impacts to grizzly

---

[23] U.S. Fish and Wildlife Service, Biological Opinion for the Bog Creek Road Project, at 40 (Dec. 27, 2019) (hereinafter, "Bog Creek BiOp").
[24] *Id.*

bears in the Yaak Valley if bears are displaced and impacted to the point that female grizzly bears, or even cubs, do not survive the disturbance.

For these reasons, FWS fails to consider an important factor by failing to assess impacts to grizzly bears in the isolated Yaak Valley population and its analysis is arbitrary and capricious in violation of the ESA and the APA. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(g)(3); 5 U.S.C. § 706(2)(A).

**III. The Incidental Take Statement is Arbitrary.**

When FWS determines that an action will not jeopardize the existence of a listed species or adversely modify the species critical habitat, but the project is likely to result in incidental takings of listed species, FWS must issue an incidental take statement that would authorize such takings as part of its biological opinion. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i); *Ariz. Cattle Growers Ass'n v. U.S. Fish and Wildlife Serv.*, 273 F.3d 1229, 1242 (9th Cir. 2001). An incidental take statement must: (1) specify the impact of the incidental taking on the species; (2) specify the "reasonable and prudent measures" that the FWS considers necessary or appropriate to minimize such impact; (3) set forth "terms and conditions" with which the action agency must comply to implement the reasonable and prudent measures (including, but not limited to, reporting requirements); and (4) specify the procedures to be used to handle or dispose of any animals actually taken. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).

The amount of take authorized in an incidental take statement must provide an effective "'trigger' that, when reached, results in an unacceptable level of incidental take …." *Ariz. Cattle Growers Ass'n*, 273 F.3d 1229 at 1249. In that circumstance, the protection from take liability provided by the incidental take statement lapses and the federal agencies must re-initiate consultation to ensure that the actual extent of take resulting from the action will not jeopardize

the affected species. *Id.*; *see* 50 C.F.R. § 402.16(a)(1). The Ninth Circuit has recognized Congress's clear preference for a numerical trigger, stating that the trigger must be numerical unless the agency can show that "no number may be practically obtained." *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 748 (9th Cir. 2020) (quoting *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1126-27 (9th Cir. 2012)). If no number can "be practically obtained," the agency can rely on a proxy but must explain why it cannot quantify the anticipated level of take. *Ctr. for Biological Diversity*, 982 F.3d at 748-49. *See also Ore. Natural Res. Council v. Allen*, 476 F.3d 1031, 1037 (9th Cir. 2007) (holding if an incidental take statement "utilizes a surrogate instead of a numerical cap on take," it "must explain why it was impracticable to express a numerical measures of take."). Here, the ITS for the Black Ram project is arbitrary for at least two reasons.

First, FWS fails to justify its decision to forego quantifying the incidental take and instead rely on a surrogate. In acknowledging that the Black Ram project is likely to cause the taking of grizzly bears, FWS issued an incidental take statement ("ITS") within the Black Ram BiOp. BiOp at 50-56. In the ITS, FWS asserted that it would be difficult to quantify take of grizzly bears and thus purports to rely on several surrogate measures of take for incidental taking of grizzly bears. *Id.* at 51-54. But merely stating that quantifying take would be difficult in not enough to satisfy the ESA's obligation. *See, e.g., Allen*, 476 F.3d at 1038 (rejecting FWS's rationale for not quantifying take of spotted owl because survey data was out of date because FWS never stated that it was not possible to update the survey data); *Conserv. Council for Hawaii v. Nat'l Marine Fisheries Serv.*, 97 F. Supp. 3d 1210, 1234-35 (D. Haw. 2015) (holding invalid incidental take statement that did not quantify take of turtles where NMFS argued it was

difficult because the agency lacked information to estimate probability of sea turtles being exposed to vessel traffic).

In trying to justify the use of surrogate take measures, FWS notes that the project is likely to result in the take of adult female grizzlies, but then lists numerous reasons for its determination that it cannot quantify take. FWS essentially argues the following: it knows that 2 adult female grizzly bears use the action area but does not know how many adult females will use the project area over the course of the project; individual grizzly bears will react differently to disturbance; individual grizzly bears may ultimate adjust to the disturbance over time; grizzly bears are not easily detected in the wild; reproductive rates of female grizzly bears may vary naturally and not as a result of disturbance; a reduction of normal reproductive success is not discernable in the wild; and the reason a grizzly bear fails to breed or reproduce is not discernable. BiOp at 51. None of these offered rationales prove that "no number may be practically obtained." *Ctr. for Biological Diversity*, 982 F.3d at 748-49.

