Rachel G. Inabnit
LAW OFFICE OF RACHEL INABNIT
P.O. Box 8846
Missoula, MT  59807
(406) 300-5316
rachel@inabnitlawoffice.com

Edward B. Zukoski (Admitted *Pro Hac Vice*)
CENTER FOR BIOLOGICAL DIVERSITY
1536 Wynkoop Street, Suite 421
Denver, CO  80202
(303) 641-3149
tzukoski@biologicaldiversity.org

Andrea Zaccardi (Admitted *Pro Hac Vice*)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 469
Victor, ID  83455
(303) 854-7748
azaccardi@biologicaldiversity.org

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL, *et al.*,<br><br>        Plaintiffs,<br><br>vs.<br><br>UNITED STATES FOREST SERVICE, *et al.*,<br><br>        Federal Defendants. | Case No. 9:22-cv-00114-DWM<br><br>**PLAINTIFFS CENTER FOR BIOLOGICAL DIVERSITY ET AL.'s MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>**ORAL ARGUMENT REQUESTED** |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ iii

TABLE OF EXHIBITS .................................................................. vii

INTRODUCTION .......................................................................1

LEGAL BACKGROUND ...............................................................1

   I.    THE ENDANGERED SPECIES ACT ......................................1

   II.   THE NATIONAL ENVIRONMENTAL POLICY ACT ...............................3

FACTUAL BACKGROUND...........................................................4

     A.    Black Ram Project.................................................4

     B.    Grizzly Bears in the Cabinet-Yaak Ecosystem .........................6

     C.    Administrative Proceedings ........................................9

STANDARD OF REVIEW ............................................................9

ARGUMENT .........................................................................10

   I.    FISH AND WILDLIFE SERVICE AND FOREST SERVICE VIOLATED THE ESA. ...............................................10

     A.    Fish and Wildlife Service Failed to Use the Best Available Science to Establish an Accurate Baseline. ...........................10

     B.    The Biological Opinion Failed to Consider the Isolation of Grizzly Bears in the Yaak Valley from Bears in the Cabinet Mountains. ......................16

     C.    Fish and Wildlife Service Failed to Support Its No-Jeopardy Conclusion. ..............................................................19

     D.    The Forest Service May Not Lawfully Rely on the Flawed Biological Opinion. ...........................................................23

   II.   THE FOREST SERVICE VIOLATED NEPA. ...........................................25

     A.    The Forest Service Failed to Disclose Baseline Conditions for Grizzly Bears. ...................................................25

     B.    The Forest Service Failed to Take a Hard Look at the Project's Climate Impacts..........................................................27

     C.    The Forest Service's Failure to Prepare an EIS Violated NEPA. ............34

REMEDY ...........................................................................43

CONCLUSION ......................................................................44

## TABLE OF AUTHORITIES

**Cases**

*350 Mont. v. Haaland*,
   50 F.4th 1254 (9th Cir. 2022) ........................................................ 29, 32

*All. for the Wild Rockies v. Savage*,
   375 F. Supp. 3d 1152 (D. Mont. 2019) .................................................43

*All. for the Wild Rockies v. U.S. Forest Serv.*,
   907 F.3d 1105 (9th Cir. 2018) .........................................................43

*Am. Rivers & Ala. Rivers All. v. FERC*,
   895 F.3d 32 (D.C. Cir. 2018) ..........................................................14

*Bair v. Cal. DOT*,
   982 F.3d 569 (9th Cir. 2020) ...........................................................4

*Bark v. U.S. Forest Serv.*,
   958 F.3d 865 (9th Cir. 2020) ..........................................................35

*Barnes v. U.S. DOT*,
   655 F.3d 1124 (9th Cir. 2011) ........................................................34

*Ctr. for Biological Diversity v. NHTSA*,
   538 F.3d 1172 (9th Cir. 2008) ........................................................27

*Ctr. for Biological Diversity v. U.S. BLM*,
   698 F.3d 1101 (9th Cir. 2012) ...................................................... 23, 24

*Defs. of Wildlife v. U.S. EPA*,
   420 F.3d 946 (9th Cir. 2005), *rev'd on other grounds*,
   *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644 (2007) ............23

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
   36 F.4th 850 (9th Cir. 2022)..................................................... 34-35, 37

*Gifford Pinchot Task Force v. U.S. Fish and Wildlife Service*,
   378 F.3d 1059 (9th Cir. 2004), *amended by* 387 F.3d 968 (9th Cir. 2004)... 17, 18

*Great Basin Res. Watch v. BLM*,
   844 F.3d 1095 (9th Cir. 2016) .......................................................4, 25

*Greenpeace Action v. Franklin*,
   14 F.3d 1324 (9th Cir. 1992) .........................................................10

*Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*,
   857 F.2d 505 (9th Cir. 1988) ...................................................... 25, 27

*Hapner v. Tidwell*,
   621 F.3d 1239 (9th Cir. 2010) ...............................................................32

*Helena Hunter & Anglers v. Tidwell*,
   841 F. Supp. 2d 1129 (D. Mont. 2009)...................................................39

*Humane Soc'y of the U.S. v. Locke*,
   626 F.3d 1040 (9th Cir. 2010) ...............................................................43

*Idaho Sporting Cong. v. Rittenhouse*,
   305 F.3d 957 (9th Cir. 2002) ...................................................... 4, 28, 34

*Ksanka Kupaqa Xa 'Ł¢in v. U.S. Fish & Wildlife Serv.*,
   534 F. Supp. 3d 1261 (D. Mont. 2021)...................................................43

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992).................................................................................10

*Mid States Coal. for Progress v. Surface Transp. Bd.*,
   345 F.3d 520 (8th Cir. 2003) ..................................................................29

*Mont. Env't Info. Ctr. v. U.S. Office of Surface Mining*,
   274 F. Supp. 3d 1074 (D. Mont. 2017)...................................................27

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)..................................................................... 10, 19, 27

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*,
   668 F.3d 1067 (9th Cir. 2011) ...........................................................3, 33

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
   524 F.3d 917 (9th Cir. 2008) ........................................................ 14-15, 19

*NRDC, Inc. v. Winter*,
   518 F.3d 658 (9th Cir. 2008), *rev'd on other grounds*,
   *Winter v. NRDC, Inc.,* 555 U.S. 7 (2008) .............................................37

*Res. Ltd. v. Robertson*,
   35 F.3d 1300 (9th Cir. 1994) ..................................................................23

*See Idaho Farm Bureau Fed'n v. Babbitt*,
   58 F.3d 1392 (9th Cir. 1995) ..................................................................44

*Sierra Club v. United States EPA*,
   762 F.3d 971 (9th Cir. 2014) ..................................................................28

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
   555 F. Supp. 3d 739 (D. Alaska 2021) ...................................................19

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  985 F.3d 1032 (D.C. Cir. 2021) .......................................................................44

*Tenn. Valley Auth. v. Hill*,
  437 U.S. 153 (1978) ..........................................................................................1

*Wild Fish Conservancy v. Salazar*,
  628 F.3d 513 (9th Cir. 2010) ...................................................................... 17, 18

*WildEarth Guardians v. Steele*,
  545 F. Supp. 3d 855 (D. Mont. 2021)..................................................... 16, 23, 24

