Rebecca K. Smith
Public Interest Defense Center, P.C.
P.O. Box 7584
Missoula, MT 59807
(406) 531-8133
publicdefense@gmail.com

Timothy M. Bechtold
Bechtold Law Firm, PLLC
P.O. Box 7051
Missoula, MT 59807
(406) 721-1435
tim@bechtoldlaw.net

Attorneys for Consolidated Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al.,<br>　　　　Plaintiffs,<br>and<br><br>ALLIANCE FOR THE WILD ROCKIES, et al.,<br>　　　Consolidated Plaintiffs,<br>vs.<br><br>U.S. FOREST SERVICE, et al,<br>　　　　Defendants,<br><br>KOOTENAI TRIBE OF IDAHO,<br>　　　　Defendant-Intervenor,<br>and<br><br>KIRSTEN KAISER, et al.,<br>　　　Consolidated Defendants. | Lead Case No.<br>CV 22-114-M-DWM<br><br>Member Case No.<br>CV 23-3-M-DWM<br><br><br>BRIEF IN SUPPORT OF CONSOLIDATED PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT |

TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A.    The Forest Service has failed to demonstrate that the Project complies with the Forest Plan – specifically the Access Amendment and Interagency Grizzly Bear Guidelines – in violation of NEPA, NFMA, and the APA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

1.    The Forest Service has failed to demonstrate compliance with the Access Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

a.    The Forest Service impermissibly ignores user-created roads and roads with breached closures in its Access Amendment calculations. . . . . . . . . . . . . . . . . . . . . . . . 6

b.    The Project EA fails to disclose the methodology for Access Amendment calculations. . . . . . . . . . . . . . . . . . 9

c.    The Forest Service impermissibly relies on an incorrect and undisclosed assumption that all barriers will be 100% effective for "in-kind replacement" of core. . . . 11

2.    The Forest Service has failed to demonstrate compliance with the Interagency Grizzly Bear Guidelines. . . . . . . . . . . . . . . . 13

B.    The Project EA fails to take a hard look at illegal motorized use and fails to discuss the efficacy of barriers and gates as mitigation measures in violation of NEPA and the APA. . . . . . . . . . . . . . . . . 17

1.    The Project EA fails to take a hard look at illegal road use because the EA relies on incorrect assumptions and data. . . . 30

    2.     The Project EA fails to provide the mandatory analysis of the efficacy of barriers and gates as mitigation measures. . . . . . . 32

   C.    The Forest Service must prepare supplemental NEPA analysis – either a supplemental EA or an EIS – to address the extremely high female grizzly mortalities suffered by the Cabinet-Yaak grizzly population in 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

TABLE OF AUTHORITIES

CASES

*Alliance for the Wild Rockies v. Bradford*, 856 F.3d 1238 (9th Cir. 2017). . . . . . . 8

*All. for Wild Rockies v. Probert*, 412 F.Supp.3d 1188 (D. Mont. 2019). . . . passim

*Alliance for the Wild Rockies v. Savage*, 897 F.3d 1025 (9th Cir. 2018) . . . . . . . . 8

*Cabinet Resources Grp. v. U.S. Fish and Wildlife Serv.,*
    465 F.Supp. 2d 1067 (D. Mont. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Oregon Nat. Res. Council v. U.S. BLM,* 470 F.3d 818 (9th Cir. 2006) . . . . . . . . . 2

*Neighbors of Cuddy Mountain v USFS,* 137 F.3d 1372 (9th Cir. 1998) . . . . . . . . 33

*N.Plains Res.Council, Incorporated v. Surface Transp.Bd.,*
    668 F.3d 1067 (9th Cir.2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Native Ecosystems Council v. Tidwell*, 599 F.3d 926 (9th Cir. 2010). . . . 36, 37, 38

 *Native Ecosystems Council v. U.S. Forest Service,*
    418 F.3d 953 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Foundation for North American Wild Sheep v. USDA,*
    681 F.2d 1172 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Southern Fork Band Council of Western Shoshone of Nevada v. U.S. Department
    of Interior,* 588 F.3d 718 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34

*Sierra Club v. Bosworth,* 352 F.Supp.2d 909 (D. Minn. 2005). . . . . . . . . . . . . . 33

*Swan View Coalition., Incorporated v. Barbouletos,*
    307 F. App'x 49 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*WildEarth Guardians v. Montana Snowmobile Association,*

790 F.3d 920 (9th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Wildearth Guardians v. Steele*, 545 F.Supp.3d 855 (D. Mont. 2021) . . . . . . . . . 34

STATUTES

16 U.S.C. §1604 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

REGULATIONS

40 C.F.R. §1501.12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

40 C.F.R. §1502.23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 9, 10

40 C.F.R. §1502.9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

## I.  INTRODUCTION

Consolidated Plaintiffs Alliance for the Wild Rockies and Native Ecosystems Council (collectively "Alliance") challenge the Black Ram Project (Project) on the Kootenai National Forest (Forest).  Alliance respectfully moves this Court for summary judgment on all claims and requests that this Court either vacate the Project decision or enjoin implementation of the Project until Defendants have complied with the law.

## II. STATEMENT OF FACTS

Pursuant to Local Rule 56.1, the relevant facts are set forth in Plaintiffs' and Consolidated Plaintiffs' Joint Statement of Undisputed Facts.

