Rachel G. Inabnit
Law Office of Rachel Inabnit, PLLC
P.O. Box 8846
Missoula, MT 59807
(406) 300-5316
rachel@inabnitlawoffice.com

Edward B. Zukoski (Admitted *Pro Hac Vice*)
Center for Biological Diversity
1536 Wynkoop Street, Suite 421
Denver, CO  80202
(303) 641-3149
tzukoski@biologicaldiversity.org

Andrea Zaccardi (Admitted *Pro Hac Vice*)
Center for Biological Diversity
P.O. Box 469
Victor, ID  83455
(303) 854-7748
azaccardi@biologicaldiversity.org

*Attorneys for Plaintiffs Center for Biological Diversity et al.*

Rebecca K. Smith
Public Interest Defense Center, P.C.
P.O. Box 7584
Missoula, MT 59807
(406) 531-8133
publicdefense@gmail.com

Timothy M. Bechtold
Bechtold Law Firm, PLLC
P.O. Box 7051
Missoula, MT 59807
(406) 721-1435
tim@bechtoldlaw.net

*Attorneys for Consolidated Plaintiffs Alliance for the Wild Rockies et al.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### MISSOULA DIVISION

CENTER FOR BIOLOGICAL, *et al.*,

      Plaintiffs,

  and

ALLIANCE FOR THE WILD ROCKIES
and NATIVE ECOSYSTEMS COUNCIL,

      Consolidated Plaintiffs,

  vs.

UNITED STATES FOREST SERVICE,
*et al.*;

      Defendants,

KOOTENAI TRIBE OF IDAHO,

      Defendant-Intervenor,

  and

KRISTEN KAISER, District Ranger,
Kootenai National Forest, Three Rangers
Ranger District, et al.,

      Consolidated Defendants.

Lead Case No.
9:22-cv-00114-M-DWM

Consolidated Case No.
9:23-cv-00003-M-DWM

**PLAINTIFFS' JOINT
STATEMENT OF
UNDISPUTED FACTS**

Plaintiffs Center for Biological Diversity et al. (case 9:22-cv-00114-M-DWM) and Consolidated Plaintiffs Alliance for the Wild Rockies et al. (9:23-cv-00003-M-DWM) hereby submit this Joint Statement of Undisputed Facts in support of our respective motions for summary judgment, filed today, pursuant to this Court's order. *See* Order, ECF No. 40, Case 9:22-cv-00114-DWM (Jan. 20, 2023).

## I.   THE BLACK RAM PROJECT

1.     The Forest Service approved the Black Ram Project ("Project") in June 2022. FS-002146. The Black Ram Project area covers 95,000 acres in the northwest corner of Montana, and is bordered on the west by mountains near the Idaho-Montana border, and on the north by the US-Canada border. Complaint, ECF No. 1 ¶ 40, Doc. 1 (June 30, 2022); Federal Defendants Answer ECF No. 21 ¶ 40, Doc. 21 (Sep. 22, 2022) (admitting). On the area's western extent, the Northwest Peaks Scenic Area overlooks the project with three peaks topping out at over 7,000 feet above sea level. *Id*. From the peaks, the area descends toward the project's low point along the Yaak River at about 3,000 feet in elevation. *Id*. The large vertical relief results in the area hosting a variety of ecosystems and habitat niches. Wildlife, including wolves and species protected under the Endangered Species Act (ESA) including Canada lynx and grizzly bear, call the Project area home. FS-002538, FS-002636.

1

2.      Over 13,000 acres of the Project area harbor "old growth" forest stands, which are characterized by large, old trees, interspersed with snags and downed timber. FS-002358.

3.      Twenty-eight miles of the Pacific Northwest National Scenic Trail, one of only eleven designated national scenic trails in the United States, which runs from Glacier National Park to the Pacific Coast in Washington, cross the area. FS-002260.

4.      Nearly 19,000 acres inventoried roadless areas occur in the area, where they are managed pursuant to the protective Roadless Area Conservation Rule. FS-002395, FS-002401.

5.      The West Fork Yaak River and Yaak River meander within the Valley; the Forest Service has found segments of these streams eligible for protection as Wild and Scenic Rivers. FS-002432.

6.      The 320-acre Pete Creek Botanical Area, designated by the Forest Plan to protect its "unique, unusual, or important" flora, lies within the Project area. FS-002167; FS-000065–000066.

7.      The Project area is within the Cabinet-Yaak Grizzly Recovery Zone "Bear Management Units" 14 and 15, which are also referred to as "Northwest Peak" and "Garver," respectively. FS-002541.

8.      Northwest Peak includes the northwest corner of Montana and northeast corner of Idaho; Garver is adjacent to Northwest Peak to the east and is entirely within Montana. Both Bear Management Units border British Columbia, Canada. FS-002541.

9.      Nearly all of Northwest Peak is Management Situation 1 habitat for grizzly bears. FS-002547–002548.

10.     Eighty-six percent of Garver is Management Situation 1 habitat for grizzly bears.  FS-002547–002548.

## II.   THE IMPERILED STATE OF GRIZZLY BEARS IN THE YAAK AREA

11.     Grizzlies once ranged throughout western North America, from central Mexico to Alaska. FWS-000961. In the lower 48 states alone, there were an estimated 50,000 grizzly bears. *Id.* But as European settlers moved west around the turn of the 19th Century, their persecution of grizzly bears caused dramatic population declines and substantial habitat loss. *Id.* By the 1930s, grizzlies had been extirpated from 98 percent of their former range. FWS-005295, FWS-005305.

12.     In 1975, two years after the Endangered Species Act's enactment, Fish and Wildlife Service listed grizzly bears across the lower 48 states as a threatened species. Amendment Listing the Grizzly Bear of the 48 Conterminous States as a Threatened Species, 40 Fed. Reg. 31,734 (July 28, 1975). Fish and Wildlife Service has long recognized that in order to conserve and recover grizzly

3

bears, it must reduce human-caused mortality and curb habitat loss. FWS-005288, FS-008245.

13.     In 1993, Fish and Wildlife Service issued an updated Grizzly Bear Recovery Plan which designated distinct "recovery zones" for grizzly bear recovery in the lower 48 states, one of which is the Cabinet-Yaak Ecosystem. FWS-005377–005394. The Fish and Wildlife Service has determined that conserving and recovering grizzly bears in each of the recovery zones is essential to the conservation of the species. FWS-005311.

14.     The Cabinet-Yaak Ecosystem is a roughly 2,600-square-mile area of primarily federal public lands in northwest Montana and northeastern Idaho, and includes the Black Ram Project area. FWS-005379. Fish and Wildlife Service has established a population size of 100 individuals as a minimum recovery goal for the Cabinet-Yaak grizzly population. *Id*.

15.     Today, the population in the Cabinet-Yaak Ecosystem falls far short of that goal of 100 individual grizzlies. *See, e.g.,* FWS-000011. Forest Service and Fish and Wildlife Service estimate a population of 60 grizzly bears in the Cabinet-Yaak Ecosystem. *Id.*; FS-002541 (Forest Service adopting Fish and Wildlife Service's estimate).

16.     Fish and Wildlife Service has acknowledged that "populations with fewer than 50 to 100 adult[] [grizzlies]," such as the population in the Cabinet-

Yaak Ecosystem, "are at higher risk of extirpation." FS-006622; *see also* FS-036324.

17.     The Fish and Wildlife Service has cited one study that indicated the likelihood of extinction for a grizzly bear population of 50 individuals with vital rates similar to the Cabinet-Yaak Ecosystem population was 85 percent. *See* FS-036293, FS-036322 (citing Proctor, et al., (2004), A comparative analysis of management options for grizzly bear conservation in the U.S. – Canada trans-border area, Ursus 15(2): 145-160).

