IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al.,<br><br>          Plaintiffs,<br><br>     and<br><br>ALLIANCE FOR THE WILD ROCKIES and NATIVE ECOSYSTEMS COUNCIL,<br><br>          Consolidated Plaintiffs,<br><br>     vs.<br><br>U.S. FOREST SERVICE, et al.,<br><br>          Defendants,<br><br>KIRSTEN KAISER, District Ranger, Kootenai National Forest, Three Rivers Ranger District, et al.,<br><br>          Consolidated Defendants,<br><br>     and<br><br>KOOTENAI TRIBE OF IDAHO,<br><br>          Defendant-Intervenor. | Lead Case No.<br>CV 22–114–M–DWM<br><br>Member Case No.<br>CV 23–3–M–DWM<br><br><br><br><br><br>OPINION and<br>ORDER |

In these consolidated cases, environmental organizations Plaintiff Center for

Biological Diversity, Plaintiff Yaak Valley Forest Council, and Plaintiff WildEarth

Guardians (collectively "Plaintiffs") along with Consolidated Plaintiff Alliance for the Wild Rockies and Consolidated Plaintiff Native Ecosystems Council (collectively "Consolidated Plaintiffs") challenge decisions by the United States Forest Service (the "USFS") and the United States Fish and Wildlife Service (the "FWS") (collectively "Federal Defendants") concerning the Kootenai National Forest Black Ram Project (the "Project").[1]  Plaintiffs and Consolidated Plaintiffs allege that the USFS's and the FWS's approval of the Project violated the National Environmental Policy Act ("NEPA"), the Endangered Species Act ("ESA"), the National Forest Management Act ("NFMA"), and the Administrative Procedure Act ("APA").  The Kootenai Tribe of Idaho (the "Tribe") has intervened as a defendant.  Currently pending are (1) Plaintiffs' motion for summary judgment, (Doc. 50); (2) Consolidated Plaintiffs' motion for summary judgment, (Doc. 52); (3) Federal Defendants' cross-motion for summary judgment, (Doc. 60); (4) the Tribe's cross-motion for summary judgment, (Doc. 65); and (5) Federal Defendants' motion to strike, (Doc. 86).  For the reasons stated herein, the motions for summary judgment are granted in part and denied in part, and the motion to strike is denied.

BACKGROUND[1]

## I.    The Black Ram Project

The Project's action area[2] ("Project area") is in the Three Rivers Ranger
District of the Kootenai National Forest in the northwest corner of Montana.
FWS-000006.  Importantly, the Project area is also located within the Tribe's
ancestral territory, known as Kootenai or Ktunaxa Territory, which is "in an area of
importance to the Tribe for exercise of its reserved rights and religious practice . . .
."  (Doc. 23-6 at ¶ 9.)

The Project area encompasses 95,412 acres, 91,647 of which are in the
Kootenai National Forest.  FS-002242.  The Project area also encompasses various
unique features such as the Pacific Northwest Trail, FS-002242, riverways
designated as eligible to be protected as Wild and Scenic Rivers, *see* FS-002253,
and the Pete Creek Botanical Area, *see* FS-002167.  The Project will involve
vegetation management on roughly 13% of the Project area, which includes
commercial timber harvest and other fire mitigation measures.  FS-002242.  Four
percent, or 3,902 acres, will be used for commercial timber harvest, 45 percent of

---

[1] This case involves two administrative records: the USFS administrative record,
cited as "FS-[bates page #]", and the FWS administrative record, cited as "FWS-
[bates page #]." All facts are undisputed unless otherwise indicated. (*See* Docs. 54,
62, 63, 67, 68, 74, 75.)
[2] "The term *action area* means all areas to be affected directly or indirectly by the
Federal action and not merely the immediate area involved in the action."  FWS-
000006 (quoting 50 C.F.R. § 402.02).

which is set to be clearcut.  FS-002153–54.  The Project also authorizes 3.3 miles

of new permanent road construction, and 90.3 miles of road reconstruction overall.

FS-002154–55.  Between 1986 and 2018, the Project area had 142 fire starts, nine

percent of which grew to be large (equal to or greater than 10 acres).  FS-002324.

The USFS proposed the Project to promote resilient vegetation; maintain or

improve watershed conditions; improve big game winter range conditions; promote

forage opportunities; maintain or improve recreational opportunities; reduce the

potential for high intensity wildfires; and provide forest products that contribute to

the sustainable supply of timber products.  FS-002148–49.  The purposes were first

acknowledged in the Kootenai National Forest's 2015 Land Management Plan

Revision.  *See* FS-000001–189.  Ultimately, the USFS indicated a need for the

Project because the composition, structure, and function of the trees in the Project

area did not meet desired conditions set for the Kootenai National Forest.  *See*  FS-

002149.

## II.    Grizzly Bear

Historically, grizzly bears lived throughout much of western North America

with populations as high as 50,000 bears.  FWS-000961.  By the time the grizzly

bear was listed as threatened in 1975, grizzly bears had been reduced to less than

two percent of their historic range with an estimated 700 to 800 individuals in the

contiguous United States.  FWS-000961.  Since 1975, some grizzly bear

populations have expanded considerably and now occupy approximately 6 percent of their historic range in that area. FWS-000962. Grizzly bears are currently listed as a threatened species under the ESA, though no critical habitat has been designated. FWS-000009.

The Project area is located within the Cabinet-Yaak Ecosystem Recovery Zone. FWS-001923. The Cabinet-Yaak Ecosystem is one of six recovery zones the FWS identified to evaluate grizzly bear recovery in the contiguous United States. *Save Our Cabinets v. U.S. Fish & Wildlife Serv.*, 255 F. Supp. 3d 1035, 1059 (D. Mont. 2017). The entire project area falls within two Bear Management Units: 14 (Northwest Peaks) and 15 (Garver):

> BMUs are analysis areas that approximate the lifetime size of a female's home range, but are not meant to depict the actual location of female home ranges on the landscape. BMUs were originally identified for management purposes to provide enough quality habitat for home range use and to ensure that grizzly bears were well distributed across each recovery zone. Because BMUs approximate female home ranges, they are an appropriate scale to use for assessing the effects of proposed actions on individuals for the purposes of Section 7(a)(2) consultation. Thus, for the purposes of analyzing grizzly bear effects in this biological opinion, the action area for the Black Ram Project includes the entirety of BMUs 14 and 15, an area larger than the Black Ram Project area.

FWS-000006–7 (internal citations omitted).

Grizzly bears' habitat needs are "driven by the search for food, water, mates, cover, security, or den sites," which are impacted by human activities. FWS-000018; *see also* FWS-001072. Habitat productivity (food distribution, quality,

and abundance) and availability of other habitat components (e.g., cover) also affect grizzly bear habitat use and function. FWS-001107. In the Cabinet-Yaak Ecosystem, grizzly bears heavily consume fruit from July through September, and huckleberries are a particularly important food source. *See* FWS-000029. According to the FWS, the Project will "reduce overstory canopy to improve growing conditions for huckleberries and other shrubs and forbs, which provide forage for grizzly bears." FWS-000046. It further explained that any attempts to improve forage along roads "will not be expected to substantially increase forage" because "bears tend to avoid areas along motorized routes." FWS-000046.

## III.  Administrative Review and Approval of the Black Ram Project

In July 2017, the USFS began developing the Project. FS-045772–73. After issuing an Environmental Assessment ("EA") in July 2019, Plaintiffs and Consolidated Plaintiffs provided comments. FS-034340–72 (Center for Biological Diversity); FS-034424–670 (WildEarth Guardians); FS-034173–269 (Yaak Valley Forest Council); FS-034673–828 (Alliance for the Wild Rockies & Native Ecosystems Council). On June 21, 2022, the USFS issued a Final EA, FS-002231–2828, Decision Notice, and Finding of No Significant Impact ("FONSI"), FS-002146–2230. On August 26, 2022 the FWS issued an amended Biological Opinion superseding an older version but not incorporating any new information,

rather merely "clarify[ing]" their rationale for the Project (hereafter the "BiOP").
FWS-00006.

## IV.   Procedural History

Plaintiffs filed suit on June 30, 2022, raising three claims and seeking a declaration that the USFS's approval of the Project and its Decision Notice, FONSI, and 2022 Final EA violated NEPA. (Doc. 1.) On December 2, 2022, Plaintiffs filed an amended complaint, adding four additional causes of action for a total of seven: (1) the USFS's failure to take a hard look in violation of NEPA; (2) the USFS's failure to prepare an environmental impact statement ("EIS") in violation of NEPA; (3) the Project's inconsistency with the Kootenai Forest Plan in violation of NFMA; (4) the FWS's failure to use the best available science and create an accurate environmental baseline for the grizzly bear in violation of the ESA; (5) the FWS's failure to consider an important factor in creating the BiOp in violation of the ESA; (6) the FWS's failure to support its no jeopardy finding in violation of the ESA; and (7) the USFS's illegal reliance on a flawed biological opinion in violation of the ESA. (Doc. 31 at ¶¶ 119–166.)

On January 6, 2023, Consolidated Plaintiffs filed suit, seeking similar relief on five causes of action. (Consol. Doc. 1.) The causes of action, in brief, are as follows: (1) the USFS's failure to demonstrate its compliance with the Access Amendment in violation of NEPA and NFMA; (2) the USFS's failure to take a

hard look at the Project's impacts on grizzly bears in violation of NEPA; (3) the USFS's failure to take a hard look at unauthorized motorized use in violation of NEPA; and (4) USFS's failure to prepare an EIS; or, alternatively (5) the USFS's failure to prepare a supplemental EA. (Consol. Doc. 1 at ¶¶ 154–88.) The cases were consolidated on January 12, 2023. (Doc. 36.)

**LEGAL STANDARDS**

Judicial review of agency actions under NEPA, NFMA, and the ESA is governed by the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 706 *et seq.*; *see San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014). Under the APA, the "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The review is deferential to the agency, and a court should "not [] substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

A decision is arbitrary and capricious only "if the agency has relied on factors Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* An

agency's action is valid if the agency considered the relevant factors and

articulated "a rational connection between the facts found and the choice made."

