JoAnn Jett Corson
Registered Diplomate Reporter
Certified Realtime Reporter
P. O. Box 8006
Missoula, Montana 59807-8006
joann_corson@mtd.uscourts.gov

United States Court Reporter

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MONTANA**
**MISSOULA DIVISION**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY et al., Plaintiffs, and ALLIANCE FOR THE WILD ROCKIES and NATIVE ECOSYSTEMS COUNCIL, Consolidated Plaintiffs, vs. U.S. FOREST SERVICE et al., Defendants, KIRSTEN KAISER, District Ranger, Kootenai National Forest, Three Rivers Ranger District et al., Consolidated Defendants, and KOOTENAI TRIBE OF IDAHO, Defendant-Intervenor. | Lead Case No. CV 22-114-M-DWM<br>Member Case No. CV 23-3-M-DWM<br>**TRANSCRIPT OF HEARING ON MOTIONS** |

**BEFORE THE HONORABLE DONALD W. MOLLOY**
**UNITED STATES DISTRICT COURT JUDGE**
**FOR THE DISTRICT OF MONTANA**

Russell Smith United States Courthouse
201 East Broadway
Missoula, Montana 59802
Thursday, July 13, 2023
09:02:09 to 10:17:41

*Proceedings recorded by machine shorthand*
*Transcript produced by computer-assisted transcription*

**APPEARANCES**

For the Plaintiffs:

MR. EDWARD B. ZUKOSKI
Attorney at Law
CENTER FOR BIOLOGICAL DIVERSITY
1536 Wynkoop Street, Suite 421
Denver, Colorado 80202

MS. ANDREA ZACCARDI
Attorney at Law
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 469
Victor, Idaho 83455

MS. RACHEL GLENN INABNIT
Attorney at Law
LAW OFFICE OF RACHEL INABNIT
P.O. Box 8846
Missoula, Montana 59807

For the Consolidated Plaintiffs:

MS. REBECCA K. SMITH
Attorney at Law
PUBLIC INTEREST DEFENSE CENTER
P.O. Box 7584
Missoula, Montana 59807

For the Federal Defendants:

MS. ERIKA FURLONG
MS. HAYLEY A. CARPENTER
Attorneys at Law
U.S. DEPARTMENT OF JUSTICE
150 M Street NE
Washington, D.C. 20002

MR. JOHN P. TUSTIN
Attorney at Law
U.S. DEPARTMENT OF JUSTICE
P.O. Box 7611
Washington, D.C. 20044

For the Defendant-Intervenor:

MS. JULIE A. WEIS
Attorney at Law
HAGLUND KELLEY
2177 SW Broadway
Portland, Oregon 97201

MR. TYSON A. McLEAN
Attorney at Law
KRIS McLEAN LAW FIRM
2315 McDonald Avenue, Suite 106
Missoula, Montana 59801

**CONTENTS**

Proceedings .......................................... 4
Argument by Mr. Zukoski .............................. 5
Argument by Ms. Smith ................................ 13
Argument by Ms. Furlong .............................. 20
Argument by Ms. Carpenter ............................ 27
Argument by Mr. Tustin ............................... 32
Argument by Ms. Weis ................................. 39
Rebuttal Argument by Ms. Smith ....................... 46
Reporter's Certificate ............................... 53

PROCEEDINGS

(Open court.)

THE COURT: Good morning. Please be seated.

Would you call the first matter on the calendar, please?

THE CLERK: This is the time set for a motions hearing in Consolidated Cases CV 22-114-M-DWM and CV 23-3-M-DWM, *Center for Biological Diversity et al. v. United States Forest Service et al.*

THE COURT: All right. Well, welcome everybody.

We have one hour, and in order to accommodate counsel, I will try not to ask questions.

I will tell you the briefing is a bit confusing to me, and there are matters that I think are not explained in a way that, for me, is understandable, but I guess you'll explain that in your oral explication of what the issues are in this case.

So the Center for Biological Diversity, that's Mr. Zukoski; and Ms. Smith for the consolidated plaintiffs. And then it looks like we have a tableful for the defendant.

So each side has 30 minutes, and you will have to divide among yourselves how the 30 minutes is to be appropriated and whether or not you want to reserve any time for rebuttal.

I think, with 30 minutes divided by two people, if

each of you wants to reserve five minutes for rebuttal, then you get down to splitting the remaining 20 minutes, which means you only have ten minutes to argue. And as you know very well, time has a way of really going fast when you're arguing, which is why I said I'll try not to interrupt too many times.

So, Mr. Zukoski, you're up.

And just tell me: You know, it's gonna be helpful to me if you get me focused on what you really think are the good issues in the case, because a 62-page complaint and then a 42-page complaint, sometimes I think a short, plain statement of what your claim is could be something less than 62 pages. But if you -- it's helpful, given the short time, if you focus on what you really think is the crux of the problem here.

So I've got you on a clock. How much time are you going to use?

MR. ZUKOSKI: Your Honor, I'm gonna use 15 minutes, and then Ms. Smith will use ten minutes, and then we'll reserve jointly five minutes for rebuttal.

THE COURT: All right. You're on the clock.

MR. ZUKOSKI: Thank you, Your Honor.

I'm gonna try to discuss three of our claims. The first relates to the arbitrary jeopardy decision, the second relates to the agency's failure to take a hard look at

climate, and, if I have time to get to it, I'll get to our claim that the finding of no significant impact was arbitrary and capricious.

To focus on the jeopardy claim, I'd like to just read part of the sentence from the biological opinion, which is the key to our argument. In making the jeopardy determination, the Fish and Wildlife Service states: Because the Black Ram Project will not reduce the reproduction, number, or distribution of grizzly bears throughout the Cabinet-Yaak Ecosystem, and considering the status of the Cabinet-Yaak Ecosystem population as well as other grizzly bear populations in the Lower 48, there will be no jeopardy.

Now this conclusion that the project will not reduce reproduction is arbitrary and is not -- is contradicted by statements in the record in the biological opinion.

The biological opinion states that motor vehicle density and use for the project will result -- may result in harm to up to three female grizzly bears and that that harm will include harm to reproductive success which may be negatively affected, reproduction may be slowed for affected females, and impacts may include decreased reproduction for one to two reproductive cycles.

So the statement that the project will not reduce reproduction is not connected to the facts found in the biological opinion.

Now the -- and just to put the three bears -- I feel like I'm talking about a fairy tale here, *The Three Bears*. The three bears that may be adversely affected, to put that in context, the Cabinet-Yaak Ecosystem, as Judge Christensen found recently in his *Gassmann* opinion, is uniquely vulnerable. There are, in the optimistic assessment of the Fish and Wildlife Service in their biological opinion, up to 60 bears in that ecosystem.