With these rationales, FWS seems to argue that it must know the exact head count of grizzly bears that inhabit the project area and that a population estimate is insufficient estimate a quantifiable measures of take. This, however, is not what the ESA requires, and courts have consistently held that population estimates are sufficient to quantify take. *See, e.g., Miccosukee Tribe v. United States*, 566 F.3d 1257, 1275 (11th Cir. 2009) (holding that even though sparrows may be hard to count, yearly population estimates are sufficient to estimate a quantifiable level of take); *Ctr. for Biological Diversity v. Provencio*, 2012 U.S. Dist. Lexis 50457, at *50-51 (D. Ariz. Jan. 23, 2012) (concluding incidental take statement arbitrary and capricious where it failed to quantify take of leopard frogs even though FWS had survey data showing the species' relative abundance); *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 422 F. Supp. 2d 1115, 1138

(N.D. Cal. 2006) ("[D]efendants have not pointed to any evidence in the record that it was impractical to *estimate* desert tortoise take. Indeed, the Service has estimated the numbers of desert tortoise in other areas of the Dunes . . . .") (emphasis added).

It is telling that other biological opinions that FWS has issued have quantified take of grizzly bears from other projects that will disturb and potentially displace grizzly bears.[25] FWS has the information it needs here to quantify take, including a general estimate as to how many bears use the area. FWS cannot now argue that this information is insufficient to practically quantify take.

Because FWS fails to provide a quantifiable trigger to take and fails to show that a numerical trigger could not be practically obtained, the BiOp and ITS are arbitrary and capricious in violation of the APA and ESA. *See* 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i); *Ariz. Cattle Growers*, 273 F.3d at 1249.

Second, the ITS is arbitrary because the surrogates are inadequate. The amount of take authorized in an incidental take statement must provide an effective "'trigger' that, when reached, results in an unacceptable level of incidental take . . . ." *Ariz. Cattle Growers Ass'n*, 273 F.3d 1229 at 1249. In that circumstance, the protection from take liability provided by the incidental take statement lapses and the federal agencies must re-initiate consultation to ensure that the actual extent of take resulting from the action will not jeopardize the affected species. *Id.*; *see* 50 C.F.R. § 402.16(a). The Ninth Circuit has recognized Congress's clear preference for a numerical trigger, stating that the trigger must be numerical unless the agency can show that "no number may be practically obtained." *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d

[25] *See, e.g.,* U.S. Fish and Wildlife Service, Biological Opinion: Effects to the Grizzly Bear from the grazing permit Upper Green River Area Grazing Permits, Sublette County, WY (Apr. 29, 2019), at 47-49 (quantifying incidental take of grizzly bears from a 10-year livestock permit).

723, 748 (9th Cir. 2020) (quoting *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1126-27 (9th Cir. 2012)). If no number can "be practically obtained," the agency can rely on a proxy but must explain why it cannot quantify the anticipated level of take. *Ctr. for Biological Diversity*, 982 F.3d at 748-49.

Because FWS alleges that it cannot quantify take of grizzly bears from the project, FWS employs surrogate measures to determine when the agencies must reinitiate consultation under the ESA. Where a surrogate is used, "[t]he chosen surrogate . . . must be able to perform the functions of a numerical limitation," including providing a "trigger" that, when reached, requires the agencies to reinitiate consultation. *Or. Natural Resources Council v. Allen*, 476 F.3d 1031, 1038 (9th Cir. 2007). Courts will invalidate incidental take statements that do not "adequately trigger reinitiation of consultation." *Id.*

In the ITS, FWS relies on six surrogate measures of take for incidental taking of grizzly bears. *Id.* at 51-54. These six measures include:

> 1) More than 4,952 acres of existing Core are affected by re-opening bermed/barriered roads; or
> 2) If the identified areas of existing Core to be affected are entered before in-kind Core is created; or
> 3) If OMRD increases to more than 40 percent in BMU 15; or
> 4) If OMRD is above the research benchmark (33 percent) in BMU 15 for more than 10 years; or
> 5) If TMRD increases to more than 32 percent in BMU 15; or
> 6) If TMRD is above the research benchmark (26 percent) [in BMU 15] for more than 10 years.