**Statutes**

5 U.S.C. § 706(2)(A) ........................................................................... passim

16 U.S.C. § 1244(a)(30) ...............................................................................38

16 U.S.C. § 1531(b) .......................................................................................1

16 U.S.C. § 1532(3) .......................................................................................2

16 U.S.C. § 1536(a)(2) ........................................................................ passim

16 U.S.C. § 1536(b)(3)(A) ......................................................... 2, 3, 11, 16

16 U.S.C. § 1536(c)(1) ...................................................................................2

16 U.S.C. § 1540(g) .......................................................................................9

42 U.S.C. § 4332(2)(C) ..............................................................................3, 4

**Regulations**

40 C.F.R. § 1500.1 ................................................................................ 29, 31

40 C.F.R. § 1501.4 .........................................................................................4

40 C.F.R. § 1508.27 .....................................................................................35

40 C.F.R. § 1508.27(b)(1).......................................................................35, 41

40 C.F.R. § 1508.27(b)(2).............................................................................35

40 C.F.R. § 1508.27(b)(3).......................................................................35, 37

40 C.F.R. § 1508.27(b)(4).............................................................................35

40 C.F.R. § 1508.27(b)(5).............................................................................35

40 C.F.R. § 1508.27(b)(6).............................................................................35

40 C.F.R. § 1508.27(b)(7)..................................................................35

40 C.F.R. § 1508.27(b)(8)..................................................................35

40 C.F.R. § 1508.27(b)(9)............................................................ 35, 36

40 C.F.R. § 1508.27(b)(10)................................................................35

40 C.F.R. § 1508.7......................................................................4, 25

40 C.F.R. § 1508.8......................................................................4, 25

40 C.F.R. § 1508.9.........................................................................4

40 C.F.R. § 1508.9(b)..................................................................4, 25

50 C.F.R. § 402.02 ................................................................. passim

50 C.F.R. § 402.12..........................................................................2

50 C.F.R. § 402.14(a)......................................................................2

50 C.F.R. § 402.14(b)......................................................................2

50 C.F.R. § 402.14(d)......................................................... 2-3, 11, 16

50 C.F.R. § 402.14(g)(1)..................................................... 2-3, 11, 16

50 C.F.R. § 402.14(g)(2)...................................................... 3, 11, 16

50 C.F.R. § 402.14(g)(3)...................................................................3

50 C.F.R. § 402.14(g)(4)...................................................................3

## Other Authorities

40 Fed. Reg. 31,734 (July 28, 1975)......................................................6

86 Fed. Reg. 10,252 (Feb. 19, 2021) ...................................................28

Council on Environmental Quality, Final Guidance for Federal Departments
    and Agencies on Consideration of Greenhouse Gas Emissions and the Effects
    of Climate Change in National Environmental Policy Act Reviews
    (Aug. 1, 2016) ............................................................... 28, 33

## TABLE OF EXHIBITS

Exhibit 1.            Declaration of Anthony South (Jan. 24, 2023)

Exhibit 2.            Declaration of Mary Campbell (Jan. 23, 2023)

Exhibit 3.            Declaration of Pam Fuqua (Jan. 23, 2023)

Exhibit 4.            Declaration of Adam Rissien (Jan. 23, 2023)

Exhibit 5.            Declaration of Randi Spivak (Jan. 24, 2023)

## INTRODUCTION

Plaintiffs Center for Biological Diversity, Yaak Valley Forest Council, and WildEarth Guardians (Plaintiffs) move this Court for an order vacating the Kootenai National Forest's June 21, 2022 Decision Notice approving the Black Ram Project (Project) for violating the Endangered Species Act (ESA) and the National Environmental Policy Act (NEPA). Plaintiffs further move this Court to vacate Fish and Wildlife Service's Black Ram Biological Opinion for violating the ESA.[1]

## LEGAL BACKGROUND

## I.      THE ENDANGERED SPECIES ACT

The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). It is designed to conserve ecosystems upon which endangered and threatened species depend and to provide a program to conserve listed species. 16 U.S.C. § 1531(b). To "conserve" means "to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this

---

[1] FS-xxxxxx indicates the Forest Service's administrative record; FWS-xxxxxx indicates Fish and Wildlife Service's record; SOUF indicates Plaintiffs' Joint Statement of Undisputed Facts.

chapter are no longer necessary," *id.* § 1532(3), *i.e.*, to bring about the recovery of a species listed as endangered or threatened.

ESA Section 7 requires each federal agency, in consultation with a federal wildlife agency (Fish and Wildlife Service for the grizzly bear), to insure that any proposed action is not likely to jeopardize the continued existence of a listed species. *Id.* § 1536(a)(2). To "jeopardize the continued existence of" means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.[2]

If any agency action "may affect" a listed species, "formal consultation" is required unless Fish and Wildlife Service concurs in writing that the action is "not likely to adversely affect" the species. 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12; *id.* § 402.14(a), (b). During formal consultation, Fish and Wildlife Service must review all relevant information, evaluate the current status and environmental baseline of the species, and evaluate the effects and cumulative effects of the proposed action on the species. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. §

---

[2] All citations are to the ESA regulations in effect prior to adoption of new regulations in 2019. The Biological Opinion states that Fish and Wildlife Service relied on the pre-2019 regulations and notes "the analysis and conclusions would have been the same, irrespective of which regulations applied." FWS-000005–000006.

402.14(g)(1)-(3). The "'[e]ffects of the action' refers to the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline." 50 C.F.R. § 402.02. Throughout its analysis, the Service must utilize the "best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d).

At the conclusion of consultation, Fish and Wildlife Service issues a "biological opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species…." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d), (g)(4). If the Service concludes that the proposed action "will jeopardize the continued existence of" a listed species, the biological opinion must outline "reasonable and prudent alternatives." 16 U.S.C. § 1536(b)(3)(A).

## II.     THE NATIONAL ENVIRONMENTAL POLICY ACT

"NEPA's purpose is twofold: (1) to ensure that agencies carefully consider information about significant environmental impacts and (2) to guarantee relevant information is available to the public." *N. Plains Res. Council, Inc. v. Surface Transp. Bd*., 668 F.3d 1067, 1072 (9th Cir. 2011); *see also* 42 U.S.C. § 4332(2)(C). NEPA imposes procedural requirements directing agencies to take a "hard look" at

environmental consequences, including direct, indirect, and cumulative impacts.
*Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002).

NEPA requires federal agencies to prepare an environmental impact statement (EIS) for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4.[3] When an agency is uncertain whether it must prepare an EIS, it may first prepare an environmental assessment (EA) to determine whether the action may have significant impacts requiring preparation of an EIS. 40 C.F.R. § 1508.9.

An EA or EIS must identify the direct, indirect, and cumulative impacts of proposed projects. 40 C.F.R. §§ 1508.7, 1508.8, 1508.9(b). The agency assesses project impacts against a baseline detailing the current nature and extent of resources in the area. *See Great Basin Res. Watch v. BLM*, 844 F.3d 1095, 1101 (9th Cir. 2016).

## FACTUAL BACKGROUND

### A.    Black Ram Project

The Yaak Valley, located in the northwest corner of Montana and largely managed by the Kootenai National Forest, is an ecological and recreational gem,

---

[3] Although the Council on Environmental Quality amended its NEPA regulations in 2020, the Forest Service "relied on Council on Environmental Quality's 1978 regulations throughout the NEPA process for the [Black Ram] Project," Answer, ECF No. 21, ¶30 (Sept. 22, 2022). Thus, the 1978 regulations apply here. *Bair v. Cal. DOT*, 982 F.3d 569, 577 n.20 (9th Cir. 2020).

bordered on the west by mountains near the Idaho-Montana border, and on the north by the U.S.-Canada border. The Valley includes thousands of acres of mature and old-growth forest stands. FS-002358. Twenty-eight miles of the Pacific Northwest National Scenic Trail, one of nation's eleven designated national scenic trails, cross the area. FS-002260. West Fork Yaak and the Yaak River, segments of which the Forest Service has deemed eligible for protection as Wild and Scenic Rivers, meander within the Valley. FS-002432. Imperiled wildlife including grizzly bears, lynx, and wolves inhabit the area. FS-002538, FS-002597.

Into this unique and fragile ecosystem, the Forest Service in 2022 approved the Black Ram Project, authorizing 1,783 acres of clearcuts, including 17 clearcuts larger than 40 acres. FS-002254; FS-002175–002177. Hundreds of acres of clearcuts will occur within the Rampike Creek area, which boasts trees as old as 230 years. FS-002762. All told, the Project authorizes more than 11,000 acres of logging and burning, including 3,902 acres of commercial logging and 7,553 acres of fuel treatments (burning and removing small trees). FS-002154. The Project approves 3.3 miles of new permanent road construction and the reconstruction or maintenance of 90.3 miles of road. FS-002155. Nearly one mile of new road will be bulldozed through old growth forest. FS-002154–002155. The Project will require up to ten years' worth of intrusion by workers and vehicles engaged in logging, road construction and reclamation, and burning. FS-002152, FS-002520.

The Forest Service found the Project "likely to adversely affect" the tiny population of grizzly bears that dwell here. FS-002151, FS-004203.

**B.     Grizzly Bears in the Cabinet-Yaak Ecosystem**

Grizzly bears once ranged throughout western North America, with approximately 50,000 grizzly bears in the lower 48 states. FWS-000961. By the 1930s, grizzlies had been extirpated from 98% of their former range. FWS-005295, FWS-005305.

In 1975, Fish and Wildlife Service listed grizzly bears across the lower-48 United States as a threatened species. 40 Fed. Reg. 31,734 (July 28, 1975). In 1993, the Service issued an updated Grizzly Bear Recovery Plan designating distinct "recovery zones" for grizzly bears in the lower 48 states, one of which is the Cabinet-Yaak Ecosystem . FWS-005377–005394. The Service has determined that conserving and recovering grizzly bears in each of the recovery zones is essential to the species' conservation. FWS-005311.