## III.  ARGUMENT

**A.    The Forest Service has failed to demonstrate that the Project complies with the Forest Plan – specifically the Access Amendment and Interagency Grizzly Bear Guidelines – in violation of NEPA, NFMA, and the APA.**

"NEPA's purpose is twofold: (1) to ensure that agencies carefully consider information about significant environmental impacts and (2) to guarantee relevant information is available to the public."  *N.Plains Res.Council, Inc. v. Surface Transp.Bd*., 668 F.3d 1067,1072 (9th Cir.2011).  "Agencies shall ensure the professional integrity, including scientific integrity, of the discussions and analyses in environmental documents. Agencies shall make use of reliable existing data and

resources. . . . They shall identify any methodologies used and shall make explicit reference to the scientific and other sources relied upon for conclusions in the statement." 40 C.F.R. §1502.23.

"Through the NEPA process, a federal agency must take a 'hard look' at the potential environmental consequences of the proposed action." *Oregon Nat. Res. Council v. U.S. BLM*, 470 F.3d 818, 820 (9th Cir. 2006)(citation and internal punctuation omitted). In order "[t]o take the required 'hard look' at a proposed project's effects, an agency may not rely on incorrect assumptions or data . . . . the data the Forest Service provides to the public to substantiate its analysis and conclusions must also be accurate." *WildEarth Guardians v. Montana Snowmobile Ass'n*, 790 F.3d 920, 926 (9th Cir. 2015).

In turn, NFMA requires that each National Forest develop a "Land and Resource Management Plan," i.e. a forest plan. 16 U.S.C. §1604(a). All site-specific projects must be consistent with the governing forest plan. 16 U.S.C. §1604(i). The "Forest Service's failure to comply with the provisions of a Forest Plan is a violation of NFMA." *Native Ecosystems Council v. U.S. Forest Service*, 418 F.3d 953, 961 (9th Cir. 2005).

As set forth below, in this case the Forest Service's failure to demonstrate compliance with the Access Amendment and Interagency Grizzly Bear Guidelines for Management Situation 1 habitat, as required by the Forest Plan, violate NEPA

and NFMA.

      **1.**      **The Forest Service has failed to demonstrate compliance with the Access Amendment**.

The Forest Plan states:  "***Standards*** . . . FW-STD-WL-02.  The Motorized Access Management within the Selkirk and Cabinet Yaak Grizzly Bear Recovery Zone Management Direction and [Record of Decision] is included in appendix B, and shall be applied."  FS-000040.  Within the official "Cabinet-Yaak Grizzly Bear Recovery Zone," the Access Amendment sets specific numeric limits on open motorized route density and total motorized route density, and requires a specific numeric minimum of secure core habitat.   FS-045909-12, 045860 (Table 2).  These limits – commonly referred to as 33/26/55 –  were derived from an agency study of six grizzly bears commonly referred to as Wakkinen and Kasworm (1997). FS-045865-66; *see Cabinet Res. Grp. v. U.S. Fish & Wildlife Serv*., 465 F.Supp. 2d 1067, 1099 (D. Mont. 2006)(discussing flaws in this study).  Although two of the six study bears were killed shortly after the study, the agencies nonetheless believe that the percentages averaged from the Wakkinen and Kasworm (1997) data constitute the best available science for motorized access management in the Cabinet-Yaak Recovery Zone.  FS-045865-66.

The Project area is within the Cabinet-Yaak Grizzly Recovery Zone "Bear Management Units" 14 and 15, which are also referred to as "Northwest Peak" and

"Garver," respectively.   FS-002541.  Northwest Peaks (#14) is 99% National Forest land, and must have no greater than 31% open motorized route density, no greater than 26% total motorized route density, and no less than 55% core. FS-045860.  Garver (#15) is 94% National Forest land, and must have no greater than 33% open motorized route density, no greater than 26% total motorized route density, and no less than 55% core.  FS-045860.  No reductions in existing percentage core are permissible in either unit until all Bear Management Units meet their minimum core standard.  FS-045910.

A document in the administrative record discloses that for the Black Ram Project analyses, when assessing "permanent" road density and core for the purposes of comparing existing condition and post-Project condition to Access Amendment standards, the Forest Service deliberately ignores known illegal road use: "any user-created routes or access, as well as breaches (e.g., dismantling or damaging gates and then proceeding to drive the route) are not considered part of the existing condition."  FS-004530.

In the Project EA section entitled "Methodology," the Forest Service fails to disclose the fact that illegal roads – both user-created roads and breaches of system roads – are ignored in Access Amendment calculations.  FS-002540; *see* FS-004530.  The Forest Service also fails to reference the record document that discloses this methodology.  FS-002540; *see* FS-004530.

Furthermore, in the most recent monitoring report in the record, the Forest

Service found 72 monitored barriers and gates had been breached, i.e. one out of

five monitored barriers and gates were breached.  FWS006182.  Additionally,

members of Yaak Valley Forest Council documented dozens of ineffective closures

in the Black Ram Project area in 2020 and 2021.  FS-004585-604; FS-004558-77;

FS-044262-66; FS-044664-88.

 Even with the exclusion of user-created and breached roads, the Project will

exceed the Wakkinen and Kasworm (1997)-derived limit of 33% for Garver during

Project implementation, with an open motorized route density of 36%.  FS-002552;

FS-045866.  Moreover, although undisclosed to the public in the Project EA, a

document in the administrative record indicates that open motorized route density

could reach as high as 42% during the Project.  FWS006056-57.