18.     Indeed, the current grizzly bear population in the Cabinet-Yaak Ecosystem persists only due to augmentation–translocation of bears from elsewhere. FWS-000966–000967; FS-046404–046405.

19.     Human-caused mortality in the Cabinet-Yaak Ecosystem poses a leading threat to the grizzly population's survival and a is major obstacle to significant population growth. FWS-000014; FS-004369, FS-004382. The risk of human-caused grizzly bear mortality increases proportionally with increased human presence in grizzly habitat. FS-008275. From 2007-2021, 76% of known grizzly deaths in the Cabinet-Yaak Ecosystem were human-caused. FS-005723. Between 1982-2021, 64% of known human-caused mortalities of grizzly bears occurred less than 500 meters from an open road. *Id.*

20.     In March 2021, Fish and Wildlife Service published a five-year status review of the grizzly bear's status to evaluate the need for continued protection of the grizzly in the conterminous 48 states. FWS-000958–000984; FS-046397. The review concluded that the Cabinet-Yaak population of grizzlies is the most vulnerable of the four populations in the lower 48, with a current resilience of "low," due to the very low population numbers, low genetic diversity, and low fecundity of females. FWS-000965–000967; FS-046403–046405. The summary explains the tenuous nature of the grizzly population in the Cabinet Yaak Ecosystem:

> The grizzly bear population in the [Cabinet-Yaak Ecosystem] currently has low resiliency (Table 2, above). Despite high population trends and high and moderate adult female survival, the [Cabinet-Yaak Ecosystem] currently has a very low numbers of bears, although this factor could improve as bears reproduce and expand in the future (Table 2, above). The [Cabinet-Yaak Ecosystem] is a smaller ecosystem that is still slowly recovering from being close to historical extirpation, particularly in the Cabinets portion of the ecosystem . . . . This ecosystem also has a less diverse assortment of foods, particularly in the form of ungulate protein, although body fat levels indicate that individuals are relatively healthy (Kasworm et al. 2020a, pp. 55–56). Large intact blocks of land are also somewhat limiting in the [Cabinet-Yaak Ecosystem] due to its overall smaller size. Even though there are large protected areas within the [Cabinet-Yaak Ecosystem] (with 44 percent designated as Wilderness or [Inventoried Roadless Areas]), as well as additional protections outside the [Cabinet-Yaak Ecosystem] recovery zone and conservation efforts on private lands that improve security for grizzly bears, habitat standards for motorized route densities have not yet been met in the [Cabinet-Yaak Ecosystem] recovery zone, which limits the availability of large intact blocks of land in the [Cabinet-Yaak Ecosystem] (Service 2021, pp. 220–221).

FWS-000966–000967; FS-046404–046405.

21.     Even though the Fish and Wildlife Service considered inventoried roadless areas as "protected areas" within the Cabinet-Yaak Ecosystem for purposes of the Five-Year Status Review, the Forest Service approved project activities—including slashing and burning—in the Northwest Peaks Inventoried Roadless Area #663 and the West Fork Yaak Inventoried Roadless Area #694, and unroaded lands contiguous to Inventoried Roadless Areas, as part of the Black Ram Project. FS-002394–002395. The Forest Service also anticipates motorized use on existing level 1 roads in the contiguous unroaded areas for "future management" purposes. FS-002395.

22.     The Status Review also indicates that the Forest Service's management of grizzly bears and their habitat in the Cabinet-Yaak Ecosystem is less protective than elsewhere:

> Federal land managers have adopted land management plans that contain legally binding and enforceable science- and research-based measures and management practices designed specifically to conserve the grizzly bear in the lower-48 States, though these measures are not yet fully implemented in the CYE [Cabinet-Yaak Ecosystem] ….

FWS-000978; FS-046416. This is a reference to the fact that National Forests in the Cabinet-Yaak Ecosystem have not yet complied with land management plan motorized access components, and as a result these forests are failing to provide secure habitat for grizzlies. *Id*.

23.     The Status Review concluded that in almost every future scenario that

Fish and Wildlife Service reviewed, conditions in the Cabinet-Yaak Ecosystem

will inhibit overall grizzly bear recovery.

> Into the foreseeable future, the [Cabinet-Yaak Ecosystem] and SE
> [Selkirk Ecosystem] have moderate to very low levels of resiliency,
> and only achieve high resiliency with the significantly improved
> conservation under Scenario 5 (Service 2021, p. 244). As a result, the
> [Cabinet-Yaak Ecosystem] and [Selkirk Ecosystem] only contribute
> moderate, to low, to very low levels of resiliency under four out of the
> five future scenarios (Service 2021, p. 244).

FWS-000979; FS-046417.

24.     The situation for the bears in Yaak Valley is even more precarious

than Fish and Wildlife Service's review indicates because the Yaak population of

grizzlies is genetically isolated from the grizzly population in the Cabinet

Mountains. FWS-003504. Yaak grizzlies thus function as a subpopulation standing

at roughly half the size of the overall Cabinet-Yaak population. *Id.* ("Our results

indicated the grizzly bears in the Cabinet and Yaak regions were separate

populations split along the Hwy 2 corridor" and "suggest[ed] complete spatial and

reproductive isolation between these 2 populations, at least in recent generations");

FS-036961, FS-036972. This places that isolated group at serious risk of

extirpation.

25.     Population trend is largely reliant upon the survival of female grizzly

bears and their cubs, which enables the population to grow. *See* FWS-000031.

Thus, Fish and Wildlife Service has stated that "providing maximum protection for females is essential to recovery." FWS-005301. The mortality of females in the Cabinet-Yaak Ecosystem has increased in the last three years (4 known females) in comparison to the previous three years (1 known female). FWS-01463.

26.     Grizzly bears have one of the lowest reproductive rates of all terrestrial mammals in North America, resulting primarily from the late age at first production, small average litter size, and the long interval between litters. FWS-005300. The average age at first production is 5.5 years and the average litter size is two cubs. *Id*. Because of the slow rate of reproduction, it takes a breeding female approximately ten years to replace herself in the wild. *Id*.

27.     Monitoring reveals observations of grizzly bears have been decreasing since 2017. By the end of 2017, Fish and Wildlife Service detected 54 individual grizzly bears alive in the Cabinet-Yaak Recovery Zone. FWS-002808. In a 2019 report, the Service stated that using DNA sampling, credible observations, and photos, among other methods, 54 individual grizzly bears were detected in 2018 but two of those bears were known dead and another two assumed dead by the end of the 2018, leaving a total of 50 detected bears. FWS-002467. Using these same methodologies, a year later the Service identified 50 individual grizzly bears, with five of those bears known dead by year's end, thus equaling a total of 45 surviving bears. FWS-001446.

28.     The most recent population count for this population is 42 individuals (45 bears counted less 3 known to be dead), which was disclosed to the public on October 11, 2022 in the Fish & Wildlife Service's latest monitoring report. FS-005690.

29.     The 2021 monitoring report states: "We provide data leading up to and including 2020; 2021 sample results have not been completed by the laboratory." FS-005718.

30.     In sum, the past four monitoring reports disclose the following population counts:

| Year | Bear Count | Comparison to Prior Year |
|------|------------|--------------------------|
| 2017 Data | 54 | N/A |
| 2018 Data | 50 | Decrease |
| 2019 Data | 45 | Decrease |
| 2020 Data | 42 | Decrease |

FS-005718; FWS-001446; FWS-002467; FWS-002808.