*Id.* (internal quotation marks omitted).  Consistent with the court's obligation not

to substitute its judgment for that of the agency, an agency's action may only be

upheld on "the basis articulated by the agency itself," and the agency must make

plain its course of inquiry, analysis, and reasoning.  *Id.* at 50.

ANALYSIS

**I.   ESA Claims**

The ESA "obligates federal agencies 'to afford first priority to the declared

national policy of saving endangered species.'"  *Pac. Coast Fed'n of Fishermen's

Ass'n v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1084–85 (9th Cir. 2005)

(quoting *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978)).  When a proposed

agency action may affect a species protected by the ESA, the agency must consult

with either the FWS or the National Marine Fisheries Service.  *See* 16 U.S.C.

§ 1536(a)(2).  Where the proposed action is "likely to adversely affect" listed

species or critical habitat, the agencies must engage in formal consultation.  50

C.F.R. § 402.14.  Such consultation results in the issuance of a biological opinion

by the consulting agency—here, the FWS.  *Id.* § 402.14(h).  In that document, the

FWS must make a "jeopardy" determination, i.e., determine whether the proposed

action is "[l]ikely to jeopardize the continued existence of any endangered species

or threatened species." 16 U.S.C. § 1536(a)(2).  The USFS's reliance on a

deficient biological opinion violates the ESA.  *Ctr. For Biological Diversity v. U.S.*

*Bureau of Land Mgmt.*, 698 F.3d 1101, 1127–8 (9th Cir. 2012).[3]

Plaintiffs assert four ESA claims against Federal Defendants: (1) the FWS

failed to use the best available science in establishing an environmental baseline

for the grizzly bear in the Project area; (2) the FWS failed to consider the

population isolation of grizzly bears between the Yaak Valley and the Cabinet

Mountain regions within the Cabinet-Yaak Ecosystem; (3) the FWS ignored the

Project's negative impacts on grizzly bear reproduction in reaching its "no

jeopardy" conclusion; and (4) as a result of these errors, the USFS relied on a

flawed biological opinion in approving the Project.  Ultimately, Plaintiffs' first and

fourth claims have merit as discussed below.

## A.    Environmental Baseline (Plaintiffs' Claim 4)

As a part of the FWS's consultation obligation, it must "[e]valuate the

current status and environmental baseline of the listed species or critical habitat."

50 C.F.R. § 402.14(g)(2).  The environmental baseline "refers to the condition of

the listed species . . . without the consequences . . . caused by the proposed action."

---

[3] Although the ESA's implementing regulations were amended in 2020, the agencies relied on the old regulations, *see* FWS-000006, and those regulations are applied here. *See Bair v. Cal. Dep't of Transp.*, 982 F.3d 569, 577 n.20 (9th Cir. 2021).

*Id.* § 402.02. It "includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area." *Id.* In determining the environmental baseline, the FWS, using information provided at least in part by the USFS, "shall use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2). This requirement "prohibits an agency from disregarding available scientific evidence that is in some way better than the evidence it relies on." *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1080 (9th Cir. 2006) (internal quotation marks and alterations omitted). "The determination of what constitutes the '*best* scientific data available' belongs to the agency's 'special expertise.'" *San Luis*, 747 F.3d at 602 (quoting *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 103 (1983)); *see also Native Ecosystems Council v. Marten*, 883 F.3d 783, 791 (9th Cir. 2018).

Here, Plaintiffs argue that the FWS violated the ESA by failing to rely on the best available science in establishing an environmental baseline for grizzly bears in the Project area. Federal Defendants and the Tribe disagree, arguing that the FWS "considered all the best available population data and exercised its expertise to decide what data to credit." (Doc. 61 at 18.) Ultimately, Plaintiffs are correct because although the FWS explained its scientific reliance, it disregarded biological information indicating an increase in grizzly bear mortality.

The FWS determined that "[t]he best estimate of population is 60 bears in the [Cabinet-Yaak Ecosystem]." FWS-000012 (citing FWS-001486). That estimate was made by taking a 2012 population estimate of 48–50 bears, created via the largest and most thorough study the FWS has done to date. *See* FWS-001486. It then took that range, picked the midpoint (49), and used its calculated growth rate of increase estimate, resulting in a gain of 7 bears through 2020, for a total of 56 bears. FWS-001486. To calculate the rate of increase, researchers entered survival and reproduction data from the ecosystem's radio-collared bears into specialized software which runs over 5,000 scenarios. *See* FWS-001486. Finally, it added the 4 bears brought to the Cabinet-Yaak ecosystem since 2012. FWS-001486.

The FWS conceded that "[w]hile the exact number of individuals is unknown, and is a dynamic number that is difficult to pinpoint, researchers estimate the population of grizzly bears in the [Cabinet-Yaak Ecosystem] is *likely* increasing, with a finite rate of increase of 1.017 for the period 1983-2020." FWS-000011 (emphasis added). The FWS's confidence in the rate of population increase is 67%, due in part to the small sample size of the studies. FWS-000012. In addition to explaining the bases and methodologies for this decision, (*see, e.g.*, Doc. 61-1 (Kasworm Decl.)), it acknowledged the inherent uncertainties that go along with the types of methodologies it did not use, including Plaintiffs' preferred

minimum counting method.[4]  This method involves using "all methods of detection" including bear capture, bear tree rub DNA, corral DNA, and photos, to determine the minimum number of bears in an area.  *See* FS-005337.

The FWS considered using minimum counts for bear population determinations, as Plaintiffs argue is necessary, but cautioned that "[t]o rely solely upon a count of the known detected individuals is an over-simplification of population biology."  FWS 000012.  The BiOp notes that "[i]t is biologically inappropriate to infer changes in the minimum number of bears detected from year to year as changes in total population size."  FWS-000012.  Finally, it explained that "minimum counts are influenced by the level of effort available each year.  Effort is influenced by funding, number of personnel, area of emphasis, and most recently COVID-19 work restrictions."  FWS-000012.  However, the FWS failed to explain how the amount of resources going into minimum counts correlates with

---

[4] For the purposes of this case, the FWS has further explained some of its methodologies in a declaration outside of the administrative record.  The declarant, Wayne Kasworm, was a FWS wildlife biologist who authored many of the reports relied on by the agency in the BiOp and throughout the record.  Although outside of the administrative record, because Wayne Kasworm's declaration is necessary to help explain the complexities of the FWS's population counting methodologies, it is considered here.  "Judicial review of an agency decision typically focuses on the administrative record in existence at the time of the decision and does not encompass any part of the record that is made initially in the reviewing court."  *Sw. Ctr. for Biological Div. v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996).  However, extra-record materials may be allowed to, *inter alia*, "explain technical terms or complex subject matter."  *Id.* (internal quotation marks omitted).

the actual numbers of bears found each year. *See, e.g.*, FS-005718 (noting that in 2012, 1376 tree rubs were checked yielding 85 rubs with grizzly bear DNA while in 2019, only 839 tree rubs were checked yielding almost the same number of rubs with grizzly bear DNA (87)).

Additionally, these methods ignore the reality of documented bear mortalities in the Cabinet-Yaak Ecosystem. For example, in 2017, the FWS detected "a minimum 54 individual grizzly bears alive and within the [Cabinet-Yaak Ecosystem] grizzly bear population at some point during [the year]," including 21 female bears. FS-005484. In 2019, the FWS detected 50 bears, including 14 female bears. FWS-001446. And, in 2020, the FWS detected 45 bears, including 14 females. FS-005690.

Ultimately, while the FWS is not required to use the minimum counts method to create an environmental baseline, it may not ignore the issue of female bear mortality altogether because to do so ignores an important aspect of the problem that the agency itself acknowledges. *See* FWS-000013 (noting that "the survival and reproduction of each individual female grizzly bear is very important" to overall increase in bear populations). Statistical modeling is scientifically accurate, but documented deaths of female bears cannot be ignored.

While courts are tasked with deferring to "the agency's judgment even in the face of uncertainty" *San Luis*, 747 F.3d at 633 (internal quotation marks omitted),

the agency cannot ignore critical data without explanation, *see Conner v. Buford*, 848 F.2d 1441, 1454 (9th Cir. 1988).  Because it did so, the FWS violated the ESA.

**B.    Genetic Isolation (Plaintiffs' Claim 5)**

Plaintiffs next argue that the BiOp is arbitrary and capricious because the FWS failed to consider the population isolation of grizzly bears between the Yaak Valley and the Cabinet Mountain regions within the Cabinet-Yaak Ecosystem. Federal Defendants and the Tribe counter both that the populations are not completely isolated and that the FWS did in fact consider population connectivity in the BiOp.  Federal Defendants and the Tribe have the better argument.

As an initial matter, the record reflects uncertainty as to whether the Cabinet and Yaak populations are even genetically diverse.  *See* FWS-000015.  However, even if the Cabinet and Yaak populations are genetically diverse, the FWS sufficiently explained its determination that they are not isolated from each other. The BiOp states that "movement . . . has occurred between the Cabinet Mountains and Yaak River portion of the [Cabinet-Yaak Ecosystem], and between the [Cabinet-Yaak Ecosystem] and other grizzly bear ecosystems."  FWS-000015. The BiOp then states that there is "increasing movements by males and females and subsequent reproduction, resulting in limited, but increasing population connectivity, particularly in the Yaak portion of the [Cabinet-Yaak Ecosystem]."

FWS-000015; *see also* FWS-000030.  Finally, it explains that "this information was considered when analyzing the effects to individual grizzly bears affected by the Black Ram Project."  FWS-000015.  Thus, Plaintiffs' contention that the "[FWS] never analyzes the lack of connectivity between grizzly bears in the Yaak and grizzly bears in the Cabinets" is without merit.  (Doc. 51 at 23.)