The recovery plan for grizzly bears states that when you look at a population of grizzlies, roughly a little under 30 percent of them are gonna be reproductive-age female grizzly bears, which means, in the whole Cabinet-Yaak Ecosystem, there are around 18 reproductive-age female grizzlies. And this project may harm up to three; interfere with the reproductive success of up to three female grizzly bears for up to five years, for up to two reproductive cycles. So, again, that does not, not (indicating air quotes) not reduce the reproduction, which is the conclusion reached by the, by the Fish and Wildlife Service.

Now the federal defendants also say, "Well, you know, this is really just a small, small number of bears, and there are other places where bear reproduction can occur, and these are only temporary impacts." But despite the fact that they're temporary impacts, again, what this interfering with reproduction will do will be to slow the opportunity for

recovery for increased reproduction and numbers of bears in a population that the Fish and Wildlife Service's 2021 five-year assessment says have low numbers, low fecundity, low resilience, and where the population is not meeting recovery targets for numbers of female bears and distributions of females with cubs. So very vulnerable population, potential impact to female bears which the Fish and Wildlife Service simply says will not happen.

THE COURT: Well, is it just that you disagree with the agency, or what's the problem legally? You lay out a case that you'd come up with a different conclusion than they do, but the means that they use to make their assessment, is that the best available science? And if it is, the fact that there may be facts that are somewhat in dispute that you don't agree with, isn't it the agency that gets the deference on that if they went through the whole process, or what is the actual problem that you see?

MR. ZUKOSKI: The problem that I see is, again, this sentence that says it will not reduce reproduction. How can it not reduce reproduction if they're saying it will reduce reproduction? There's just a disconnect between the facts that they've laid out in terms of the harm and their ultimate conclusion. So it's just that, that disconnect, that failure to connect the facts with the decision which is the problem.

Your Honor, I'm gonna move on to the agency's

failure to take a hard look at the climate impacts of the proposed project.

By now, it's well settled that courts -- and courts have found that agencies must disclose the climate impacts of their actions and take a hard look at them, and the agency did not do that here.

And this matters because the project's purpose is in part to increase the resilience of this forest to factors that may result in additional climate emissions. And if the agency and the public doesn't know what the climate impacts are, there's no way to understand whether this project will make things better or worse from a climate perspective or whether the impacts can be mitigated.

Now the Forest Service's analysis is limited to about a dozen sentences in the environmental assessment and about five pages of text in something called a carbon report, which is a cut-and-paste, cookie-cutter document from a 2015 timber sale in Idaho on a different forest that is stale because there's no recognition of science or modeling or anything else after 2013.

And so it predates a lot of the science, models, and agency guidance, including guidance from the Council on Environmental Quality, on how these climate impacts -- how agencies should look at them. And the only number concerning, you know, attempting to quantify impacts related to this

specific project is a number put in there for the Kootenai National Forest, which is actually not a number for the Kootenai National Forest because, when they were cutting and pasting the document, they cut and pasted and put the carbon stores on the Idaho National Forest in their document.

And the conclusion of the document is that, well, we don't have to worry about climate impacts here because the impacts of this project are infinitesimal compared to the carbon stored on all the forests in the United States or all the forests in the globe. And this is precisely the type of unhelpful and, as the Ninth Circuit called it, opaque comparison that does not represent a hard look, that doesn't give the public or the decision-maker any information, because it simply is stating the problem of climate change, which is that individual actions are -- will have individually relatively small impacts but, when added together, we got one big problem, and it's important to understand what that additionality is.

And, again, the Ninth Circuit in *350 Montana* and the Council on Environmental Quality guidance on climate change analysis specifically says this is the kind of comparison that agencies should not do, and that's what they did here.

And by that basis of comparison, no project ever on the forest -- or clear-cutting the entire forest would not result in anything other than infinitesimal impacts compared

to a global forest source, so it's really an unhelpful analysis. And the Council on Environmental Quality has recommended that agencies, to be helpful and to understand these impacts, attempt to quantify what those carbon emissions are and compare those to the carbon emissions of the no-action alternative so that there is an understanding of what the difference is between doing nothing and doing this project.

Now the impacts, and the impacts of this project, are gonna be twofold. First of all, there're gonna be carbon emissions from simply implementing the project. 57 million board feet of timber are gonna be moved off the forest. Tens of thousands of truck trips. There's gonna be a lot of heavy equipment moving stuff around in the forest for ten years. That all has carbon impacts. Those can be disclosed. Those are the kinds of impacts that agencies have regularly disclosed. They do it in the context of coal mining, just looking at the impacts of getting the coal out of the ground. So they can do that.

The other type of impact on climate is that logging removes carbon from the forest. It's cutting down the wood which is storing carbon -- which is a carbon store, and it's preventing the forest from storing more carbon over time.

And these types of impacts can be modeled. They have been modeled by experts. They have been -- the Council on Environmental Quality regulations say, "There's a good way

to do this with respect to these kinds of projects, these logging projects, thinning projects, resilience projects, and, look, here's a model that the Forest Service has." The Forest Service didn't use that model here.

Now the Forest Service presents a number of excuses for why these impacts -- why they can get away with saying, "Ah, it's infinitesimal. Don't worry about it."

One of them is they say, "Well, the impacts are not gonna be significant." Well, that's sort of prejudging the issue, but, in addition, the Forest Service's attorneys did a back-of-the-envelope calculation based on some material in the record to conclude that the impacts would be as much as -- well, let me be careful here.

It says the project could affect 1 million tons of carbon, of CO2, which is a substantial amount of carbon. That's running a natural gas power plant, the average one in the United States, flat-out for two and a half years. That's 2 percent of the annual emissions of the State of Montana. So that's a real number. And when we're trying to -- when, you know, the national policy is let's ratchet down these things by, you know, 50 percent over the next ten, 20 years, that's a significant amount of carbon, and it should have been analyzed. It should have been disclosed.

Now the Forest Service also includes a number of other excuses. "Oh, you know, these are old trees. Some of

the wood will be stored. You know, when you cut down the trees, some of the wood will stay in whatever wood product is made."

But they never address: What's the scale of those countervailing impacts? What's their quantity? And what is the timing? Because there's a short-term and a long-term problem here. You cut down the trees, you lose carbon immediately. Yes, the trees will eventually -- you know, new trees will grow in eventually if you leave it as a forest, but studies show that it takes centuries for the carbon you cut down in these old trees to come back to where it was now. And, again, that kind of trade-off is very important because we're trying to keep carbon in the ground now. More carbon leaving the atmosphere now means -- going into the atmosphere now means more harm, more climate change.

THE COURT: You're at 14 and a half minutes.

MR. ZUKOSKI: Yes, Your Honor.

I will yield the balance of my time.

THE COURT: All right.

MR. ZUKOSKI: Thank you.

THE COURT: Ms. Smith.

MS. SMITH: Thank you, Your Honor. May it please the Court. My name is Rebecca Smith for the consolidated plaintiffs.