BiOp at 54. These surrogate measures fail to provide a real and meaningful trigger for several reasons. For one, they are all coextensive with the proposed action's scope. Additionally, FWS does not provide an explanation of the causal connection between the surrogate measures and the take of individual grizzly bears. Instead, for each surrogate measure of take, FWS merely

explains that the measures reflect what is proposed by the Forest Service, with no explanation as to what the causal connection is to take of grizzly bears and thus why the take measures reflect appropriate triggers for reinitiation. *See* BiOp at 53-54. FWS also fails to include necessary monitoring to track whether or when the surrogates are exceeded such that reinitiation of consultation is triggered.

For example, the first surrogate measure is triggered only if more than 4,952 acres of Core will be affected. While impacts to core habitat may certainly be a concern for grizzly bears, FWS fails to explain why impacting Core above a level of 4,952 acres—the exact amount proposed for treatment by the Forest Service—would be causally connected to a greater extent of take than that currently anticipated. The exact acreage of habitat impacted is arbitrary because grizzly bears have very large home ranges. So unlike, for example, a water-dependent species living in a small vernal pool that will be killed when that pool is destroyed by a proposed project,[26] this surrogate does not help anticipate the level of extent of take to grizzly bears to provide a meaningful trigger. Rather, FWS simply states that this is the amount of acreage to be impacted by the proposed action. BiOp at 53. FWS identifies no causal connection as the law requires.

The second measure of take is that the identified areas of core habitat cannot be entered before in-kind core is created. This take measure is particularly troublesome because replacing core with in-kind habitat prior to or concurrent with impacting existing core habitat is already a requirement under the Forest Plan's Access Amendment.[27] This surrogate is akin to saying that

---

[26] *See* 80 Fed.Reg. 26,832, 26,834 (May 11, 2015) (stating quantifying the habitat area encompassing three vernal pools that would be filled under the project is an appropriate surrogate for incidental take because all shrimp in the pools would be killed).
[27] United States Department of Agriculture, Forest Service, Northern Region, Land Management Plan: Kootenai National Forest (2015 Revision), at 149. *See also id.* at 5 (explaining the Access

compliance with already existing law is sufficient to prevent increased take of grizzly bears. This does not satisfy FWS's mandate to establish a causal connection.

Measures 4-6 limit the percentage of Open Motorized Route Density ("OMRD") and Total Motorized Route Density ("TMRD") in BMU 15. Essentially, these measures limit OMRD to 40% and TMRD to 32% for the life of the project (ten years), then suggest more restrictive limitations for OMRD and TMRD in BMU 15 "for more than 10 years" (i.e., after the proposed life of the project). Again, FWS bases these measures on what the Forest Service has proposed and provides no explanation of the causal connection between the take measures and anticipated take of grizzly bears. BiOp at 53-54. In fact, one of these measures is completely inconsistent with the terms and conditions set by FWS.

In the non-discretionary terms and conditions, FWS requires that OMRD not exceed 37% for any time during the 10-year life of the project. BiOp at 55-56.[28] It is nonsensical to limit OMRD to 37% in the terms and conditions while setting trigger for reinitiation at a higher rate (OMRD at 40%). Given the Forest Service is required to keep OMRD at 37% in BMU 15, a measure of take that triggers reinitiation at the higher 40% figure will never be reached and renders this surrogate take measure meaningless. This significant inconsistency highlights the arbitrary nature of the surrogate measures FWS has included.

Because FWS did not establish a sufficient causal connection, the surrogates are coextensive with the proposed action, and there is no monitoring to track when the surrogates

Amendment is a Forest Plan standard); *id.* at 2 (defining "standards" as a "limitation or requirement.").

[28] FWS had originally drafted terms and conditions to require the Forest Service to limit OMRD in BMU 15 to 36%, but because the Forest Service concluded that "it was not feasible to get OMRD as low as 36 percent," FWS raised this term and condition OMRD limitation to 37%. BiOp, Appx. B at 66-67.

might be triggered, the surrogates are inadequate to effectively reinitiate consultation. Because FWS fails to include an acceptable surrogate to trigger reconsultation, the BiOp and ITS are arbitrary and capricious in violation of the APA and ESA. *See* 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i); 5 U.S.C. § 706(2)(A).