The Cabinet-Yaak Ecosystem is a roughly 2,600-square-mile area of primarily federal public lands in northwest Montana and northeastern Idaho that includes the Black Ram Project area. FWS-005379. Fish and Wildlife Service has established a population size of 100 individuals as a minimum recovery goal for the Cabinet-Yaak grizzly population. *Id.*

Today, the population of grizzlies in the Cabinet-Yaak Ecosystem falls far short of that goal. *See, e.g.,* FWS-000011. Fish and Wildlife Service estimates that 60 grizzly bears inhabit the Cabinet-Yaak Ecosystem. *Id.*; FS-002541 (Forest Service adopting Fish and Wildlife Service's estimate). The most recent agency monitoring report indicates that monitoring in 2020 identified only 42 grizzly bears that survived to the year's end. FS-005690. Scientists have found that "populations fewer than 50-100 [individual adult grizzly bears] are at higher risk of extirpation." FS-006622. Indeed, the Cabinet-Yaak Ecosystem grizzly population persists only due to augmentation-translocation of bears from elsewhere. FWS-000966–000967.

In 2021, Fish and Wildlife Service published a five-year status review evaluating the grizzly bear's progress towards recovery in the lower-48 states. FWS-000958–000984. The review concluded that the Cabinet-Yaak population of grizzlies is the most vulnerable of the four populations in the lower-48 states, with a "low" level of resiliency due to very low population numbers, low genetic diversity, and low fecundity of females. FWS-000965–000967. The review found that in almost every future scenario the Service reviewed, conditions in the Cabinet-Yaak Ecosystem will inhibit overall grizzly bear recovery. FWS-000979.

The situation for bears in the Yaak Valley is especially precarious because the Yaak population is genetically isolated from grizzly bears in the Cabinet Mountains, and thus functions as a subpopulation roughly half the size of the

overall Cabinet-Yaak population. FWS-003504 ("Our results indicated the grizzly bears in the Cabinet and Yaak regions were separate populations split along the Hwy 2 corridor" and "suggest[ed] complete spatial and reproductive isolation between these 2 populations, at least in recent generations").

Human-caused mortality in the Cabinet-Yaak Ecosystem poses a leading threat to grizzly bear survival and is a major obstacle to population growth. FWS-000014. The risk of human-caused grizzly bear mortality increases proportionally with increased human presence in grizzly habitat. From 2007-2021, 76% of known grizzly deaths in the Cabinet-Yaak Ecosystem were human-caused. FS-005723. Between 1982-2021, 64% of known human-caused mortalities of grizzly bears occurred less than 500 meters from an open road. *Id.*

Population trend is largely reliant upon the survival of female grizzly bears and their cubs, which enables the population to grow. FWS-000031. Thus, Fish and Wildlife Service recognizes that "providing maximum protection for females is essential to recovery." FWS-005301. Female mortalities in the Cabinet-Yaak Ecosystem have increased in the last three years (4 known females) in comparison to the previous three (1 known female). FWS-001463.

Grizzly bears have one of the lowest reproductive rates of all terrestrial mammals in North America, resulting primarily from the late age at first production (5.5 years), small average litter size (two cubs), and the long interval

between litters (three-year average). FWS-005300. Because of the slow rate of reproduction, it takes a breeding female approximately ten years to replace herself in the wild. *Id.*

The Black Ram Project is likely to further inhibit the recovery of this fragile grizzly bear population. The Project will cause "significant effects to feeding, breeding, or sheltering" and will likely displace female grizzly bears from core habitat that is important for bears to thrive. FWS-000053–000054. Fish and Wildlife Service concluded that the Project is "likely to adversely affect" grizzly bears. FWS-000005.

### C.   Administrative Proceedings

Despite the extraordinary values the Project threatens and its vast scope, the Forest Service prepared only an EA pursuant to NEPA and issued a "finding of no significant impact," obviating the need for a more thorough EIS. FS-002146, FS-002231. The Forest Service and Fish and Wildlife Service engaged in formal consultation, resulting in a Biological Opinion finding that the Project will not jeopardize the grizzly bear's continued existence. FWS-000001.

## STANDARD OF REVIEW

Plaintiffs bring this case under the ESA's citizen suit provision, 16 U.S.C. § 1540(g), and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706. Courts review both NEPA and ESA claims under the APA's standard of review,

which directs courts to "set aside agency decisions found to be … arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law."

5 U.S.C. § 706(2)(A). An action is "arbitrary and capricious if the agency has

relied on factors which Congress has not intended it to consider, entirely failed to

consider an important aspect of the problem, offered an explanation for its decision

that runs counter to the evidence before the agency, or is so implausible that it

could not be ascribed to a difference in view or the product of agency expertise."

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

(1983). The reviewing court "may not supply a reasoned basis for the agency's

action that the agency itself has not given." *Id.; see also Greenpeace Action v.

Franklin*, 14 F.3d 1324, 1332 (9th Cir. 1992) (citation and quotation omitted).[4]

## ARGUMENT

### I.    FISH AND WILDLIFE SERVICE AND FOREST SERVICE VIOLATED THE ESA.

#### A.    Fish and Wildlife Service Failed to Use the Best Available Science to Establish an Accurate Baseline.

During consultation, Fish and Wildlife Service must review all relevant

information available, which includes evaluating the current status and

---

[4] Plaintiffs have Article III standing because they show: (1) an injury in fact that is (2) fairly traceable to the challenged action and is (3) likely to be redressed by judicial intervention. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Plaintiff organizations' members have concrete interests in the wildlife and values the Project will impair. *See* declarations attached (Exhibits 1-5).

environmental baseline of the listed species. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(g)(1), (2). The baseline shall include "the past and present impacts of all Federal, State or private actions and other human activities in the action area." 50 C.F.R. § 402.02. This baseline functions as a starting point against which the Service analyzes a project's impact on the listed species. *See, e.g.,* FWS-000052–000053 (Biological Opinion explaining that the Service bases its jeopardy opinion on the effects of the action and cumulative effects added to the environmental baseline). The ESA requires the Service to utilize the "best scientific and commercial data available" in its biological opinion. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d).

The Black Ram Biological Opinion used an estimated population of 60 grizzly bears in the Cabinet-Yaak Ecosystem to assess the Project's impacts. *See* FWS-000011 (citing Kasworm et al. (2021), FWS-001445-001552). In estimating the population, the Service relies on data from 2012 concluding that 48-50 bears inhabited the Cabinet-Yaak Ecosystem. FWS-001486. To calculate the population, Fish and Wildlife Service uses the outdated 2012 figures as a baseline, then applies an unsupported growth rate of 1.7% to allege that seven bears were added to the population through 2020, resulting in a population of approximately 56 grizzly bears. *Id.* Further inflating the population, the Service notes that eight bears were brought into the Cabinets since 2012, four of which are known to have left the

target area or died, and so adds four more bears to its population estimate. *Id.* Fish and Wildlife Service finally declares, with little supporting evidence, that "a population estimate of about 60 bears would seem reasonable." *Id.*

However, Fish and Wildlife Service ignores more recent data indicating that the Cabinet-Yaak population is decreasing, not steadily increasing. For example, by the end of 2017, Fish and Wildlife Service detected 54 individual grizzly bears alive in the Cabinet-Yaak Recovery Zone. FWS-002808. In a 2019 report, the Service stated that using DNA sampling, credible observations, and photos, among other methods, 54 individual grizzly bears were detected in 2018, but two of those bears were known dead and another two assumed dead by the end of the 2018, leaving a total of 50 detected bears. FWS-002467. Using these same methodologies, a year later the Service identified 50 individual grizzly bears, with five of those bears known dead by year's end, thus equaling a total of 45 surviving bears. FWS-001446. The most recent monitoring report, disclosed to the public in October 2022 after issuance of the Biological Opinion, shows this downward trajectory continuing, identifying 45 bears in 2020 with three known dead, and thus detecting just 42 living grizzly bears by year's end. FS-005690.

This data also reveals that mortality rates have risen—monitoring shows that mortalities increased in the past three years (2018-2020) compared to mortalities recorded in the previous three years (2015-2017), with a significant uptick in the

number of female grizzly bears killed. For the most recent three years, from 2018 to 2020, Fish and Wildlife Service identified 10 grizzly bear mortalities. FWS-001463. Four of these grizzly bears were females and two were cubs of an unknown sex. *Id.* By comparison, for the previous three years, from 2015 to 2017, the Service only identified 7 mortalities; only one mortality was confirmed female and one was of an unknown sex. *Id.*

The increase of female mortalities is significant because "[g]rizzly bear population growth and persistence relies on female grizzly bears that successfully reproduce and rear young." FWS-000031. Thus, the 1993 Grizzly Bear Recovery Plan stated that "providing maximum protection for females is essential to recovery." FWS-005301. The Biological Opinion acknowledged that because the Cabinet-Yaak population is small, "the survival and reproduction of each individual female grizzly bear is very important." FWS-000013.