Similarly, even with the exclusion of user-created and breached roads, the

Project will exceed the Wakkinen and Kasworm (1997)-derived limit of 26% for

Garver during Project implementation, with a total motorized route density of 32%.

FS-002553; FS-045866.

Regarding core, the Forest Service plans to remove barriers or gates on 36

road segments to allow motorized access in existing core for the Project.  This

action will eliminate 4,952 acres of existing core habitat.  FS-004404.  Core will be

reduced in Northwest Peak from 46,854 acres to 44,931 acres out of 83,030 total

acres, which is a reduction from 56% core to 54% core.  FS-004406.  Core will be

reduced in Garver from 32,434 acres to 29,405 acres out of 58,841 total acres,

which is a reduction from 55% core to 50% core.  FS-004406.

The Forest Service proposes to install barriers on roads to create new core

areas as "in-kind" replacement of core.  FS-002553.  If barriers are 100% effective,

new core would total 2,269 acres in Northwest Peak and 3,062 acres in Garver;

however, these calculations do not exclude from core those areas with illegal

motorized use or breached closures.   FS-004406; FS-002540.

Critically, if the new barriers installed for "in-kind replacement" of core are

not effective, core in both Northwest Peak and Garver will be reduced below the

Wakkinen and Kasworm (1997)-derived minimum, and Access Amendment

standard, of 55%.  *See* FS-045865-66.  Additionally, the level of actual core

remaining after Project implementation has not yet been disclosed to the public

because the core calculations do not exclude from core those areas with illegal

motorized use or breached closures.   FS-004406; FS-002540.

> ### a.   The Forest Service impermissibly ignores user-created roads and roads with breached closures in its Access Amendment calculations.

First, the Forest Service's refusal to include user-created roads and roads

with breached closures in road density calculations, as well as its failure to exclude

the same from core calculations, make it impossible to determine whether the

Project complies with the Access Amendment, which violates NFMA and NEPA.

The Ninth Circuit holds "we must . . . be able reasonably to ascertain from the

record that the Forest Service is in compliance with [a Forest] Plan standard."

*Native Ecosystems*, 418 F.3d at 963.  A reviewing court cannot "be expected to

chisel that which must be precise from what the agency has left vague and

indecisive."  *Id*. (citation omitted).  In *Native Ecosystems*, the Ninth Circuit found:

"The Elkhorn project EIS utilized a calculation denominator that was plainly

inconsistent with the Forest Plan standard. []  In our own review of the

administrative record, we are unable to discern that the Forest Service's hiding

cover calculations complied with the requirements of the [Forest] Plan."  *Id.*

Similarly here, the Black Ram Project EA fails to provide a calculation that

is consistent with the Forest Plan, and the administrative record also fails to

establish that the Project complies with the Forest Plan; therefore, the Project

violates NFMA and NEPA.  *See Native Ecosystems*, 418 F.3d at 963.  Under the

Forest Plan Access Amendment, any road with motorized use must be included in

road density calculations and excluded from core blocks.  Open Motorized Route

Density must include all roads "not meeting all restricted or obliterated criteria . . .

."  FS-045859.  Total Motorized Route Density must include all roads "not meeting

all reclaimed criteria . . . ."  FS-045859.  A restricted road "requires effective

physical obstruction," and a reclaimed/obliterated road "no longer function[s] as a

road." FS-007215-16.   Additionally, core areas must have "effective barriers"

with no areas that "function as a motorized route."  FS-045909.

The Ninth Circuit has addressed a similar issue in the context of "Bears

Outside Recovery Zone" Access Amendment standards in two cases.  First, in

*Alliance for the Wild Rockies v. Bradford*, the court held that any road with an

ineffective road closure must be counted in total road calculations.  856 F.3d 1238,

1243 (9th Cir. 2017).  Second, in *Alliance for the Wild Rockies v. Savage*, the court

held that unauthorized roads, referred to as "undetermined roads" in that case, must

be counted in total road calculations.  897 F.3d 1025, 1035-37, and  n.16, n.18 (9th

Cir. 2018).  The same is true in this case: both breached roads (i.e. roads with

ineffective closures) and user-created roads (i.e. unauthorized roads) must be

included in Access Amendment calculations.  The fact that they are not in this case

is undisputed and requires a remand to the agency.

In conclusion, by excluding user-created roads and breached roads from

Access Amendment calculations for the Black Ram Project, the Forest Service is

impermissibly excluding roads with actual motorized use from Access Amendment

calculations.  The Forest Service's failure to disclose the true existing condition

and post-Project condition of motorized access in the Project area renders it

impossible to determine whether the Project complies with the Access Amendment

standards, in violation of both NFMA and NEPA.  *See, e.g., Native Ecosystems*,
418 F.3d at 963.

> **b.**    **The Project EA fails to disclose the methodology for Access
> Amendment calculations.**

Second, as noted above, the NEPA regulations require that the Forest Service
"shall identify any methodologies used" in a project EA.  40 C.F.R. §1502.23.
Moreover, in order to take the mandatory "hard look" at a project's effects, the
"data the Forest Service provides to the public . . . must . . . be accurate."
*WildEarth Guardians*, 790 F.3d at 926.