31.     The Fish and Wildlife Service acknowledges that the Cabinet-Yaak grizzly population is failing two out of four recovery targets: it is failing the target

for females with cubs and it is failing the target for distribution of females with cubs. FWS-000012–000013.

32.    The Project will likely cause "incidental take" of Cabinet-Yaak grizzly bears: "any female grizzly bears that use [Bear Management Unit]s 14 and 15 during the Black Ram Project may experience some level of harm resulting in incidental take." FWS-000059.

33.    Fish and Wildlife Service reported in Kasworm et al. (2021) that there is a 60% probability that the population is stable or increasing with a growth rate of 1.7%. FWS-001486. The Service used the 2012 population estimate and applied this projected growth rate to establish a baseline population of 60 bears. *Id.*; FWS-000011.

34.    In the June 2022 Final EA, the Forest Service states that as of 2017, the Cabinet-Yaak Ecosystem had an estimated population of 55-60 bears with a 73% probability that the population was stable or increasing. FS-002541 (relying on Kasworm et al. 2018, FWS-002948–003049).

35.    As with the Biological Opinion, this estimate was based on 2012 population data plus an annual population increase of 2.1% and the addition of three surviving bears augmented into the Cabinet Mountains. *See* FWS-002984.

36.    The June 2022 Final EA's section that addresses bear mortality only discloses mortalities from 2017 and 2018. FS-002548.

### III.   THE BLACK RAM PROJECT'S IMPACTS

37.     The Black Ram Project approved logging and burning directly impacting more than 11,000 acres. FS-002153–002154, FS-002255. The Forest Service authorized 1,783 acres of clearcuts (described in the documents as "Clearcuts with Reserves"), including 17 clearcuts larger than 40 acres in size. FS-002153, FS-002254; FS-002175–002177. One of the clearcuts approved would be 137 acres, the size of more than 100 football fields. FS-002175 (Unit 33). The Project involves a total of 3,902 acres of commercial logging, and an additional 7,553 acres of fuel treatments (burning and removing small trees). FS-002154. The Project will require up to ten years' worth of intrusion by workers and vehicles engaged in logging, road construction and reclamation, and burning. FS-002520. The Project will remove 57 million board feet of commercial timber. FS-002154.

38.     The Black Ram Project authorizes logging within 579 acres of old growth forest, and burning another 343 acres. FS-002154. It also authorizes 0.8 miles of new road construction through old growth forest, and will impact an additional 440 acres of mature forest, known as "recruitment potential old growth," with logging and burning within those stands. FS-002154–002155. The Project will also clearcut hundreds of acres of forest within the Rampike Creek area, which boasts trees as old as 230 years. FS-002762. The Project authorizes numerous clearcuts within forest stands that average 170-180 years old, meaning some trees

are likely much older. FS-018240 (clearcut logging in Unit 72B will remove trees on average 170-180 years old); FS-018249 (same for Unit 76B); FS-018503 (same for Unit 68); FS-018513 (same for Unit 69).

39.    River segments, protected by Kootenai Forest Plan special management provisions, within the Project area include stretches of the West Yaak classified as "wild" and "recreational," and a "recreational" segment of the Yaak River. FS-002432. "These river segments have outstanding remarkable values (ORV) of scenery, fisheries, recreation and history." *Id*.

40.    Within river stretches eligible for protection as wild and scenic rivers and protected by special management provisions of the Kootenai Forest Plan, the Project authorizes more than 650 acres (more than a square mile) of logging and burning, including: 454 acres of logging (274 acres of intermediate or regeneration harvest, 177 acres of "slashing" trees up to 22 inches in circumference, and 3 acres of "fuel breaks," causing the complete elimination of trees), and an additional 200 acres of "ecosystem burning." FS-002253; *see also* FS-002335 (describing ladder fuel reduction).

41.    To protect the river corridors' remarkable values, the Forest Plan states "desired conditions" for these lands are that they be managed such that "[n]atural ecological processes (e.g., plant succession) and disturbances (e.g., floods, fire, insects, and disease) are the primary forces affecting the composition,

13

structure, and pattern of vegetation." FS-000063 (MA2-DC-VEG-01). Plan "guidelines" direct that for "recreational" river segments, "[t]imber harvest is allowed [but only] to maintain or restore the values for which the eligible scenic or recreational river was identified," and for "wild" segments tree cutting is generally barred. FS-000065 (MA2-GDL-TBR-01, MA2-GDL-TBR-02 (guidelines)).

42.     The Final EA asserts that the Project complies with the Forest Plan provisions protecting wild and scenic-eligible river segments because the lands impacted are too small to matter. FS-002385 ("Given the small area that would be treated, this project would be consistent with this desired condition."). The square mile of logging and burning will represent a sizable chunk of the West Fork Yaak (2,758 acres) and Yaak (9,230 acres) wild and scenic eligible acreage.

43.     The EA contends that "fuels treatment" in the wild and scenic segments will "contribute to the resistance and resiliency of the treated areas, provide for safer egress for public, and provide safer conditions for firefighters." FS-002336.

44.     The Black Ram Project authorizes slashing of understory vegetation on up to 200 acres, and 2,300 acres of prescribed burns, within inventoried roadless areas, which the Forest Service admits would impact roadless area values. FS-002335, FS-002395.

45.     Logging and burning, including eleven logging units, will occur adjacent to over eight miles of the Pacific Northwest National Scenic Trail (the Trail). FS-002442 (Table 64); FS-002474. The EA admits that during the Project's ten-year life, "[p]roposed timber harvest and fuel treatments may affect user access to this trail," meaning that access will be restricted or prohibited. FS-002442. A Kootenai National Forest Plan "guideline" directs that "[m]anagement activities should be consistent with the mapped scenic integrity objective" which for the Trail is "High to Very High." FS-000045. Logging would make it impossible for views along the Trail to meet the Plan's direction for more than a decade: "Timber harvest along these [trail segments] would not achieve the designated [scenic integrity objective] of high" for up to 15 years after logging occurs, even assuming various "design features" are implemented. FS-002475.

46.     The Decision Notice identifies the Pacific Northwest National Scenic Trail as a unique characteristic of the Project area, but dismisses the scenic impact of destructive clearcuts as not significant, apparently because the Final EA concludes that 15 years of impacts *post-harvest* are "short term." *Id*.; FS-002167. In drafting the EA, Forest Service staff initially concluded: "Short-term effects [to scenery] include post-harvest or post fuel treatment up to 5 years." FS-045671. The Final EA reached a similar definition of short-term impacts for other values. FS-002283 (defining a "time frame" for aquatic resource impacts: "short-term effects

are those that would occur immediately … and up to 5 years post

implementation.").

47.     The Forest Service acknowledges the 320-acre Pete Creek Botanical

Area, designated by the Forest Plan to protect its "unique, unusual, or important"

flora, as one of the Project area's "unique characteristics." FS-002167; FS-00065-

000066. The Project will eliminate more than 2% of the Botanical Area's existing

vegetation to create a seven-acre clearcut "fuel break." FS-002336, FS-002340.

48.     The EA alleges that the clearcut will "reduce fuels and decrease the

potential fire severity." FS-002340.

49.     Concerning forest disturbances, the EA states:

> While these events [e.g., wildfire, insect or disease epidemics] might
> occur, extreme conditions are not predictable, so it cannot be said,
> with reasonable certainty, whether these events would have an effect
> versus the action alternatives.

FS-002369.