Equally unpersuasive is Plaintiffs' insistence that the FWS has a duty to consider project impacts on listed species on scales smaller than those designated through ESA listing or recovery planning.  In *Wild Fish Conservancy v. Salazar*, the FWS determined that the decline of an isolated bull trout population would not lead to an overall population decrease.  628 F.3d 513, 525–29 (9th Cir. 2010).  Upon review, the court held that the BiOp did not sufficiently "articulate a rational connection between the facts found and the conclusions made."  *Id.* at 525 (internal quotation marks and alteration omitted).  Plaintiffs argue that here, the FWS also did not properly identify nor explain why the isolated Yaak segment of the grizzly bear would escape jeopardy because of the Project.  However, unlike the situation in *Wild Fish Conservancy*, the BiOp explains both why there is not an isolated population segment that is independently affected in the Yaak region and why there has been a decrease in population in the area.  *See* FWS-000015.

Ultimately, Plaintiffs are correct that "[f]ocusing solely on a vast scale can mask multiple site-specific impacts that, when aggregated, do pose a significant

risk to a species." *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378

F.3d 1059, 1063 (9th Cir. 2004), *superseded by regulation on other grounds by*

*Definition of Destruction or Adverse Modification of Critical Habita*t, 81 Fed. Reg.

7214 (Feb. 11, 2016).  However, the agency considered those impacts here and

determined no greater impact would follow.  Thus, its analysis was not arbitrary

and capricious.

### C.    Jeopardy Determination (Plaintiffs' Claim 6)

Section 7 of the ESA requires the USFS to consult with the FWS to ensure

the proposed agency action will not jeopardize the continued existence of the

grizzly bear.  16 U.S.C. § 1536(a)(2).  To "jeopardize the continued existence of" a

species means "to engage in an action that reasonably would be expected, directly

or indirectly, to reduce appreciably the likelihood of both survival and recovery of

a listed species in the wild by *reducing the reproduction*, numbers, or distribution

of that species."  50 C.F.R. § 402.02 (emphasis added).  "Recovery means

improvement in the status of listed species to the point at which listing is no longer

appropriate under the criteria set out in section 4(a)(1) of the Act."  *Id.*

Plaintiffs argue the FWS ignored the Project's negative impacts on grizzly

bear reproduction.  Federal Defendants and the Tribe counter that the FWS is only

required to consider impacts on a species level, not at the ecosystem or individual

bear level, which it says it did.  They also argue that even if there are negative

impacts on grizzly bear reproduction, those impacts are non-lethal, minor, and temporary. The crux of the parties' dispute comes down to how much consideration the FWS is required give to the Project's effect on reproduction for female bears, specifically in the Project area. Although somewhat counterintuitive, Federal Defendants and the Tribe are correct.

In the BiOp, the FWS determined that the Project would not jeopardize the grizzly bear's continued existence, *see* FWS-000057, while also acknowledging that the Cabinet-Yaak population is "still a small population in which the survival and reproduction of each individual female grizzly bear is very important," FWS-000013. In making its determination, the FWS found that the "Project will not reduce the reproduction, numbers, or distribution of grizzly bears throughout the [Cabinet-Yaak Ecosystem]" and that "the level of adverse effects is not reasonably expected to reduce appreciably the likelihood of both the survival and recovery of the listed entity of grizzly bears as a whole." *See* FWS-000057.

The Cabinet-Yaak Ecosystem includes 22 Bear Management Units, FWS-000012, and the Project area impacts only Units 14 and 15, FWS-000006. The FWS found that the Project "may result in adverse effects to a few individual female grizzly bears as a consequence of the potential disturbance and/or displacement related to the temporary increases in motorized access that could displace grizzly bears from otherwise suitable habitats." FWS-000053. However,

in supporting its no jeopardy finding, it determined that the increased motorized access will not impede movement of the bear within the Project area.  FWS-000054.

In supporting their respective no jeopardy arguments, the parties all point to a FWS memo from March 2006 ("2006 Memo") cited in the BiOp that proclaims its stated purpose as follows: "to clarify the role of recovery units in making jeopardy determinations."  FWS-004970–91.  While the force of law of the 2006 Memo is in dispute, *see Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000), because the parties all rely on divergent interpretations to support their conclusions, a more detailed consideration is required.  The 2006 Memo instructs that "the establishment of 'recovery units,' [like the Cabinet-Yaak Ecosystem] does not create a new listed entity" but that "when an action appreciably impairs or precludes the capacity of a recovery unit from providing both the survival and recovery function assigned to it, that action may represent jeopardy to the species."  FWS-004970.  Thus, the 2006 Memo indicates that some consideration of groups of bears smaller than the species level is required.  However, the memo ultimately concludes that "[w]hile a proposed Federal action may have significant adverse consequences to one or more 'recovery units,' this would only result in a jeopardy determination if these adverse consequences reduce appreciably the likelihood of both the survival and recovery of the listed entity."  FWS-004970.  Thus, the 2006

Memo does not support a finding that a potential impact on reproduction of female bears must compel a jeopardy finding when the species as a whole is not in decline. The BiOp appropriately reaches the same conclusion. FWS-000009.

Ultimately, Federal Defendants and the Tribe are correct that the plain language of the ESA and its implementing regulations state that the no jeopardy determination is made on a species level. 16 U.S.C. § 1536(a)(2) ("Each Federal agency shall . . . insure that any action . . . is not likely to jeopardize the continued existence of any endangered *species* or threatened *species*. . . .") (emphasis added); 50 C.F.R. § 402.02 ("Jeopardize the continued existence of means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed *species* in the wild by reducing the reproduction, numbers or distribution of that *species*.") (emphasis added).

The FWS was required to "articulate[] a rational connection between the fact found and the conclusion made." *Wild Fish Conservancy*, 628 F.3d at 527 (internal quotation marks omitted). It did so when it acknowledged the impact on the reproductive females while also finding no adverse impact would occur. Contrary to Plaintiffs' position, the FWS was not required to make a jeopardy determination at the sub-species level of a recovery area or project area.

**D.      Agency Reliance on BiOp (Plaintiffs' Claim 6)**

Plaintiffs argue that the USFS's approval of the Project is invalid because it relied on a deficient BiOp. Indeed, an agency violates the ESA if it relies on a legally flawed BiOp. *Ctr. for Biological Diversity*, 698 F.3d at 1127–28. Because the FWS failed to use the best available science to create its environmental baseline for grizzly bears, the BiOp was flawed. Accordingly, its approval of the Project pursuant to that BiOp was arbitrary and capricious.

## II.   NEPA CLAIMS

NEPA sets procedural requirements for federal agencies to follow when contemplating actions that will have an impact on the environment. 42 U.S.C. § 4332. Consequently, agencies must consider alternatives to the proposed action—including no action—and compare the environmental consequences of those alternatives against the proposed action. 40 C.F.R. § 1502.14.[5] NEPA's implementing regulations allow for federal agencies to prepare an EA to determine if preparation of a more extensive environmental review through an EIS is necessary. *Id.* § 1501.4(b)–(c). An EA is a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." *Id.* § 1508.9(a). It must discuss the need for the proposed action, available

---

[5] Although NEPA's implementing regulations were updated in 2020, the USFS applied the 2019 version here and so does this Order. *See Bair*, 982 F.3d at 577 n.20.

alternatives to the proposed action, and the environmental impacts of the proposed action and of the alternatives. *Id.* § 1508.9(b). It must also list the agencies and persons consulted. *Id.* If, because of the EA, the agency finds that the proposed action will not have a significant impact on the environment, the agency need not prepare an EIS. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 145 (2010).

In reviewing allegations that agency action violates NEPA, the Court employs the "arbitrary and capricious standard." *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1008–09 (9th Cir. 2006) (citing 5 U.S.C. § 706(2)(A)). Under that standard, courts look to "whether the agency has taken a 'hard look' at the consequences of its actions, 'based [its decision] on a consideration of the relevant factors,' and provided a 'convincing statement of reasons to explain why the project's impacts are insignificant.'" *Id.* at 1009 (quoting *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 730 (9th Cir. 2001), *abrogated on other grounds by Monsanto Co.*, 561 U.S. at 157–58).

A.     **Lead Case: CV 22–114–M–DWM[6]**

In the lead case, Plaintiffs argue that the USFS violated NEPA by failing to abide by its obligation to take a "hard look" at the Project's impact on the climate change and on grizzly bears. They are correct as to climate impacts but not as to

---

[6] Plaintiffs' Third Claim (NFMA violations) was not argued in their summary judgment brief and is thus waived.

grizzly bears.

### 1. Climate Impacts (Plaintiffs' Claim 1)

Plaintiffs first argue that the USFS failed to take a "hard look" at the environmental consequences of the Project when it did not consider the Project's broader climate impacts. That argument has merit. To be sure, the statutory text of NEPA does not directly address climate impacts and "the [FWS] is only required to focus on the issues 'that are truly significant to the action in question.'" *Hapner v. Tidwell*, 621 F.3d 1239, 1245 (9th Cir. 2010) (quoting 40 C.F.R. § 1500.1(b)). Nevertheless, both the Council on Environmental Quality and recent caselaw indicate that such impacts fall within NEPA's framework. Here, while the USFS did address climate change in its review, merely discussing carbon impacts and concluding that they will be minor does not equate to a "hard look."

In 2016, the Council on Environmental Quality issued guidance for federal agencies in the NEPA review process, instructing that "[c]limate change is a fundamental environmental issue, and its effects fall squarely within NEPA's purview." (Doc. 61-3 at 3 ("Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and Effects of Climate Change in National Environmental Policy Act Reviews").) It also acknowledges that "[c]limate change is a particularly complex challenge given its global nature and the inherent interrelationships among its sources, causation, mechanisms of action,

and impacts." (*Id.*)  Similarly, courts have become more critical of agencies'

rationale regarding the significance of a proposed action when the action will have

impacts on global climate change.  *See 350 Mont. v. Haaland*, 50 F.4th 1254 (9th

Cir. 2022).  Although NEPA's implementing regulations somewhat cabin broader

environmental analyses by stating that "[i]mpacts shall be discussed in proportion

to their significance," 40 C.F.R. § 1502.2(b), a "hard look" under NEPA requires

"a reasonably thorough discussion of the significant aspects of the probable

environmental consequences," *Ctr. for Biological Diversity v. Nat'l Highway*

*Traffic Safety Admin.*, 538 F.3d 1172, 1194 (9th Cir. 2008) (internal quotation

marks omitted).  Thus, it follows that if there is little chance that a Project will

have a significant impact on climate change, little analysis by the agency is

required to meet NEPA's "hard look" standard.