Your Honor, I want to focus today on the

intersection between illegal motorized use and the Access Amendment, and primarily I just want to sort of jump in and discuss two cases that have been issued by this Court after the plaintiffs' summary judgment reply was filed.

And that is the *Knotty Pine* decision which is Judge Christensen's preliminary injunction order in *Center for Biological Diversity v. U.S. Forest Service*. We filed a notice of supplemental authority on that.

And then the second case I wanted to touch on is Judge Christensen's summary judgment order for the Ripley Project which is *Alliance for the Wild Rockies v. Gassmann*, and that will probably take up all of my ten minutes.

Starting with the preliminary injunction order in the Knotty Pine Project, the claim in that case was almost identical to this claim, the issue being how do illegal motorized -- how does illegal motorized use and illegal roads factor into the road density calculations required under the forest plan Access Amendment?

And so I think that maybe the easiest way to look at this is just to jump to that *Knotty Pine* decision where the judge basically laid out the Forest Service's rationale for excluding illegal road use from the open road density -- total motorized density and core calculations. This is in the *Center for Biological Diversity* decision, 2023 Westlaw 3052299 at page -- starting at page 7.

Essentially what the Forest Service argued in that case was that illegal motorized use was spatially disparate and temporary, and, therefore, because there was no single road that was chronically used, they didn't need to include that in the road density calculations.

And so Judge Christensen sort of looked at three facts in that record that contradicted that conclusion. This is at page 10 where the decision states that the notion that the lack of long-term use of a single road or repairs to defective closure devices excuses the failure to consider illegal roads, he says, is contradicted by the project biological opinion. And there's three facts there that are relevant.

The first fact is that illegal motorized use was observed in that project area in two of the eight years for which the Forest Service provided monitoring.

The second fact was that the Yaak Valley Forest Council did a survey of roads that highlighted multiple gated or bermed roads that may have been bypassed and documented a few user-created motor vehicle routes.

And then the third fact was that some forest users have and will continue to break the law and drive motorized vehicles where such illegal use -- where such use is illegal.

And so the way that that applies here in this case is that the project biological opinion in Black Ram is almost

verbatim the same as that project biological opinion in *Knotty Pine*. And by that I mean the facts are almost exactly the same with the exception that there's actually more illegal motorized use in Black Ram.

And so if we look at the Black Ram Project biological opinion, which is Forest Service Bates No. 004392, they actually state: The Fish and Wildlife Service discloses that whereas *Knotty Pine* had two out of eight years with illegal motorized use in the Knotty Pine Project area, for Black Ram there's actually illegal motorized use documented in three out of the eight years.

So there's actually more illegal use that has been documented in the Black Ram Project area than the Knotty Pine Project area.

Additionally, the Knotty Pine Project biological opinion includes almost the exact same statement. This is at, again, at Bates No. 4392. It says, quote: The Yaak Valley Forest Council also provided information to the Forest and Service regarding their survey of roads.

It goes on to say: The reports highlight multiple gated or bermed roads that may have been bypassed.

It goes on to say: A few user-created motorized vehicle routes are documented.

And then the Black Ram Project biological opinion says: The reports further corroborate data from the forest

showing that illegal motorized use has occurred in multiple locations in the action area. That's the same thing that they said in the Knotty Pine Project biological opinion.

And then on that third fact, the Black Ram Project, like the Knotty Pine Project, it says, again at Bates No. 4392: We anticipate illegal motorized use will continue.

And so those -- you know, almost verbatim -- those same three key facts that Judge Christensen relied on in the *Knotty Pine* to dismiss the Forest Service's argument that it didn't need to include illegal motorized use, those same facts are present in this case, and, in fact, there's even more illegal motorized use in this case.

I also want to note that another document that Judge Christensen relied on in that decision was the forest plan's biological assessment. And so what he noted was that the agency's approach in the project was actually inconsistent with the same agency's discussion and promises in the forest plan biological assessment.

So in the forest plan biological assessment, what the agency said was, quote: To err on the side of the bear and show all potential effects, if illegal motorized access has occurred on a restricted route, the route is analyzed as open for the entire bear year even if the route may only receive little or short-term use. And that's in this administrative record at Forest Service Bates No. 969.

The forest plan BA goes on to say: Unauthorized motorized use occurs both in the form of breaching closure devices and user-created routes. So we're talking about failed closures and illegally created user routes.

And then the forest plan biological assessment provides the discussion of the Interagency Grizzly Bear Committee codes. And so this was an argument the Forest Service raised in the *Knotty Pine* decision. They said: Our decision to exclude illegal roads from the calculation is consistent with the IGBC analysis. And Judge Christensen rejected that decision because when we look at the actual forest plan biological assessment, what it says in terms of IGBC codes is that there is a focus on actual use.

So at Bates No. 956, Forest Service Bates 956, the forest plan biological assessment says, quote: Open motorized trails, a trail that receives motorized use. Trails used by four-wheelers, four-wheel-drive vehicles, and motorized trail bikes are examples of this type of access route.

And then the forest plan biological assessment goes on to explain that that type of motorized use, a four-wheel-drive vehicle, four-wheelers, motorized trail bikes, a trail that receives that type of motorized use must be included in the open road density calculations.

And so this is really just a repeat of the decision -- of the sort of claim that Judge Christensen

already addressed very recently in April in the *Knotty Pine* decision, with the exception again that there is actually more illegal motorized use documented by the agencies themselves in this case.

And so, you know, to the extent the agency makes arguments that this Court should not consider the illegal road violations that were found by the Yaak Valley Forest Council, you could actually just completely ignore all those monitoring reports and still find, based on the agency's own findings, that there is reoccurring illegal motorized use. And that even though no single road might be used every year, the fact that it constantly happens is chronic and is permanent, and that's what this Court found in *Probert*, which was the other Access Amendment case that we discussed in our briefing.

In the *Probert* case, which Your Honor wrote, as you recall, the issue there was that there was no single road that continued to receive illegal motorized use, but the fact that there was every year illegal motorized use meant that there was this increase above the Access Amendment baseline. And so that is -- the *Probert* decision was what Judge Christensen talked about in the *Knotty Pine* as well, that it doesn't matter that it's not a single road receiving motorized use every year; it's the fact that this is a chronic problem, and the chronic nature of the problem is what makes it permanent.

As the Court said in the *Knotty Pine* decision --

this is at page 10 -- Judge Christensen noted that the closure monitoring reports demonstrate that small percentages of closures will be breached even if the precise location or frequency is unknown. And he goes on to say that the broader problem of illegal motorized access is a fluctuating but permanent one, even if particular instances are scattered.

And then he goes on to conclude: This case does not involve mere speculation that future closures may not be effective. Rather, this case relies upon documented past failures and expected future unauthorized use and thus falls squarely within *Probert*'s reasoning.

THE COURT: You're at 25 minutes.

MS. SMITH: Okay. Thank you, Your Honor.