**IV. The BiOp and ITS are Arbitrary and Capricious Because FWS Fails to Analyze or Consider Relevant Factors.**

In a biological opinion, FWS must consider how the agency action under evaluation affects listed species, and thus must evaluate all effects and cumulative effects of the action. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(g)(3). For the purposes of the ESA, "'[e]ffects of the action' are all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action. A consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur." 50 C.F.R. § 402.02(d). Moreover, "(e)ffects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action." *Id.* Cumulative effects "are those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." *Id.*

Here, FWS failed to analyze or consider relevant factors in its assessment of the Black Ram project's impacts to grizzly bears. As one example, FWS failed to analyze or consider how the Black Ram project may result in increased snowmobiling, which in turn may negatively impact grizzly bears in the area. While citing the Kootenai Forest Plan Biological Opinion to acknowledge that snowmobiling can negatively affect grizzly bears, especially as they are emerging from their den, FWS seems to conclude that snowmobiling in the Black Ram project area will not impact grizzly bears because "[t]he dense forest vegetation limits off route

snowmobile use in nearly the entire action area." BiOp at 20. For perhaps this reason, FWS dedicates only two paragraphs to discussing the potential impacts of snowmobiling in the project area on grizzlies. What this scant analysis ignores is the fact that the Black Ram logging project will remove much of the "dense forest vegetation" that is currently limiting off route snowmobiling, making it easier for snowmobiles to access areas that may not be currently accessible. And construction of new roads may also increase the accessibility for snowmobile use. Increased snowmobiling in the project area is a reasonably foreseeable indirect and cumulative impact of the Black Ram project that may negatively impact grizzly bears and warrants a full analysis.

The Supreme Court has held that an action is arbitrary and capricious "if the agency has relied on factors which congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view of the product of agency expertise." *Motor Vehicles Mfrs. Ass'n*, 463 U.S. at 43. Because FWS has entirely failed to consider an important aspect of the problem—i.e., the potential for increased snowmobiling resulting from thousands of acres of new clearcuts and miles of upgraded roads, and the associated impact on grizzly bears—the Black Ram BiOp is arbitrary and capricious in violation of the ESA and APA. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(g)(3); 5 U.S.C. § 706(2)(A).

## V. FWS Fails to Support Its No-Jeopardy Finding

Section 7(a)(2) of the ESA imposes on federal agencies a substantive duty to ensure that actions they authorize or carry out are not likely to jeopardize listed species or destroy or adversely modify critical habitat designated for such species. 16 U.S.C. § 1536(a)(2). An

agency "jeopardizes" a protected species if it "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. If the federal action results in a jeopardy conclusion, FWS may propose reasonable and prudent alternatives that the federal agency can take to avoid jeopardy. 16 U.S.C. § 1536(b)(3)(A).

The Ninth Circuit has made clear that a species may be jeopardized even "if there is no appreciable reduction of survival odds" because "a species can often cling to survival even when recovery is far out of reach." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524, F.3d 917, 931 (9th Cir. 2008), superseded by statute on other grounds, as stated in *Sovereign Inupiat for a Living Arctic v. Bureau of Land Mgmt.*, 2021 U.S. Dist. LEXIS 155471, at *75 (D. Alaska Aug. 18, 2021). Thus, FWS "must analyze effects on recovery as well as effects on survival." *Id.* at 932. Under the ESA, "[r]ecovery means improvement in the status of listed species to the point at which listing is no longer appropriate under the criteria set out in section 4(a)(1) of the Act." 50 C.F.R. § 402.02. Moreover, the regulations make clear that "reducing the reproduction" of a species may constitute jeopardizing the survival or recovery of that species. *Id.*

As FWS recognizes in the BiOp, "[p]ursuant to Service policy, when an action impairs or precludes the capacity of a recovery unit from providing both the survival and recovery function assigned to it, that action may represent jeopardy to the species (U.S. Fish and Wildlife Service memo, March 6, 2006.)." BiOp at 7. Thus, an agency action that negatively impacts the survival or recovery of grizzly bears in the Cabinet-Yaak Recovery Zone may be sufficient to lead to a

positive jeopardy finding, even if the action does not cause jeopardy across the grizzly bear's entire range.

There are currently two known reproducing females that use the action area. BiOp at 14, 43, 52. FWS notes that during project implementation, administrative use limits on restricted roads will increase Open Motorized Route Density and Total Motorized Route Density, and "female grizzly bears are expected to experience significant effects to feeding, breeding, or sheltering." BiOp at 46-47. Further, FWS acknowledges that female grizzly bears may be displaced as a consequence of the project and that reproductive success for females may be negatively affected for at least 3-5 bear years, potentially affecting 1-2 reproductive cycles for adult female grizzly bears. *Id.* at 46-48.