The Service notes that the Black Ram Project area "has been an important area for female grizzly bears over the past several decades, and has supported multiple reproductive females that have contributed to the [Cabinet-Yaak Ecosystem] population," including two adult female grizzly bears with young observed as recently as June 2021. FWS-000017. The Black Ram Project will harm female bears using the action area, including causing "significant effects to feeding, breeding, or sheltering" and likely displacing female bears from core

13

habitat and other areas. FWS 000053–000054. Despite recognizing the importance of female survival to the population and the harm the Black Ram Project will cause to females and females with young, Fish and Wildlife Service never analyzed the potential that the population is decreasing or the recent uptick in female mortality. Instead, Fish and Wildlife Service still bases its analysis on outdated, 2012 data and the counter-factual assumption that the population is stable or increasing. FS-005690. Recent data does not support this assumption.

Despite recent data showing a likely decline in the population and an increase in grizzly bear mortality, particularly female mortality, Fish and Wildlife Service nevertheless relied on Kasworm et al. (2021) which concluded that there is a 60% probability that the population is stable or increasing with a growth rate of 1.7%. FWS-001486. Kasworm et al. (2021) used the 2012 population estimate and applied this projected growth rate to establish the baseline population of 60 bears, which the Service uses as a baseline population for the Biological Opinion. FWS-001486; FWS-000011.

Establishing an environmental baseline that fails to consider factors harming the species or degrading the species' habitat violates the ESA. *See, e.g., Am. Rivers & Ala. Rivers All. v. FERC*, 895 F.3d 32, 46-47 (D.C. Cir. 2018) (holding Fish and Wildlife Service acted arbitrarily in establishing a baseline that failed to consider degradation caused by power plant); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries*

*Serv.*, 524 F.3d 917, 929 (9th Cir. 2008) (finding that a biological opinion violated ESA where it did not "incorporate degraded baseline conditions into its jeopardy analysis."). Here, Fish and Wildlife Service's failure to analyze data showing that the population may be decreasing and that mortalities are increasing in the Biological Opinion violated the ESA.

Fish and Wildlife Service's failure to consider recent information regarding decreased grizzly bear detections and increased mortalities is a critical error because had the Biological Opinion addressed this data, the agency may have found that the Black Ram Project could cause more harm to the struggling Cabinet-Yaak grizzly bear population. For example, because female grizzly bear survival drives population trends and is crucial to grizzly bear recovery, so many female mortalities in such a small population may significantly threaten this population's recovery. And because the Service acknowledges that the Project will displace grizzly bears, including females, and will cause "significant effects to feeding, breeding, or sheltering" of female grizzly bears, FWS-000053–000054, the Project could magnify the impacts of these recent mortalities to female grizzly bears and, in turn, the population as a whole. In short, the Service may have reached a different jeopardy conclusion had it considered this data.

"A biological opinion violates the ESA if it fails to consider the relevant factors and articulate a rational connection between the facts found and the choice

made." *WildEarth Guardians v. Steele*, 545 F. Supp. 3d 855, 867 (D. Mont. 2021) (citation and alterations omitted). Here, Fish and Wildlife Service fails to explain how monitoring that shows a decline in grizzly bear observations since 2017 and an increase in grizzly bear mortalities, including and especially female grizzly bears, supports a growth rate of approximately 1.7% and an estimated population of 60 grizzly bears. Moreover, Fish and Wildlife Service's failure to consider the best available science demonstrating a decline in grizzly bear observations and an increase in grizzly bear mortality since 2017 violates the ESA. *See* 16 U.S.C. § 1536(a)(2); *id*. § 1536(b)(3)(A); 50 C.F.R. § 402.14(d); *id*. § 402.14(g)(1), (2).

## B. The Biological Opinion Failed to Consider the Isolation of Grizzly Bears in the Yaak Valley from Bears in the Cabinet Mountains.

The best available science shows that grizzly bears in the Yaak Valley and the Cabinet Mountains are completely isolated from each other with no genetic exchange and thus function as two disjunct populations. FWS-003493–003510. The Black Ram Project area lies only within the Yaak Valley portion of the Cabinet-Yaak Recovery Zone and thus will disproportionately harm grizzly bears in the Yaak. FS-002242. Fish and Wildlife Service, however, never analyzes the lack of connectivity between grizzly bears in the Yaak and grizzly bears in the Cabinets, or how the Project is likely to disproportionately impact the Yaak sub-population. For example, the Service never analyzed whether the Project could lead to or increase the chances of extirpation of grizzly bears in the Yaak Valley,

thereby impacting grizzly recovery in the Cabinet-Yaak Recovery Zone. The Service only analyzed impacts on the grizzly bear population across the entire Cabinet-Yaak Recovery Zone.

Courts have previously recognized Fish and Wildlife Service's duty to consider project impacts on listed species on scales smaller than those designated through ESA listing or recovery planning. *See Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 529 (9th Cir. 2010); *Gifford Pinchot Task Force v. U.S. Fish and Wildlife Service*, 378 F.3d 1059 (9th Cir. 2004), *amended by* 387 F.3d 968 (9th Cir. 2004). In *Wild Fish Conservancy*, the court invalidated a biological opinion that failed to consider the decline of an isolated bull trout sub-population in Icicle Creek on the species as a whole. 629 F.3d at 525-29. The biological opinion there evaluated a project's impacts to the Icicle Creek sub-population, considered "the smallest local population in the Wenatchee River core area and the most vulnerable to extirpation." *Id.* at 526. Despite this sub-population experiencing long-term negative population trends, the Service concluded the project would not be expected to reduce the likelihood of survival and recovery of the larger Columbia River interim recovery unit. *Id.* The court invalidated the biological opinion, finding that because the Icicle Creek sub-population was important to the Wenatchee River core area, a relative stronghold for bull trout in the upper Columbia River area, a decline in this population could harm recovery. *Id.* at 528-

29. The court held that the Service failed to articulate a rational connection between the facts found and the no-jeopardy conclusion made. *Id.* at 529.

Similarly, in *Gifford Pinchot Task Force*, plaintiffs challenged the validity of several biological opinions alleging that they failed to consider local impacts from logging projects on the Northern spotted owl. 378 F.3d at 1075. The court stressed the importance of considering local impacts, stating that "[f]ocusing solely on a vast scale can mask multiple site-specific impacts that, when aggregated, do pose a significant risk to a species." *Id.* (citation omitted). The court ultimately found that the biological opinions did consider local impacts and thus did not invalidate them on those grounds. *Id.*

By contrast, the Black Ram Biological Opinion failed to even consider how the Project could harm the isolated Yaak Valley grizzly population, and what those impacts could mean for recovery of the Cabinet-Yaak Recovery Zone population and for the grizzly bear as a whole. Fish and Wildlife Service has stated that grizzly bear recovery in the Cabinet-Yaak Recovery Zone is necessary for recovery of grizzly bears across the lower 48 states. FWS-005311.

Thus, Fish and Wildlife Service was required to analyze how the Black Ram Project may impact the small grizzly population in the Yaak Valley. In failing to consider local impacts, Fish and Wildlife Service entirely failed to consider an important aspect of the problem and failed to articulate a rational connection

between the facts found and the no-jeopardy conclusion made, rendering the Biological Opinion arbitrary and capricious. 5 U.S.C. § 706(2)(A); *State Farm*, 463 U.S. at 43.

   **C.**   **Fish and Wildlife Service Failed to Support Its No-Jeopardy Conclusion.**

ESA Section 7 requires each federal agency, in consultation with a federal wildlife agency (Fish and Wildlife Service for the grizzly bear), to insure that any proposed action is not likely to jeopardize the continued existence of a listed species, or result in the destruction or adverse modification of critical habitat. 16 U.S.C. § 1536(a)(2). To "jeopardize the continued existence of" means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.