Here, the Project EA violates both mandates.  First, the Project EA fails to
identify the methodology the Forest Service uses for Access Amendment
calculations.  As noted above, a document in the administrative record entitled
"Process review for assessing [Bear Management Unit] metrics for the
project-specific grizzly bear analysis in the Black Ram Project" discloses that for
the Black Ram Project analyses, when assessing "permanent" road density and core
for the purposes of comparing existing condition and post-Project condition to
Access Amendment standards, the Forest Service excludes known illegal road use
from the calculations:

> The routes used to establish the 'permanent' condition are those that
> are authorized routes. Unauthorized use features are not. That is, *any
> user-created routes or access, as well as breaches* (e.g., dismantling

or damaging gates and then proceeding to drive the route) *are not considered part of the existing condition*.

 FS-004530 (emphasis added).

The Project EA includes a section in the grizzly bear analysis section entitled "Methodology."  FS-002540.  This "Methodology" section fails to disclose the fact that both user-created roads and breaches of existing road closures are excluded from Access Amendment road density calculations and included in core calculations in the Project EA.  FS-002540; *see* FS-004530.  This "Methodology" section in the Project EA also fails to reference the record document entitled "Process review for assessing [Bear Management Unit] metrics for the project-specific grizzly bear analysis in the Black Ram Project."  FS-002540; *see* FS-004530.  These failures violate the regulatory mandate that the Forest Service "shall identify any methodologies used" in a project EA.  40 C.F.R. §1502.23.

Additionally, by failing to disclose accurate calculations of open motorized route density, total route density, and core – as those terms are defined by the Access Amendment – the Forest Service is also violating NEPA's "hard look" requirement because the "data the Forest Service provides to the public . . . must . . . be accurate."  *WildEarth Guardians*, 790 F.3d at 926.

**c.    The Forest Service impermissibly relies on an incorrect and undisclosed assumption that all barriers will be 100% effective for "in-kind replacement" of core.**

Finally, as noted above, an "agency may not rely on incorrect assumptions" in a NEPA analysis. *WildEarth Guardians*, 790 F.3d at 926.  In this Project, the Forest Service plans to remove barriers or gates on 36 road segments to allow motorized access in existing core for the Project.  This action will eliminate 4,952 acres of existing core habitat.  FS-004404.  Core will be reduced in Northwest Peak from 56% core to 54% core.  FS-004406.   Core will be reduced in Garver from 55% core to 50% core.  FS-004406.  The Forest Service proposes to install barriers on roads to create new core areas as "in-kind" replacement of core.  FS-002553.

Critically, however, if the new barriers installed for "in-kind replacement" of core are not effective, core in both Northwest Peak and Garver will be reduced below the Wakkinen and Kasworm (1997) - derived minimum, and Access Amendment standard, of 55%.  *See* FS-045865-66.  The Project EA's analysis and conclusion regarding Access Amendment compliance is therefore premised on an unstated assumption that all barriers will be 100% effective.

Contrary to this unstated assumption, as set forth in more detail below in Section III(B), in the most recent monitoring report in the record, the Forest Service itself found that 72 monitored barriers and gates had been breached, i.e. one out of five monitored barriers and gates were breached.  FWS006182.

Additionally, members of Yaak Valley Forest Council documented dozens of ineffective closures in the Black Ram Project area in 2020 and 2021.  FS-004585-604, 4558 - 4577; FS-044262-66; FS-044664-88.  Many of these ineffective closures are barriers – i.e. dirt berms – that have been easily driven over or around by all terrain vehicles or motorcycles.  *See e.g.* FS-044262-66; FS-044664-88 (15 berms with established trails around them in Black Ram Project area).

Accordingly, the agency's assumption that barriers will be 100% effective is an incorrect assumption that the Forest Service "may not rely on" in the Project EA.  *WildEarth Guardians*, 790 F.3d at 926.  Without 100% barrier effectiveness, it is unclear whether the Project will violate the Access Amendment standard for core: the Project reduces core and proposes "in-kind replacement" of core, but in-kind replacement of core is only lawful if the barriers are "effective" so that routes behind the barriers can "no longer function as motorized routes."  FS-045090.  If a motorcyle can drive over or around a berm, then that route can still "function as a motorized route" and accordingly cannot be counted as in-kind core replacement.  *See id.*  A remand is therefore necessary to take a hard look at how the 22% ineffective closure rate across the Forest, and at least 15 known failed berms in the Black Ram Project area itself, impact the agency's "in-kind replacement" assumptions for grizzly core habitat.  *See WildEarth Guardians*, 790 F.3d at 926.

2.   **The Forest Service has failed to demonstrate compliance with the Interagency Grizzly Bear Guidelines.**

In addition to mandating compliance with the Access Amendment, the Forest Plan also mandates compliance with the Interagency Grizzly Bear Guidelines.  The Forest Plan states: "***Guidelines*** . . . Elements contained in the most recent 'Interagency Grizzly Bear Guidelines,' or a conservation strategy once a grizzly bear population is delisted, would be applied to management activities." FS-000042.  Nearly all of the Northwest Peak Bear Management Unit is Management Situation 1 habitat for grizzly bears.  FS-002547-48.  86% of the Garver Bear Management Unit  is Management Situation 1 habitat for grizzly bears.  FS-002547-48.

The most recent Interagency Grizzly Bear Guidelines in the administrative record are from 1986, and for "Management Situation 1," they state: "Management decisions will favor the needs of the grizzly bear when grizzly habitat and other land use values compete. Land uses which can affect grizzlies and/or their habitat will be made compatible with grizzly needs or such uses will be disallowed or eliminated." FS-005037.