50.     "The action area has been an important area for female grizzly bears

over the past several decades," and there are currently two known reproducing

females that use the action area. FWS-000017; FWS-000053. Data from collared

female grizzly bears reveal that up to three adult females have used the action area

at the same time in past years. *Id.*

51.     Fish and Wildlife Service found that female grizzly bears may be

displaced for ten years due to Project activities including increased motorized use.

FWS-000053. In addition to direct displacement, the Service notes "female grizzly bears are expected to experience significant effects to feeding, breeding, or sheltering," FWS-000053, and that reproductive success for females may be impaired for at least three to five bear years, potentially affecting two reproductive cycles for adult female grizzly bears. FWS-000054–000055.

52.     The Forest Service concluded and Fish and Wildlife Service agreed that the Project is "likely to adversely affect" grizzly bears. FWS-000005; FS-002151; FS-004203.

## IV.    THE FOREST SERVICE'S AND FISH AND WILDLIFE SERVICE'S REVIEW AND APPROVAL OF THE BLACK RAM PROJECT

53.     In July 2017, District Ranger Kirsten Kaiser sent a "project initiation letter" to the Kootenai National Forest's "Interdisciplinary Team" and "Resource Specialists" commencing the agency's process for developing the Black Ram Project. FS-045772. The letter stated: "The level of NEPA is expected to be an Environmental Impact Statement (EIS) given the large project scale, scope and presence of wildlife species and habitat." *Id*.

54.     In July 2018, the Kootenai National Forest issued a scoping notice proving the public with an "opportunity to comment" comment on its proposal for the Black Ram Project. FS-033959. The notice indicated that the agency intended to prepare an environmental assessment. *Id*. Plaintiffs Yaak Valley Forest Council

17

and Alliance for the Wild Rockies provided comments in response. FS-033888;

FS-033924.

55.     Following scoping, in July 2019, the Kootenai National Forest issued

an EA on the project for public review. FS-003499. Each of the Plaintiff

organizations provided comments on the EA. FS-034340 (Center for Biological

Diversity comments); FS-034424 (WildEarth Guardians comments); FS-034173

(Yaak Valley Forest Council comments); FS-034673 (Alliance for the Wild

Rockies and Native Ecosystems Council comments).

56.     The Kootenai National Forest issued what the agency labeled a "final

EA" and draft Decision Notice tentatively approving the project on December 10,

2019. FS-002908 ("final" EA), FS-035816 (Draft Decision Notice).

57.     Pursuant to 36 C.F.R. § 218.8, each of the Plaintiff organizations filed

an objection to the "final EA" and draft Decision Notice in January 2020. FS-

036023 (Center for Biological Diversity and WildEarth Guardians January 2020

objection); FS-036083 (Yaak Valley Forest Council January 2020 objection); FS-

035844 (Alliance for the Wild Rockies and Native Ecosystems Council

objections). The Forest Service canceled this objection period on February 18,

2020 without resolving the objections. FS-035804. The letter notifying the public

provided no explanation for the cancellation. *Id*. In response to emails, the Forest

Service stated that the objection process had been canceled due to unspecified "timing and workload issues on the Forest." FS-045333.

58.    On September 28, 2020, the Forest Service issued a new draft Decision Notice, continuing to rely on the December 2019 Final EA. FS-002831. Pursuant to 36 C.F.R. § 218.8, each of the Plaintiff organizations filed an objection to the September 2020 final EA and draft Decision Notice in November 2020. FS-035279 (Center for Biological Diversity and WildEarth Guardians objection); FS-035224 (Yaak Valley Forest Council objection); FS-035362 (Alliance for the Wild Rockies and Native Ecosystems Council objections).

59.    On January 27, 2021, Deputy Regional Forester Keith Lannom issued a decision on all of the objections, including those of Plaintiff organizations, asserting that "the [Black Ram] project complies with all applicable laws and the Kootenai National Forest Plan (2015). The Forest Supervisor may sign the Decision Notice for this project as soon as he is in receipt of the Biological Opinion. My review constitutes the final administrative determination of the Department of Agriculture." FS-035221 (cover letter); FS-035188 (objection responses).

60.    Following the disposal of all objections, Fish and Wildlife Service issued the 2021 Biological Opinion on September 15, 2021. FWS-00082–000155; FS-004450.

61.    On June 21, 2022, the Kootenai National Forest issued a new and Final EA. FS-002231. That same day Supervisor Chad Benson signed the Decision Notice and Finding of No Significant Impact approving the Black Ram Project and concluding that the Forest Service need not prepare an environmental impact statement. FS-002146. The Forest Service stated that changes that the agency made to the 2022 EA after the pre-decisional objection process in January 2021 were "minor," and the result of "public comments and corrections related to technical errors, omissions, or clarifications." FS-002247.

62.    The Final EA evaluated three alternatives: the required "no action" alternative; and the following two action alternatives:

- the proposed action, Alternative 2, which would involve 1,783 acres of clearcuts, 3,904 acres of total commercial logging; 7,553 acres of fuel treatments outside logged areas, including 2,199 acres in inventoried roadless areas; 0.8 miles of road construction in old growth forest; and 90.3 miles of road reconstruction or maintenance; and

- Alternative 3, which would involve 1,833 acres of clearcuts (103% of that for Alt. 2), 3,577 acres of total commercial logging (92% of that for Alt. 2); 7,553 acres of fuel treatments outside logged areas, including 2,199 acres in inventoried roadless areas (identical to Alt. 2); 0 miles of road construction in old growth forest; and 89.4 miles of road reconstruction or maintenance (99% of that for Alt. 2).

FS-002254–002256.

63.    Following issuance of the 2021 Biological Opinion and the June 21, 2022 Decision Notice, on June 30, 2022, Plaintiffs Center for Biological Diversity,

Yaak Valley Forest Council, and WildEarth Guardians sent a 60-day notice of intent to sue to Fish and Wildlife Service and the Forest Service pursuant to section 11(g) of the ESA, 16 U.S.C. § 1540(g). FWS-007405. The 60-day notice alleged several violations of the ESA and the APA. *Id*.

64.     On August 26, 2022, Fish and Wildlife Service issued an amended 2022 Biological Opinion and Incidental Take Statement. FS-004369. The agency noted that the 2022 Biological Opinion supersedes the 2021 Biological Opinion. Fish and Wildlife Service states in the 2022 Biological Opinion that it "does NOT incorporate any new information, nor does it change any of our determinations or decisions regarding the Black Ram Project," but that the 2022 BiOp "serves to clarify our rationale." FWS-000006 (emphasis in original); FS-004369, FS-004374.

65.     On September 23, 2022, Plaintiffs Center for Biological Diversity, Yaak Valley Forest Council, and WildEarth Guardians sent a 60-day notice of intent to sue to Fish and Wildlife Service and the Forest Service pursuant to section 11(g) of the ESA, 16 U.S.C. § 1540(g). The 60-day notice alleged the August 26, 2022 biological opinion violated several violations of the ESA and the APA.

66.     The Forest Service did not issue a new decision notice or EA following issuance of the amended 2022 Biological Opinion.

## V.     THE PROJECT'S CARBON IMPACTS.

67.     Council on Environmental Quality guidance addressing climate change recognizes that logging and prescribed burning can impact carbon stores, and urges land management agencies to "include a comparison of estimated net GHG emissions and carbon stock changes that are projected to occur with and without implementation of proposed land or resource management actions." Council on Environmental Quality, Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews (Aug. 1, 2016) at 25-26, available at https://ceq.doe.gov/docs/ceq-regulations-and-guidance/nepa_final_ghg_guidance.pdf (last visited January 27, 2023).