  In a recent decision regarding the Department of the Interior's NEPA

analysis on a proposed coal mine expansion in central Montana, the Ninth Circuit

held that the agency failed to properly explain why it considered climate impacts of

the project to be minor.  *350 Mont.*, 50 F.4th at 1270.  There, the court held that

"[w]ithout some articulated criteria for significance in terms of contribution to

global warming that is grounded in the record and available scientific evidence,

Interior's conclusion that the Mine Expansion's [greenhouse gas] emissions will be

'minor' is deeply troubling and insufficient to meet [the agency's] burden." *Id.* at

1266 (internal quotation marks and citation omitted).  Plaintiffs argue that the USFS's analysis is similarly lacking here.

In the EA, the USFS considered the Project's impacts on climate change in two documents: (1) the Black Ram Project's Carbon Report ("Project Carbon Report"), FS-020739–48; and (2) the Forest Carbon Assessment for the Kootenai National Forest in the Forest Service's Northern Region ("Forest Carbon Report"), FS-020711–02038.

The Project Carbon Report provides "a *qualitative* analysis of [the Project's] effects on carbon cycling and storage." FS-020739.[7]  The Project Carbon Report explains:

> In the short term, the proposed action would remove and release some carbon currently stored within treatment area biomass through harvest of live and dead trees and other fuel reduction activities, including prescribed burning.  A portion of the carbon removed would remain stored for a period of time in wood products.  Additionally, motorized equipment used during any of the proposed activities will emit greenhouse gasses.

FS-020742 (internal citations omitted).  It further explains that the "long-term ability of forests to sequester carbon depends in part on their resilience to multiple

---

[7] Despite the USFS's assertion that the Project Carbon Report was specifically prepared for the Project, it is almost entirely copied from a 2015 report for a similar type of project on the Idaho Panhandle National Forest. *See* FS-038344–53.  While the majority is copied verbatim from the Idaho Panhandle report, there are some areas—such as select passages from the "existing conditions" section—that appear to be independently prepared for the Project. *Compare* FS-020741 *with* FS-038346.

stresses, including increasing probability of drought stress, high severity fires, and large scale insect outbreaks associated with projected climate change." FS-020743. The Project Carbon Report notes that the Project would decrease these potential threats by increasing the long-term productivity of the forest, leading to higher future carbon sequestration. FS-020743. And it further notes that: "The total carbon stored on the Kootenai National Forest is approximately 174 Tg, or about thirty-nine one hundredths of one percent (0.0039) of approximately 44,931 Tg of carbon stored in forests of the coterminous United States." FS-020743. Although it does not provide hard numbers explaining how much carbon would be released if the Project were implemented, it concludes that the Project would not "have a discernable impact on atmospheric concentrations of greenhouse gases or global warming, considering the limited changes in both rate and timing of carbon flux predicted within these few affected forest acres and the global scale of the atmospheric greenhouse gas pool and the multitude of natural events and human activities globally contributing to that pool." FS-020743.

The USFS also analyzed climate impacts in the Forest Carbon Report, a 2021 report on the history and outlook of carbon sequestration in the Kootenai National Forest. FS-020711–38. According to the USFS, the Forest Carbon Report puts into perspective the miniscule effect that timber harvest has had on the USFS's carbon storage. *See generally* FS-020711–38. That report finds that

despite completed timber projects, carbon stored in trees in the Kootenai National

Forest increased between 1990 and 2013 but that "stocks in the Kootenai [National

Forest] would have been approximately 0.9 percent higher in 2011 if harvest had

not occurred since 1990." FS-020723.  It further explains that although logging

has had an impact on carbon storage, "[r]oot disease . . . was the primary

disturbance influencing carbon stocks" during that period.  FS-020722.  And when

considering all natural forests in North Idaho, Montana, and Northeastern

Washington, "fire has been the most significant disturbance affecting carbon

storage since 1990." FS-020723.

Here, Plaintiffs argue that this analysis of the Project's carbon impact was

insufficient.  Federal Defendants and the Tribe counter that the USFS properly

analyzed environmental impacts in a manner proportionate to their significance,

which they insist are localized, infinitesimal, and minor.  Ultimately, Plaintiffs are

correct because although the USFS took steps to explain how the Project could

impact carbon emissions, it did so only in general terms, which does not meet

NEPA's "hard look" standard.

The Project greenlights thousands of acres of logging included clearcutting

on 1,783 acres, FS-002254–55, and harvesting in old-growth stands of trees that

are up to 230 years old, FS-002762.  Despite the parties' agreement that forests are

an important tool for carbon sequestration, *see* FS-020739, because the Project will

allegedly "affect only a tiny percentage of the forest carbon stocks of the Kootenai National Forest, and an infinitesimal amount of the total forest carbon stocks of the United States," FS-020743, the USFS concluded no further effects analysis of the Project's impact on climate change was required.  However, the USFS did not explain how this determination was made using "the high quality and accurate scientific analysis that NEPA's implementing regulations demand of environmental information produced by agencies." *See 350 Mont.*, 50 F.4th at 1270 (internal quotation marks and alteration omitted).

In *350 Montana v. Haaland*, the Ninth Circuit rejected the agency's claim that project climate impacts would be minor based on "an opaque comparison to total global emissions." 50 F.4th at 1269–70.  This problem exists here as well. Federal Defendants attempt to distinguish this situation by pointing out that carbon lost from logging replenishes more quickly than carbon lost from coal mining. While that may be the case, nothing in *350 Montana* explicitly limits its holding to coal.  Rather, it instructs that "[w]ithout some articulated criteria for significance in terms of contribution to global warming that is grounded in the record and available scientific evidence," an agency's conclusion that the Project's carbon impacts will be "minor" is insufficient. *Id.* at 1266.  Thus, consistent with *350 Montana*, the USFS is required to determine "the extent to which this particular project's [carbon emissions] will add to the severe impacts of climate change." *Id.*

In light of the above, the USFS's consideration of the Project's climate impacts fails NEPA in two ways.  First, by relying almost entirely on the cookie-cutter and boilerplate Project Climate Report to analyze the carbon impact of the project, the USFS did not utilize high quality and accurate information which NEPA requires.  *See* 40 C.F.R § 1500.1.  Second, even though the USFS posited that the short-term loss of carbon from logging would be outweighed by the net increase in carbon sequestration resulting from a healthier forest, this assertion is not backed up by a scientific explanation.  Rather, the USFS generally concludes that carbon as a result of the Project's activities make up "only a tiny percentage of forest carbon stocks of the Kootenai National Forest, and an infinitesimal amount of total forest carbon stocks of the United States."  FS-020743.  Under this logic, the USFS could always skirt "hard look" analysis when doing a carbon impacts review by breaking up a project into small pieces and comparing them to huge carbon stocks such as those contained within the over two million acres of land in the Kootenai National Forest.

Notwithstanding *350 Montana*'s guidance here, the parties dispute how to apply two pre-*350 Montana* cases dealing specifically with logging projects and carbon emissions: *Hapner v. Tidwell*, 621 F.3d 1239 (9th Cir. 2010), and *Swomley v. Schroyer*, 484 F. Supp. 3d 970, 973 (D. Colo. 2020).  In *Hapner*, the Ninth Circuit affirmed a 2009 decision by this Court granting summary judgment in

favor of the USFS regarding the approval of the Smith Creek Project in the
Gallatin National Forest. The Smith Creek Project in *Hapner* authorized logging
on up to 810 acres and prescribed burning on an additional 300 acres. 621 F.3d at
1242. The Ninth Circuit held that because "[t]he Project involves a relatively
small amount of land and . . . will thin rather than clear cut trees" and because the
USFS "addressed comments regarding climate change" in its notice of decision,
the USFS "adequately considered the [Smith Creek Project's] impacts on global
warming in proportion to its significance." *Id.* at 1245. Similarly, in *Swomley* a
district court affirmed the USFS's approval of the Upper Fryingpan Project, which
authorized logging on 1,631 acres of land in the White River National Forest. 484
F. Supp. 3d at 973.[8] Relying in part on *Hapner*, that court determined that
although the project involved more acres of logging than *Hapner*, the impact was
still minor, and the USFS properly addressed the potential impact on climate
change. *Id.* at 976–77. In both cases, the courts decided that because the carbon
impact was small, only a passing analysis was required.

Federal Defendants and the Tribe rely on *Hapner* and *Swomley* to argue that
because the Project's carbon impact is small, the USFS may minimize its carbon
analysis. Plaintiffs differentiate *Hapner* and *Swomley* by arguing that the Project

---

[8] The Tenth Circuit affirmed the district court; however, because the plaintiffs did
not "adequately brief [the] issue on appeal," it was not addressed on the merits.
*See Swomley v. Schroyer*, 2021 WL 4810161, at *3 (10th Cir. Oct. 15, 2021).

involves a much larger logging project than either case. Plaintiffs are correct. The

project in *Hapner* involved 810 acres of logging and prescribed burning on an

additional 300 acres, 621 F.3d at 1242, while the project in *Swomley* involved

1,631 acres of logging, 484 F. Supp. 3d at 973. The Project here involves 3,902

acres logging, 45 percent of which is set to be clearcut. FS-002153–54. Thus, on

the facts, neither *Hapner* nor *Swomley* supports the USFS's limited carbon impacts

analysis here.

To Federal Defendants' credit, they are correct that the USFS contemplated

other aspects of the Project that will have a net positive impact on carbon

emissions. For example, the EA discusses how the USFS plans to ameliorate root

disease from a selection of trees in the Project area, which will lead to growth of

trees that can store more carbon than diseased trees. *See* FS-002243 (noting that a

purpose and need of the Project is to "[p]romote" root disease-resistant tree species

like "western larch, ponderosa pine, and western white pine"). However, like its

analysis of the net carbon loss resulting from logging, the EA does not sufficiently

provide scientific evidence indicating why this benefit would offset the carbon loss

leading to an overall "minor" impact on the environment.