THE COURT: Ms. Furlong, are you the first six-minute arguer?

MS. FURLONG: I am, Your Honor.

Actually, it's a little bit more complicated than that, unfortunately. Federal defendants and the Kootenai Tribe of Idaho conferred and agreed that the Tribe would be allocated seven minutes with the remaining ten allocated --

THE COURT: All right. Just -- you're taking ten minutes. All right. That leaves 20 minutes for the rest of them.

MS. FURLONG: Thank you, Your Honor.

THE COURT: Use the podium, if you would, please.

MS. FURLONG: Good morning, Your Honor. May it please the Court. My name is Erika Furlong and, along with my cocounsel, Hayley Carpenter, and Mr. John Tustin, I represent federal defendants in this matter.

I'll be responding to plaintiffs' Endangered Species Act claims. Ms. Carpenter will turn to responding to plaintiffs' NEPA claims and NEPA supplementation claim. And Mr. Carpenter [sic] will respond to consolidated plaintiffs' remaining claims.

As an initial matter, it's worth emphasizing that the Forest Service designed the Black Ram Project to increase the forest's resilience to disease, drought, and wildfire and to improve forage habitat for wildlife, most notably grizzly bear, in an area where it's limited due to dense forest.

THE COURT: So let me just interrupt.

The Forest Service project is designed to promote resilient vegetation, maintain or improve watershed conditions, improve big game winter range conditions, promote forage opportunities, maintain or improve recreational opportunities, reduce the potential for high-intensity wildfires, and provide forest products that contribute to the sustainability supply of timber products.

Doesn't mention anything about grizzly bears, because doesn't the ESA -- that's the primary concern.

MS. FURLONG: Your Honor, it does mention benefits

to grizzly bears throughout the EA record, maybe not specifically in the purpose and need section, but certainly when it comes to ecosystem burns. Many of those analyses explain that the ecosystem burns will create forage habitat specifically in grizzly bear habitat. In addition, the Fish and Wildlife Service analyzed some of the project activities and acknowledged that beneficial forage habitat, thousands of acres of it, would be created in areas where grizzly bears can securely access it.

Although plaintiffs bring most of these claims about the concern for grizzly bears, the agencies both analyzed the project activities and determined that there would not be any grizzly bear mortality and conservatively determined that the project would have low-level temporary impacts to grizzly bears and would ultimately, again, benefit the grizzly bear.

THE COURT: But didn't, didn't you file a supplemental affidavit that said there's three females that died in 2022?

MS. FURLONG: Well, Your Honor, I would say, certainly in the context of the plaintiffs' Endangered Species Act claims, they have not alleged any, any type of reinitiation claim or anything like that that would even begin to make it appropriate to be looking outside the record in this matter, nor have they moved to supplement the record to be able to bring that in. That's really more consolidated

plaintiffs' NEPA supplementation claim.

But with respect to those 2022 mortalities and even plaintiffs' claims that there have been uncharacteristically, you know, more mortalities than have occurred historically, federal defendants feel that it's inappropriate to be cherry-picking data from specific years.

While it may be concerning to have high mortality events as occurred in 2022, the appropriate way to analyze these events is by using the methodology that the Fish and Wildlife Service established in the recovery plan, and that methodology analyzes mortality events in six-year time intervals.

THE COURT: Well, that's a complete change from what the agency's view in this area has been for the past 15 or 20 years, isn't it?

MS. FURLONG: Well, Your Honor --

THE COURT: I've been dealing with them for probably 25 years.

MS. FURLONG: I'm well aware of how extensive grizzly bear litigation is in this district, and I'm not quite sure what the past positions are that you're alluding to.

Certainly both agencies are keeping apprised of the population data. At this point, you know, the best data that exists in the monitoring report suggests that the population is stable to increasing.

THE COURT: Yeah.

All right. Go ahead with your argument.

MS. FURLONG: Thank you, Your Honor.

So I, I had hoped to cover several of the Endangered Species Act claims, and I still might. Given plaintiffs' focus on the jeopardy determination, I'll turn to that first.

In reaching the jeopardy determination, Fish and Wildlife Service considered the status of the Cabinet-Yaak Ecosystem and conservatively determined that the project's anticipated low-level and temporary effects on the grizzly bears would not rise to the level of jeopardy.

As you have likely seen in federal defendants' briefing, federal defendants just -- you know, plaintiffs' assertion that the jeopardy determination must be performed at the level of the Cabinet-Yaak Ecosystem is contrary to the plain language of the Endangered Species Act and is nowhere to be found in either the statute or its regulations and also doesn't find support in Fish and Wildlife Service's policies or any guidance.

Notwithstanding that point, federal defendants acknowledge that the Cabinet-Yaak Ecosystem is one of the smaller ecosystems and, you know, has certain conditions that neighboring ecosystems such as Yellowstone and Northern Continental Divide don't face. And for that reason, Fish and Wildlife Service did carefully consider factors that are

specific to the Cabinet-Yaak Ecosystem in arriving at its jeopardy determination.

Plaintiffs' cherry-picking of one sentence in the biological opinion to suggest that Fish and Wildlife Service's conclusion is unsupported, you know, just seems, seems to kind of lose the focus of what Fish and Wildlife Service did here, which is conservatively analyze the project's impacts. Again, the effects analysis under the Endangered Species Act is very conservative to ensure protection of the species.

So in analyzing potential motorized impacts, which are the only impacts associated with the forest that are anticipated to adversely -- or to rise to the level of an adverse effect on the species, the Fish and Wildlife Service recognized that the action area constitutes the home range of approximately two grizzly bears. And even though grizzly bears are highly individualistic and there's data to suggest that many grizzly bears are able to successfully reproduce even under conditions that will occur during the project, the Fish and Wildlife Service assumed, assumed kind of the worst case in, you know, that there could be displacement that would then result in reproductive impairment.

But there's also several design features within the project that suggest that this would not occur. For instance, during the life of the project, which is approximately ten years, activities will only occur on 9 percent of the action

area, and those -- that 9 percent will be spread out over the course of all ten years. So at any given time, it will be far less than that 9 percent that will have ongoing activities, which will leave female grizzly bears ample opportunity to utilize habitat in other portions of the action area.

In addition, plaintiffs' emphasis on this narrow issue kind of ignores the context of the success story that is the Cabinet-Yaak Ecosystem. Not to say that the recovery effort is, you know, close to being concluded, but in the past several decades, you know, this even small population has seen considerable growth from just, you know, as little potentially as 15 bears approximately 40 years ago to an estimated 60 to 65 bears as of 2022.

As a result, it was appropriate that the Fish and Wildlife Service arrived at its conclusion that where there are low-level impacts, you know -- you know, positive population growth in both the ecosystem and really robust populations that are increasingly connected to this population, and thus you would not see appreciable impairment of survival or recovery function, certainly not at the listed -- entity of the listed -- or, excuse me, at the level of the listed entity and not even at the level of the Cabinet-Yaak Ecosystem.