These impacts are of especially significant import for grizzly bears because grizzly bears have one of the slowest reproductive rates among terrestrial mammals.[29] Slow reproduction is a result of a late age of first reproduction, small average litter size, and the long inter-birth interval.[30] Given these factors, it may take a female grizzly bear 10 or more years to replace herself in a population.[31]

In the Cabinet-Yaak Recovery Zone, several recovery goals have not been met, including criteria related to occupancy and reproduction by female grizzly bears. *See id.* at 48. Thus, the impact to 1-2 reproductive cycles for at least two currently reproductive adult females using the project area could seriously impair meeting recover goals. Despite this information, FWS absurdly concludes that because impacts will be temporary, the Black Ram project will not

---

[29] U.S. Fish and Wildlife Service, Grizzly Bear Recovery Office, Missoula, MT. Species Status Assessment for the Grizzly Bear (Ursus arctos horribilis) in the Lower-48 States: A Biological Report (Jan. 2021), at 45.
[30] *Id.*
[31] *Id.*

reduce the reproduction of grizzly bears in the recovery zone, and therefore, the project will not lead to jeopardy. *See id.* at 49 ("Because the Black Ram Project will not reduce the reproduction, numbers, or distribution of grizzly bears throughout the CYE, and considering the status of the CYE population as well as other grizzly bear populations in the lower 48, we conclude that the level of adverse effects is not reasonably expected to reduce appreciably the likelihood of both the survival and recovery of the listed entity of grizzly bears as a whole."). In reaching this conclusion, not only does FWS gloss over the impacts on reproductive females in the project area, but FWS ignores its own policy that requires the agency to determine whether project impacts would impact the survival and recovery of grizzly bears in the Cabinet-Yaak Recovery Zone alone, not "the listed entity of grizzly bears as a whole."

By applying the incorrect standard to reach its jeopardy conclusion in failing to consider the survival and recovery impacts to the grizzly bear population in the Cabinet-Yaak Recovery Zone and by ignoring how impacts to reproductivity will impair recovery in this recovery zone, FWS has reached a no jeopardy conclusion that is arbitrary and capricious, in violation of the ESA and APA. 16 U.S.C. § 1536(a)(2); 5 U.S.C. § 706(2)(A).

Moreover, as described more fully above, FWS fails to rely on the best available science and data in its jeopardy analysis, relying on the unsupported conclusion that the Cabinet-Yaak grizzly bear population trend is increasing. *See* BiOp at 48. The difference between an increasing population trend, decreasing population trend, or stagnant levels is a key and relevant factor to the FWS's no-jeopardy determination. Because it failed to consider best available science and relevant factors in analyzing the Cabinet-Yaak grizzly bear population trend, the FWS's no-jeopardy determination is arbitrary. The facts found do not rationally support FWS's conclusion. 16 U.S.C. § 1536(a)(2); 5 U.S.C. § 706(2)(A).

## VI. The Forest Service May Not Lawfully Rely on the Flawed 2021 BiOp.

Because the 2021 BiOp was arbitrary and unlawful for the reasons stated above, the Forest Service cannot lawfully rely on it to discharge that agency's own ESA responsibilities in connection with the Black Ram project. An action agency cannot rely on a faulty biological opinion to fulfill its substantive section 7 duties to ensure it does not jeopardize the continued existence of a listed species. *See Defs. of Wildlife v. EPA*, 420 F.3d 946, 976 (9th Cir. 2005) (*rev'd on other grounds*, *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644 (2007)); *Resources Ltd. Inc. v. Robertson*, 35 F.3d 1300, 1304 (9th Cir. 1994) ("Consulting with the FWS alone does not satisfy an agency's duty under the Endangered Species Act.").

## CONCLUSION

For the reasons stated above, FWS and USFS have violated Section 7 of the ESA. If these violations of law are not cured within 60 days, the parties to this notice letter intend to file suit in federal court to enforce the ESA.

Andrea Zaccardi

Andrea Zaccardi, Carnivore Conservation Legal Director
Center for Biological Diversity
P.O. Box 469
Victor, ID 83455
(303) 854-7748
azaccardi@biologicaldiversity.org

Edward B. Zukoski, Senior Attorney
Center for Biological Diversity
1536 Wynkoop Street, Suite 421
Denver, CO 80202
(303) 641-3149
tzukoski@biologicaldiversity.org

Marla Fox, Staff Attorney

WildEarth Guardians
P.O. Box 13086
Portland, OR 97213
(651) 434-7737
mfox@wildearthguardians.org