The Ninth Circuit has held that a species may be jeopardized even "if there is no appreciable reduction of survival odds" because "a species can often cling to survival even when recovery is far out of reach." *Nat'l Wildlife Fed'n,* 524 F.3d at 931, superseded by statute on other grounds, as stated in *Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*, 555 F. Supp. 3d 739 (D. Alaska 2021). Thus, Fish and Wildlife Service "must analyze effects on recovery as well as effects on survival." *Nat'l Wildlife Fed'n,* 524 F.3d at 932. Under the ESA,

"[r]ecovery means improvement in the status of listed species to the point at which listing is no longer appropriate under the criteria set out in section 4(a)(1) of the Act." 50 C.F.R. § 402.02. The regulations recognize that "reducing the reproduction" of a species may jeopardize the species' survival or recovery. *Id.*

Fish and Wildlife Service's Biological Opinion recognizes that "[p]ursuant to Service policy, when an action impairs or precludes the capacity of a recovery unit from providing both the survival and recovery function assigned to it, that action may represent jeopardy to the species." FWS-000009 (citation omitted). Thus, an agency action that negatively impacts the survival or recovery of grizzly bears in the Cabinet-Yaak Recovery Zone may lead to a jeopardy finding, even if the action does not cause jeopardy across the grizzly bear's entire range in the lower 48 states.

"The action area has been an important area for female grizzly bears over the past several decades," and there are currently two known reproducing females that use the action area. FWS-000017; FWS-000053. Data from collared female grizzly bears reveal that up to three adult females have used the action area at the same time in past years. FWS-000017. The Service acknowledges that because the Cabinet-Yaak population is so small and is not meeting some targets of the Grizzly Bear Recovery Plan, "the survival and reproduction of *each individual female grizzly bear* is very important." FWS-000013 (emphasis added).

Fish and Wildlife Service found that the Project activities, including increased motorized use, may displace female grizzly bears for up to ten years. FWS-000053. In addition to direct displacement, "female grizzly bears are expected to experience significant effects to feeding, breeding, or sheltering," FWS-000053, and reproductive success for females may be impaired for at least three to five bear years, potentially affecting two reproductive cycles for adult female grizzly bears. FWS-000054–000055. Impacts to reproductive success are especially significant for grizzlies because it may take a female grizzly bear ten or more years to replace herself in the population due to grizzly bear's slow reproductive rates. *See* SOUF ¶ 26, FWS-005300.

Further, in the Cabinet-Yaak Recovery Zone, several recovery goals specified in the 1993 Recovery Plan have not been met, including criteria related to female grizzly bear occupancy and reproduction. FWS-000012. Thus, the impact to one to two reproductive cycles for at least two currently reproductive adult females using the action area could further impair recovery.

Despite acknowledging that Project implementation will harm female grizzly bear reproductivity and could further delay this population from meeting Recovery Plan goals, Fish and Wildlife Service makes the unsupported leap that because impacts will be temporary, the Project will not reduce grizzly reproduction in the recovery zone and therefore will not lead to jeopardy:

21

> Because the Black Ram Project will not reduce the reproduction, numbers, or distribution of grizzly bears throughout the [Cabinet-Yaak Ecosystem] population as well as other grizzly bear populations in the lower 48, we conclude that the level of adverse effects is not reasonably expected to reduce appreciably the likelihood of both the survival and recovery of the listed entity of grizzly bears as a whole.

FWS-000057. This conclusion directly contradicts Fish and Wildlife Service's own admission that the Project will in fact harm the reproductive success of female bears in the action area for up to two reproductive cycles.

Moreover, the regulations defining jeopardy contain no exception for temporary impacts to survival and recovery, including impacts to reproductive success. 50 C.F.R. § 402.02. Should the Service be able to avoid a jeopardy finding by excluding temporary impacts, the agency could find no jeopardy for multiple projects implemented in succession that could impede a listed species from meeting recovery goals and impact the species for decades.

As explained above, Fish and Wildlife Service ignored data showing that the population may be decreasing and that mortality levels, including female mortality rates, may be increasing. Because a decreasing population and increasing mortality rates may significantly impact the survival and recovery of grizzly bears in the Cabinet-Yaak Recovery Zone, this data concerning impacts to female reproduction, if considered as the ESA requires, may have led the Service to a different jeopardy conclusion.

"A Biological Opinion is arbitrary and capricious if it fails to consider the relevant factors and articulate a rational connection between the facts found and the choice made." *Ctr. for Biological Diversity v. U.S. BLM*, 698 F.3d 1101, 1121 (9th Cir. 2012) (citation and internal alterations omitted); *accord Steele*, 545 F. Supp. 3d at 867. By applying the incorrect standard to reach its jeopardy conclusion and by ignoring how impacts to reproduction will impair recovery in the Cabinet-Yaak Recovery Zone, Fish and Wildlife Service failed to articulate a rational connection between the facts found and the choice made, rendering its no-jeopardy conclusion arbitrary and capricious in violation of the ESA and APA. 16 U.S.C. § 1536(a)(2); 5 U.S.C. § 706(2)(A).

### D.     The Forest Service May Not Lawfully Rely on the Flawed Biological Opinion.

The Forest Service cannot rely on a faulty biological opinion to fulfill its Section 7 duties to insure it does not jeopardize a listed species' continued existence. *See Defs. of Wildlife v. U.S. EPA*, 420 F.3d 946, 976 (9th Cir. 2005), *rev'd on other grounds*, *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644 (2007). "Consulting with the [Fish and Wildlife Service] alone does not satisfy an agency's duty under the Endangered Species Act." *Res. Ltd. v. Robertson*, 35 F.3d 1300, 1304 (9th Cir. 1994). The Forest Service violates the ESA if it approves or implements an action in reliance on a legally flawed biological opinion or fails in its approval or implementation decision "to discuss information that would

undercut the [biological] opinion's conclusion." *Ctr. for Biological Diversity v. U.S. BLM*, 698 F.3d at 1127-28; *accord Steele*, 545 F. Supp. at 880.

Here, the Forest Service had access to data that runs contrary to the no-jeopardy conclusion set forth by Fish and Wildlife Service, including all of Fish and Wildlife Service monitoring reports that demonstrate decreasing grizzly bear observations and increases in mortality. The Forest Service also had access to information regarding the presence of reproducing female grizzly bears with cubs in the project area that the Black Ram Project will likely be harm. Nevertheless, the Forest Service did not question this information that undercuts Fish and Wildlife Service's no-jeopardy conclusion. "Ignoring information that would undercut the opinion's conclusions violates the Forest Service's obligation under § 7 of the ESA." *Steele*, 545 F. Supp. 3d at 881 (citation and internal quotations omitted).

Because the 2022 Biological Opinion was arbitrary and capricious, and therefore unlawful, and the Forest Service did not question Fish and Wildlife Service's conclusions in the face of information undercutting those conclusions, the Forest Service's reliance on this inadequate Biological Opinion in authorizing the Project was likewise unlawful.

## II.     THE FOREST SERVICE VIOLATED NEPA.

### A.     The Forest Service Failed to Disclose Baseline Conditions for Grizzly Bears.

An EA must identify the direct, indirect, and cumulative impacts from a proposed project. *See* 40 C.F.R. §§ 1508.7; 1508.8; 1508.9(b). To that end, NEPA requires that agencies set an appropriate baseline detailing the nature and extent of the resources in the area the project will impact. "Without establishing the baseline conditions which exist before a project begins, there is simply no way to determine what effect [an action] will have on the environment and consequently, no way to comply with NEPA." *Great Basin Res. Watch*, 844 F.3d at 1101 (quoting *Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988)).

Here, the Forest Service relied on outdated and unsupported data and ignored important factors in establishing the baseline for the grizzly bear population and trajectory in the Cabinet-Yaak Ecosystem. The EA states that as of 2017, the Cabinet-Yaak Ecosystem had an estimated population of 55-60 bears with a 73% probability that the population was stable or increasing. FS-002541. As with the Biological Opinion, this estimate was based on 2012 population data plus

an annual population increase of 2.1% and the addition of three surviving bears augmented into the Cabinet Mountains. *See* FWS-002984.[5]

But monitoring has revealed a decline in the number of grizzly bears observed since 2017. *See* FWS-002808 (identifying 54 grizzly bears alive at the end of 2017); FWS-002467 (identifying 50 grizzly bears alive at the end of 2018); FWS-001446 (identifying 45 grizzly bears alive at the end of 2019); *see also* FS-005690 (released after approval of the Project, identifying 42 grizzly bears alive at the end of 2020). Additionally, monitoring shows that mortalities, especially among females, have increased in the past three years compared to mortalities in the previous three years. *See* FWS-001463 (reporting 7 mortalities with one confirmed female death from 2015 to 2017, compared with 10 mortalities with four confirmed female deaths from 2018 to 2020).