The Ninth Circuit has previously addressed this language and required a remand where the Forest Service did not address this Forest Plan requirement in a project EIS or Record of Decision:

the Forest Service did not adopt *any* standard in either the FEIS or the ROD for evaluating when land uses "compete" within the meaning of the Forest Plan, or even acknowledge the requirement. We therefore conclude that the district court's grant of summary judgment to the agency defendants on this point was in error. As the Service did not adequately consider a factor relevant to its compliance with the Forest Plan, its decision cannot stand.

*Swan View Coal., Inc. v. Barbouletos*, 307 F. App'x 49, 51 (9th Cir. 2009).

The same holding is required in this case.  The Forest Service "did not adequately consider a factor relevant to its compliance with the Forest Plan" because it did not "even acknowledge the requirement" that "[m]anagement decisions will favor the needs of the grizzly bear when grizzly habitat and other land use values compete" in the Black Ram Project EA or decision.  *Id.*; FS-005037.  Moreover, the Forest Service "did not adopt *any* standard in either the [EA or decision] for evaluating when land uses 'compete' within the meaning of the Forest Plan [.]"  *See Barbouletos*, 307 F. Appx at 51.

Furthermore, the Black Ram Project does not favor the needs of grizzlies and the Project is not compatible with the needs of grizzlies for the following reasons:

• The Project is likely to adversely affect Cabinet-Yaak grizzly bears, FS-002538;

• The Project may cause incidental take of female Cabinet-Yaak grizzlies, FS-004427;

- The Project will allow a potentially 10-year exceedence of the best available scientific limits on road density for grizzly bears in the Cabinet-Yaak Recovery Zone, FS-002552-53, FS-045866, FWS006056-57;

- If all barriers are not 100% effective, the Project may reduce core below the 55% minimum that the agencies believe is the best available science, *see* FS-045865-66;

- The recovery target for Cabinet-Yaak grizzlies is 100 bears, but the last count of actual live bears was 42 individuals in 2020, FS-005718, down from 45 individuals in 2019, FS-005611, 50 individuals in 2018, FS-005961, and 54 individuals in 2017, FS-005509;

- The Cabinet-Yaak grizzly population is failing all recovery targets/goals, FS-005710;

- In the six-year period 2017 - 2022, there have been at least 17 mortalities of Cabinet-Yaak grizzlies, which is a mortality rate of at least 2.8 bears/year, FS-005705-07, Declaration of Michael Garrity ¶¶5, 15(Jan. 25, 2023);

- In the six-year period 2017 - 2022, there have been at least seven mortalities of female Cabinet-Yaak grizzlies, which is a female mortality rate of at least 1.2 female bears/year, FS-005705-07; Garrity Declaration ¶¶5, 15;

- "In the small Cabinet and Yaak populations, the difference between growth and decline is 1 or 2 adult females being killed annually or not," FS-036976; and

- The  Cabinet-Yaak grizzly population has "low" resiliency, which means a low ability for populations to persist in the face of stochastic events, or for populations to recover from years with low reproduction or reduced survival, FS-007432, 007451.

Additionally, there are a number of other express and applicable provisions from the Interagency Guidelines, but the Project EA also fails to address these provisions.  One such provision states:  "Logging and/or fire management activities which will adversely affect grizzly bear populations or their habitat will not be permitted."  FS-005042.  Similarly, [e]xisting or proposed activities or uses which will adversely affect grizzly populations and/or their habitat will be terminated, removed, relocated or denied."  FS-005051.  The agencies reach a conclusion that the Black Ram Project is "likely to adversely affect" grizzly bears, FS-002538, but the conflict between the Interagency Guidelines and the adverse effect finding is not addressed in the Project EA.  Other provisions from the Interagency Guidelines that are not addressed in the Project EA include timing restrictions, FS-005042, and road restrictions,  FS-005048, 005052.

Instead of disclosing these provisions and applying them to the Project, the

16

Project EA offers a conclusory sentence: "The planning process, project design, and forest-level activity are all consistent with the guidelines (see [Interagency Grizzly Bear Committee] guideline consistency in the project file)." FS-002557. The referenced document, however, was not publicly available on the Forest Service's website during the public comment or objection period for the Black Ram Project. *See* FS-002557. Therefore, any reliance on this document would be improper because "[a]gencies may not incorporate material by reference unless it is reasonably available for inspection by potentially interested persons within the time allowed for comment." 40 C.F.R. §1501.12; *see also Wildearth Guardians*, 790 F.3d at 925.

For all of these reasons, the Forest Service has failed to demonstrate Forest Plan compliance, in violation of NEPA, NFMA, and the APA.

**B.    The Project EA fails to take a hard look at illegal motorized use and fails to discuss the efficacy of barriers and gates as mitigation measures in violation of NEPA and the APA.**

Access to Project units would occur on open, gated, barriered, or newly-constructed roads. FS-002551. The Project authorizes 3.3 miles of new permanent road construction and road reconstruction on 90.3 miles of open, gated, or barriered roads. FS-002155, 002550. The Forest Service promises to "block" 32.0 miles of existing system roads to provide for "in-kind" grizzly bear core habitat replacement. The Forest Service also promises to "block[] the entrance" for 20.0

17

miles of existing system roads in order to "decommission" the roads and "remove[]" those roads "from the system."  FS-002495; FS-002155, 002191.