68.     Numerous studies, including those by the Forest Service itself, have concluded that logging mature forests releases significant amounts of carbon stored in the trees and by preventing such forests from continuing to sequester carbon in trees and roots. FS-038267 (2016 Tongass National Forest Plan EIS, concluding older trees store more carbon). When forest stands are cut down, the vast majority of the stored carbon in the forest is released over time as $CO^2$, thereby converting forests from a sink to a "source" or "emitter." *See* FS-038272 (DellaSala 2015 report on Tongass National Forest as carbon sink); FS-038329 (Law et al. 2018 study reporting "[i]ncreased harvest through proposed thinning practices in

22

[Oregon] has been shown to elevate emissions for decades to centuries regardless of product end use"). A 2019 report, funded in part by the Department of Agriculture, found that "preservation (i.e., no harvest)" of some forests in the American Northwest, including in northwest Montana, could reduce the contribution of land management to climate pollution. FS-038332, FS-038338 (Buotte et al.). The study's coarse-scale map indicates that there are likely forest stands in the Project area rated as "high" or "medium" priority for preservation to mitigate climate change because of their importance in storing carbon, and the degradation of those carbon stores should logging occur. FS-038334 (Figure 1).

69.     The EA defers analysis of climate pollution and impact to carbon stores to a "Carbon Report," which "rationalizes why we believe the proposed activities do not warrant additional affects analysis under NEPA." FS-002364 (EA); FS-020739 (Carbon Report). The Report asserts that the Kootenai National Forest stores 174 teragrams (million tons) of carbon (the equivalent of 638 million tons of carbon dioxide pollution), but concludes that no effects analysis on this issue is required because the Project "would affect only a tiny percentage of the forest carbon stocks of the Kootenai National Forest, and an infinitesimal amount of the total forest carbon stocks of the United States." FS-020743.

70.     The Carbon Report appears to be cut and pasted, with only minor alterations, from a 2015 report for an Idaho timber sale prepared more than seven

years before the Black Ram Decision Notice. *Compare* FS-020739 (Black Ram Carbon Report) *with* FS-038342 (2015 Idaho report). The Black Ram Carbon Report appears to have substituted the name "Kootenai" for "Idaho Panhandle" National Forest. For example, the reports conclude that each forest sequesters *precisely the same amount* of carbon. *Compare* FS-020743 ("total carbon stored on the Kootenai National Forest is approximately 174 [teragrams]") *with* FS-038348 ("total carbon stored on the Idaho Panhandle National Forest is approximately 174 [teragrams]"). The Carbon Report, like the 2015 Idaho report, assumes that the agency considers only two alternatives (the proposed action and no action), although the Black Ram EA analyzes three alternatives. *See* FS-020741–020742; FS-002254–002257.

71.     The Carbon Report states that the "proposed action would remove and release some carbon currently stored" and addresses the scale of those impacts by calling them "infinitesimal" by comparison to carbon stores on all U.S. forests, and a "tiny percentage" compared to the hundreds of millions of tons of carbon stored on the Kootenai. FS-020742–020743.

72.     The Carbon Report references no climate science that has emerged since 2013. FS-020745–020748.

73.     Studies by academics, provided by Plaintiffs to the Forest Service as part of the administrative process for the Project, disclosed and quantified the

impacts of logging on carbon stores in Oregon and on the Tongass National Forest

in Alaska. *See* FS-035338 (citing studies); FS-038281 (2015 Tongass study); FS-

038326 (2019 article re: Oregon). The Council on Environmental Quality's 2016

guidance also identifies a model that uses Forest Service data to quantify climate

impacts of logging actions. *See* Council Greenhouse Gas NEPA Guidance (2016)

at 26, n.86.

74.     The "Kootenai Forest Carbon Assessment White Paper 2021"

evaluates carbon stores at the Kootenai Forest level. FS-020722–020723. The

White Paper also announces the Forest Supervisor's "expectation … that all

environmental analyses will utilize this white paper to develop a project specific

analysis for carbon." FS-020711.

## VI.   ROADS AND GRIZZLY BEARS

75.     There are 408 miles of existing "open" and "closed" National Forest

System Roads in the Project Area, which equates to a total road density of 2.9

miles/square mile. FS-004210.

76.     Access to Project logging units would occur on open, gated, barriered,

or newly constructed roads. FS-002551.

77.     The Project authorizes 3.3 miles of new permanent road construction.

FS-002155.

78.     The Project authorizes 0.2 miles of temporary road construction. FS-002155.

79.     The Project authorizes road reconstruction on 90.3 miles. FS-002155.

80.     Road reconstruction may occur on existing open roads, existing gated roads, and "previously barriered" roads. FS-002550.

81.     The Project allows both the "use of gated routes beyond administrative use levels" and the "reconstruction and use of previously barriered routes[.]" FS-002551.

82.     The Project EA does not disclose the mileage of Project roads that will receive "use of gated routes beyond administrative use levels[.]" FS-002551.

83.     The Project EA does not disclose the specific mileage of "reconstruction and use of previously barriered routes[.]" FS-002551.

84.     The Project promises to "block" 32.0 miles of existing National Forest System Roads as "road storage" to provide for "in-kind" grizzly bear core habitat replacement. Of these roads, at least 25.6 miles of roads will not have the culverts removed. FS-002495; FS-002155, FS-002190.

85.     The Project promises to "block[] the entrance" for 20.0 miles of existing system roads in order to "decommission" the roads and "remove[]" those roads "from the system." The majority of these roads – 13.92 miles – have a prescription to leave culverts in place. FS-002495; FS-002155, FS-002191.

86.     "Undetermined" roads are roads that are not authorized as National Forest System Roads but rather are "road prisms that exist on the landscape from previous management activities or were illegally created," i.e. unauthorized roads. FS-002496.

87.     The Project promises to "decommission" 3.1 miles of "undetermined" roads. FS-002699.

88.     The Project authorizes the addition of 2.0 miles of "undetermined" roads into the system. FS-002699.

89.     In terms of all of the human uses that affect grizzly bears, Fish and Wildlife Service has long found: "[r]oads probably pose the most imminent threat to grizzly habitat today []. The management of roads is one of the most powerful tools available to balance the needs of people with the needs of bears." FS-008274.

90.     Roads pose a threat to grizzly bears because roads provide humans with access into grizzly bear habitat, which leads to direct bear mortality from accidental shootings and intentional poaching. FS-008275.

91.     Human access also leads to indirect bear mortality by creating circumstances in which bears become habituated to human food and are later killed by wildlife managers. FS-008275.

92.     Roads and human access also result in indirect mortality by displacing grizzly bears from good habitat into areas that provide sub-optimal habitat conditions. FS-008388–8389.

93.     Displacement may have long term effects: "Females who have learned to avoid roads may also teach their cubs to avoid roads. In this way, learned avoidance behavior can persist for several generations of bears before they again utilize habitat associated with closed roads." FS-008389.

94.     Grizzly bears are displaced from open and closed roads:

grizzlies avoided roaded areas even where existing roads were officially closed to public use[]. Females with cubs remained primarily in high, rocky, marginal habitat far from roads. Avoidance behavior by bears of illegal vehicular traffic, foot traffic, and/or authorized use behind road closures may account for the lack of use of areas near roads by female grizzly bears in this area. This research demonstrated that a significant portion of the habitat in the study area apparently remained unused by female grizzlies for several years. Since adult females are the most important segment of the population, this lack of use of both open-roaded and closed-roaded areas is significant to the population.

FS-008389.