Ultimately, "[greenhouse gas] reduction must happen quickly" and removing

carbon from forests in the form of logging, even if the trees are going to grow

back, will take decades to centuries to re-sequester. FS-038329. Put more simply,

logging causes immediate carbon losses, while re-sequestration happens slowly over time, time that the planet may not have.  FS-020739 ("[I]t is recognized that global research indicates the world's climate is warming and that most of the observed 20th century increase in global average temperatures is very likely due to increased human-caused greenhouse gas emissions.").

While the USFS did address climate change in the EA through the Forest and Project Carbon Plans, merely discussing carbon impacts and concluding that they will be minor does not equate to a "hard look."  NEPA requires more than a statement of platitudes, it requires appraisal to the public of the actual impacts of an individual project.  With all in agreement that climate change as a result of carbon emissions is an increasingly serious national and global problem, *see* FS-020739, the USFS has the responsibility to give the public an accurate picture of what impacts a project may have, no matter how "infinitesimal" they believe they may be.  They did not do so here.  Accordingly, the agency failed to take a "hard look" at the Project's carbon emissions, violating NEPA.

### 2.    Baseline Conditions for Grizzly Bears (Plaintiffs' Claim 1)

Plaintiffs further argue that the USFS violated NEPA when it relied on "stale" data to establish the environmental baseline for its grizzly bear analysis.  As described in detail above, the FWS calculated an environmental baseline for grizzly bears that violated the ESA.  However, NEPA's and the ESA's directives

for establishing baselines are not the same.  While the ESA requires the FWS to "[e]valuate the current status and environmental baseline of the listed species or critical habitat," 50 C.F.R. § 402.14(g)(2), under NEPA, the USFS is required to identify the impacts of a proposed project, *see* 40 C.F.R. §§ 1508.7, 1508.8, 1508.9(b).  Here, the USFS analyzed the existing conditions for grizzly bears including the current population trends it identified in the Cabinet-Yaak Ecosystem, key stressors on grizzly bear discovery, grizzly bear attractants, and the impacts of roads on grizzly bears.  FS-002541–44.  And Federal Defendants argue that under NEPA, "establishment of a baseline is not an independent legal requirement, but rather, a practical requirement in environmental analysis often employed to identify the environmental consequences of a proposed agency action."  (Doc. 61 at 34–35 (quoting *Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 568 (9th Cir. 2016).)  However, in the case relied on by Federal Defendants to make their point, the court determined that the environmental review document at issue was faulty because it failed to meet a "duty to assess . . . the actual baseline conditions" relevant there.  *Or. Nat. Desert Ass'n*, 840 F.3d at 569.  Thus, while the "establishment of a baseline is not an independent legal requirement," it is a "practical" one that ensures an accurate consideration of the environmental consequences of a proposed action.  *Id.* at 538.  In this effort the USFS's analysis falls short.

The EA reads: "[i]n 2017, the Cabinet-Yaak Ecosystem had an estimated 55-60 individuals with a 73 percent probability that the population was stable or increasing (Kasworm et al. 2018)." FS-002541. However, the agency had more recent data available to it. While the ESA's baseline standards do not apply here, the information provided in the BiOp includes citations to "(Kasworm et al. 2021)." *See* FWS-000011. In relying on data from a 2018 study, rather than data from more recent studies, the USFS's determination of baseline conditions was arbitrary and capricious.

### 3.     Failure to Prepare an EIS (Plaintiffs' Claim 2)[9]

Agencies must prepare an EIS for federal actions that will "significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(2)(C). To determine whether a proposed action will do so, agencies may prepare an EA that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9(a)(1). An EIS is required when an EA raises "substantial questions" that an agency action will have a significant environmental effect. *Blue Mtns. Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998)

---

[9] Consolidated Plaintiffs make a similar claim but fail to address it in their summary judgment briefing. (*See* CV 23–3–M–DWM, Doc. 1 at ¶¶ 173–82.) It is therefore waived. *See Jenkins v. Cnty. of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005).

(internal quotation marks omitted).  "In challenging an agency decision not to

prepare an EIS, plaintiffs need not prove that significant environmental effects *will*

occur; they need only raise a substantial question that they might. This presents a

low standard that is permissive for environmental challenge." *Env't Def. Ctr. v.*

*Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 878–79 (9th Cir. 2022) (internal

quotations marks and citation omitted).  "If the agency concludes in the EA that

there is no significant effect from the proposed project, the federal agency may

issue a finding of no significant impact [] in lieu of preparing an EIS." *Native*

*Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005)

(citing 40 C.F.R. §§ 1508.9(a)(1), 1508.13).

     Whether or not an action may significantly affect the environment is

addressed in terms of "context" and "intensity."  40 C.F.R. § 1508.27.  "Context

simply delimits the scope of the agency's action, including the interests affected."

*In Def. of Animals, Dreamcatcher Wild Horse & Burro Sanctuary v. U.S. Dep't of*

*Interior*, 751 F.3d 1054, 1068 (9th Cir. 2014) (internal quotation marks omitted).

"Intensity refers to the 'severity of impact,' and the regulations identify ten factors

that agencies should consider in evaluating intensity.  *Id.* (quoting 40 C.F.R.

§ 1508.27(b)(1)–(10) (listing factors)).

     After conducting an EA here, the USFS determined that the Project had no

significant effects, FS-00231–828, and accordingly issued a FONSI instead of

preparing an EIS.  FS-002146–230.  Plaintiffs argue that the FONSI is arbitrary

and capricious because it fails to adequately consider the presence of the grizzly

bear and unique characteristics of the Project.  Federal Defendants argue that the

USFS specifically considered these factors and narrowly tailored the EA to address

why those specific impacts would not occur.  Plaintiffs have the better argument.

### a.    Context

The "particular[] identification of the geographic area within which

[environmental impacts] may occur[] is a task assigned to the special competency

of the appropriate agencies."  *Kleppe v. Sierra Club*, 427 U.S. 390, 413–14 (1976).

In the FONSI, the USFS considered the impact of the Project on a variety of levels,

including the locality level.  It outlined the proposed harvest, fuel, and thinning

treatments as well as the attendant roads, and where each treatment will occur.  *See*

FS-002154–55.  Thus, as required under NEPA, the USFS properly addressed the

context of the Project.

### b.    Intensity: Grizzly Bear

Relevant here, one intensity factor is the degree to which a proposed action

"may adversely affect an endangered or threatened species or its [critical] habitat."

40 C.F.R. § 1508.27(b)(9).  A finding of jeopardy could support a finding that an

EIS is required under this factor.  *Forest Serv. Emp. For Env't Ethics v. U.S.*

*Forest Serv.*, 726 F. Supp. 2d 1195, 1218 (D. Mont. 2010).  Federal Defendants

and the Tribe argue that because the FWS found no jeopardy to grizzly bears

would result from the Project, the intensity factor was satisfied.  Plaintiffs contend

instead that because some grizzly bears may be harmed during the Project's

lifecycle, this factor weighs in favor of the preparation of an EIS.

As Plaintiffs correctly note, the decision notice for the Project admits that it

is "likely to adversely affect grizzly bears," FS-002170, but that impact on

individual bears does not necessarily demonstrate a significant effect on the

environment.  *See Env't Prot. Info. Ctr.*, 451 F.3d at 1010 ("NEPA regulations

direct the agency to consider the degree of adverse effect on a species, not the

impact on individuals of that species.").  And, because the record does not reflect

that grizzly bears would be affected or jeopardized as a species, Federal

Defendants and the Tribe are correct that this factor does not mandate the

preparation of an EIS.

### c.    Intensity: Unique Characteristics

The intensity inquiry also requires consideration of "[u]nique characteristics

of the geographic area."  40 C.F.R. § 1508.27(b)(3).  Plaintiffs' unique

characteristics argument focuses on the proposed impacts to Wild and Scenic River

designation areas, the Pacific Northwest Trial, and the Pete Creek Botanical Area.

The Pacific Northwest Trail cuts through 28.1 miles of the Project area.  FS-

002470.  After analyzing the impacts of the Project on the Trail, the USFS

concluded that "[d]ue to project design, layout, and design features, no significant

adverse effects to the trail are expected," FS-002167, even though "[p]roposed

timber harvest and fuel treatments may affect user access to this trail," by blocking

trail use and scenic views from the trail, FS-002442.

Additionally, there are 3,538 of acres in the Project area eligible for Wild

and Scenic River designation, FS-002253, divided between three segments of the

Yaak River, FS-002443. Of that acreage, the Project authorizes the following

treatments in the recreational segments: 274 acres is set for harvest treatment, 200

acres for non-harvest ecosystem burning, 177 acres for ladder fuels reduction, and

3 acres for fuel break, FS-002253; and 108 acres of non-harvest ecosystem burning

in the wild segment, FS-002443. "These river segments have outstanding

remarkable values (ORV) of scenery, fisheries, recreation and history." FS-

002432.

Finally, the 320-acre Pete Creek Botanical Area, designated for protection

due to its unique flora, is within the Project area. FS-002167. The Project will

impact roughly 2% of the flora in this area, an amount which the USFS posits will

"reduce fuels and decrease the potential fire severity." FS-002340.

Regarding both the Wild and Scenic River and Botanical Area analysis, the

USFS again concluded "[d]ue to project design, layout, and design features, no

significant adverse effects to these unique characteristics are expected." FS-

002168.  In reaching this conclusion, the USFS analyzed the impacts in these areas, essentially finding that too small an amount of these areas will be affected to be significant.  Even so, Plaintiffs raise more than "substantial questions" that each of these unique areas may be impacted by the Project.  *See Env't Def. Ctr.*, 36 F.4th at 878–79.  Therefore, it was arbitrary and capricious for the USFS to find no significant impact and elect to not prepare an EIS.