THE COURT: You're at nine minutes, 55 seconds.

MS. FURLONG: Oh, geez. Okay.

Well, so with respect to plaintiffs' population claim, they have not identified a single piece of information that Fish and Wildlife Service failed to consider, let alone a specific piece of best available scientific or commercial data that Fish and Wildlife Service failed to consider. And so on that basis alone, plaintiffs' claim should be foreclosed.

THE COURT: All right.

So next up, I guess, is Ms. Carpenter?

MS. CARPENTER: Yes, Your Honor.

THE COURT: And you're going to use seven minutes?

MS. CARPENTER: Your Honor, I don't believe I need seven minutes unless Your Honor has questions.

THE COURT: No. I'm just asking you: How much time are you going to use?

MS. CARPENTER: Sure, Your Honor. I would say probably less than five.

THE COURT: I'll tell you when you're at five.

MS. CARPENTER: Thank you, Your Honor.

So good morning, Your Honor. I am planning on handling -- on covering plaintiffs' climate change, hard-look NEPA claim, and then I will plan to pass the baton to Mr. Tustin.

So plaintiffs assert that the Forest Service failed to take a hard look at the project's climate impacts, Your Honor, but the agency analyzed the project's climate

impacts in proportion to their significance, which is all that NEPA requires.

The Forest Service prepared both a qualitative project-level analysis of the carbon storage impacts of the project in what we refer to in briefing as the project climate report -- or, excuse me, Your Honor, project carbon report.

The Forest Service also prepared a quantitative forest-level analysis in what we refer to in briefing as the forest carbon report.

Combined, these reports found that the project's impacts to carbon storage would be minimal because they would be localized and infinitesimal in relation to the role the world's forests play in mitigating climate change and indistinguishable from the effects of not taking the action.

Additionally, the project will improve the health and thereby the carbon storage of the project area by mitigating root disease, which was the leading cause of carbon stock decline on the forest from 1990 to 2011.

Plaintiffs attempt to cast doubt on the Forest Service's carbon impacts by comparing this case to *350 Montana v. Haaland*, but that case is distinguishable from the case at bar. The project at issue in *350 Montana* was a coal mine expansion rather than a project involving emissions from biomass, as here. The Ninth Circuit recognized in *Helping Hand Tools v. United States Environmental Protection Agency*

that projects involving emissions from biomass participate differently in the carbon cycle than fossil fuels because they replenish more quickly.

Also, unlike in *350 Montana*, Your Honor, the Forest Service here supported its conclusions regarding climate impacts with a project and forest carbon reports. This project is closer to those addressed in the *Hapner v. Tidwell* and *Swomley v. Schroyer* cases where the Court found that the Forest Service analyzed climate impacts in proportion to their little significance in terms of the respective projects there.

In sum, Your Honor, the Forest Service took a hard look at the project's climate impacts and carbon storage impacts here.

THE COURT: Did they use the carbon report from a forest in Idaho?

MS. CARPENTER: Your Honor, the project, the project carbon report is very similar to the other project in Idaho, but, Your Honor, the projects were very similar. The forests are very close to one another even though they are in different states.

And, Your Honor, the existing condition -- the description of the existing conditions in both of those reports, the one here and then the Forest Service project in Idaho, the existing conditions are different in both of those reports.

And then here, Your Honor, even if Your Honor is troubled by the similarity between the project carbon report and the carbon report in the other project, here, the Forest Service then did a quantitative forest-level carbon storage analysis in the forest carbon report, Your Honor, and that's a quantitative analysis. And that quantitative analysis found that from 1990 to 2011, the disturbance that caused the most negative influence on carbon stocks was root disease rather than timber harvest throughout that entire period.

So, Your Honor, this project is designed to mitigate root disease, and 88 percent of the project area has some level of root disease hazard here, and that's in the record.

And so, Your Honor, root-diseased trees do not cycle carbon as effectively as healthy trees, and so in the long run, this project will, will improve carbon storage in that way, by removing root-diseased trees and allowing the forest to replenish with tree species that are more resistant to root disease.

THE COURT: Well, let me ask you one other question, and it really goes back to where you started.

You said, "No big deal. Whatever carbon issues are here, when you look at the world's carbon situation and global warming, this is not even a drop in the bucket."

Can't that argument be made about every single project? And then at some point you end up with Vermont being

flooded, the southern states in the United States existing in 115 degrees, people dying? You look at other parts of the world?

So, I mean -- and I know what the cases say about, well, you sort of have to make proportionality, but don't you have to have the facts about this forest and this project, not the one in Idaho, in order to make those determinations?

MS. CARPENTER: Your Honor, if the record here merely said the impacts here are infinitesimal related to the world's emissions, then I agree, Your Honor, that that statement could be said about many projects, if not all, you know, projects that the Forest Service completes.

But, Your Honor, there's more than that here. The forest carbon report, again, is a quantitative analysis, and it's at the forest level. It's not at the project level but it's at the Kootenai National Forest level. And it found that, over a 21-year period, that root disease was a greater problem for carbon storage than all timber harvest.

So, Your Honor, I do believe that here, in this particular case, on this particular forest, the Forest Service has backed up that claim, that the impacts to carbon storage for this project are infinitesimal.

THE COURT: All right.

So, Mr. Tustin, you're up next.

MS. CARPENTER: Thank you, Your Honor.

THE COURT: And how much time, Mr. Tustin, do you intend to use?

MR. TUSTIN: Thank you, Your Honor. How much time is remaining?

THE COURT: You have basically 14 minutes and 18 seconds.

MR. TUSTIN: Okay. I want to be sure to reserve at least seven minutes for the intervenor defendants, so I'll use six or seven minutes of the time.

THE COURT: Okay.

MR. TUSTIN: All right. Thank you, Your Honor.

I'm prepared to address the consolidated plaintiffs' National Forest Management Act claims and National Environmental Policy Act claims, as well as any questions the Court may have about remedy or the status of project activities.

But I want to start with the focus of plaintiffs' presentation, which was the NEPA claims. But before, even before I get in there, I want to touch upon a point that Your Honor raised in colloquy with Ms. Furlong about the project's benefits to grizzly bears.

Now while that was not an express statement in the purpose and need, as Ms. Furlong explained, the benefits to grizzly bears are permeated and discussed throughout the environmental documents. And, in particular, the project

complies with Forest Guideline 15, Wildlife 15, that applies the elements of the Interagency Grizzly Bear Guidelines to forest management activities. And we discussed this in great detail in our brief, our opening brief, from pages 53 to 55 and our reply at 31.

And, just briefly, you know, this guideline requires the Forest Service to give grizzly bear habitat maintenance and improvement the highest priority. And to the extent where any other land values or uses compete, the management decisions must favor the grizzly bear.