However, similar to Fish and Wildlife Service, the Forest Service's June 202 EA relies on this outdated baseline data extrapolated from 2012 estimates rather than more recent observations of the grizzly bear's population and increased female mortality in the Cabinet-Yaak Ecosystem. *See* FS-002541; FWS-002984. The Forest Service cannot arbitrarily pinpoint the 2017 population data to describe

---

[5] Kasworm et al. (2018), relied upon by the Forest Service in its EA, projected a 2.1% growth rate while Kasworm et al. (2021), relied upon by Fish and Wildlife Service's Biological Opinion as discussed above, projected a lower growth rate (1.7%). FWS-001486; FWS-002984.

the status of grizzly bears in the Cabinet-Yaak Ecosystem because this baseline

ignores important subsequent information necessary to "determine what effect [the

Black Ram Project] will have on the environment." *Half Moon Bay*, 857 F.2d at

510. Because the baseline arbitrarily inflated population growth and ignored

female mortalities, the death or displacement of one or more female grizzly bears

may have more of a detrimental impact to recovery than the Forest Service and

Fish and Wildlife Service originally concluded. The Forest Service's failure to

include accurate baseline data is arbitrary and capricious and violates NEPA. 5

U.S.C. § 706(2)(A); *State Farm*, 463 U.S. at 43 (an action is arbitrary and

capricious where "the agency … entirely failed to consider an important aspect of

the problem.").

## B. The Forest Service Failed to Take a Hard Look at the Project's Climate Impacts.

NEPA requires agencies to disclose the climate pollution impacts of federal

agency actions, addressing one of the defining environmental issues of our time.

*See, e.g., Ctr. for Biological Diversity v. NHTSA*, 538 F.3d 1172 (9th Cir. 2008);

*Mont. Env't Info. Ctr. v. U.S. Office of Surface Mining*, 274 F. Supp. 3d 1074 (D.

Mont. 2017). Council on Environmental Quality guidance addressing climate

change recognizes that logging and prescribed burning can impact carbon stores,

and urges land management agencies to "include a comparison of estimated net

GHG emissions and carbon stock changes that are projected to occur with and

27

without implementation of proposed land or resource management actions."
Council on Environmental Quality, Final Guidance for Federal Departments and
Agencies on Consideration of Greenhouse Gas Emissions and the Effects of
Climate Change in National Environmental Policy Act Reviews (Aug. 1, 2016) at
25-26, available at https://ceq.doe.gov/docs/ceq-regulations-and-
guidance/nepa_final_ghg_guidance.pdf (last visited January 27, 2023).[6]

The Black Ram Project will have at least two types of impacts regarding
climate change. First, chainsawing forests, bulldozing roads, and transporting 57
million board feet of timber to mills will result in fossil fuel emissions, adding to
climate pollution. The EA failed to address, quantitatively or qualitatively, these
direct and indirect emissions, violating NEPA's "hard look" mandate. *Idaho
Sporting Cong.*, 305 F.3d at 973.

Second, removing mature trees will remove carbon stored in those trees, and
eliminate those trees' ability to continue sequestering carbon, thus resulting in a net
increase in carbon pollution over the status quo. Although experts and the Forest
Service itself, including the Kootenai National Forest, have used models to

---

[6] The Council's 2016 guidance, withdrawn in 2017, was effectively reinstated well
before the EA was issued. 86 Fed. Reg. 10,252 (Feb. 19, 2021) ("agencies should
consider all available tools and resources in assessing [greenhouse gas] emissions
and climate change effects of their proposed actions, including, as appropriate and
relevant, [the Council's] 2016 [Greenhouse Gas] Guidance."). This Court may take
judicial notice of guidance documents published on agency websites. *Sierra Club
v. United States EPA*, 762 F.3d 971, 975 n.1 (9th Cir. 2014).

quantify the impacts of logging and other forest disturbance on carbon pollution, the Forest Service, as discussed below, refused to quantify the Project's climate pollution and instead merely dismissed the pollution impacts as insignificant. NEPA requires more. "When the nature of the effect is reasonably foreseeable, but its extent is not," agencies "may not simply ignore the effect." *Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 549 (8th Cir. 2003). Further, the Forest Service's dismissal of these impacts violated the agency's duty to use "high quality" information and "accurate scientific analysis" in EAs. 40 C.F.R. § 1500.1; *see also 350 Mont. v. Haaland*, 50 F.4th 1254, 1272 (9th Cir. 2022).

A robust quantitative analysis was possible, and required, because numerous studies, including those by the Forest Service itself, have concluded that logging mature forests worsens climate change by releasing significant amounts of carbon stored in the trees and by preventing those forests from continuing to sequester carbon in trees and roots. FS-038267 (2016 Tongass National Forest Plan EIS, concluding older trees store more carbon). When forest stands are logged, the vast majority of carbon the forest stores is released over time as $CO^2$, converting forests from a sink to a carbon "source" or "emitter." *See* FS-038272 (DellaSala 2015 report on Tongass National Forest as carbon sink); FS-038329 (Law et al. 2018 study reporting "[i]ncreased harvest through proposed thinning practices in [Oregon] has been shown to elevate emissions for decades to centuries"). A 2019

29

report, funded in part by the Department of Agriculture, found that "preservation (i.e., no harvest)" of some forests in the American Northwest, including in northwest Montana, could reduce the contribution of land management to climate pollution. FS-038332, FS-038338 (Buotte et al. 2019). The study's coarse-scale map indicates that there are likely forest stands in the project area rated as "high" or "medium" priority for preservation to mitigate climate change because of their importance in storing carbon, and the degradation of those carbon stores should logging occur. FS-038334 (Figure 1).

The Project will degrade carbon stores by removing trees on thousands of acres, including clearcutting at least 1,783 acres. FS-002254. Many stands of mature trees will be logged; some stands slated for clearcuts average 170-180 years old, including some trees as old as 230 years. FS-002762 (Rampike area includes trees 150-230 years old); FS-018240, FS-018249, FS-018503, FS-018513 (clearcut logging in specific units will remove trees averaging 170-180 years old).

Despite the Project's potential to degrade carbon stores, the EA defers analysis to a "Carbon Report," which "rationalizes why we believe the proposed activities do not warrant additional affects analysis under NEPA." FS-002364 (EA); FS-020739 (Carbon Report). The Report asserts that the Kootenai National Forest stores 174 teragrams (million tons) of carbon (the equivalent of 638 million tons of carbon dioxide pollution), but refuses to undertake a quantitative analysis,

and concludes that no effects analysis is required because the Project "would affect only a tiny percentage of the forest carbon stocks of the Kootenai National Forest, and an infinitesimal amount of the total forest carbon stocks of the United States." FS-020743.

The Forest Service's reliance on the Carbon Report violates NEPA because it utilizes neither "high quality" information nor "accurate scientific analysis." 40 C.F.R. § 1500.1. The Carbon Report appears to be cut and pasted, with minor alterations, from a 2015 report for an Idaho timber sale prepared more than seven years before the Black Ram Decision Notice. *Compare* FS-020739 (Black Ram Carbon Report) *with* FS-038342 (2015 Idaho report). In copying the Idaho report, the Black Ram Carbon Report appears to have simply substituted the name "Kootenai" for "Idaho Panhandle" National Forest, resulting in the unlikely coincidence that the two forests, though different in size, location, and mix of tree species, sequester *precisely the same amount* of carbon. *Compare* FS-020743 ("total carbon stored on the Kootenai National Forest is approximately 174 [teragrams]") *with* FS-038348 ("total carbon stored on the Idaho Panhandle National Forest is approximately 174 [teragrams]"). In copying the 2015 Idaho Panhandle report, the Carbon Report also assumes the agency considers only two alternatives (the proposed action and no action) while the Black Ram EA analyzes three. *See* FS-020741–020742; FS-002254–002257. Cut-and-pasting an analysis

from one forest project to support a NEPA analysis for a different project on a different forest, with no apparent site-specific data of any kind, is not the "hard look" NEPA requires.