On July 23, 2021, Yaak Valley Forest Council (Yaak Valley) informed the Forest Service that "based on field reviews conducted on July 22, 2021, . . . the Forest Service's efforts to limit unauthorized use are ineffective at halting motor vehicle trespass, contradicting the commitments made in both the EA and [Biological Assessment]."  FS-004583.  Yaak Valley documented the following ineffective barriers and instances of illegal motorized use in the Project area:



| Site | Yaak Valley Forest Council  Photo (July 22, 2021) | Forest Service Photo (July or August 2021) |
|------|---------------------------------------------------|--------------------------------------------|
| BR-1 | User-created bypass with an 8-foot cleared opening to the left of the gate | |
| BR-2 | Newly-installed berm can be bypassed to the left and right | |



| BR-3 | | 5-foot opening to the left of gate with tire tracks behind the gate on the road bed | |
| BR-4 | | Tire ruts allow motorized use passage to the left of the berm | |

//

//

//



| BR-5 | 4-foot wide passage to the left of the berm with visible tire tracks |
| BR-6 | User-created road with no barrier |

//

//

//

20

| BR-7 |  3.5-foot wide passage to the right of the berm |  |
|------|---------------------------------------------------------------------|----------------------|
| BR-8 |  Shallow berm is ineffective and road is frequently traveled. | No Forest Service photo provided.  Forest Service Report states: "This route is barriered (MVUM) but we consider it open for bear management unit assessment due to use." |
| BR-10 |  User-created road with ineffective barrier. | No Forest Service photo provided.  Forest Service Report states: "We documented this route this year. Unauthorized use is illegal regardless of terrain." |

//

//

| | | |
|---|---|---|
| BR-9 | <br><br>User-created road with ineffective barrier. | No Forest Service photo provided.  Forest Service Report states: "We documented this route this year. Unauthorized use is illegal regardless of terrain." |
| BR-11 | <br><br>Motor vehicle passage to right of berm with sign broken from being driven over |  |

//

//

//

22



BR-12 — Newly-installed berm can be bypassed to the left and right.

BR-13 — Motor vehicle passage to the right of the gate.

//

//

//

| BR-14 |  5-foot wide passage to the right of the berm allows motorized access into grizzly core. |  |
| BR-15 |  Ineffective barrier |  |

//

//

//



| BR-16 | No barrier after fallen trees removed; motor vehicle tracks present | |
| BR-17 | No barrier and not mapped as an open road. | |
| BR-18 | 5-foot wide passage to the right of the gate | |



FS-004585-604, 004558-77.

Furthermore, Yaak Valley completed additional surveys on September 30, 2021, and October 1, 2021, including revisiting many of the locations pictured above, and Yaak Valley documented 15 ineffective berms, 17 ineffective gates, and 13 roads with no gate or berm.  FS-044262-66 (Yaak Valley report with photos excluded); FS-044664-88 (Forest Service response with photos included).

The photographs below document 15 berms with established trails around

26

the berms that allow motorcycle and potentially all terrain vehicle use:



FS-044262-66; FS-044664-88.

The photographs below document 17 ineffective gates with openings around the gate that allow motorcycle and potentially all terrain vehicle use:

//


//



FS-044262-66; FS-044664-88.

//

//

The photographs below document 13 roads with no gate or berm:



FS-044262-66; FS-044664-88.

Finally, during 2020, across the Kootenai National Forest, the Forest Service itself found 32 breached barriers and repaired none. FWS006182. The Forest Service also found 40 breached gates and repaired only nine. FWS006182. The Forest Service did not disclose this monitoring report in its administrative record for the Project; instead, the document is found only in the U.S. Fish & Wildlife Service administrative record for the Project. FWS006182.

1.      **The Project EA fails to take a hard look at illegal road use because the EA relies on incorrect assumptions and data.**

As discussed above, in order "[t]o take the required 'hard look' at a proposed project's effects, an agency may not rely on incorrect assumptions or data . . . ." *Native Ecosystems Council*, 418 F.3d at 964.  In *All. for Wild Rockies v. Probert*, this Court addressed a case in which a logging project EIS on the Kootenai National Forest assumed that all road closures would be effective following project implementation.  412 F.Supp.3d 1188, 1207 (D. Mont. 2019).  However, a monitoring report in the record found ineffective closures and illegal road use.  *Id.* The Forest Service argued that its general statements in the EIS about grizzly bear displacement were sufficient, but this Court found that the EIS "specifically relie[d] on restricted public access to roads."  *Id.*

Thus, this Court held: "while the agency considered bear disturbance and displacement, the actual effects analyzed were limited by its assumption that public use would be effectively restricted.  As argued by Alliance, that assumption has shown false . . . ."  *Id.* at 1207-08.  The Court ultimately held: "This therefore leads to the close question of whether the incorrect assumptions of the NEPA documents coupled with the uncertainty of the extent of ineffective closures is sufficient to trigger supplemental analysis. It is."  *Id.* at 1208.

The same holding is required here.  As discussed above in Section (A)(1)(c), the Project EA's Access Amendment compliance calculations assume all road

closures will be effective.  Moreover, the Project EA represents and assumes that

any breaches will be quickly repaired:

> In the past, we have noted unauthorized use of restricted roads, and
> occasionally an unauthorized, user-created road is discovered. The
> District has made repairs for any such breaches as quickly as possible
> after discovery. . . .By making needed repairs, we continue to maintain
> the . . . standards for core and motorized route densities.