95.     Displacement may negatively impact the survival rates of grizzly cubs:

survivorship of the offspring of females that lived in unroaded, high elevation habitat was lower than that recorded in other study areas in the [Northern Continental Divide Ecosystem]. The majority of this mortality was due to natural factors related to the dangers of living in steep, rocky habitats. This is important in that the effects of road avoidance may result not only in higher mortality along roads and in

avoidance of and lack of use of the resources along roads, but in the survival of young when their mothers are forced to live in less favorable areas away from roads.

FS-008389.

96.     The Grizzly Bear Recovery Plan finds that:

Timber management programs may negatively affect grizzly bears by (1) removing thermal, resting, and security cover; (2) displacement from habitat during the logging period; and (3) increases in human/ grizzly bear confrontation potential or disturbance factors as a result of road building and management. New roads into formerly unroaded areas may cause bears to abandon the area.

FS-008261.

97.     On July 23, 2021, Yaak Valley Forest Council (Yaak Valley)

informed the Forest Service that

based on field reviews conducted on July 22, 2021, . . . the Forest Service's efforts to limit unauthorized use are ineffective at halting motor vehicle trespass, contradicting the commitments made in both the EA and [Biological Assessment]. [Yaak Valley's] survey within the Black Ram project area found evidence that [] motor vehicle use continues on 5821, 92, 5835, 5839, 276, 5857, 5860, 5890, 5892, 5886A, 5886, 5856, 748, 338P, 338R, 5895, 5894, 747, and 6134 closed routes within the Black Ram project area, including on routes where gates and other structures have failed to prevent such use, and including on routes that the Council found unauthorized use occurring in 2020 that the Forest Service apparently never fixed.

FS-004583.

98.     Yaak Valley documented the following ineffective barriers and

instances of illegal motorized use in 2020 and again on July 22, 2021 in the Project

area:

| Site | Yaak Valley Forest Council  Photo (July 22, 2021) | Forest Service Photo (July or August 2021) |
|------|---------------------------------------------------|--------------------------------------------|
| BR-1 |  User-created bypass with an 8-foot cleared opening to the left of the gate |  |
| BR-2 |  Newly-installed berm can be bypassed to the left and right |  |

| BR-3 | <br>5-foot opening to the left of gate with tire tracks behind the gate on the road bed |  |
|---|---|---|
| BR-4 | <br>Tire ruts allow motorized use passage to the left of the berm |  |



| BR-5 | 4-foot wide passage to the left of the berm with visible tire tracks | |
| BR-6 | User-created road with no barrier | |

| BR-7 |   |
| --- | --- |
| | 3.5-foot wide passage to the right of the berm |
| BR-8 |  Shallow berm is ineffective and road is frequently traveled. | No Forest Service photo provided.  Forest Service Report states: "This route is barriered (MVUM) but we consider it open for bear management unit assessment due to use." |
| BR-10 |  User-created road with ineffective barrier. | No Forest Service photo provided.  Forest Service Report states: "We documented this route this year. Unauthorized use is illegal regardless of terrain." |

33

| BR-9 | <br><br>User-created road with ineffective barrier. | No Forest Service photo provided. Forest Service Report states: "We documented this route this year. Unauthorized use is illegal regardless of terrain." |
| --- | --- | --- |
| BR-11 | <br>Motor vehicle passage to right of berm with sign broken from being driven over |  |

| BR-12 |  Newly-installed berm can be bypassed to the left and right. |  |
| BR-13 |  Motor vehicle passage to the right of the gate. |  |

| | | |
|---|---|---|
| BR-14 | <br><br>5-foot wide passage to the right of the berm allows motorized access into grizzly core. |  |
| BR-15 | <br><br>Ineffective barrier |  |

| | | |
|---|---|---|
| BR-16 |   No barrier after fallen trees removed; motor vehicle tracks present |  |
| BR-17 |   No barrier and not mapped as an open road. |  |
| BR-18 |   5-foot wide passage to the right of the gate |  |



FS-004585–004604, FS-004558–004577.

99.     In its October 2021 response to Yaak Valley's report on ineffective barriers and illegal road use, the Forest Service excluded Yaak Valley's July 22, 2021 photos and observations showing that all of the problems still remain, and only included Yaak Valley's 2020 photos. FS-004558–004577.

100.   Additionally, as shown in the table of photographs above, the Forest Service responded to Yaak Valley's report with agency photos, primarily dated July and August 2021, that in some cases have been taken from a different angle in order to obscure the full extent of the openings still being used/and or available to motorized vehicles. FS-004585–004604, FS-004558–004577.

101.   Additionally, in response to Yaak Valley's report, for several of the illegal routes, the Forest Service first states that it was "[u]naware of this purported route" in 2020, but then it concedes that "[w]e documented this route this year," i.e. in 2021. No action was taken in response to this known illegal road use, and instead the Forest Service simply states: "Unauthorized use is illegal regardless of terrain." FS-004566, FS-004567.

102.   In response to Yaak Valley's report, it appears that the Forest Service added two berms – at "BR-2" and "BR-12." FS-004559, FS-004569.

103.   As noted above, the new berms at BR-2 and BR-12 can be driven around. FS-004586, FS-004596.

104.   Neither the Project's Decision Notice nor the Project EA discloses to the public any of these 20 instances of known ineffective barriers and/or illegal user-created roads in the Project area. *See, e.g*., FS-002544.

105.   Yaak Valley completed additional surveys on September 30, 2021 and October 1, 2021, including many of the locations above, and documented 15

ineffective berms, 17 ineffective gates, and 13 roads with no gate or berm. FS-044262–044266 (Yaak Valley report with photos excluded); FS-044664–044688 (Forest Service response with photos included).

106.   The photographs below document 15 berms with established trails around the berm:



FS-044262–044266; FS-044664–044688.

107.    Despite the established trails around these berms that provide motorized access to motorcycles and/or ATVs, the Forest Service represents that these berms are "functional." FS-044664–044688.

108.    The photographs below document 17 ineffective gates with openings around the gate that allows motorcycle and/or ATV use:



FS-044262–044266; FS-044664–044688.

109.   Despite the openings around these gates that provide motorized access to motorcycles and/or ATVs, the Forest Service represents that these gates are "functional." FS-044664–044688.

110.   The photographs below document 13 roads with no gate or berm:



FS-044262–044266; FS-044664–044688.

111.   Despite the lack of berm or gate, the Forest Service represents that these "closures" are "functional."  FS-044664–044688.

112.   Neither the Project Decision Notice nor the Project EA discloses to the public any of these 45 instances of ineffective barriers, ineffective gates, and/or missing gates/berms. *See, e.g.*, FS-002544.

113.   Neither the Project Decision Notice nor the Project EA discloses to the public the actual results of Forest-wide annual monitoring of road closure

effectiveness from the "Annual Compliance Monitoring Final Summary Report."

*See e.g.* FS-002544; FS-006160–006240.

114. The table below is excerpted from the 2020 "Annual Compliance

Monitoring Final Summary Report" provided in the record:

Table 9. Summary of restricted Existing route monitoring within the Cabinet-Yaak Recovery Zone in 2020. Data on file at the district or supervisory offices.

| Grizzly Bear Recovery Zone | National Forest | Closure Type | 2020 | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Number of Closure Devices[1] BY20 | Number Monitored[2] # | Total Monitored in BY Percent % | Number Breach detected[3] # | Total monitored that were breached % | Percent Repaired % |
| Cabinet-Yaak | Idaho Panhandle | Gate | 48 | 43 | 90 | 4[4] | 9 | 25 |
| | | Barrier | 41 | 6 | 15 | 0 | 0 | n/a |
| | | Total | 89 | 49 | 55 | 4[4] | 8 | 25 |
| | Kootenai[1] | Gate | 268 | 232 | 86 | 40 | 17 | 24 |
| | | Barrier | 683 | 683 | 100 | 32 | 5 | 0 |
| | | Total | 931 | 915 | 98 | 72 | 22 | 23 |
| | Lolo | Gate | | | 100 | | | 8 |
| | | Barrier | | | 100 | | | 0 |
| | | Total | | 72 | 100 | 13 | 18 | 84% (so far) |
| Recovery Zone Total | | | 1,092 | 1,036 | 95 | 89 | 9 | |

FWS-006182.