### B.      Consolidated Case: CV 23–3–M–DWM

Consolidated Plaintiffs assert three NEPA claims against Federal Defendants: (1) the USFS failed to demonstrate its compliance with specific (a) standards and (b) guidelines from the Kootenai National Forest Management Plan; (2) the USFS failed to take a "hard look" at unauthorized motorized use; and (3) the USFS failed to prepare a supplemental NEPA document to address recent female grizzly mortality.  Consolidated Plaintiffs asserted two additional claims in their complaint (Claims Two and Four) but declined to argue them in their summary judgment brief.  Thus, they are waived.  Ultimately, Consolidated Plaintiffs' standards, "hard look", and supplemental NEPA claims have merit.

### 1.      Forest Plan Requirements for Bear Management Units (Consolidated Claim I)

As explained above, a federal agency must take a "hard look" at the potential environmental impacts of a proposed action.  *See Envtl. Prot. Info. Ctr.*, 451 F.3d at 1009.  In doing so, the USFS "may not rely on incorrect assumptions

or data" and must also provide "accurate" data "to the public to substantiate its analysis and conclusions." *WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 926 (9th Cir. 2015) (internal quotation marks omitted). Relatedly, the National Forest Management Act ("NFMA") requires the USFS to develop a land and resource management plan, 16 U.S.C. § 1604(a), to which it must comply, *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 961 (9th Cir. 2005). The USFS most recently redid the land and resource management plan for the Kootenai National Forest ("Forest Plan") in 2015. *See* FS-000001–189. Relevant here, the Forest Plan incorporates wildlife standard FW-STD-WL-02 and wildlife goal FW-GDL-WL-15, which both regard grizzly bears. FS-000040–42. FW-STD-WL-02 provides that "[t]he Motorized Access Management within the Selkirk and Cabinet Yaak Grizzly Bear Zone Management Direction and [Record of Decision] . . . shall be applied." FS-000040. This is referred to as the "Access Amendment." FW-GDL-WL-15 provides that "[e]lements contained in the most recent 'Interagency Grizzly Bear Guidelines,' or conservation strategy once a grizzly bear population is delisted, would be applied to management activities." FS-000042. This is referred to as the "Interagency Guidelines."

In the latest in a long line of litigation concerning the USFS's methods of addressing illegal or unauthorized motorized access,[10] Consolidated Plaintiffs argue that the USFS has failed to demonstrate how it has complied with both the Access Amendment and Interagency Guidelines, violating NEPA and NFMA. Federal Defendants respond that Consolidated Plaintiffs "misinterpret" those requirements. Consolidated Plaintiffs are ultimately correct.

### a.    FW-STD-WL-02 / Access Amendment

As outlined above, FW-STD-WL-02, or the "Access Amendment," sets road and motorized trail restrictions in Cabinet-Yaak grizzly bear habitat on National Forest lands. FS-045909–12. The Access Amendment sets specific numeric limits on open motorized route density and total motorized route density and requires a specific minimum amount of secure core habitat. FS-045909–12; FS-045860 (Table 2). Open motorized route density is calculated by counting "open roads, other roads not meeting all restricted or obliterated criteria, and open motorized trails." FS-045859. Total motorized route density is calculated by counting "open roads, restricted roads, roads not meeting all reclaimed criteria, and open motorized trails." FS-045859. Core area is "[a]n area of secure habitat with a [Bear Management Unit ("BMU")] that contains no motorized travel routes or high

---

[10] An in-depth description of the history of litigation concerning illegal roads in the Kootenai National Forest may be found in *Center for Biological Diversity v. U.S. Forest Serv.*, ___ F. Supp. 3d ____, 2023 WL 3052299 (D. Mont. Apr. 24, 2023).

use non-motorized trails during the non-denning season [April 1 to November 30]." FS-045859. "Core areas do not include any gated roads but may contain roads that are impassable due to vegetation or constructed barriers." FS-045859. "BMUs must remain at or above the core standard." FS-000158.

As discussed above, BMUs 14 and 15 occur within the Project area. *See* FWS-000006. BMU 14 is 99% National Forest land, must have no greater than 31% open motorized route density, no greater than 26% total motorized route density, and no less than 55% core. FS-000157. BMU 15 is 94% National Forest land, must have no greater than 33% open motorized route density, no greater than 26% total motorized route density, and no less than 55% core. FS-000157.

Consolidated Plaintiffs pursue three arguments for why the USFS failed to comply with the Access Amendment: (1) the USFS intentionally ignored illegal, unauthorized road use in its road density calculations; (2) the USFS failed to disclose its methodology for calculating its compliance with the Access Amendment; and (3) the USFS impermissibly relied on the assumption that road barriers are 100% effective. Consolidated Plaintiffs are correct as to their first two arguments but not their third.

i.    **Unauthorized Road Use**

Courts "must be able reasonably to ascertain from the record that the [USFS] is in compliance with [a Forest Plan] standard." *Native Ecosystems Council*, 418 F.3d at 963. On this administrative record, it is not possible to do so.

In a 2022 BMU metrics updates, the USFS stated:

> The routes used to establish the 'permanent' condition are those that are *authorized* routes. Unauthorized use features are not. That is, any user-created routes or access, as well as breaches (e.g., dismantling or damaging gates and then proceeding to drive the route) <u>are not considered part of the existing condition</u>. Importantly, because we address discovered or reported unauthorized use promptly, . . . and because in our experience unauthorized use on any given route is *not* chronic from year to year, <u>such use does not contribute to a long term or 'permanent' change to the routes database</u>.

FS-004530 (underlined emphasis added). Consolidated Plaintiffs rely on this statement as the USFS's admission that it refuses to disclose the actual motorized use, including unauthorized use, as required by the Access Amendment. Federal Defendants counter that because the use of these unauthorized routes is not chronic and is "generally addresse[d] . . . within the bear year," (Doc. 61 at 61), the impacts are both minor and have been addressed.

Courts repeatedly have rejected "the apparently boilerplate assertion that . . . because unauthorized motorized access is unpredictable, its effects on grizzly bears are unknowable." *Center for Biological Diversity v. U.S. Forest Serv.*, ___ F. Supp. 3d ____, 2023 WL 3052299, at *10 (D. Mont. Apr. 24, 2023) (hereinafter "*Knotty Pine*"); *see also Alliance for the Wild Rockies* v. *Marten*, 2023 WL

4977712, at *10 (D. Mont. Aug. 3, 2023) ("*Marten II*").  Further, the agencies may

not "rely[] on factual assumptions the agencies *know* to be incorrect to dodge their

statutory and regulatory duties to obtain, disclose, and analyze the best scientific

and commercial data available" in assessing cumulative effects.  *Alliance for the*

*Wild Rockies v. Gassmann*, 604 F. Supp. 3d 1022, 1032 (D. Mont. 2022).  And,

reliance on an assertion that the effects of motorized use are purportedly

unpredictable "fails to consider an important aspect of the problem and offers an

explanation for such failure that runs counter to the detailed evidence gathered and

provided by [the USFS] and third parties regarding unauthorized motorized access

and closure failures."  *Knotty Pine*, 2023 WL 3052299, at *10.

That is exactly what happened here.  Because the USFS does not include

illegal motorized road use that it knows occurs into its calculations, the Court is

being asked to "chisel that which must be precise from what the agency has left

vague and indecisive."  *Native Ecosystems Council*, 418 F.3d at 963 (quoting *SEC*

*v. Chenery Corp.*, 332 U.S. 194, 196–197 (1947)).  Therefore, the USFS's decision

was:

> arbitrary and capricious insofar as it assumes the effectiveness of
> closure devices; claims inability to account for the effects of
> unauthorized motorized access despite [the USFS's] monitoring and
> databases, which demonstrate capacity to account for fluctuating
> conditions and new information; and fails to account for inaccuracies
> in how roads are classified in the USFS's database despite data showing
> differing on-the-ground conditions.

*Marten II*, 2023 WL 4977712, at *11.

### ii.    Methodology

Next, Consolidated Plaintiffs argue that the USFS obscured its methodology

for how it calculated compliance with the Access Amendment in violation of

NEPA.  Federal Defendants and the Tribe argue that the methodology was

intentionally omitted from the EA because it was incorporated by reference.

Consolidated Plaintiffs have the better argument.

In preparing an environmental impact statement, an agency may

"incorporate material . . . by reference when the effect will be to cut down on bulk

without impeding agency and public review of the action."  *Id.* § 1502.21.

Importantly, however, incorporation by reference is only allowed "into an

environmental *impact statement*," not into an environmental assessment.  *Native*

*Village of Nuiqsut v. Bureau of Land Mgmt.*, 9 F.4th 1201, 1214 (9th Cir. 2021).

In the EA, the USFS indicates that the Access Amendment was considered

as the "source" for measuring road density for the Project but provides no more

explanation.  *See* FS-002540 (Table 83).  Because it incorporates the road densities

with no further discussion of how they are calculated—including the fact they do

not include unauthorized roads, *see* FS-004530, the USFS failed to state its

methodology as required by § 1502.24.  At the July 13 hearing, Federal Defendants

were given the opportunity to support the contention that incorporation by

reference into an EA is allowed.  They were not able to do so.  Therefore,

Consolidated Plaintiffs are correct that the USFS's failure to explicitly disclose its

methodology in the EA section titled "Methodology," *see* FS-002540, violates

NEPA.

### iii.    Effective Road Barriers

Consolidated Plaintiffs next argue that when the USFS calculated road

density for the Project, it relied on the incorrect assumption that every road closure

will be 100% effective, again violating the directive that "an agency may not rely

on incorrect assumptions" in a NEPA analysis. *WildEarth Guardians*, 790 F.3d at

926 (internal quotation marks omitted).  Federal Defendants and the Tribe counter

that Consolidated Plaintiffs' arguments "mischaracterize[] the role of closure

devices." (Doc. 61 at 82.)  While the substance of this dispute is explored in the

discussion of Consolidated Claim 3 below, Federal Defendants persuasively show

that there is no assumption that the closures are 100% effective.