And the Forest Service documented how this project complies with Guideline 15, and that's in the record at Forest Service 4615 to 18, which goes through each of these elements and shows how the project complies. And this is the exact same approach the Forest Service took in response to this Court's decision in *Swan View Coalition and Friends of Wild Swan v. Weber*, and those cases are discussed in our brief. So to the extent the Court has questions about how the project complies with grizzly bears, that compliance with the guideline shows that the project favors grizzly bears and that other uses do not compete.

Turning to the NEPA claims, I want to first mention that we have a forfeiture argument that plaintiffs failed to exhaust under the applicable Forest Service regulations, and it's the consolidated plaintiffs' burden to show that they

satisfy these regulations. They can't. What they're trying to do is rely on the submitted comments of Yaak Valley, which are expressly prohibited by the Forest Service regulations.

The plaintiffs attempt to dismiss this in their reply as a red herring. It's not. They don't even engage. It's their burden to show how they complied, and they did not comply.

But turning to the merits of these arguments, the merits also fail. There are two ways to look at the merits. There's the record documents, and there's Yaak Valley's forest comments. And I want to focus on -- I'll touch on each of those before I address the two cases that counsel for consolidated plaintiffs raised.

If you look at the record documents alone, which is all that the Court could do for this argument, is that counsel for consolidated plaintiffs repeatedly said that there's extensive illegal use in this project. There is not. What they have cited is they have cited entire forestwide statistics of the 75 breaches. This is the entire forest, not the project area. And even if you look at that, those 72 breaches are just 8 percent of the devices monitored, of the 915 devices monitored.

Looking at this project area, there are no breach closure devices in the project area for Bear 2020. That's in our Responsive Statement of Fact 115, Fish and Wildlife

Service 62, 25 to 29. And for Bear 2019, there is none in Bear Management Unit 14, and the few vices -- devices in Bear Management 15 --

THE REPORTER: I'm sorry; and how many devices?

MR. TUSTIN: There's, there's a handful of devices. I believe there's three, but I'd have to verify -- devices in bear management unit were repaired. So there were very isolated instances in Bear Management Unit 15 in 2019. The record shows they were repaired. None in Bear Management Unit 2014 -- Bear Management Unit 14 in 2019. And in 2020, none in the project area.

So the Court can't look at forestwide statistics to presume widespread illegal breaches in the project area when the record itself contradicts this very claim.

Turning to Yaak Valley's comments, again, consolidated plaintiffs cannot rely on these because they did not satisfy the exhaustion requirements, but even if the Court did, these comments and photos do not show violations. The Access Amendments expressly prohibit roads that are impassable due to regrowth. It allows many of the features they complain about.

If you look at the photos, they focus on a side of the access barrier, saying that if it's possible to drive a motorcycle around, that therefore means it's ineffective. That is not what the standard allows. It has to be

demonstrated and widespread use of illegal access, and, indeed, if you close everything off, you're closing off the forest to all other kinds of nonmotorized users, such as hikers, equestrians, and bicycles.

THE COURT: Have you been up there?

MR. TUSTIN: I've had many cases on the Kootenai, but I have not yet been up there. I've been to the Flathead, but not up there yet.

And -- but on the Flathead, we saw similar allegations of the allegations of illegal abuses, and it's just not borne out by the record and how the Forest Service responds to them.

Turning to the two cases that the plaintiff -- the consolidated plaintiffs addressed, the *Knotty Pine* decision and the *Ripley* decision, we addressed the *Knotty Pine* decision in Note 6 of our reply. Your Honor, this decision is irrelevant to this case. One, it concerns an Endangered Species Act claim that is not pleaded or argued here. And, two, it's on a preliminary injunction order. It's not on the merits.

Far more probative, we think, is the *Ripley* decision, which recently came out, and we think that is quite favorable to the federal defendants' position here. In that case, the plaintiffs made very similar types of allegations, photos, documents of what they believed was unauthorized use.

The Forest Service responded. But in that decision, Judge DeSoto conducted a very thorough analysis and rejected them. And Judge Christensen adopted her recommendations and conducted additional analysis and also rejected them.

So to the Court -- to the extent the Court wants to look at prior decisions on illegal use, we'd urge the Court to look at the *Ripley* decision; but, again, to keep in mind that *Ripley*, both *Rip-* -- that *Ripley* was outside of the bears' outside recovery zone, and here we are inside a bear management unit with different standards about density, about mileage, and with express monitoring requirements.

THE COURT: All right. Well, you are at 23 minutes and 11 seconds, which leaves just about seven minutes for your cocounsel there.

But I have a question for you --

MR. TUSTIN: Yes.

THE COURT: -- and the clock is not running. And it has to do with the NEPA claims.

And I think the EA includes incorporation and reference of where information about road density calculations can be found, but it also seems like the federal defendants, your folks in this case, cite to a regulation about incorporation that only refers to the environmental impact statement, which, there is not one in this case.

So how can that be used to support your Forest

Service lack of discussion about any of the science that's used here?

MR. TUSTIN: Well, incorporational reference clearly applies to environmental assessments. While the regulations expressly do not say that, there's many cases in the Ninth Circuit that apply the more stringent EIS requirements to environmental assessments. And the whole purpose of an environmental assessment is to be a short and concise document.

So incorporation by reference is absolutely allowed for environmental assessments and findings of no significant impacts. Otherwise, you would be presented with a strange situation that's directly contrary to what the regulations allow; that you would have more succinct environmental impact statements that are able to reference documents and environmental assessments that must therefore include the documents in their entirety.

So incorporation by reference does apply to environmental assessments, and we can say that they were provided, available in the record, and noticed for comment.

THE COURT: Well, maybe. Why wasn't there an EIS in this case? Seems like a fairly major project.

MR. TUSTIN: Well, the environmental impact statement -- I'm happy to address that. What the Forest Service has to do is provide a concise statement of reasons

for why it believes an environmental impact statement is not necessary, and they've done that here. Just because in the abstract someone might think it is a large project, so long as the Forest Service goes through and explains why the context is not significant and why each of the ten intensity factors is not significant, then they've met their burden of proof to show that, and it's plaintiffs' burden to show that it's arbitrary and capricious.

And we've discussed that in our briefing, and if the Court had specific questions, I would ask you to ask Ms. Carpenter, who is prepared to address that claim.

THE COURT: Well, all right.

MR. TUSTIN: Thank you, Your Honor.

THE COURT: Who is up next?

MS. WEIS: (Indicating.)

THE COURT: Yes. Ms. Weis?

MS. WEIS: Correct, Your Honor.

THE COURT: And how many minutes are you going to consume?

MS. WEIS: Seven minutes, Your Honor.

THE COURT: You've got the whole rest of the time.

MS. WEIS: All right. Thank you.

May it please the Court, my name is Julie Weis, and I represent the intervenor Kootenai Tribe of Idaho. With me at counsel table is our local counsel, Tyson McLean.

THE COURT: You know that podium has a rocker switch down by your right hand.