What "analysis" the cookie-cutter Report contains dismissing climate pollution is also neither "high quality" nor "accurate." The Report admits vaguely that the "proposed action would remove and release some carbon currently stored" but does not address the scale of those impacts beyond calling them "infinitesimal" by comparison to carbon stores on all U.S. forests, and a "tiny percentage" compared to the hundreds of millions of tons of carbon stored on the Kootenai National Forest. FS-020742–020743. The Ninth Circuit held that a similar "unsupported assertion" that a federal action's climate pollution "will be 'minor'" violated NEPA because it "boils down to an observation that could be applied to any other domestic source of [greenhouse gases] if compared to global [greenhouse gas] emissions." *350 Mont.,* 50 F.4th at 1266, 1269-70 (finding the agency "frustrated NEPA's purpose" in part due to unsupported emissions comparisons).[7]

---

[7] *Hapner v. Tidwell*, which upheld an EA declining to address a logging project's climate impacts, is inapposite. 621 F.3d 1239 (9th Cir. 2010). That project involved "a relatively small amount of land [1,110 acres] and it [would] thin rather than clear cut [800 acres of] trees." *Id*. at 1246. Black Ram involves an area 10 times larger, with more than 11,000 acres of logging and burning, including more than 1,700 acres of clearcuts.

Because the Carbon Report uses an old Idaho forest report as a template, it references no climate science that has emerged since 2013, FS-020745–020748, ignoring studies demonstrating the importance of protecting mature forests, and those showing that methods and models exist allowing the agency to quantify impacts of logging such stands. *See supra* 29-30. Studies by academics, provided by Plaintiffs well before the agency's decision, have disclosed and quantified the impacts of logging on carbon stores in Oregon and on the Tongass National Forest in Alaska, demonstrating that quantification of climate pollution impacts is possible. *See* FS-035338 (citing studies); FS-038281 (DellaSala 2015 re: Tongass study); FS-038326 (Law et al. 2018 re: Oregon). The Council on Environmental Quality's 2016 guidance also identifies a model that uses Forest Service data to quantify climate impacts of logging actions. *See* Council Greenhouse Gas NEPA Guidance (2016) at 26, n.86. Ignoring nearly a decade of climate science does not represent a "hard look." "Reliance on data that is too stale to carry the weight assigned to it may be arbitrary and capricious." *N. Plains Res. Council,* 668 F.3d at 1086 (reliance on 10+ year old data held arbitrary).

The only other significant document in the record concerning climate impacts, the "Kootenai Forest Carbon Assessment White Paper 2021," contradicts the Carbon Report in two key respects. FS-020711. First, the White Paper evaluates carbon stores at the Kootenai Forest level, demonstrating that the agency

has models that quantify climate pollution impacts of logging and other disturbance. FS-020722–020723. Second, the White Paper announces the Forest Supervisor's "expectation … that all environmental analyses will utilize this white paper to develop a *project specific analysis* for carbon," indicating such project-level analysis is possible. FS-020711 (emphasis added). For Black Ram, the agency defied that "expectation," relying on the cut-and-paste Carbon Report to explain why it need *not* undertake a project-specific analysis. The agency's failure to take the hard look and use accurate scientific analysis violates NEPA. *Idaho Sporting Cong.*, 305 F.3d at 973.

> ### C.      The Forest Service's Failure to Prepare an EIS Violated NEPA.

"In reviewing an agency's decision not to prepare an EIS … a court [must] determine whether the agency has taken a 'hard look' at the consequences of its actions, based [its decision] on a consideration of the relevant factors, and provided a convincing statement of reasons to explain why a project's impacts are insignificant." *Barnes v. U.S. DOT*, 655 F.3d 1124, 1132 (9th Cir. 2011) (internal quotations and citations omitted).

"In challenging an agency decision not to prepare an EIS, plaintiffs need not prove that significant environmental effects *will* occur; they need only raise a 'substantial question' that they might. This presents a 'low standard' that is permissive for environmental challenge." *Env't Def. Ctr. v. Bureau of Ocean*

*Energy Mgmt.*, 36 F.4th 850, 878-79 (9th Cir. 2022) (emphasis in original) (citations omitted).

Whether an action is significant is addressed in terms of "context" and "intensity." 40 C.F.R. § 1508.27. In assessing context, "significance … usually depend[s] upon the effects in the locale rather than in the world as a whole." *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 869 (9th Cir. 2020) (citation omitted). Intensity refers to the "severity of impact," and regulations identify ten non-exhaustive factors agencies should consider in evaluating intensity. 40 C.F.R. § 1508.27(b)(1)-(10). "Meeting just one of these 'significance factors' may be sufficient for [the courts] to require an agency to prepare an EIS." *Env't Def. Ctr.*, 36 F.4th at 879.

Plaintiffs exceed the "low standard" by raising "substantial questions" about the Project's potential for significant impacts concerning both context and at least two intensity factors: the potential for adverse impacts to grizzlies and harm to unique geographic areas.

First, regarding context, the Project's scope and impacts within the northern Yaak region will be significant. The Project authorizes more than 11,000 acres of clearcutting, other logging, and burning that will occur over a decade within a sensitive area containing numerous unique resources. The Project will:

- commercially log more than 3,904 acres (6+ square miles) and will burn and remove small trees from an additional 7,553 acres. FS-002154. The Project will remove 57 million board feet of timber, authorizes 3.3 miles

of new permanent road construction, and 90.3 miles of road reconstruction. FS-002154–002155.

- clearcut at least 1,783 acres (nearly three square miles), including 17 clearcuts larger than 40 acres in size. One clearcut will be 137 acres, the size of more than 100 football fields. FS-002254; FS-002175–002177.

- log within 579 acres of old growth forest, and burn within another 343 acres. FS-002154. It would also bulldoze 0.8 miles of new road *through* designated old growth, and log and burn within an additional 440 acres of mature forest, known as "recruitment potential old growth." FS-002154– 002155. The Project will clearcut hundreds of acres of forest within the Rampike Creek area, which boasts trees as old as 230 years. FS-002762.

As discussed below, the Project will also harm grizzly bears, degrade lands managed to protect river corridors eligible for wild and scenic river designation, and harm scenic vistas adjacent to the Congressionally-designated Pacific Northwest National Scenic Trail.

Forest Service staff preparing the NEPA analysis initially stated: "The level of NEPA is expected to be an Environmental Impact Statement (EIS) given the large project scale, scope and presence of wildlife species and habitat." FS-045772. This was the correct assessment then and remains so now. Because the Project will unleash all these impacts in a remote, highly sensitive area, this context demonstrates that an EIS was required.

Second, concerning intensity, the Project exceeds the threshold for one intensity factor because it "may adversely affect an endangered or threatened species or its habitat." 40 C.F.R. § 1508.27(b)(9). The Decision Notice admits that

the Project "is *likely* to adversely affect grizzly bears," a higher bar than that set by the NEPA regulations' "may adversely affect" intensity standard. FS-002170 (emphasis added). A finding that threatened or endangered species are "likely to be adversely affected" by federal action "is *prima facie* evidence that an EIS should have been prepared." *Env't Def. Ctr.*, 36 F.4th at 879.

The Project will adversely affect grizzlies, including likely harming and reducing reproductive success of several female grizzlies for 3-5 years and displacing them from important habitat. *See supra* 21. These impacts will befall the precarious Yaak population, which may include only a dozen females and which, across the Cabinet-Yaak Ecosystem, already suffers from "low resiliency due to low numbers of bears, low fecundity, … [and] low genetic diversity." FS-004423; *see* SOUF ¶ 20.[8]

In weighing intensity, agencies must also consider impacts to "[u]nique characteristics of the geographic area such as proximity to … wild and scenic rivers, or ecologically critical areas." 40 C.F.R. § 1508.27(b)(3). The northern Yaak region contains numerous unique characteristics that the Project's logging,

---

[8] Although Fish and Wildlife Service concluded the Project will not jeopardize the existence of grizzly bears in the lower 48, that does not eliminate the need for an EIS. *NRDC, Inc. v. Winter*, 518 F.3d 658, 692 (9th Cir. 2008), *rev'd on other grounds*, *Winter v. NRDC, Inc.,* 555 U.S. 7 (2008) (no jeopardy finding not determinative for NEPA significance purposes where agency found project "may adversely affect" species).

burning, and road construction will likely significantly harm, requiring EIS preparation.

The Decision Notice identifies the Pacific Northwest National Scenic Trail (the Trail) as a unique characteristic of the area, but alleges that "no significant adverse effects to [it] are expected." FS-002167; 16 U.S.C. § 1244(a)(30) (designating the Trail). The EA's analysis belies this conclusion. Logging and burning, including eleven logging units, will occur adjacent to over eight miles of the Trail. FS-002442 (Table 64); FS-002474. The EA admits that during the Project's ten-year implementation, "[p]roposed timber harvest and fuel treatments may affect user access to this trail," by blocking trail use. FS-002442. The Project will also violate a Kootenai National Forest Plan "guideline" directing that "[m]anagement activities should be consistent with the mapped scenic integrity objective," which for the Trail is "High to Very High." FS-000045. Logging would make it impossible for views along the Trail to meet the Plan's direction: "Timber harvest along these [trail segments] would not achieve the designated [scenic integrity objective] of high" for up to 15 years after logging occurs, even assuming various "design features" are implemented. FS-002475.