FS-002544.

Contrary to this representation and assumption that all breaches are quickly

repaired, during 2020, the Forest Service itself found 32 breached barriers and

repaired none of them (0%).  FWS006182.  Additionally, during 2020, the Forest

Service found 40 breached gates and repaired only nine of the breached gates

(24%).  FWS006182.  This available data is not disclosed to the public anywhere in

the Project EA or Decision.  FWS006182; *see, e.g.,* FS-002544.

Furthermore, neither the Project Decision nor the Project EA discloses to the

public any of the 45 instances of ineffective barriers, ineffective gates, and/or

missing gates/berms discovered and documented by Yaak Valley during surveys on

September 30, 2021, and October 1, 2021.  FS-044262-66; FS-044664-88.

Similarly, neither the Project Decision nor the Project EA discloses to the public

any of the 20 instances of known ineffective barriers and/or illegal user-created

roads in the Project area discovered by Yaak Valley in its 2020 and July 2021

surveys. FS-004585-604, 004558-77.

31

Significantly, in response to one of Yaak Valley's reports, the Forest Service acknowledges the existence of illegal, user-created roads in the Black Ram Project area, but refuses to take any response action.  Instead of taking action, the Forest Service simply states: "Unauthorized use is illegal regardless of terrain." FS-004566, 004567.

Thus, as in *Probert*, 412 F.Supp.3d at 1207, here too the record disproves the Project EA's assumptions.  While the Project EA assumes 100% closure effectiveness in its Access Amendment compliance calculations, and assumes that any breaches will be quickly repaired, the record belies these assumptions.  For these reasons, here, as in *Probert*, "the actual effects analyzed were limited by [the EA's] assumption that public use would be effectively restricted. As argued by Alliance, that assumption has shown false . . . ." 412 F.Supp.3d at 1207-08. Accordingly, "the incorrect assumptions of the NEPA documents coupled with the uncertainty of the extent of ineffective closures" requires a remand for a supplemental NEPA analysis to take a hard look at this issue.  *See id.* at 1208.

## 2.   The Project EA fails to provide the mandatory analysis of the efficacy of barriers and gates as mitigation measures.

As discussed above, the Project EA violates NEPA because it is premised on false assumptions that closures will be 100% effective at preventing motorized use, and that any breaches in closures will be quickly repaired. In addition, more broadly, the Project EA fails to comply with NEPA's mandate to

discuss the efficacy of the proposed mitigation measures – here berms and gates –
in the NEPA analysis document.

The Ninth Circuit holds:  "An essential component of a reasonably complete
mitigation discussion is an assessment of whether the proposed mitigation
measures can be effective. . . . A mitigation discussion without at least some
evaluation of effectiveness is useless in making that determination."  *S. Fork Band
Council of W. Shoshone of Nevada v. U.S. Dep't of Interior*, 588 F.3d 718, 727
(9th Cir. 2009).  "Mitigation must be discussed in sufficient detail to ensure that
environmental consequences have been fairly evaluated."  *Neighbors of Cuddy
Mountain v USFS*, 137 F.3d 1372, 1380 (9th Cir. 1998) (citations & quotation
marks omitted).

If the effectiveness of a mitigation measure – such as a road closure – is not
assured, then the Forest Service cannot issue a Decision Notice & Finding of No
Significant Impact, and instead must prepare an EIS. *See, e.g., Foundation for
North American Wild Sheep v. USDA*, 681 F.2d 1172, 1178 (9th Cir. 1982)
(EIS required because Forest Service failed to establish road closure was an
effective mitigation method); *Sierra Club v. Bosworth*, 352 F.Supp.2d 909, 924-25
(D. Minn. 2005)(EIS required because of "questionable efficacy of road closures
through use of berms and gates" and "illegal uses").

In this case, the Project EA does not provide the required "evaluation of

33

effectiveness" for closure devices, *see S. Fork Band Council*, 588 F.3d at 727, which at bare minimum should include a disclosure of the failure rate of closure devices, as well as the available data in the record from Forest Service and Yaak Valley monitoring reports documenting dozens of breaches.  As discussed above, the Forest Service monitoring report in the record documents 72 breaches of berms and gates in 2020; this available data is not disclosed to the public anywhere in the Project EA or Decision.  FWS006182; *see, e.g.,* FS-002544.

Furthermore, neither the Project Decision nor the Project EA discloses to the public any of the 45 instances of ineffective barriers, ineffective gates, and/or missing gates/berms discovered and documented by Yaak Valley during surveys on September 30, 2021, and October 1, 2021.  FS-044262-66; FS-044664-88. Similarly, neither the Project Decision nor the Project EA discloses to the public any of the 20 instances of known ineffective barriers and/or illegal user-created roads in the Project area discovered by Yaak Valley in its 2020 and July 2021 surveys. FS-004585-604, 004558-77.

The agency's failure to disclose and discuss this key information in the Project EA violates NEPA.  *S. Fork Band*, 588 F.3d at 727; *see also Wildearth Guardians v. Steele*, 545 F.Supp.3d 855, 867 (D. Mont. 2021)(this Court finding that the failure to address monitoring reports finding ineffective road closures in a biological opinion violates the Endangered Species Act).