115. Thus, during 2020, in the Kootenai National Forest, the Forest Service found 32 breached barriers and repaired none of them (0%). FWS-006182.

116. Additionally, during 2020, in the Kootenai National Forest, the Forest Service found 40 breached gates and repaired only 9 of the breached gates (24%). FWS-006182.

117. In sum, during 2020, in the Kootenai National Forest, 22% of the monitored barriers and gates had been breached, i.e. more than <u>one out of five barriers and gates were breached</u>. FWS-006182. This statistic is not disclosed to

the public anywhere in the Project EA or Decision Notice. FWS-006182; s*ee, e.g.*,
FS-002544.

118.   In sum, during 2020, in the Kootenai National Forest, only 23% of the
breached barriers and gates were actually repaired, i.e. one out of five breached
barriers and gates were actually repaired. FWS-006182. This statistic is not
disclosed to the public anywhere in the Project EA. FWS-006182; s*ee, e.g.*, FS-
002544.

119.   Instead of disclosing actual and available Project-area and/or Forest-
wide monitoring data to the public, the Project EA provides one boilerplate and
demonstrably false paragraph:

> In the past, we have noted unauthorized use of restricted roads, and
> occasionally an unauthorized, user-created road is discovered. The District
> has made repairs for any such breaches as quickly as possible after
> discovery. The annual Adopt-A-Road event, which has occurred for the last
> 25 years, meets our monitoring requirement from the 2015 Forest Plan and
> helps us identify needed road or barrier repairs. By making needed repairs,
> we continue to maintain the associated BMUs' standards for core and
> motorized route densities. Monitoring of road closures occurs daily or
> weekly by employees working and driving on forest roads across the District
> as well as the project area.

FS-002544.

120.   The Forest Plan states: "***Standards . . . FW-STD-WL-02.*** The
Motorized Access Management within the Selkirk and Cabinet Yaak Grizzly Bear
Recovery Zone Management Direction and [Record of Decision] is included in
appendix B, and shall be applied." FS-000040.

121.   The Forest Plan Access Amendment sets road and motorized trail restrictions in Cabinet-Yaak grizzly bear habitat on National Forest lands.  FS-045909–045912.

122.   Within the official "Cabinet-Yaak Grizzly Bear Recovery Zone," the Access Amendment sets specific numeric limits on open motorized route density and total motorized route density, and requires a specific numeric minimum of secure core habitat. FS-045909–045912, FS-045860 (Table 2).

123.   These limits -- commonly referred to as 33/26/55 -- were derived from an agency study of six grizzly bears commonly referred to as Wakkinen and Kasworm (1997). FS-045865–045866. Although two of the six study bears were killed shortly after the study, the agencies nonetheless believe that Wakkinen and Kasworm (1997) constitutes the best available science for grizzly management in the Cabinet-Yaak Recovery Zone. *Id*.

124.   "Open Motorized Route Density" includes open roads, other roads not meeting all restricted or obliterated criteria, and open motorized trails. FS-045859.

125.   "Total Motorized Route Density" includes open roads, restricted roads, roads not meeting all reclaimed criteria, and open motorized trails. FS-045859.

126.   "Core Areas" contain no motorized travel routes or high-use nonmotorized trails during the non-denning season (April 1 to November 30) and

are more than 0.3 miles (500 meters) from a drivable road. Core areas do not include any gated roads but may contain roads *that are impassable* due to vegetation or constructed barriers. FS-045859.

127.   Routine forest management may be proposed in a core area block after 10-years of core area benefit. However, Bear Management Units must remain at or above the core standard. Therefore, potential losses to existing core must be compensated with in-kind replacement concurrently or prior to incurring the losses. Following management, core areas must subsequently be managed undisturbed for 10 years. FS-045910.

128.   The Northwest Peaks (#14) and Garver (#15) Bear Management Units are first priority management units under the Access Amendment. FS-045860.

129.   Northwest Peaks (#14) is 99% National Forest land, and must have no greater than 31% open motorized route density, no greater than 26% total motorized route density, and no less than 55% core. FS-045860. No reductions in existing percentage core are permissible until all Bear Management Units meet their minimum core standard. FS-045910.

130.   Garver (#15) is 94% National Forest land, and must have no greater than 33% open motorized route density, no greater than 26% total motorized route density, and no less than 55% core. FS-045860. No reductions in existing

percentage core are permissible until all Bear Management Units meet their minimum core standard. FS-045910.

131.   A document in the administrative record entitled "Process review for assessing [Bear Management Unit] metrics for the project-specific grizzly bear analysis in the Black Ram Project" discloses that for the Black Ram Project analyses, when assessing "permanent" road density and core for the purposes of comparing existing condition and post-Project condition to Access Amendment standards, the Forest Service excluded known illegal road use from the calculations: "The routes used to establish the 'permanent' condition are those that are authorized routes. Unauthorized use features are not. That is, any user-created routes or access, as well as breaches (e.g., dismantling or damaging gates and then proceeding to drive the route) are not considered part of the existing condition." FS-004530.

132.   The Project EA includes a section in the grizzly bear analysis section entitled "Methodology." FS-002540. This "Methodology" section does not disclose the fact that illegal roads – both user-created roads and breaches of existing roads – were excluded from Access Amendment road density and core calculations in the Project EA. FS-002540.

133.   The Project EA includes a section in the grizzly bear analysis section entitled "Assumption and Limitations." FS-002540. This "Assumptions and

48

Limitations" section does not disclose the fact that illegal roads – both user-created roads and breaches of existing roads – were excluded from road density and core calculations, nor does it disclose the assumption that all barriers will be 100% effective at preventing motorized use, nor does it disclose the known repeated failures of barriers and user-created roads in this specific Project area, as well as consistently across the Kootenai National Forest. FS-002540.

134.   Without disclosing the exclusion of user-created and breached roads, the Project EA represents the following existing conditions:

Table 84. Established BMU Standards and Existing Measures for BMUs 14 and 15 (values are all in percent).

| BMU | OMRD (standard/existing) | TMRD (standard/existing) | Core (standard/existing) |
|---|---|---|---|
| 14 - Northwest Peak | 31/28 | 26/24 | 55/56 |
| 15 – Garver | 33/30 | 26/26 | 55/55 |

OMRD: > 1 mile per square mile; TMRD: > 2 miles per square mile

FS-002542.

135.   Without disclosing the exclusion of user-created and breached roads, the Project EA represents the following conditions for open motorized route density before, during, and after the Project:

Table 87. Expected project impacts to OMRD.

| BMU (Standard %) | Existing Condition | During – Alt. 2 | During – Alt.3 | Post-Project – Alts. 2 and 3 |
|---|---|---|---|---|
| BMU 14 (31) | 28 | 31 | 31 | 28 |
| BMU 15 (33) | 30 | 36* | 36* | 30 |

* See the text above for the likely scenario for a temporary increase in OMRD.

FS-002552.

136.   Thus, even with the exclusion of user-created and breached roads, the Project will exceed the Wakkinen and Kasworm (1997)-derived limit of 33% for Garver during Project implementation, with an open motorized route density of 36%. FS-002552; FS-045866.