Consolidated Plaintiffs point out that when a road is considered closed, for

example by building a dirt berm or putting up a gate, it can be driven around by

all-terrain vehicles or motorcycles.  This fact that road closures can be, and are,

illegally evaded is not reasonably in dispute. *See* FS-000972 (noting that use of

utility vehicles with higher clearance that can "navigate steep embankments,

earthen berms and ditches" is increasing, along with the use of "mobile welders to

cut through locks and gates").  What Federal Defendants dispute is rather that there *is* an assumption that gates are 100% effective.  Their position instead is that illegal road use is both occurring and illegal, a fact which they acknowledge throughout the record.  On this narrow issue, Federal Defendants are correct.  However as discussed below, the fact that the USFS does not rely on the assumption that road closures are effective in every circumstance does not also mean that their analysis satisfies NEPA's requirements.

### b.  FW-GDL-WL-15 / Interagency Guidelines

The Interagency Guidelines create conservation strategies and rules that must be applied to USFS land when certain management circumstances exist, ranging from the presence of grizzly population centers (referred to as "Management Situation 1") to locations where grizzlies do not occur (referred to as "Management Situation 5").  *See* FS-000042; *see also* FS-005037–39.  Like the Access Amendment, the Forest Plan requires compliance with the Interagency Guidelines.  *See* FS-000042.  BMUs 14 and 15 contain management situations described in the Interagency Guidelines.  FS-004226.  Specifically, the majority of BMUs 14 and 15 are considered "Management Situation 1" grizzly bear habitat, FS-004226, which means that "[t]he area contains grizzly population centers (areas key to the survival of grizzly where seasonal or year-long grizzly activity, under

natural, free-ranging conditions is common) and habitat components needed for the survival and recovery of the species or a segment of its population," FS-005037.

Land management in grizzly bear habitat must "maintain and enhance habitat and [] minimize potential for grizzly-human conflicts." FS-002547. Consolidated Plaintiffs argue that the USFS did not acknowledge the Interagency Guidelines nor comply with its standards. Federal Defendants and the Tribe acknowledge that when land use values compete, the management decision must favor the grizzly bear. Ultimately, because the USFS considered the Interagency Guidelines and explained how it analyzed these competing values, Federal Defendants and the Tribe are correct.

The EA contemplates that the Interagency Guidelines require that land management "trend[s] towards desired vegetative conditions similar to that which grizzly bears evolved." FS-002470. Further, the EA explains that the Project was planned and designed consistent with the Interagency Guidelines. FS-002557. Ultimately, these references demonstrate that the USFS considered and complied with the Interagency Grizzly Bear Guidelines.

## 2. Failure to Take a "Hard Look" at Unauthorized Road Use (Consolidated Claim 3)

Consolidated Plaintiffs also bring a successful "hard look" claim, arguing that the USFS failed to take a "hard look" at unauthorized road use.

### a. Administrative Exhaustion

Page 48 of 62

As an initial matter, Federal Defendants and the Tribe argue that Consolidated Plaintiffs forfeited this issue by failing to administratively exhaust it. Issues raised as legal objections must first be raised as comments "regarding the proposed project or activity and attributed to the objector." 36 C.F.R. § 218.8(c). "A party forfeits arguments that are not raised during the administrative process." *Lands Council v. McNair*, 629 F.3d 1070, 1076 (9th Cir. 2010). This claim relies heavily on photographs taken by Plaintiff Yaak Valley Forest Council of allegedly ineffective route closures throughout the Kootenai National Forest. (*See* Doc. 53 at 23–29.) Consolidated Plaintiffs did not take those photos but signed on to Yaak Valley Forest Council's comments and objections regarding this issue. *See* FS-035461; FS-034340–72. Thus, the record reflects that Consolidated Plaintiffs did not forfeit this argument because they raised the same objection during the administrative review process.

### b. Unauthorized Road Use

As previously discussed, an agency must take a "hard look" at a proposed project's environmental impacts and "may not rely on incorrect assumptions or data when doing so." *Native Ecosystems Council*, 418 F.3d at 964. Like with the other road-based arguments addressed above, the parties use the previous illegal roads cases as guides. Consolidated Plaintiffs insist this case is similar to *Alliance for the Wild Rockies v. Probert*, 412 F. Supp. 3d 1188, 1208 (D. Mont. 2019),

*Knotty Pine*, and *Marten II*, while Federal Defendants and the Tribe argue *Alliance for the Wild Rockies v. Marten*, 464 F. Supp. 3d 1169, 1176 (D. Mont. 2020) (*Marten I*) is more applicable.  As is usually the case, neither side is entirely correct.  However, because the record reflects that the USFS did not take a "hard look" at unauthorized or illegal road use, Consolidated Plaintiffs' argument takes the day.

First, in *Probert*, the USFS had prepared an EIS for a logging project located in the Kootenai National Forest where plaintiffs argued barriered roads should be considered in its calculation of linear miles.  412 F. Supp. 3d at 1195.  The Court found that the miles were properly omitted from the calculation "assuming the closures were effective" but that the eight years of data on road closure effectiveness from the area proved that the closures were not in fact effective.  *Id* at 1195, 1207–08.  The Court determined that "incorrect assumptions of the NEPA documents coupled with the uncertainty of the extent of ineffective closures" did not satisfy NEPA's "hard look" standard.  *Id.* at 1208.

Federal Defendants contend that *Probert* does not apply for three reasons: (1) the BiOp in this case already acknowledges *Probert* by noting that illegal motorized use occurs in the Kootenai National Forest; (2) *Marten I* limits *Probert* only to cases that involve more than the "the mere possibility that planned road closures will be ineffective," *Marten I*, 464 F. Supp. 3d at 1171–72; and (3)

*Probert* was based on eight years of data and the record here reflects only two years. Each of these arguments fails.

Federal Defendants are correct that the record in this case acknowledges that illegal motorized use must be considered as part of the NEPA review. *See* FS-002148. However, that acknowledgement does not equal a "hard look" at the impacts of the Project. Federal Defendants are also correct that *Marten I* limited *Probert*, but the record in *Marten I* is distinctively different from this record.

In *Marten I*, the plaintiffs raised a similar challenge to the one in *Probert* concerning projects on the Custer Gallatin National Forest and the Helena-Lewis and Clark National Forest. *Marten I*, 464 F. Supp. 3d at 1171–72. There, the plaintiffs only "speculate[d] that the [project's] temporary roads will not be effectively obliterated in the future." *Id.* at 1176. This Court differentiated *Marten I* from *Probert* by finding that "*Probert* dealt with documented historic road closures," not speculation or "the mere possibility that planned road closures will be ineffective." *Id.*

The *Probert* and *Marten I* debate was recently addressed again in *Knotty Pine*. There, the Court enjoined the implementation of the Knotty Pine Project, another project involving commercial harvest, non-harvest fuel treatments, precommercial thinning, and prescribed burning on the Kootenai National Forest. *See* 2023 WL 3052299, at *2, *16. One claim in *Knotty Pine* was almost identical

to Consolidated Plaintiffs' claim here, namely, what is required of the USFS when factoring illegal motorized use into the road density calculations under the Access Amendment. *See id.* at *10. There, the USFS argued because unauthorized or illegal motorized use was not chronic and spread out, it was not necessary to include it in the road density calculations. *See id.* at *7. The Court identified three facts from the record that disproved that contention:

> (1) illegal motorized use was observed in the Project area in two of the eight years for which [the USFS] provided monitoring reports; (2) the Yaak Valley Forest Council's survey of roads in the Project area "highlighted multiple gated or bermed roads that may have been bypassed by all-terrain vehicles or motorcycles at some time in the past" and documented "a few user-created motor vehicle routes"; and (3) "some [USFS] users have, and will likely continue to break the law and drive motorized vehicles where such use is illegal."

*Id.* at *10. Those same facts exist in this Project's record: (1) illegal motorized use has been documented in three of eight years reported, FS-004392; (2) similar photos were submitted by Yaak Valley Forest Council, FS-004392; and (3) the USFS similarly acknowledges that some forest users have and will continue to break the law by bypassing road closures, FS-002544.

Thus, just like in *Knotty Pine*, "[t]his case does not involve mere speculation that future closures may not be effective; rather this case relies upon documented past failures and expected future unauthorized use and thus falls squarely within *Probert*'s reasoning." 2023 WL 3052299, at *10. The USFS contends that even though these breaches do occur, it makes "repairs for any such breaches as quickly

as possible after discovery." FS-002544.  However, the record does not support

this assertion.  For example, in 2020, the USFS found 32 breached barriers and

repaired none of them and found 40 breached gates and repaired about a quarter of

them.[11]  FWS-006182.

The Yaak Valley Forest Council also documented 45 instances of ineffective

barriers and gates in 2020 and 2021 that the EA did not disclose.  *See* FS-044262–

66.  However, even if the Yaak Valley Forest Council's complaints are not

considered, on the USFS's record alone, Consolidated Plaintiffs are still correct.

While the record only indicates two years of road closure evidence, *see, e.g.*, FWS-

006182 (2020), "according to data provided by the [USFS] from [] 2012 through

2020 [], illegal motorized use was observed in the [Project] area in 3 of the 8

years," FWS-000024.  Thus, the USFS acknowledges the history of breaches.

As the Court noted in both *Probert* and *Marten II*, "the [USFS] cannot be

expected to prevent all unauthorized motor vehicle access in perpetuity, and

'infrequent, isolated, or insignificant deviations from the biological opinion' such

as the occasional gate breach by a third party would not trigger reinitiation of

consultation."  *Marten II*, 2023 WL 4977712, at *12 (quoting *Probert*, 412 F.

Supp. 3d at 1205).  And, as the Court in *Knotty Pine* noted, the FWS

---

[11] A barrier "includes concrete, earth berm, other, other barrier, rocks, [or] vegetation."  FWS-006182.

"acknowledges . . . that the broader problem of illegal motorized access is a fluctuating but permanent one, even if particular instances are scattered." 2023 WL 3052299, at *10.  Nevertheless, just like in *Probert*, *Knotty Pine*, and *Marten II*, "the actual effects analyzed were limited by [the EA's] assumption that the public use would be effectively restricted," *Probert*, 412 F. Supp. 3d at 1207–08. That unsupported assumption, "coupled with the uncertainty of the extent of ineffective closures" amounts to a NEPA violation.