(Discussion off the record re: raising podium.)

MS. WEIS: May I start my clock now, Your Honor?

THE COURT: I turned it off --

MS. WEIS: Oh, thank you.

THE COURT: -- while you were messing around.

MS. WEIS: Thank you, Your Honor.

The Tribe supports the Black Ram Project, and I'd like to begin just by offering you a little bit of context about why the Tribe does support the Black Ram Project.

Tribal Council Vice Chairman Gary Akin, Jr. could not join us today, but he testified by way of a declaration in this case where he explained the Tribe's support for the Black Ram Project.

As Your Honor knows, the Kootenai Tribe is a sovereign nation. It has been in existence since time immemorial. And this project is located in the Tribe's aboriginal territory. This is where the Tribe has reserved treaty resources and rights. It's a very important area.

The Tribe's creation story is also very important to understanding why the Tribe is participating in this case, because the Tribe holds that the Creator's spirit told the Kootenai people to keep and guard the land forever, and, in return, the land would keep and guard the Kootenai people.

The Tribe has never lost sight of that purpose, and its support for Black Ram flows from that purpose.

All of the attorneys at counsel table and their clients want to see the grizzly bear recovered; we just differ in our viewpoints as to how it should happen. And the Kootenai Tribe is a very proactive forest restoration tribe because it knows, Your Honor, that when it was managing the land, before first contact, even, that fire was important on the landscape. It used fire to manage the forest.

When the Kootenai -- when the forest was established as a national forest, it lost the ability to do that. Fire was excluded. It was, it was a, it was a misguided notion to exclude fire from the landscape, and the forest became less resilient. You had an increase in tree species that are, that are not designed to survive fire and an increase in fuels on the forest.

So it's really important to allow some prudent reintroduction of fire that can only happen if you take care of the forest first and remove some of those trees, remove fuels.

Now because the Black Ram Project is in Kootenai Territory, the Tribe involved itself in government-to-government consultation with the agencies, and it also worked one-on-one with natural resource specialists at the Tribe and at the agencies to talk about the ways in which the project

might impact tribally important species and how to make it better.

And at the end of the day, the Tribe concluded that this is a very good project. It fosters restoration on the forest, and it should be allowed to proceed.

My second topic, after just giving you a little bit of context for the Tribe's participation, I'm gonna touch briefly on remedy, not because the Tribe thinks that you should reach it, because we don't, but because in your *Steele* decision where you left the revised Flathead Forest Plan and its biological opinion in place despite some legal infirmity, you quoted -- or you cited to the *Savage 2* decision. That's *Alliance for the Wild Rockies v. Savage*, 375 F.Supp.3d 1152.

That's an important decision involving the East Reservoir Project where that project also was allowed to stay in place despite legal infirmity having to do with the calculation of the baseline linear road miles. But the Court noted the project was designed to decrease the likelihood and severity of wildfire. And so by not allowing the project to go forward in its entirety, there was a risk to the forest ecosystem.

That's the same thing here. The Kootenai Tribe was an amicus in that case, Your Honor, and the Court actually approvingly discussed the Tribe's concerns about remedying the historical problem of, you know, the exclusion of fire from

the landscape, the need to restore the resilience of the forest. The Court actually agreed, at page 1158, with the Tribe's plea that ecological restoration happen sooner rather than later, and that holds in this case as well.

I'm going to briefly touch on the jeopardy issue, Your Honor, because the plaintiffs in this case are really focusing on one bear management unit out of 22. This project involves two bear management units, 14 and 15. The metrics in 14 are not going to exceed forest plan standards with implementation. It's only 15 that will do that before coming back down to meet the standards after the project.

So we're talking about one bear management unit out of 22. And bear management units, the project area is not where a jeopardy determination is made. There are occasions when, if a recovery unit, like the Cabinet-Yaak Ecosystem, if it's no longer -- because of an action agency's project, if it's no longer meeting its recovery and its survival goals, the agency has the authority to make a jeopardy determination at that level. So not at the project level but perhaps at the population level.

They did not make that in this case, and so as typically is the case, the no-jeopardy determination is made at the level of the species. And the record is very clear that there is no jeopardy at the level of the species.

Very quickly, Your Honor, about those three female

mortalities, we certainly understand your concern about that. From our perspective, the 25-year-old who was found deceased, likely of natural causes, is a success story because she was at the end of her reproductive years. Bears die of natural causes, Your Honor, and she was a success story.

But the important thing is if you look at Mr. Kasworm's declaration, he explains that the loss of a single bear, the loss of two bears, you can't just determine in a vacuum that suddenly the population is going downhill, because these metrics are done on an annual basis and continually updated in a cumulative fashion. Mr. Kasworm's declaration is very informative on that.

My last point, Your Honor, I would like to go back to the motorized access, because really what we have is two cases. We have *Probert* that said eight years of monitoring data that showed ineffective road closures, that was a problem, and it had not been considered. Versus *Marten* where we have speculation about what's gonna happen. Are road closures going to be effective? And so somewhere in between there, you have to evaluate this case on its facts.

And if you look at the facts of the case, Mr. Tustin did a really nice job explaining that in 2020, in that monitoring report, there was only one instance of unauthorized use of a user-created road in one of the units. And as far as the existing routes, there was no unauthorized route -- use of

any of those routes. So there really is no evidence of unauthorized use.

And if we look at -- we did; I think we did a very nice job in the Tribe's statement of disputed facts talking about the allegations of breached berms, ineffective gates, and roads with no gate or berm. There's no validity to that. I refer you to paragraphs 106, 108, and 110.

And the --

THE COURT: You're just about out of time.

MS. WEIS: The last point, Your Honor, I'd like to make about *Ripley* is it's really important because, there, the Court did not find that an effective road closure is 100 percent effective. In fact, in *Ripley*, the Court concluded there was a berm failure rate perhaps of about 35 percent, and yet that was not declared to be ineffective road closure.

So each case has to be decided on its facts. And, on the facts of this case, the Court should uphold Black Ram.

Thank you.

THE COURT: Well, let me ask you a question, because you're arguing about, initially, about the Tribe and the importance of fire and how fire helps the land. Isn't this project to reduce fire, not to help the land by increasing fire?

MS. WEIS: It's actually both, Your Honor. You

can't simply reintroduce fire on a landscape that has been allowed to have fire excluded for so long. It's very unsafe. There have to be fire breaks. There has to be fuel reduction. Once you get that taken care of and you get back to a more natural -- in range with the historic range of variability forests, then you can allow fire to play its natural role.

So back in the day, before the forest was put off limits to fire, what would happen is there would be these small, naturally occurring fires and also fires created by the Tribe, or by Kootenai tribal peoples, and those would burn the trees that were not going to be resistant to fire, and they would burn the fuels, and so the fires wouldn't get out of control. But the situation right now is just waiting for an out-of-control, catastrophic wildfire.