The Decision Notice dismisses the scenic impact of clearcuts as not significant, apparently because the EA concludes that 15 years of impacts post-harvest are "short term." *Id*.; FS-002167. But half a generation is hardly "short

term." Further, the EA's dismissal of these impacts as "short term" arbitrarily conflicts with statements of Forest Service staff drafting the EA, who initially concluded: "Short-term effects [to scenery] include post-harvest or post fuel treatment up to 5 years." FS-045671. The EA reached a similar definition of short-term impacts for other values. FS-002283 (defining a "time frame" for aquatic resource impacts: "short-term effects are those that would occur immediately … and up to 5 years post implementation."). The Forest Service's unexplained, shifting definition of "short term," which apparently helped it conclude that 15 years of violating Forest Plan guidelines meant to protect vistas was not significant, is arbitrary. *See Helena Hunter & Anglers v. Tidwell*, 841 F. Supp. 2d 1129, 1135-36 (D. Mont. 2009) (remanding to Forest Service to prepare EIS in part because EA contained contradictory statements regarding wetlands impacts).

The Project will degrade another area with unique characteristics: lands eligible for inclusion in the wild and scenic river system. Such river segments, protected by Kootenai Forest Plan management provisions, within the project area include stretches of the West Yaak classified as "wild" and "recreational," and a "recreational" segment of the Yaak River. FS-002432. "These river segments have outstanding remarkable values (ORV) of scenery, fisheries, recreation and history." *Id*.

To protect the river corridors' remarkable values, the Forest Plan's "desired conditions" provide that these lands should be managed such that "[n]atural ecological processes (e.g., plant succession) and disturbances (e.g., floods, fire, insects, and disease) are the primary forces affecting the composition, structure, and pattern of vegetation." FS-000063. Further, Plan "guidelines" direct that for "recreational" river segments, "[t]imber harvest is allowed [but only] to maintain or restore the values for which the eligible scenic or recreational river was identified," and for "wild" segments, tree cutting is generally prohibited. FS-000065.

Within these unique areas, the Project authorizes 454 acres of logging (274 acres of intermediate or regeneration harvest, 177 acres of "slashing" trees up to 22 inches in circumference, and three acres of "fuel breaks," causing the complete elimination of trees), and 200 additional acres of "ecosystem burning." FS-002253; FS-002335 (describing ladder fuel reduction).

Although logging and burning over 650 acres (more than a square mile) of forest within areas managed to protect wild and scenic river values could significantly degrade recreational and scenic values, the EA asserts that the Project complies with the Forest Plan because the lands impacted are too small to matter: "Given the small area that would be treated, this project would be consistent with this desired condition." FS-002385. But that square mile of logging and burning

40

will represent a sizable chunk of the West Fork Yaak (2,758 acres) and Yaak (9,230 acres) wild and scenic eligible acreage. The EA also fails to disclose how those treatments will impair the values that resulted in the Forest originally deeming these areas eligible for wild and scenic protection.

The EA also contends that "fuels treatment" in the wild and scenic segments will "contribute to the resistance and resiliency of the treated areas, provide for safer egress for public, and provide safer conditions for firefighters." FS-002336. Fire safety is a laudable goal, but the EA's brief discussion does not address the potentially significant impacts to the areas' outstandingly remarkable values or explain how the Project will maintain "*natural* ecological processes." *See also* 40 C.F.R. § 1508.27(b)(1) ("A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial."). This factor weighs in favor of preparing an EIS.

The Forest Service also acknowledges the 320-acre Pete Creek Botanical Area, designated by the Forest Plan to protect its "unique, unusual, or important" flora, as one of the project area's "unique characteristics." FS-002167; FS-00065–000066. The Project will eliminate more than 2% of the Botanical Area's existing vegetation—the very reason this area was found to be unique and protected—to create a seven-acre clearcut "fuel break." FS-002336, FS-002340.

Without disclosing any of the Botanical Area's existing values, or the potential significance of botanical values that logging will eradicate, the EA alleges that the clearcut will "reduce fuels and decrease the potential fire severity." FS-002340. Looking at only the potential benefit of logging to this unique area without disclosing what the "fuel break" will damage is arbitrary because agencies cannot turn a blind eye to harms while disclosing benefits. It is particularly arbitrary here where the damage to the unique area is certain but the threat that logging seeks to forestall (wildfire) may never occur. The EA admits: "While these events [e.g., wildfire, insect or disease epidemics] *might* occur, extreme conditions are *not predictable*, so *it cannot be said, with reasonable certainty, whether these events would have an effect* versus the action alternatives." FS-002369 (emphases added). Because a unique area will be damaged, and the EA fails to disclose anything beyond the number of acres to be clearcut, or how elimination of those values will impact the reasons the Botanical Area was protected, the potential for significant impacts favors preparing an EIS.

Because Plaintiffs raise more than "substantial questions" that the Project will have significant impacts in terms of context and intensity, the agency must prepare an EIS.

## REMEDY

The APA directs that "[t]he reviewing court shall … set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Vacatur is the presumed remedy where an agency has acted unlawfully. *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018). This presumption can only be overcome "[i]n rare circumstances." *Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010). "In determining the appropriate remedy, the Court must weigh the seriousness of the agency's errors against the disruptive consequences of vacatur." *All. for the Wild Rockies v. Savage*, 375 F. Supp. 3d 1152, 1155-56 (D. Mont. 2019) (internal quotations and citation omitted).

Given consultation's critical role in implementing Congress' clear intent to make protection of listed species a foremost priority, the ESA violations here, which put at risk the tiny sub-population of Yaak grizzlies, are serious. *See Ksanka Kupaqa Xa '£¢in v. U.S. Fish & Wildlife Serv.*, 534 F. Supp. 3d 1261, 1273-74 (D. Mont. 2021) (setting aside mine plan where Fish and Wildlife and Forest Service consultation concerning grizzly bears held unlawful). Further, vacatur would promote, not undermine, NEPA's purpose of thoughtful decision-making based on a hard look at environmental impacts *before* a decision is made. "[I]f you can build

first and consider environmental consequences later, NEPA's action-forcing purpose loses its bite." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1051 (D.C. Cir. 2021) (citation omitted).

Additionally, the disruptive consequences of vacatur are minimal. Here, allowing the challenged action (with its thousands of acres of clearcuts and roadbuilding) to proceed will result in far more environmental harm than vacatur. *C.f. Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405-06 (9th Cir. 1995) (declining to vacate where doing so would imperil species). The Forest Service has yet to award contracts for logging. This is not the rare case where a remedy other than vacatur is required.

## CONCLUSION

For the reasons set forth, Plaintiffs request this Court grant Plaintiffs' Motion for Summary Judgment.

Respectfully submitted January 27, 2023.

/s/ Edward B. Zukoski
Edward B. Zukoski (Admitted *Pro Hac Vice*)
Center for Biological Diversity
1536 Wynkoop Street, Suite 421
Denver, CO  80202
(303) 641-3149
tzukoski@biologicaldiversity.org

/s/ Andrea Zaccardi (Admitted *Pro Hac Vice*)
Center for Biological Diversity
P.O. Box 469
Victor, ID  83455

(303) 854-7748
azaccardi@biologicaldiversity.org

/s/ Rachel Inabnit
Rachel G. Inabnit
LAW OFFICE OF RACHEL INABNIT,
P.O. Box 8846
Missoula, MT  59807
(406) 300-5316
rachel@inabnitlawoffice.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(d)(2), I hereby certify that this memorandum contains 9,999 words, excluding material Local Rule 7.2(d)(2)(E) omits from the word-count requirement.

*/s/ Edward B. Zukoski*
Edward B. Zukoski (Admitted *Pro Hac Vice*)
Center for Biological Diversity
1536 Wynkoop Street, Suite 421
Denver, CO  80202
(303) 641-3149
tzukoski@biologicaldiversity.org

*Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on January 27, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system. I further certify that a true and accurate copy of the foregoing document will be served on all counsel or parties of record via transmission of Notice of Electronic Filing generated by CM/ECF.

*/s/ Edward B. Zukoski*
Edward B. Zukoski (Admitted *Pro Hac Vice*)
Center for Biological Diversity
1536 Wynkoop Street, Suite 421
Denver, CO  80202
(303) 641-3149
tzukoski@biologicaldiversity.org

*Attorney for Plaintiffs*

46