**C.    The Forest Service must prepare supplemental NEPA analysis – either a supplemental EA or an EIS – to address the extremely high female grizzly mortalities suffered by the Cabinet-Yaak grizzly population in 2022.**

Finally, regardless of the Court's holdings on any other claims, significant new information has come to light since the June 2022 Decision Notice, and supplemental NEPA analysis is therefore required at this time – either in the form of a supplemental EA or a full EIS.  The NEPA regulations mandate:

Agencies:

(1) Shall prepare supplements to either draft or final environmental impact statements if a major Federal action remains to occur, and:

(i) The agency makes substantial changes to the proposed action that are relevant to environmental concerns; or

(ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

40 C.F.R. §1502.9.

The requirement to supplement an EIS under these circumstances applies in equal force to EAs.  For example, in *Native Ecosystems Council v. Tidwell*, the Ninth Circuit held:

the Forest Service's decision not to supplement the Environmental Assessment following the Connelly Review's discussion of the 1900 acres of nesting habitat fails to comply with the agency's obligations to supplement an environmental assessment when "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its

35

impacts."

599 F.3d 926, 937 (9th Cir. 2010)(citations omitted).

In *Tidwell*, the Ninth Circuit found that the Forest Service's EA was "predicated on the assumption that no nesting habitat existed in the project area[.]" 599 F.3d at 937. However, new information that post-dated the original EA undermined that assumption; thus the court found a supplemental EA or EIS would be necessary to address the impact to the species. *Id.*

In this case, as in *Tidwell*, new information that post-dates the Forest Service's EA indicates that actual effects on a sensitive wildlife species may differ from the impacts analyzed in the original EA. *See Tidwell*, 599 F.3d at 937. Here, the Black Ram Project EA is predicated on an assumption that the Cabinet-Yaak grizzly population is increasing and recovering; however, new information establishes a record-high female Cabinet-Yaak grizzly mortality rate in 2022, which undermines any assumption that this population is increasing and recovering.

The Project EA provides the public with the following assumptions regarding the status of the Cabinet-Yaak grizzly population:

- "In 2017, the Cabinet-Yaak Ecosystem had an estimated 55-60 individuals with a 73 percent probability that the population was stable or increasing (Kasworm et al. 2018)," FS-002541;

- "In the Cabinet-Yaak Recovery Zone . . . bear numbers have been increasing and with increasing confidence. . . . it is evident in the Cabinet-Yaak Recovery Zone and on the Kootenai National Forest that Forest Service activities under this framework have been successful at supporting recovery," FS-002557;

- "Current research indicates the population is increasing and is greater than when listed," FS-002559;

After the Project EA was released in June 2022, new information was released by the U.S. Fish & Wildlife Service regarding the status of the Cabinet-Yaak grizzly population.  On October 17, 2022, U.S. Fish and Wildlife Service biologist Wayne Kasworm presented a powerpoint to the Kootenai Valley Resource Initiative collaborative group.  Garrity Declaration ¶15.  In the powerpoint presentation at page 8, the U.S. Fish & Wildlife Service disclosed the fact that by that date – October 17, 2022 – three female Cabinet-Yaak grizzly bears had been killed in 2022.  *Id.*  The following image is an unaltered screenshot of page 8 of the U.S. Fish & Wildlife Service presentation:

//


//


37



*Id.*

The only published, peer-reviewed scientific study on the Cabinet-Yaak

grizzly population is "Density, Distribution, and Genetic Structure of Grizzly

Bears in the Cabinet-Yaak Ecosystem," which was published in The Journal of

Wildlife Management, and is commonly referred to Kendall et al. (2016).  FS-

036961-78.  Kendall et al. (2016) expressly finds: "In the small Cabinet and Yaak

populations, the difference between growth and decline is 1 or 2 adult females

being killed annually or not."  FS-036976.  Thus, the death of three females in a

single year will likely lead to decline.  *Id.*

The loss of three female Cabinet-Yaak grizzlies in a single year – 2022 – is

thus significant new information or a change in circumstances that necessitates a

new and more accurate analysis in the Black Ram Project EA or EIS of the current status of the Cabinet- Yaak grizzly population and how this logging and roading project will likely impact this imperiled population.  This new analysis is particularly crucial because the Project occurs within the designated Recovery Zone for this population and, as discussed above in Section (A)(1), the Project allows road densities and impacts that will exceed the "best available science" limits for potentially ten years during Project implementation.  The Forest Service's failure to prepare a supplemental EA or EIS under these circumstances violates NEPA and the APA.  *See Tidwell*, 599 F.3d at 937.

## IV.  CONCLUSION

For all of the reasons stated above, Alliance respectfully requests that the Court enter summary judgment in Alliance's favor, either vacate the Black Ram Project decision or enjoin the Black Ram Project, and remand to the agency for further analysis.


Respectfully submitted this 27th Day of January, 2023.

/s/ Rebecca K. Smith
Rebecca K. Smith
PUBLIC INTEREST DEFENSE CENTER, PC

Timothy M. Bechtold
BECHTOLD LAW FIRM, PLLC

Attorneys for Consolidated Plaintiffs

CERTIFICATE OF COMPLIANCE

The undersigned certifies that the foregoing brief is 6,476 words, which is

within the 6,500 word limit set by Doc. 40, excluding the caption, table of

authorities, table of contents, signature blocks, and certificate of compliance.

/s/ Rebecca K. Smith
Rebecca K. Smith
PUBLIC INTEREST DEFENSE CENTER, P.C

Timothy M. Bechtold
BECHTOLD LAW FIRM, PLLC

Attorneys for Consolidated Plaintiffs