137.   Moreover, although undisclosed to the public in the Project EA, a document in the administrative record indicates that open motorized route density could reach as high as 42% during the Project. FWS-006056–006057.

138.   Without disclosing the exclusion of user-created and breached roads, the Project EA represents the following conditions for total motorized route density before, during, and after the Project:

Table 88. Project impacts to TMRD.

| BMU (Standard %) | Existing Condition | During Alt. 2 | During Alt. 3 | Post-Project Alts. 2 and 3 |
|---|---|---|---|---|
| BMU 14 (26) | 24 | 26 | 26 | 23 |
| BMU 15 (26) | 26 | 32 | 32 | 26 |

FS-002553.

139.   Thus, even excluding the impact of user-created and breached roads, the Project will exceed the Wakkinen and Kasworm (1997)-derived limit of 26% for Garver (Bear Management Unit 15) during Project implementation, with a total motorized route density of 32%. FS-002553; FS-045866.

140.   Regarding core, the Forest Service plans to remove barriers or gates on 36 road segments to allow motorized access in existing core for the Project. This action will eliminate 4,952 acres of existing core habitat. FS-004404.

141.   Core will be reduced in Northwest Peak from 46,854 acres to 44,931 acres out of 83,030 total acres, which is a reduction from 56% core to 54% core. FS-004406.

142.   The Forest Service proposes to install barriers on roads to create new core areas as "in-kind" replacement of core. FS-002553. If barriers are 100% effective, new core would total 2,269 acres in Northwest Peak. FS-004406.

143.   Core will be reduced in Garver from 32,434 acres acres to 29,405 acres out of 58,841 total acres, which is a reduction from 55% core to 50% core. FS-004406.

144.   The Forest Service proposes to install barriers on roads to create new core areas as "in-kind" replacement of core. FS-002553. If barriers are 100% effective, new core would total 3,062 acres in Garver. FS-004406.

145.   If the new barriers installed for "in-kind replacement" of core are not effective, core in both Northwest Peak and Garver will be reduced below the Wakkinen and Kasworm (1997)-derived minimum of 55%. *See* FS-045865–045866.

146.   The Forest Plan states: "***Guidelines*** . . . Elements contained in the most recent 'Interagency Grizzly Bear Guidelines,' or a conservation strategy once a grizzly bear population is delisted, would be applied to management activities." FS-000042.

147.   The most recent Interagency Grizzly Bear Guidelines in the administrative record are from 1986, and for "Management Situation 1," they state:

> Grizzly habitat maintenance and improvement . . . and grizzly-human conflict minimization will receive the highest management priority. Management decisions will favor the needs of the grizzly bear when grizzly habitat and other land use values compete. Land uses which can affect grizzlies and/or their habitat will be made compatible with grizzly needs or such uses will be disallowed or eliminated. Grizzly-human conflicts will be resolved in favor of grizzlies unless the bear involved is determined to be a nuisance. Nuisance bears may be controlled through either relocation or removal but only if such control would result in a more natural free-ranging grizzly population and all reasonable measures have been taken to protect the bear and/or its habitat (including area closures and/or activity curtailments).

FS-005037.

148.   One element from the Interagency Grizzly Bear Guidelines states: "Timber sale and fire management EAs will specify agency grizzly management goals and measures to meet them. Contracts will include specific measures to protect, maintain and/or improve grizzly habitat and meet grizzly management goals and objectives. Timber sale contracts will include a clause providing for cancellation or temporary cessation of activities if such are needed to resolve a grizzly-human conflict situation. Contractors' full cooperation in meeting grizzly

management goals and objectives will be a condition of their receiving and holding contracts []." FS-005041.

149.   One element from the Interagency Grizzly Bear Guidelines states: "Logging and/or fire management activities which will adversely affect grizzly bear populations or their habitat will not be permitted. Adverse population effects are population reductions and/or grizzly positive conditioning. Adverse habitat effects are reductions in habitat quantity and/or quality []." FS-005042.

150.   One element from the Interagency Grizzly Bear Guidelines states: "Logging and burning activities will occur at a time or season when the area is of little or no biological importance to grizzlies. Where winter logging is infeasible, summer logging operations will be restricted in time and space to prevent significant disruptions of normal or expected grizzly activities." FS-005042.

151.   One element from the Interagency Grizzly Bear Guidelines states: "All roads used for timber sale purposes will be single purpose roads only, and will be closed to public use not associated with timber sale operation and administration. Exceptions could be: (a) seasonal closures if data show grizzlies use of the area to be seasonal and the road facilitates other important resource use that would not be possible without the road; (b) roads could be open for short periods, such as for hunting seasons and wood gathering, if human use is of short duration." FS-005048.

152.    One element from the Interagency Grizzly Bear Guidelines states: "The following uses, developments or activities will be evaluated to determine their compatibility with grizzly habitat requirements: (a) proposed roads[.] . . . Existing or proposed activities or uses which will adversely affect grizzly populations and/or their habitat will be terminated, removed, relocated or denied. Adverse population effects are population reductions and/or grizzly positive conditioning. Adverse habitat effects are reductions in habitat quantity and/or quantity." FS-005051.

153.    One element from the Interagency Grizzly Bear Guidelines states: "Special care will be taken to assure that trail and road construction does not degrade important grizzly use areas." FS-005052.

154.    The Project EA does not disclose any of the foregoing provisions from the Interagency Grizzly Bear Guidelines, nor apply them to the Project area. Instead, the EA offers a conclusory sentence: "The planning process, project design, and forest-level activity are all consistent with the guidelines (see [Interagency Grizzly Bear Committee] guideline consistency in the project file)." FS-002557.

155.    The "[Interagency Grizzly Bear Committee] guideline consistency in the project file" was not publicly available on the Forest Service's website during the public comment or objection period for the Black Ram Project. *See* FS-002557.

54

Respectfully submitted January 27, 2023.

/s/ *Edward B. Zukoski*
Edward B. Zukoski (Admitted *Pro Hac Vice*)
Center for Biological Diversity
1536 Wynkoop Street, Suite 421
Denver, CO  80202
(303) 641-3149
tzukoski@biologicaldiversity.org

/s/ Andrea Zaccardi (Admitted *Pro Hac Vice*)
Center for Biological Diversity
P.O. Box 469
Victor, ID  83455
(303) 854-7748
azaccardi@biologicaldiversity.org

Rachel G. Inabnit
Law Office of Rachel Inabnit, PLLC
P.O. Box 8846
Missoula, MT 59807
(406) 300-5316
rachel@inabnitlawoffice.com

*Attorneys for Plaintiffs Center for Biological Diversity et al.*

Rebecca K. Smith
Public Interest Defense Center, P.C.
P.O. Box 7584
Missoula, MT 59807
(406) 531-8133
publicdefense@gmail.com

Timothy M. Bechtold
Bechtold Law Firm, PLLC
P.O. Box 7051
Missoula, MT 59807
(406) 721-1435
tim@bechtoldlaw.net

*Attorneys for Consolidated Plaintiffs Alliance for the Wild Rockies et al.*

## CERTIFICATE OF SERVICE

I hereby certify that on January 27, 2023, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system. I further certify that a true

and accurate copy of the foregoing document will be served on all counsel or

parties of record via transmission of Notice of Electronic Filing generated by

CM/ECF.

*/s/ Edward B. Zukoski*
Edward B. Zukoski (Admitted *Pro Hac Vice*)
Center for Biological Diversity
1536 Wynkoop Street, Suite 421
Denver, CO  80202
(303) 641-3149
tzukoski@biologicaldiversity.org