### c.   Mitigation

Finally as it relates to roads, Consolidated Plaintiffs argue the USFS did not disclose record evidence of road closures nor sufficiently discuss road closures in the Project Decision nor the EA.  Federal Defendants and the Tribe disagree and are correct.

An agency is required to consider and analyze the efficacy of any proposed mitigation measures that would reduce the environmental impact of a proposed action.  *See* 42 U.S.C. § 4332(2)(C)(ii).  "An essential component of a reasonably complete mitigation discussion is an assessment of whether the proposed mitigation measures can be effective. . . . A mitigation discussion without at least *some* evaluation of effectiveness is useless in making that determination."  *S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718, 727 (9th Cir. 2009).  "Mitigation must be discussed in sufficient detail to ensure that

environmental consequences have been fairly evaluated." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998) (internal quotation marks omitted). However, mitigation measures "need not be legally enforceable, funded or even in final form to comply with NEPA's procedural requirements." *Nat'l Parks & Conservation Ass'n v. U.S. Dep't of Transp.*, 222 F.3d 677, 681 n.4 (9th Cir. 2000).

For example, of the 931 road closures in the Kootenai National Forest in 2020, 72 breaches were detected, 23% percent of which were repaired. FWS-006182. Neither this data, nor Plaintiff Yaak Valley Forest Council's monitoring and the USFS's responses, were referenced in the EA or the Project Decision. *See, e.g.*, FS-002544. However, the EA does address how the USFS considers road closures in the context of limiting Project activity around gated roads at times important for grizzly bear fertility. *See* FS-002263–64. Thus, it seems that the USFS did consider some aspects of the effectiveness of road closures and how it is dealing with those that are ineffective or under-effective.

While an inclusion of the ineffective closure numbers may have been useful, the cases cited by Consolidated Plaintiffs do not support a requirement to do so, at least in the mitigation context. For example, in *Foundation for North American Wild Sheep v. U.S. Department of Agriculture*, the Ninth Circuit held that because "[n]o effort was made to quantify the amount of unauthorized traffic nor was the

effect on the Bighorn of this traffic evaluated" mitigation measures were not

adequately considered. 681 F.2d 1172, 1178 (9th Cir. 1982). While road closures

pose a problem for the USFS as discussed above, in the context of mitigation, the

agency's analysis was adequate. Ultimately, the USFS adequately considered the

mitigation benefit provided by road closures.

### 3.     Failure to Prepare an EIS (Consolidated Claim 5)

Federal agencies must prepare a supplemental NEPA document when there

"are significant new circumstances or information relevant to environmental

concerns and bearing on the proposed action or its impacts" or when the "agency

makes substantial changes in the proposed action that are relevant to environmental

concerns." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 372 n.16 (1989) (quoting

40 C.F.R. §§ 1502.9(c)(1)(i-ii) (1987)). Significant new circumstances may

include new information regarding impacts on a listed species. *See Native*

*Ecosystems Council v. Tidwell*, 599 F.3d 926, 937 (9th Cir. 2010).

Consolidated Plaintiffs argue that Wayne Kasworm's post-EA presentation

noting that three female Cabinet-Yaak grizzly bears had been killed in 2022

constitutes significant new information warranting supplemental NEPA analysis.

(*See* Doc. 61-1 at ¶ 9.) Similar to arguments made regarding the FWS's

environmental baseline for grizzly bears above, Federal Defendants and the Tribe

counter that population and mortality data from one year is insignificant when

considering overall bear population trends.  While Kasworm acknowledges in his declaration that these mortalities may cause the overall rate of population growth for Cabinet-Yaak grizzly bears to decrease, he also posits that "we do not expect a marked decline for 2022."  (Doc. 61-1 at ¶ 14.)  Given that the FWS admits that the Project may have an impact on the 1-2 reproductive cycles for adult female bears, FWS-000054–55 (noting that "reproduction may be slowed for the affected females during implementation of the Black Ram Project"), this increase in mortality of adult female bears constitutes a "significant new circumstance . . . relevant to environmental concerns" that has a "bearing on the proposed action or its impacts," 40 C.F.R. § 1502.9(c)(1).  Thus, supplemental NEPA analysis is required.

## III.    Motion to Strike

Federal Defendants also move to strike Consolidated Plaintiffs' Declaration of Michael Garrity or, in the alternative, to strike and redact the following paragraphs: 3 (sentences 2 through 6, inclusive), 4 (all), 5 (all), 6 (all), 7 (all), 8 (all), 9 (sentences 1 and 6), 12 (sentence 4), 14 (sentences 3 and 4), and 15 (all). (Doc. 58 (referencing Doc. 53-1).)  They argue that the declaration does not meet any of the narrow exceptions for extra-record evidence.  Consolidated Plaintiffs oppose this motion, insisting that the declaration is properly presented to support standing and its supplemental EIS claim.  They further argue that if Federal

Defendants' motion is granted, Federal Defendants' declaration of Wayne Kasworm should be stricken as well. (*See* Doc. 61-1.) Plaintiffs take no position, and the Tribe does not oppose this motion. (*See* Doc. 58 at 3.) Because each party in this case has submitted declarations outside of the administrative record, and because Consolidated Plaintiffs submit the declaration for permissible purposes, the motion to strike is denied.

"Judicial review of an agency decision typically focuses on the administrative record in existence at the time of the decision and does not encompass any part of the record that is made initially in the reviewing court." *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996). However, extra-record materials may be allowed: "(1) if necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) when the agency has relied on documents not in the record, or (3) when supplementing the record is necessary to explain technical terms or complex subject matter." *Id.* (internal quotation marks omitted).

Here, Federal Defendants argue that the administrative record "contain[s] all the information relevant to Consolidated Plaintiffs' specific claims regarding grizzly bears, roads closure devices, and unauthorized motorized access." (Doc. 59 at 3.) However, this position is slightly disingenuous as they themselves submit an extra-record declaration to support their grizzly bear analysis. Further, as

Consolidated Plaintiffs point out, much of the declaration is submitted to establish their standing. (*See* Doc. 53-1 at ¶¶ 1–4, 9–14.)  The remainder of the declaration considers mortality data for grizzly bears in the Project area that occurred after the administrative record closed.  Therefore, Federal Defendants' motion to strike is denied.

## IV.  Remedy

The APA directs that "[t]he reviewing court shall ... set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Vacatur is the presumed remedy where an agency has acted unlawfully, *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018), but the district court "is not required to set aside every unlawful agency action," *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995).  The agency action "can be left in place while the agency follows the necessary procedures." *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995).  The determination of "[w]hether agency action should be vacated depends on how serious the agency's errors are and the disruptive consequences of an interim change that may itself be changed." *Cal. Cmtys. Against Toxics v. U.S. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (per curiam) (internal quotations omitted)).

Moreover, "preparation of an EIS is not mandated in all cases simply because an agency has prepared a deficient EA or otherwise failed to comply with NEPA." *Ctr. for Biological Diversity*, 538 F.3d at 1225. "Put differently, courts may decline to vacate agency decisions when vacatur would cause serious and irremediable harms that significantly outweigh the magnitude of the agency's error." *Se. Alaska Conservation Council v. U.S. Forest Serv.*, 468 F. Supp. 3d 1148, 1150 (D. Alaska 2020) (internal quotation marks omitted). For example, where an agency's error "is limited in scope and severity, and vacatur would result in a disproportionate disruption to the Project," remand without vacatur may be warranted. *Alliance for the Wild Rockies v. Savage*, 375 F. Supp. 3d 1152, 1156 (D. Mont. 2019).

In assessing the seriousness of the error, courts "consider whether vacating a faulty [decision] could result in possible environmental harm." *Pollinator Stewardship Council v. Env't Prot. Agency*, 806 F.3d 520, 532 (9th Cir. 2015). Another consideration is "whether the agency would likely be able to offer better reasoning or whether by complying with procedural rules, it could adopt the same [decision] on remand, or whether such fundamental flaws in the agency's decision make it unlikely that the same [decision] would be adopted on remand." *Id.* Additionally, the Court considers whether the errors are "limited in scope." *Savage*, 375 F. Supp. 3d at 1156.

The seriousness of the error must be weighed against "the disruptive consequences of an interim change that may itself be changed." *Pollinator Stewardship Council*, 806 F.3d at 532 (internal quotation marks omitted). "The Project's economic impact is relevant to the question of whether to vacate on remand." *Savage*, (citing *Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010)). The potential disruptive effects on the environment, local communities, and wildlife are also relevant considerations. *Id.*

Here, the errors are serious and disruptive consequences of vacatur relatively minor. As discussed above the USFS and the FWS violated various statutory requirements set out in the ESA, NEPA, and NFMA. Federal Defendants and the Tribe argue that if vacatur or partial vacatur is ordered, it would be substantially disruptive because it blocks the Project, which moves the Kootenai National Forest in a desired and healthy direction. If the Project is not moved in that direction, they argue further harm would ensue. They further argue that if vacatur is granted, the Project should be able to proceed while the agencies fix the errors described above. However, vacating decisions reliant on such serious errors actually furthers the goals of both statutes. Thus, the EA, FONSI, and BiOp are vacated consistent with this Order. The Project may not continue while the agencies remedy these issues.

CONCLUSION

For the reasons set forth above, IT IS ORDERED that the parties' motions

for summary judgment (Docs. 50, 52, 60, 65) are GRANTED IN PART and

DENIED IN PART as follows:

1.    Plaintiffs' motion (Doc. 50.) is GRANTED as to Claims One, Two,

Four, and Six.

2.    Consolidated Plaintiffs' motion (Doc. 52.) is GRANTED as to Claims

One, Three, and Five.

3.    Federal Defendants' and the Tribe's motions (Docs. 60, 65) are

GRANTED in all other respects.

IT IS FURTHER ORDERED that Federal Defendants motion to strike (Doc.

58) is DENIED.

IT IS FURTHER ORDERED that this matter is remanded to the agencies for

further review consistent with this Order.

DATED this _17_ day of August, 2023.

_15:33 P.M._

Donald W. Molloy, District Judge
United States District Court