So it's both, Your Honor.

THE COURT: All right. Thank you.

MS. WEIS: Thank you.

THE COURT: Mr. Zukoski, I'll give you six minutes.

MS. SMITH: Actually it's going to be me, Your Honor.

THE COURT: Or Ms. Smith.

MS. SMITH: Thank you, Your Honor.

I'd first like to address your question about whether an EA can incorporate by reference. In *Native Village v. Bureau of Land Management*, 9 F.4th at page 1214 -- that's a

Ninth Circuit decision from 2021 -- the Ninth Circuit held that, in fact, an EA cannot incorporate by reference.

Second, in response to your question about whether this was a large project that should require an EIS, the answer is yes. Just like *Ripley*, 2023 Westlaw 4172930 at page 31, explained that in part because of the uniquely vulnerable status of this grizzly bear population and the uncertain effect on widespread illegal road use, an EIS might be necessary. And, again, the standard for that is just whether substantial questions have been raised. And so just like they were raised in *Ripley*, they've also been raised here.

Third, Your Honor, I do want to just briefly discuss, if I can, the issue of illegal road use in *Ripley*. There is now something that the decisions from this Court have recognized as something of a spectrum. There was the *Alliance for the Wild Rockies v. Marten* case, which was the Helena National Forest. It was not the Cabinet-Yaak Grizzly Bear Recovery Zone or BORZ. In fact, there's no Cabinet-Yaak grizzly bears in the Helena National Forest, and so *Marten* had nothing to do with Cabinet-Yaak grizzly bears or the Access Amendment, and there were no monitoring reports in that record. That's one end of the spectrum.

The other end of the spectrum is this Court's decision in *Probert* where it looked at eight years of

monitoring reports. And so in the *Knotty Pine* decision, Judge Christensen said, "Is this more like *Marten*, or is it more like *Probert*?" And he said it falls in the gray area in between, but it's more like *Probert* because two out of eight years, there has been illegal motorized use in this project area.

And so if *Knotty Pine* falls in the "more like *Probert*" category, this case also must fall in the "more like *Probert*" category because the eight years of monitoring reports in this case show illegal motorized use in three out of eight years, which is more than the two out of eight years addressed in *Knotty Pine*.

Fourth, Your Honor, the notion that illegal use must be widespread in order to make an argument that a road barrier is not effective, you know, this goes back to: What's the whole purpose of the Access Amendment? It's about the impacts on grizzly bears based on science. And so Judge Christensen addressed this argument in *Knotty Pine* as well and pointed to the Grizzly Bear Recovery Plan. This is in the *Knotty Pine* decision at page 10 where he noted, quote: Even occasional human-related vehicle noise can result in continued road avoidance and habitat loss.

And then, quote: Unpredictable random road use, the kind of use that may occur, the administrative use of closed roads may be even more disturbing to bears that have a

negative association with roads.

So it's actually not necessary to have widespread use. The recovery plan, which has been in effect for 30 years, has found even occasional use and unpredictable random road use are both going to have that negative impact on grizzly bears.

Fifth, the argument that there's been no breached closures in the project area based solely on 2020 data, again, I would point the Court back to the *Knotty Pine* decision where Judge Christensen looked at the project's biological opinion. In that case, two out of eight years was enough illegal road use in the project area. Here, there's even more; three out of eight years had illegal road use. And that's at Forest Service Bates No. 8388 to 8389.

And so while the government argues this Court should look at many years of data when we're looking at population numbers, they're also arguing that this Court should only look at one year of data when we look at illegal motorized use. And they can't have it both ways. We're either looking at all the years or a single year. And, here, when we look at those eight years of data, we see three out of eight with illegal motorized use.

Regarding administrative exhaustion, this claim was exhausted at Forest Service Bates No. 35461. At that page, this wasn't a matter of the Alliance incorporating someone

else's comments. The Alliance's administrative objection specifically states: Please see the attached road closure violations report by the Yaak Valley Forest Council which documents over 21 road closure violations in the project area.

The Forest Service acknowledged that that was a problem, and, when they created the administrative record index for this project, they titled it "AWR Objection Reference, YVFC Black Ram Project Report dated November 2020," and they gave it the Bates Nos. 036180 to 036190.

So absolutely this was raised in Alliance's objection and included supporting evidence. The Forest Service acknowledged that and included that document, gave it a Bates number, and acknowledged that was our objection reference.

No. 7, regarding climate change, Your Honor, this is more of an issue about relying on incorrect data and assumptions. It's less about what is the proportional impact of the Black Ram Project and more about this classic NEPA requirement that the government can't just rely on incorrect data and assumptions in a project EA.

And, here, if they are relying on a carbon report for some other national forest, then they are violating that mandate to use correct data in this analysis, and that's something the Ninth Circuit addressed in the *WildEarth Guardians v. Montana Snowmobile Association* case, the notion

that incorrect data violates NEPA.

Next I want to clarify on population status. The government made a representation that the Cabinet-Yaak population is doing fine: That it used to be 15 bears. Now it's 60 to 65.

That's comparing apples to oranges. That number of 15 bears was the Cabinet Mountains only, and you can find this in the record in the Kendall et al. published, peer-reviewed report. That is at Bates -- Forest Service Bates No. 036962.

There were 15 bears in the Cabinet Mountains in the 1980s. Kendall et al. did a thorough DNA research survey in the Cabinet-Yaak Ecosystem. They looked at the whole Cabinet-Yaak Ecosystem. And what they found, based on DNA evidence, was 48 individual bears, half in the Cabinets, half in the Yaak. And so the estimate from that published, peer-reviewed journal article was 22 to 24 bears now in the Cabinets.

So the increase from 15 to 22 bears is not very much. It's certainly not a success story, and we certainly know that, you know, it is generally assumed that the population in the Cabinet-Yaak is about half of what the recovery plan says is needed for that viable population of a hundred bears.

And that's all I have, Your Honor.

THE COURT: That's good, because you're out of time.

Thank you for the arguments. The briefs are long. I will get something out as quickly as I can.

Again, I appreciate the argument of counsel.

We'll be in recess.

(Proceedings were concluded at 10:17:41.)

REPORTER'S CERTIFICATE

I, JoAnn Jett Corson, a Registered Diplomate Reporter and Certified Realtime Reporter, certify that the foregoing transcript is a true and correct record of the proceedings given at the time and place hereinbefore mentioned; that the proceedings were reported by me in machine shorthand and thereafter reduced to typewriting using computer-assisted transcription; that after being reduced to typewriting, a certified copy of this transcript will be filed electronically with the Court.

I further certify that I am not attorney for, nor employed by, nor related to any of the parties or attorneys to this action, nor financially interested in this action.

IN WITNESS WHEREOF, I have set my hand at Missoula, Montana this 29th day of August, 2023.

/s/ JoAnn Jett Corson

JoAnn Jett Corson
United States Court Reporter